CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

5/21/2026

LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:25-cv-00846 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| VIRGINIA POLYTECHNIC | ) | By:    Hon. Thomas T. Cullen |
| INSTITUTE AND STATE | ) | United States District Judge |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

In the fall of 2024, Plaintiff John Doe[1] ("Johnny"), then a student at Virginia Tech ("VT" or "the university") and member of its Corps of Cadets, was accused by two female students of sexual assault.

Johnny's first accuser, Pauline Poe, with whom he previously had at least two consensual sexual encounters, claimed that Johnny had continued to engage in sexual intercourse with her after she withdrew consent. A couple weeks later, Jane Roe, a fellow member of the Corps of Cadets, complained that Johnny, with whom she had previously been intimate, had sex with her after a night of heavy (underage) drinking. Jane, who claimed to have no memory of this encounter, later alleged that it amounted to sexual assault on Johnny's part because she was incapacitated.

After receiving these two complaints, VT officials sprang into action. The same day that Jane reported Johnny to VT's Title IX office—over five weeks after their allegedly non-

---

[1] The court previously granted Johnny's request to proceed pseudonymously. His accusers are afforded the same treatment herein.

consensual encounter—the university issued a campus-wide alert about the purported sexual assault. VT's email did not identify Johnny or Jane by name, but it provided the specific location of the alleged incident and noted that the parties involved knew each other. Although no one from the Title IX office had yet to investigate Jane's claims—let alone get Johnny's side of the story—the campus-wide email characterized him as "the offender" and Jane as "the survivor." The following day, a VT official placed Johnny on interim suspension, which resulted in his being evicted from his dorm room, pending the outcome of separate Title IX and student-conduct investigations.

VT officials investigated Pauline's and Jane's claims over the next six months. Johnny, who vehemently denied sexually assaulting anyone, maintained his innocence throughout the process, and he desperately tried to present abundant evidence that he claimed substantially undermined his accusers' claims and their credibility.

As to Pauline Poe, Johnny pointed out—to the investigator, to the hearing officers, and to anyone else who might listen—that her roommate (whom Pauline had initially claimed would confirm her account) largely refuted it. Johnny also noted that a local judge, who denied Pauline's request for a permanent protective order against Johnny, characterized key aspects of her account as "extremely unique, if not bizarre." Johnny also alleged that Pauline withheld—and even doctored—various text messages they had exchanged the night of the alleged assault. He also claimed that Pauline omitted a critical detail of her later accounts to VT investigators—specifically, her allegation that Johnny had threatened her with a knife before they had sex—when she initially reported the encounter to local police. Finally, Johnny presented a report from a forensic nurse who examined a photograph that Pauline gave to VT

investigators. According to Pauline, this photograph depicted a bruise that she suffered during their non-consensual encounter. The forensic nurse, however, opined that it depicted no such thing.

Regarding Jane Roe's sexual-assault claim, Johnny alleges that he presented substantial evidence that disproved her account. He pointed out that Jane had initially waited more than five weeks to report him to VT's Title IX officials, and that she only did so then to receive immunity from a charge of underage drinking that stemmed from her imbibing on the night of the alleged assault. According to Johnny, this underage-drinking charge was Jane's second serious disciplinary infraction while a member of the Corps of Cadets, and a conviction could have resulted in Jane losing her ROTC scholarship. Although Jane later downplayed her disciplinary exposure for underage drinking, she filed her Title IX complaint against Johnny the day before she was scheduled to stand trial on that charge (and, according to Johnny, shortly after she had discussed matters with Pauline). As soon as Jane accused Johnny of sexual assault, VT granted her immunity for underage drinking and the disciplinary proceeding that may have resulted in the loss of her scholarship was dropped.

What's more, Johnny marshalled considerable evidence to refute the notion that Jane was incapacitated—the required mental state for a victim of sexual assault under these circumstances based on VT's policies—when they had sex. He presented detailed written testimony from a psychologist at the University of Pennsylvania School of Medicine, who regularly advises the accrediting body for university Title IX investigators. In her report, this expert, who examined the record evidence, explained that, although Jane was likely intoxicated at the time she had sex with Johnny, Jane had not—based on her own account of the night in

question, the accounts of multiple eyewitnesses who interacted with her at the time, and other evidence—exhibited any signs incapacitation. Specifically, the psychologist noted that, just prior to climbing into her bed with Johnny, Jane had walked another student back to his dorm, sent several coherent text messages, cleaned up after another student who had become ill from drinking, and changed her clothes.

Johnny also pointed VT investigators to Jane's conduct towards him in the days and weeks following this alleged sexual assault. Not only did she wait over five weeks to accuse him, but, in the interim, she sent Johnny several friendly text messages, including one in which Jane described herself as his "sugar baby," and another in which she asked to travel with him over the upcoming Thanksgiving holiday. And three weeks after the alleged sexual assault (but before she had accused him of it), Jane had Johnny back over to her dorm room for another night of underage drinking.

Johnny's efforts to disprove these accusations ultimately proved futile. The VT officials who investigated both incidents allegedly gave short shrift to this exculpatory and impeachment evidence and ultimately substantiated Pauline's and Jane's claims of sexual assault. They submitted their written findings to disciplinary tribunals for formal adjudication. Although Johnny claims that he attempted to present this same exculpatory evidence at the ensuing hearings, his defense largely fell on deaf ears.

The hearing officers, applying preponderance-of-the-evidence standards, ultimately concluded that it was more likely than not that Johnny had sexually assaulted Pauline and Jane. Based on their determination in Jane's case, the hearing officers recommended that Johnny be expelled from VT. Johnny appealed those decisions, but his appeals were summarily denied.

Consistent with Virginia law, once the expulsion was considered final, VT officials placed a notation on his official transcript indicating, for posterity, that he had been expelled for committing sexual assault.

According to Johnny, all of this was preordained given the deep-seated anti-male bias of the VT officials who investigated and adjudicated Pauline's and Jane's sexual-assault claims, as well as inherent anti-male bias in VT's Title IX policies, the combination of which made it nearly impossible for him to defend against false accusations of sexual assault. Johnny contends that by imposing arbitrary, inconsistent, and shifting standards for evaluating the sexual-assault claims, denying him a meaningful opportunity to confront and cross-examine his accusers at those hearings, and effectively ignoring substantial evidence that largely refuted the purported victims' accounts, VT and its officials violated his rights under the Constitution and federal anti-discrimination law, specifically Title IX. In this lawsuit, he names VT itself, among other entities, and over a dozen VT officials who were involved in the investigation and adjudication of the sexual-assault claims at various stages. He sues many of these administrators in their individual capacities, meaning that they would be personally liable for monetary damages if Johnny were to prevail on these constitutional claims.

VT and the other named defendants have filed motions to dismiss all but two of Johnny's 33 claims. The defendants correctly point out that the constitutional rights Johnny alleges VT administrators violated were not clearly established by United States Supreme Court or Fourth Circuit precedent at the time his investigations occurred. As such, the doctrine of qualified immunity unquestionably bars his claims against these individual defendants for money damages.

But that does not end the inquiry—far from it. Johnny has alleged abundant facts that, if true, raise grave concerns about the way VT, through these administrators, conducted the investigations of Pauline's and Jane's sexual-assault claims, as well as the ultimate outcomes of those inquiries. Simply put, Johnny has alleged facts that, if true, raise a plausible inference the VT discriminated against him in these investigations because he is male and, in so doing, violated Title IX. Accordingly, Johnny's claims against the university will be allowed to proceed, as well as a single official-capacity claim against one of the administrator defendants.

## I.    FACTUAL BACKGROUND

The facts below are taken from Johnny's complaint and, at this stage, are presumed true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**The Pauline Poe Incident**

On October 12, 2023, Pauline reported to the Blacksburg Police Department ("BPD") that Johnny, whom she had met several months before on the dating app Tinder, sexually assaulted her the previous evening in her off-campus apartment. (Compl. ¶ 120.) Specifically, she alleged that, shortly after Johnny arrived at her apartment for a "date night," he brandished a switchblade knife and violently sexually assaulted her in her bedroom for an hour and a half. (*Id.*) VT's Office of Equity and Accessibility ("OEA") had an initial outreach with Pauline that same day. (Defs. Resp. in Opp. Mot. Prelim. Inj. Ex. 2 [ECF No. 29-2].)

On October 26, 2023, Pauline obtained a 72-hour Emergency Protective Order ("EPO") against Johnny from a magistrate at the Montgomery County General District Court based on the same allegations Pauline made to BPD. (Compl. ¶ 122.) That same day, Pauline met with Defendant Deziree Twigger, an OEA official, at VT's Women's Center, where

Pauline verbally requested an investigation into the alleged assault. (Defs. Resp. in Opp. Mot. Prelim. Inj. Ex. 2.) Then, on November 2, 2023, because of the pending charge against him, Defendant Martha Glass, VT's Assistant Vice President for Student Affairs, placed Johnny on interim suspension and evicted him from his dorm room pending investigation and adjudication of Pauline's allegations. (Compl. ¶ 123.) Johnny appealed that decision, but Glass denied Johnny's appeal of the interim suspension less than one week later. (*Id.*)

After the 72-hour EPO period expired, Pauline petitioned the Montgomery County General District Court for a permanent Protective Order. (*Id.* ¶ 125.) A General District Court Judge held a hearing on the petition on November 14, 2023, and denied the petition after hearing Pauline's testimony. (*Id.* ¶ 127.) According to Johnny, the judge said Pauline's testimony was "extremely unique, if not bizarre." (*Id.*) Notably, Pauline conceded on cross-examination that Johnny never threatened her with a knife, tacitly admitting that she lied to BPD that Johnny "brandished" a knife. (*Id.*) Additionally, the Commonwealth's Attorney declined to press criminal charges against Johnny because it found that Pauline was not a credible witness. (*Id.* ¶ 129.) Specifically, Pauline's roommate refuted key aspects of Pauline's story and told BPD that Pauline "was happy and laughing and being loud" on the night in question and never mentioned a sexual assault or needing help. (*Id.* ¶¶ 130–31.)

The OEA, and specifically Defendants Kathryn Polidoro, Kristin Barnett, and Deziree Twigger, were responsible for both investigations. (*Id.* ¶¶ 80–82.) Johnny takes issue with their investigation, including their alleged failure to create a timeline of events and denial of Johnny's

written request to check VT's Canvas[2] records for evidence that Pauline took an online quiz for one of her classes during the timeframe of the alleged assault. (*Id.* ¶¶ 137–47.) Johnny also points out that their "Summary of Relevant Information" did not mention Pauline roommate's refutation about her story or that Pauline falsely told the General District Court that she mentioned a knife during her first interview with BPD, when, in reality, she did not mention a knife until a subsequent meeting with BPD and in written statement she submitted in the days and weeks following the initial interview.[3] (*Id.* ¶ 148.)

On May 9, 2024, the Office of Student Conduct held a hearing on Pauline's allegations, with Defendants Ariana DiFillippo and Sarah Stayer serving as the Hearing Officers. (*Id.* ¶ 150.) In accordance with VT policy, the Hearing Officers applied the preponderance of evidence standard of proof, did not afford Johnny a presumption of innocence, and did not allow Johnny's lawyer to cross-examine Pauline. (*Id.*) Johnny takes issue with all of these actions. (*See id.* ¶¶ 151–59.)

The Hearing Officers issued a written decision on May 31, 2024, finding Johnny "responsible" for violations of the Student Code of Conduct—specifically, sexual assault, abusive conduct, and dating violence—and suspended Johnny for two years. (*Id.* ¶ 160.) The Hearing Officers based their findings on their determination that Pauline was "more credible"

---

[2] Canvas is a web-based platform used in schools and universities where students submit assignments and assessments, access course materials, communicate with peers and instructors, and view their grades.

[3] To clarify, Johnny contends that Pauline told BPD that Johnny brandished a "pocketknife" the day after her initial interview with BPD, and that the allegation about him brandishing a "switchblade" knife came from a written statement Pauline gave to BPD two weeks after her initial report and interview. (Compl. ¶ 134 n.90). In his Complaint, Johnny pasted a portion of the BPD report following Pauline's initial interview, which shows that the BPD officer who filled out the report checked "None" in the "Weapon Force" column. (*Id.* ¶ 134.) Johnny alleges that because the BPD officer did not check the "knife" box in that column, Pauline did not report in her initial interview that Johnny threatened her with a knife. (*Id.*)

than Johnny because Johnny "was unable to articulate how consent was established and could not articulate, in detail, how the sexual encounter progressed," whereas Pauline's "version of events remained the same in both the investigation and the hearing." (*Id.* ¶ 161.) Johnny alleges that Defendants mischaracterized his testimony and disregarded Pauline's false or inconsistent statements during the BPD investigation, the Protective Order hearing, the OEA investigation, and the VT hearing. (*Id.* ¶¶ 162–81.) In addition, he alleges that Defendants disregarded the fact that Pauline withheld and spoliated relevant evidence, such as security-camera footage from outside the front door of her apartment, written records from her medical exam on the night at issue, and text messages between her and Johnny. (*Id.* ¶¶ 182–86.)

**The Jane Roe Incident**

Johnny and Jane were also acquainted. (*Id.* ¶ 15.) Though they were not dating, they "occasionally engaged in sexual activity with each other." (*Id.*) On the night of September 17, 2023, Jane and her roommate hosted three other students, including Johnny, for drinks in their dorm room. (*Id.*) Johnny had too much to drink, so Jane suggested that he spend the night at her dorm, and she used Johnny's phone to send text messages to his roommate, telling him that Johnny was spending the night with her. (*Id.* ¶ 17.) They had sex after going to bed for the night. (*Id.*)

Over the next few weeks, Jane and Johnny remained on good terms, and they communicated with each other, spent time in her dorm room and at an off-campus restaurant together, and made plans to spend time together on the first weekend of Thanksgiving break. (*Id.* ¶ 18.)

Jane was a member of VT's Corps of Cadets, and, because she and those she hosted in her dorm room—also members of the Corps of Cadets—were under 21 years old, the Corps of Cadets began investigating whether they drank alcohol in Jane's room on September 17.[4] (*Id.* ¶ 16, 19.) Jane confided in her roommate, Cadet DM, that she feared losing her ROTC scholarship, and that she did not remember having sex with Johnny the night of the party. (*Id.* ¶ 19–20.) Cadet DM told Jane that she was sexually assaulted because she did not remember having sex while intoxicated. (*Id.* ¶ 21.) The Corps of Cadets set a November 2 hearing on the allegations of underage drinking.

The day before her scheduled hearing, on November 1, 2023, Jane filed a Title IX complaint against Johnny. (*Id.* ¶ 218.) She alleged that Johnny sexually assaulted her in her dorm room "at some point between 11:45 p.m. on September 17 and 1:30 a.m. on September 18." (*Id.* ¶ 219.) Jane said that she "was heavily intoxicated" when she went to bed "and did not remember consenting to sex." (*Id.* ¶ 220.) The same day that Jane made her report, the VT Police Department sent a campus-wide email about the report, and though the email did not identify Jane and Johnny by name, it referred to Jane as "the survivor" and Johnny as "the offender." (*Id.* ¶ 222.) Shortly afterward, the Corps of Cadets indefinitely postponed its November 2 hearing on the underage drinking charges pending against Jane, and on January 24, 2024, VT gave Jane an immunity letter for her pending charges. (*Id.* ¶ 223.)

Based on Jane's allegations, the OEA began an investigation into whether Jane was "incapacitated" when she had sex with Johnny, and whether Johnny knew or should have known that Jane was "incapacitated" at the time. (*Id.* ¶ 226.) Importantly, VT trains its

---

[4] It is not clear to the court how the Corps found out about the underage drinking.

investigators that "incapacity" is not the same as "impaired, drunk, intoxicated, or under the influence," and that a person is "incapacitated" when she is "unable to understand who, what, where, when, why, or how." (*Id.* ¶ 228.) Investigators interviewed Cadets MS, CP, and DM, all of whom saw Jane within the hour before she got into bed with Johnny. (*Id.* ¶ 234.) According to Johnny, Cadet MS told an investigator that "it was Johnny, not Jane, who appeared to have had too much to drink at the party." (*Id.* ¶ 235.) Additionally, Cadet MS said that, after Johnny went to sleep, Jane walked Cadet CP back to his dorm room, which was in a different building, and that Jane "could walk fine" and was "not slurring [her] speech." (*Id.* ¶ 236.) Cadet CP told investigators that Jane was a little "loose and giggl[y]" while walking him back. (*Id.* ¶ 237.) Cadet MS said that Jane seemed "perfectly" fine when she got back to her room. (*Id.* ¶ 238.) Johnny provided investigators with the text messages Jane sent to his roommate between 10:16 p.m. and 11:22 p.m., as well as texts Jane sent him in the weeks following the alleged incident. (*Id.* ¶¶ 240, 242–46.) These include messages Jane sent to Johnny's cousin about them all hanging out together, referring to herself as Johnny's "sugar baby," and arranging to drink again in her dorm room. Johnny also provided investigators with written expert testimony that concluded, based on the available evidence, that Jane was not "incapacitated." (*Id.* ¶¶ 247–51.)

Defendants Polidoro, Barnett, and Twigger issued a written report 170 days after Jane filed her Title IX complaint. (*Id.* ¶ 252.) Johnny raises myriad issues with the Investigation Report, including (1) that "the report did not properly set forth the elements of the alleged offense," (2) that the report "did not include any timeline of relevant events," (3) that the report "gave short shrift" to the written expert testimony, and (4) that the report "included evidence that should have been excluded because it was irrelevant and prejudicial." (*Id.* ¶¶ 253–

- 11 -

68.) After OEA issued its report but before the hearing on Jane's allegations, Johnny had numerous communications with Defendants Rohsaan Settle (the Acting Director of the Office of Student Conduct) and Kristina Hartman (Associate University Legal Counsel). (*Id.* ¶ 269.) Johnny also raises issues with these communications, including: (1) Settle and Hartman refused to allow Plaintiff "to submit his written response to OEA's Investigation Report to the Hearing Officers;" (2) they ruled that Johnny's attorney "would not be permitted to cross-examine the OEA investigators at the hearing;" and (3) they refused to allow Johnny to "submit additional written expert testimony to respond to OEA's mischaracterization of the evidence." (*Id.* ¶¶ 270–78.)

The Office of Student Conduct held hearings on Jane's allegations on June 24 and September 20, 2024,[5] with Defendants Quintavis Cureton and Sarah McCoy serving as the Hearing Officers. (*Id.* ¶ 281.) Regarding the hearing, Johnny takes issue with Cureton and McCoy's use of the preponderance-of-the-evidence standard rather than the clear-and-convincing-evidence standard and the fact that they allowed Jane to opt out of cross-examination by Johnny's lawyer before the lawyer had conducted his full cross-examination. (*Id.* ¶¶ 282–83.)

Cureton and McCoy issued a written decision finding Johnny responsible for sexual misconduct. But in their decision, they stated that the second element of the offense was that Johnny should have known that Jane was "intoxicated," rather than "incapacitated;" Johnny

---

[5] The September hearing was necessary because, during the June hearing, Johnny discovered that OEA had withheld an interview of Cadet DM by the VT Police Department from its Investigation Report. (Compl. ¶ 281 n.274.) The Hearing Officers produced that interview in their Formal Hearing Outcome and allowed Johnny to address that withheld interview in his appeal. (*Id.*)

contends that this was an *ex post facto* change of the elements and contrary to VT's standards for finding a student guilty of the offense. (*Id.* ¶¶ 286–89.) Johnny also contends that Cureton and McCoy ignored "extensive" evidence that Jane was not "incapacitated": namely, his expert's testimony, Cadet MS's statements that Jane did not appear to intoxicated, and evidence of Jane's conduct showing that she had full "situational awareness." (*Id.* ¶¶ 294–305.) Johnny's other misgivings about the decision include Cureton and McCoy applying a lower credibility standard to Jane than to Johnny. (*Id.* ¶¶ 306–14.)

### **Appeals of Both Decisions**

Johnny appealed both the Pauline Poe and Jane Roe decisions on the grounds that the Hearing Officers' findings against him on the issue of responsibility were "arbitrary." (*Id.* ¶¶ 205, 329.) Defendant Chelsea Haines denied the Poe appeal "via a letter that was less than one page and that provided no analysis." (*Id.* ¶ 206.) Defendant Frances Keene denied Johnny's appeals of the Jane Roe proceedings[6] in "perfunctory letters," and her analysis was limited to determining whether the Hearing Officers employed fair procedures—which Johnny contends was the wrong standard of review. (*Id.* ¶¶ 330, 332–33.) Johnny also contends that both Haines and Keene based their denials of his appeals on *ex parte* communications with Cureton and McCoy because they were allowed to submit bench memos in response to Johnny's appeals. (*Id.* ¶¶ 210, 335.)

---

[6] Johnny submitted an appeal after the first hearing on the Jane Roe matter and a second, substantially similar, appeal after the limited re-convened hearing. (Compl. ¶ 51 n.33.)

## II.    PROCEDURAL HISTORY

On November 24, 2025, Johnny filed suit against VT, VT's Board of Visitors (its governing body), and numerous university officials in both their individual and official capacities. The university official defendants are: (1) Dr. Timothy Sands, the President of VT; (2) Dr. Frances Keene, Vice President for Student Affairs and the Appellate Officer in the Jane Roe proceeding; (3) Dr. Martha Glass, Assistant Vice President for Student Affairs; (4) Dr. Chelsea Haines, Chief of Staff to the Vice President of Student Affairs and the Appellate Officer in the Pauline Poe proceeding; (5) Rohsaan Settle, the Associate Dean and Director of the VT Dean of Students Office; (6) Dr. Quintavis Cureton, the Associate Director of the VT Office of Student Conduct from June 2023 to July 2025 and a Hearing Officer in the Jane Roe proceeding; (7) Sarah McCoy, the Assistant Director of the VT Office of Student Conduct and Hearing Officer in the Jane Roe proceeding; (8) Ariana DiFillippo, a Student Conduct Coordinator in the VT Office of Student Conduct and Hearing Officer in the Pauline Poe proceeding; (9) Sarah Stayer, an Associate Director for Community Standards & Well Being and a Hearing Officer in the Pauline Poe proceeding; (10) Kristina Hartman, an Associate University Legal Counsel and the legal adviser for both proceedings; (11) Kathryn Polidoro, the Director of Title IX Compliance/Title IX Coordinator from July 2018 to September 2024 and an OEA official in both investigations; (12) Kristin Barnett, the Deputy Director for Title IX Investigations and an OEA official in both investigations; (13) Deziree Twigger, a University Investigator, Title IX Compliance Specialist, and one of the OEA officials in both investigations.

Johnny brings a total of 33 causes of action against Defendants. These include claims under 42 U.S.C. § 1983, in the university-official defendants' official and individual capacities, for violations of Johnny's rights to procedural due process, substantive due process, and equal protection under the Fourteenth Amendment (Counts 1, 2, 3, 6, 7, 8, 11, 12, 17, 18, 23, 24, 27, and 28). Johnny also brings claims under Title IX of the Education Amendments of 1972—under both deliberate-indifference and erroneous-outcome theories (Counts 15, 16, 31, and 32)—and Virginia common law gross and willful and wanton negligence (Counts 4, 5, 9, 10, 13, 14, 19, 20, 21, 25, and 26). Finally, he brings a claim under the Declaratory Judgment Act (Count 33). As relief, Johnny seeks: (1) a declaratory judgment that the notations on his VT transcript relating to the Pauline Poe and Jane Roe matters are ongoing violations of his Fourteenth Amendment rights; (2) a permanent injunction ordering the President and the Vice President for Student Affairs to permanently expunge any reference from the Pauline Poe and Jane Roe matters from his VT records, including his transcript; (3) $10,000,000 in compensatory damages and $10,000,000 in punitive damages; and (4) attorneys' fees and expert-witness fees.

With his Complaint, Johnny also filed a motion for a preliminary injunction. Specifically, he requests a preliminary injunction requiring the President and Vice President for Student Affairs to remove all references to the disciplinary matters from Johnny's transcript. (Pl. Br. in Supp. Mot. Prelim. Inj. at 2 [ECF No. 3-1].) Defendants filed a response in opposition on January 15, 2026 (Defs. Br. in Opp. Mot. Prelim. Inj. [ECF No. 29]), and Johnny filed a reply on January 22, 2026. (Pl. Reply Br. [ECF No. 32].)

On February 9, 2026, Defendants filed motions to dismiss for failure to state a claim. (*See* ECF Nos. 40–53.) All together, Defendants seek dismissal of all claims except for the Title IX claims under the erroneous-outcome theory (Counts 15 and 31). Johnny filed a response in opposition to the motions to dismiss (Pl. Br. in Opp. Mot. Dismiss [ECF No. 66]), and Defendants filed a joint reply brief. (Defs. Reply Br. [ECF No. 70].)

The court held a hearing on the motions on April 29, 2026. Accordingly, both the motion for preliminary injunction and the motions to dismiss are ripe for disposition.

### III.    LEGAL STANDARD

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). When evaluating the sufficiency of a complaint, the court is obligated to consider the factual allegations asserted in the complaint as well as any exhibits attached thereto. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citing Fed. R. Civ. P. 10(c)).

## IV.    ANALYSIS

### A. Johnny's argument that Defendants made concessions as to other claims by not seeking to dismiss the Title IX erroneous-outcome claims

At the threshold, Johnny argues in his opposition brief that, by not challenging his Title IX erroneous-outcome claims, Defendants concede "that [Johnny] pleads facts that support elements of several of [Johnny's] other claims, including his Title IX 'deliberate indifference' claims, his substantive due process claims, and his claims for 'gross negligence' and 'willful and wanton negligence.'" (Pl. Br. in Opp. Mot. Dismiss at 2.) Johnny also argues that Defendants concede that the Investigators, Hearing Officers, and Appellate Officers are not entitled to qualified immunity on his due process claims. (*Id.*) Defendants counter that the plausibility of Plaintiff's Title IX erroneous-outcome claims cannot "serve as the basis for supporting some or all of his other claims." (Defs. Reply Br. at 3.) Defendants are correct. Although the elements and evidence for the erroneous-outcome claims may overlap with some of Johnny's other claims, at the motion-to-dismiss stage, the court must assess whether he has plausibly alleged each challenged claim individually. *See Columbia Gas Transmission LLC v. Tri-State Airport Auth.*, No. 3:14-11854, 2016 WL 593863, at *5 (S.D.W. Va. Feb. 12, 2016) ("While there may be some overlap in the facts necessary to prove these claims, they are nonetheless separate causes of action, requiring proof of different facts.").

### B. Board of Visitors as a Party

Every defendant except for VT seeks dismissal from this case for varied reasons. The court begins with the Board of Visitors.

The Board of Visitors argues that it should be dismissed as a party from this action because it is the same entity as VT. Under Va. Code Ann. § 23.1-2600(A), "[t]he board of

visitors of Virginia Polytechnic Institute and State University (the board) is a corporation under the name and style of 'Virginia Polytechnic Institute and State University' . . . ." Accordingly, the Board argues that the action cannot proceed with VT and the Board named as two separate defendants because, by statute, they are one and the same. Johnny does not contest that point, and in any case, the court agrees with the Board. *Cf. Robertson v. Va. State Univ.*, No. 3:23cv777, 2024 WL 1774821, at *6 (E.D. Va. Apr. 24, 2024) (noting that "The Visitors of Virginia State University" and Virginia State University "do not qualify as two separate entities"). Therefore, the Board of Visitors will be dismissed as a party from this case.

### C. Counts 15, 16, 31, 32, and 33: Title IX and Declaratory Judgment Counts against Sands and Keene

Next, Defendants Sands and Keene argue that the Title IX and declaratory judgment claims against them should be dismissed. Johnny names VT *and* both Sands and Keene in their official capacities in his Title IX claims. Sands and Keene argue that, because "an official capacity suit against a state officer . . . is no different from a suit against the State itself[,]" a claim against an individual in his or her official capacity is duplicative of a claim against a governmental entity named in the same count and should be dismissed. (Sands & Kenne Mot. Dismiss at 10.) Johnny does not appear to contest this argument. In any case, the court agrees with Sands and Keene. *See Hill v. Robeson County, N.C.*, 733 F. Supp. 2d 676, 682 (E.D.N.C. 2010) ("A claim against a government employee in his official capacity is tantamount to a claim against the government entity for which he works and should be dismissed as duplicative." (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) & *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004))). Accordingly, Counts 15, 16, 31, and 32 will be dismissed as to Sands and Keene.

Sands and Keene also argue that Count 33, the declaratory judgment claim, should be dismissed because declaratory judgment is a remedy and not an independent cause of action. Johnny does not appear to contest that argument either. In any case, the court agrees with Sands and Keene.

Ordinarily, the Declaratory Judgment Act "creates a remedy, not a substantive cause of action[,]" and its purpose is to allow "prospective defendants to sue to establish their nonliability," not to "create a substantive tack-on claim for an already-existing plaintiff who is adjudicating an already-live legal issue." *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 298 F. Supp. 3d 834, 843 (W.D. Va. 2018). A declaratory judgment is "appropriate only when it will clarify and settle the legal relationship of the parties[,]" thereby "allow[ing] the uncertain party to gain relief from the insecurity caused by a potential suit waiting in the wings." *Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-00249, 2020 WL 1309461, at *9 (W.D. Va. Mar. 19, 2020) [hereinafter *VT I*] (quoting *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998)). Therefore, a declaratory judgment is "not appropriate if the questionable conduct has already occurred." *Id.* Here, Johnny requests a declaration that the disciplinary notations on his transcript "are ongoing violations of [his] Fourteenth Amendment rights and are ongoing injuries[.]" (Compl. ¶ 691.) Though Johnny alleges ongoing injuries, he "does not request clarification of his rights to avoid future litigation[,]" and therefore, he has not stated a claim for a declaratory judgment. *See VT I*, 2020 WL 1309461, at *9.

Because Sands is named only in the Title IX and declaratory judgment claims, he will be dismissed as a party to this case. Keene, however, is named in both her individual and official capacities in Counts 27 and 28, with Johnny alleging that she violated his procedural

- 19 -

and substantive due process rights. Keene argues that those claims against her in her individual capacity should be dismissed because she is entitled to qualified immunity and in her official capacity because the *Ex parte Young* exception to sovereign immunity does not apply. Because her remaining university official co-defendants make similar arguments in support of dismissal, the court will address them below.

### D. Official Capacities (*Ex parte Young*)

Defendants argue that all § 1983 claims in their official capacities should be dismissed because the *Ex parte Young* exception to Eleventh Amendment sovereign immunity does not apply. "The *Ex parte Young* exception 'allows suits against state officers for prospective equitable relief from ongoing violations of federal law.'" *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 318 (quoting *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001)). "To determine whether a suit may proceed under *Ex parte Young*, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

First, the court must determine whether the injunctive relief Johnny seeks is "properly characterized as prospective." *Univ. of N.C. Sys.*, 133 F.4th at 319. Johnny seeks a "permanent injunction ordering the President of Virginia Tech and the Virginia Tech Vice President for Student Affairs to permanently expunge any reference to the Pauline Poe [and Jane Roe] matter[s] from Plaintiff's Virginia Tech records, including his transcript." (Compl. at 197 (prayers for relief).) The Fourth Circuit has held that "an erroneous university record of a student's permanent expulsion for sexual misconduct inflicts an ongoing injury for which the

- 20 -

student can seek equitable relief." *Univ. of N.C. Sys.*, 133 F.4th at 319. Therefore, the relief

Johnny seeks is prospective.

Additionally, "*Ex parte Young* authorizes suits only against officers with 'some

connection with the enforcement of the act'" because, without an enforcement duty, "the

officer is merely a 'representative of the State' who cannot be sued because allowing such a

suit would essentially 'make the State a party.'" *Doyle v. Hogan*, 1 F.4th 249, 254 (4th Cir. 2021)

(quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

> This enforcement duty exists when there is a "'special relation'
> between the state officer sued and the challenged statute," which
> provides the officer with the authority to enforce the particular
> law at issue. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316,
> 331 (4th Cir. 2001) (quoting *Ex parte Young*, 209 U.S. at 157). That
> authority can come from the "particular act" being challenged, a
> more general law providing enforcement authority, or "the
> general duties of the officer." *Ex parte Young*, 209 U.S. at 157–58.
> That said, [the Fourth Circuit has] held that it is not enough that
> the officer possesses the "[g]eneral authority to enforce the laws
> of the state" broadly if the officer cannot enforce the law at issue.
> *Waste Mgmt. Holdings*, 252 F.3d at 331 (emphasis added) (quoting
> *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412,
> 1416 (6th Cir. 1996)). Instead, the officer sued must be able to
> enforce, if he so chooses, the specific law the plaintiff challenges.

*Id.* at 254–55 (cleaned up). Under this standard, Johnny alleged that only Keene has a "special

relation" with the challenged act—the notations referencing sexual misconduct on his

transcript—because, citing to the Virginia Tech Student Code of Conduct, Johnny alleges that

Keene "has responsibility for the University conduct system, with direct supervisory oversight

of disciplinary matters assumed by the Office of Student Conduct under the Director of

Student Conduct." (Compl. ¶ 71.) Drawing reasonable inferences in Johnny's favor, the court

concludes that Keene, as Director of Student Conduct, has the authority to direct the registrar

to remove notations of the Pauline Poe and Jane Roe matters from Johnny's records if the court finds the proceedings violated Title IX or Johnny's constitutional rights. On the other hand, Johnny does not allege that any other individual officers has direct supervisory authority over disciplinary matters and resulting sanctions. (*See* Compl. ¶¶ 72–82.) Therefore, the *Ex parte Young* exception applies only to Keene, and the official-capacity claims against the remaining individual-officer defendants will be dismissed.

### E.  Qualified Immunity for the Constitutional Claims

Defendants Glass, Polidoro, Barnett, Twigger, DeFillippo, Stayer, Haines, Cureton, McCoy, and Keene argue that the procedural and substantive due process claims against them in their individual capacities should be dismissed because Johnny has not alleged that he had a protected property or liberty interest sufficient to invoke his Due Process rights. And even if he did, Defendants argue that they are entitled to qualified immunity because the rights Johnny contends Defendants violated were not clearly established at the time of the disciplinary proceedings and subsequent disciplinary actions. Defendants DiFillippo and Stayer—the only defendants against whom Johnny asserts an equal protection claim—additionally argue that they are entitled to qualified immunity as to that claim.

### 1.  Procedural and Substantive Due Process

To state a claim for procedural and substantive due process, a plaintiff must first allege that he possessed a constitutionally cognizable life, liberty, or property interest. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 720 (E.D. Va. 2015). Here, Johnny claims he has a liberty interest in his

good name and reputation and a property interest in his continued enrollment in VT. (Compl. ¶¶ 88–92.)

The Fourth Circuit recently recognized, for the first time, that university students have a liberty interest in their reputation where they were expelled from school following a finding of sexual misconduct. *Univ. of N.C. Sys.*, 133 F.4th at 319. Specifically, the court explained that "[a] plaintiff asserting a liberty interest in his reputation must show (1) a stigmatizing statement, (2) some type of dissemination, and (3) some other government action that 'alters or extinguishes one of his legal rights.'" *Id.* (quoting *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021)). In *Doe v. University of North Carolina System*, the court found that Doe's allegations that his "expulsion for sexual misconduct will remain a part of [his] permanent educational records" and "will impair his ability to seek further education or employment" satisfied that standard. *Id.* The court concluded: "There is no question that a notation of expulsion, contained in a student's educational record, implies a 'serious character defect[] such as dishonesty or immorality.' This is all the more true when that expulsion is based on a finding of sexual misconduct." *Id.* (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308 (4th Cir. 2006)). Accordingly, Johnny—whose expulsion for sexual misconduct is now part of his permanent records—has a liberty interest in his good name and reputation.

As for Johnny's asserted property interest in his continued enrollment, neither the Fourth Circuit, the Supreme Court of Virginia, nor the Virginia Constitution has made a blanket recognition of such a right. *See Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:21-cv-378, 2024 WL 1417977, at *9 (W.D. Va. Apr. 2, 2024) [hereinafter *VT II*]. But courts in this district have held that a legitimate claim of entitlement to a government benefit—i.e., a

- 23 -

property right—can be created by an "independent source[,]" such as "a statute, regulation, an express or implied contract, or a mutually explicit understanding." *Id.* at \*6 (quoting *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012)). In the specific context of students who receive disciplinary sanctions following a finding of sexual misconduct, this court has held that, "in the absence of a state statute, a plaintiff can plead an 'independent source' sufficient to withstand a motion to dismiss by alleging that the university at issue, through its policies or practices, does not expel, suspend, or dismiss students without cause." *Id.* at \*10 (citing *Doe v. Alger*, 175 F. Supp. 3d 646, 657 (W.D. Va. 2016)).

In *Ortegel v. Virginia Polytechnic and State University*, a court in this district held that a plaintiff's allegations that Virginia Tech had a policy of not disciplining students without cause sufficiently alleged a property interest at the motion-to-dismiss stage. No. 7:22-cv-510, 2023 WL 8014237, at \*12 (W.D. Va. Nov. 20, 2023). Additionally, in *Doe v. Virginia Polytechnic Institute and State University*, another court in this district held that a plaintiff sufficiently pleaded that he had a property interest in his continued enrollment at Virginia Tech because he founded his allegations on "specific references to Virginia Tech's Student Code of Conduct" and adequately alleged that the Code "created an expectation that students 'could only be dismissed after a finding is made that a student violated the Code." 2024 WL 1417977, at \*12 (cleaned up).

Similarly, in the case at bar, Johnny has sufficiently pleaded a property interest in his continued enrollment in Virginia Tech through its policies and procedures. He alleges that "VT has a system of suspending or expelling students only after a finding of cause," specifically alleging that the Student Code of Conduct (in both its previous iterations and its current one)

- 24 -

"provides for suspension or expulsion for non-academic reasons only after a student had been found 'responsible' for violating the Code . . . after an impartial, thorough, and prompt investigation, hearing, and appeal." (Compl. ¶¶ 91–92.)

To defeat Defendants' claims of qualified immunity, however, Johnny has to do more than allege that he has a property or liberty interest. Qualified immunity is an affirmative defense that "shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Univ. of N.C. Sys.*, 133 F.4th at 315 (quoting *Ridpath*, 447 F.3d at 306). The test for whether an official is entitled to qualified immunity is well-settled; courts "must consider whether (1) the facts 'make out a violation of a constitutional right' and (2) whether that right was 'clearly established at the time of the defendant's alleged misconduct.'" *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 238 (4th Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts have discretion to address the prongs in either order. *Univ. of N.C. Sys.*, 133 F.4th at 316. To determine if a right was clearly established, "a court must pinpoint the precise constitutional right at issue." *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022). "In doing so, a court must be careful to not define the right 'at a high level of generality because the dispositive question is whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *Halcomb v. Ravenell*, 992 F.3d 316, 320 (4th Cir. 2021) (cleaned up)). "There is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

- 25 -

In the Fourth Circuit, "decisions of the Supreme Court, the Fourth Circuit, and the highest court of the state in which the conduct occurred" are the only sources of law that can create a clearly established right. *George Mason Univ.*, 132 F. Supp. 3d at 725 (citing *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010)). "When there are no relevant decisions from these courts of controlling authority, the Fourth Circuit will consider 'a consensus of cases of persuasive authority' from other jurisdictions, if such exists." *Id.* (quoting *Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004).

"The Supreme Court has [only] assumed, without actually deciding, that university students possess a constitutionally protectible property right in their continued enrollment in a university." *Sheppard*, 993 F.3d at 239 (quoting *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002) (cleaned up)). The Fourth Circuit has followed that same "watchful approach." *Id.* But the "assume-without-deciding" approach cannot clearly establish a right for the purposes of a § 1983 lawsuit. *See id.* at 240 ("The Supreme Court and this Court's assumptions, without express recognition, hardly amount to a clearly established right."). Only two circuits—the First and Sixth—"have concluded that no state-specific analysis is necessary" and found that the Supreme Court has "conferred a generalized property interest in public education for all students." *VT II*, 2024 WL 1417977, at *8–9 (collecting cases and citing *Goss v. Lopez*, 419 U.S. 565 (1975)). But two circuit court decisions do not establish a consensus.

Most other circuits have recognized a property interest in continued university enrollment by grounding it in an "'underlying state created interest,' as required by the Supreme Court's instruction that a property interest derive from an 'independent source.'" *Id.*

at *7 (collecting cases from the Tenth, Eleventh, Second, Third, and Seventh Circuits). As a result, in those circuits, the right emanates from their respective states' laws. Accordingly, these decisions have no bearing on whether such a right is clearly established *in Virginia.*

Johnny alternatively argues that Virginia Code § 23.1-412 creates a clearly established property right in continued public university enrollment, but that argument also falls short. Johnny points to the statute's language—requiring public colleges and universities to "adopt non-academic codes of conduct" and mandating that students "*shall* have the . . . *rights* afforded to them by the [school's] codes of conduct and related policies and procedures"—as well as VT's subsequent adoption of a stand-alone Student Code of Conduct pursuant to the statute's requirements to support his argument. (Compl. ¶¶ 90–91 (quoting Va. Code Ann. § 23.1-412(A)–(B) (emphasis added)).) But neither the Fourth Circuit nor the Supreme Court of Virginia has endorsed that theory—likely because no plaintiff in this context has raised this question, and because state statutes generally do not provide clearly established rights. *See George Mason Univ.*, 132 F. Supp. 3d at 725; *S.C. Dep't of Soc. Servs.*, 597 F.3d at 176. Thus, even if he is correct, his novel theory was not "clearly established" at the time he was expelled.

Johnny's procedural due process claims also encompass allegations that Defendants did not allow his lawyer to complete his cross-examination of Jane Roe, and that the Hearing Officers used the preponderance of the evidence standard—as required by Virginia Tech policy—rather than a clear and convincing evidence standard. (*See* Compl. ¶¶ 496–97, 609–10 (Counts 7 and 23).) In *Doe v. University of North Carolina System*, the Fourth Circuit recognized the right to cross examination in the university disciplinary context, but noted that such a right had not, up to that point, "been clearly enough established to deny [officials] the protection

of qualified immunity." 133 F.4th at 317. Because that opinion was published in 2025 and the proceedings at issue in this case occurred in 2024, that right was not clearly established *at the time* of the challenged conduct. Additionally, neither the Supreme Court nor the Fourth Circuit has ever recognized the right to have the clear and convincing standard of proof in such adjudications; in fact, a court in this district has rejected the very same argument in another case. *See Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 501 (W.D. Va. 2019). Accordingly, although the VT officials actions, as alleged, would have violated Johnny's rights by denying him the opportunity to cross examine his accusers, the officials who denied him that right would be protected by qualified immunity because the right was not "clearly established" at the time they did so.

Finally, Johnny's asserted liberty interest in his good name and reputation is also not clearly established for the same reason as his right to cross examination during a student disciplinary proceeding. Though the Fourth Circuit recognized a liberty interest in reputation in the university disciplinary context in *Doe v. University of North Carolina System*, 133 F.4th at 317–18, this recognition did not occur before the Jane Roe and Pauline Poe proceedings, and the Fourth Circuit noted in that opinion that such a liberty interest was not previously clearly established. *See id.* (explaining that the court had not "expressly found that a student possessed a liberty interest implicated by a university disciplinary action").

Accordingly, the doctrine of qualified immunity bars both the procedural and substantive due process claims against the university-official defendants. These claims will therefore be dismissed as to the defendants in their individual capacities.

## 2. Equal Protection

In his equal protection claim, Johnny challenges the "two-track system for adjudication of allegations of student-on-student misconduct: one track for allegations of on-campus misconduct, where the accused is presumed innocent and his attorney has the right to cross-examine the accuser; and a separate track for allegations of off-campus misconduct, where the accused is not presumed innocent and where his attorney is prohibited from cross-examining the accuser." (Compl. ¶ 154.) Specifically, he takes issue with the proceedings for the incident with Pauline Poe, which occurred off-campus and was therefore subject to the second, "lesser-rights," track. Defendants DiFillippo and Stayer were the Hearing Officers in the Pauline Poe proceeding.

DiFillippo and Strayer counter that qualified immunity shields them from liability, but the parties dispute the precise contours of the right that must be clearly established for purposes of analyzing qualified immunity. Defendants argue that "it is not clearly established that universities cannot adjudicate off-campus misconduct matters under different procedures than those occurring on-campus and subject to stricter requirements under Title IX." (DiFillippo & Stayer Mot. Dismiss at 20.) Johnny takes a broader view, arguing that he "had a clearly established statutory right under Title IX to be free from sex discrimination in a VT disciplinary action." (Pl. Br. in Opp. Mot. Dismiss at 17.) In essence, Johnny contends that an alleged violation of Title IX is "clearly established" right, the violation of which necessarily gives rise to an equal protection claim.

Johnny frames the issue far too broadly. A plaintiff seeking to recover damages for a violation of a statutory right may use a right conferred by *that* statute to defeat qualified

- 29 -

immunity. But a plaintiff cannot use a *statutory* right to defeat qualified immunity for a *constitutional* claim, unless claims under the statute are analyzed congruently to that constitutional claim. That is true because qualified immunity must be assessed on a claim-by-claim basis (*i.e.*, a § 1983 suit for procedural due process requires a showing of a clearly established right under the procedural due process doctrine). *See Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("[O]fficials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some other statute or regulation. Rather, these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages. And if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation."); *Wheeler v. Gilmore*, 998 F. Supp. 666, 670 (E.D. Va. 1998) ("[B]ecause none of the Virginia Code provisions plaintiff cites is the basis of his cause of action, none defeats [defendant's] claim of qualified immunity."). Relevant here, the Supreme Court has held that the standards for establishing liability under Title IX and the Equal Protection Clause are similar—but not wholly congruent—and as a result, a plaintiff can have distinct claims under both Title IX and the EPC. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).[7] Simply put, Johnny cannot invoke Title IX to defeat qualified immunity for an equal protection claim.

---

[7] Additionally, school officials cannot be sued in their individual capacities under Title IX. *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 419 (E.D. Va. 1999). Therefore, allowing Title IX to form the basis of a clearly established right for an individual-capacity equal protection claim would create an exception that swallows the rule.

Of course, Johnny could use a clearly established right under the Equal Protection Clause to defeat DiFillippo and Strayer's purported qualified immunity on his equal protection claim. In so doing, the right in question cannot be defined at a high level of generality, but the court need not find a case with the exact same fact pattern as this one. Although Johnny incorrectly frames the right underlying his equal protection claim in his briefing, the court can plausibly infer that he alleges a right to be free from sex discrimination in a university disciplinary proceeding, as well as a right and a right to be afforded the same protections as similarly situated individuals (*i.e.*, male students accused of on-campus sexual assault). (*See* Compl. ¶ 153 ("A VT student is subject to the same rules for sexual conduct with another VT student occurring on campus as he is for sexual conduct with another VT student occurring off campus; and he is subject to the same sanctions for a violation of those rules regardless of whether the violation occurs on campus or off campus.").) But this purported right has not been clearly established by the Supreme Court or the Fourth Circuit, and therefore DiFillippo and Stayer could not have been on notice that adjudicating on- and off-campus sexual assault accusations differently violates the Equal Protection Clause (even assuming that it does).

Accordingly, Defendants DiFillippo and Stayer are entitled to qualified immunity on the equal protection claim and Count 6 will be dismissed.

### F. Due Process Official-Capacity Claims as to Defendant Keene (Counts 27 and 28)

Because Johnny adequately alleged that the *Ex parte Young* exception applies to Defendant Keene, the court must address the merits of the procedural and substantive due process claims against her in her official capacity (and *only* in her official capacity, since the individual-capacity claims against her are barred by qualified immunity).

### 1.  Procedural Due Process

In addition to showing that he had a "constitutionally cognizable life, liberty, or property interest," a plaintiff alleging a violation of procedural due process must show that the "deprivation of that interest was caused by some form of state action" and that the "procedures employed were constitutionally inadequate." *Sansotta*, 724 F.3d at 540. As noted above, Plaintiff has adequately alleged that his expulsion from Virginia Tech constituted a deprivation of an established property right, specifically his continued enrollment at the university. *See Doe v. Alger*, 228 F. Supp. 3d 713, 729 (W.D. Va. 2016). The remaining question is the adequacy of the procedures employed.

It is well-settled that "[t]he fundamental requirements of due process are 'notice and an opportunity to be heard.'" *Doe v. Va. Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023) [hereinafter *VT III*] (quoting *Mallette v. Arlington Cnty. Emps' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996)). But neither the Supreme Court nor the Fourth Circuit have outlined the contours of due process protections owed to students during school disciplinary proceedings. The Fourth Circuit has, however, has long embraced the seminal Fifth Circuit decision, *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 159 (5th Cir. 1961), recognizing that, "in cases involving student misconduct, 'the best approach is to hold a hearing which gives [university officials] an opportunity to hear both sides in considerable detail.'" *VT II*, 2024 WL 1417977, at *13 (quoting *VT III*, 77 F.4th at 236)) (cleaned up). Although university disciplinary proceedings need not rise to the level of a formal trial or trial-like proceeding to satisfy due process, "the student should 'be given the opportunity to present . . . his own defense against the charges and to produce either oral testimony or written

affidavits of witnesses in his behalf.'" *Id.* (quoting *Dixon*, 294 F.2d at 159). Above the notice

and opportunity-to-be-heard threshold, "due process . . . is 'flexible and calls for such

procedural protections as the particular situation demands.'" *Butler v. Rector & Bd. of Visitors of*

*Coll. of William & Mary*, 121 F. App'x 515, 519 (4th Cir. 2005) (quoting *Mallette v. Arlington Cnty.*

*Emps. Supp. Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996)).

Johnny alleges that Defendant Keene deprived him of procedural due process "by

denying his appeals based on her *ex parte* communications with the Hearing Officers, . . . [and]

issuing appellate decisions that were biased against [him] because of his sex" and "because he

was the respondent."[8] (Compl. ¶¶ 644–46.) In support of his claim that Keene based her

decisions on *ex parte* communication with Hearing Officers Cureton and McCoy, Johnny

alleges:

> 210. According [to] the VT Student Code of Conduct, appeals
> are decided by an Appellate Officer in the Office of Student
> Affairs, which is separate from the office in which the Hearing
> Officers work. But on information and belief,[9] appeals are first
> sent to the Hearing Officers who decided the case that that those

___

[8] The allegations that Defendant Keene was biased in her decision are too conclusory and therefore not sufficient to state a claim for procedural due process on that basis. *See Monzon v. Hall*, No. 7:21-cv-193, 2022 WL 4213094, at *7 (W.D. Va. Sep. 13, 2022) ("Mere conclusory allegations of discrimination are insufficient[.]"). The only additional evidence Johnny provides in support of this allegation was that another university administrator called her "one of the best warriors to have in the social justice fight" and that she wrote in her Ph.D. dissertation that social justice is often a consideration in student-conduct cases. (Compl. ¶¶ 385, 387.) These general assertions about her educational background and others' perception of her as a "social justice warrior"—as well as Johnny's argument that a "'social justice warrior' should not be a decisionmaker in a Title IX case, let alone be in charge of a university's conduct system" (*id.* ¶ 388)—do not demonstrate that Keene was biased against Johnny because he is a man and a respondent in a sexual assault case. A concern for victims of sexual assault and a policy of steadfast enforcement of Title IX does not evince a bias against men or those accused of sexual assault. *See Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d 508, 518 (E.D. Va. 2019) ("Courts have widely held that vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias.").

[9] Normally, "[p]leading on information and belief alone is not enough to raise allegations above a speculative level." *Mao v. Global Trust Mgmt., LLC*, No. 4:21-cv-65, 2022 WL 989012, at *12 (E.D. Va. Mar. 31, 2022) (citing *Walters v. McMahen*, 795 F. Supp. 2d 350, 255 (D. Md. 2011)). But Johnny bolsters his allegation with deposition testimony, which, at the motion to dismiss stage, is enough to make this claim plausible.

> Hearing Officers can write an ex parte bench memo to the Appellate Officer that responds to the appellant's arguments.
>
> 211. Such a procedure violates an appellant's right to due process in two ways. First, it deprives the appellant of information on which the Appellate Officer's decision is based. Second, it deprives the appellant of a decision by a neutral Appellate Officer.

(Compl. ¶¶ 210–11.)

In support of this specific allegation, Johnny cites to the deposition of Kyle Rose, a former VT Hearing Officer, taken for another Title IX case in this district, *Jacob Doe v. Virginia Polytechnic Institute and State University*, No. 7:19-cv-249 (W.D. Va.). (Compl. ¶ 210 n.183.) In his deposition, Mr. Rose stated, "[The student] would submit [the appeal] to Student Conduct, and, following that, the hearing officers would draft a response to the appeal. And the appeal itself, as well as the response, . . . would get assigned to an appeals officer [who] would make a final decision based off of that information." (*Id.*) Further, Johnny contends that Keene denied both of his appeals "in perfunctory letters with little analysis." (*Id.* ¶ 330.) Specifically, he argues that she applied the incorrect standard of review to the appeals because her analysis "was limited to determining whether the Hearing Officers employed fair procedures[;]" rather, he contends she "was required to address Johnny's arguments regarding the *substance* of the determinations[.]" (*Id.* ¶¶ 333–34.) He maintains that her failure to do so renders her denials of his appeals arbitrary and capricious. (*Id.* ¶ 334.) At this stage, Johnny has sufficiently alleged that Keene violated his procedural due process rights.

To start, "[i]t is no longer open to question that any expulsion from a state university or college must comport with the Due Process Clause of the Fourteenth Amendment." *Tigrett v. Rector & Visitors of Univ. of Va.*, 137 F. Supp. 2d 670, 675 (W.D. Va. 2001) (citing *Goss v.*

*Lopez*, 419 U.S. 565, 576 n.8 (1975)). The Fourth Circuit has recognized that, "as a general rule, *ex parte* communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process." *Thompson v. Greene*, 427 F.3d 263, 269 n.7 (4th Cir. 2005) (quoting *Doe v. Hampton*, 566 F.2d 265, 276 (D.C. Cir. 1977)). Johnny's due process claims are viable because, drawing all inferences in his favor, he pleads that Keene violated VT's own written policies or guidelines, "which other courts have found may constitute evidence of due process violations." *Doe v. Citadel*, No. 2:21-cv-04198, 2022 WL 2806473, at *8 (D.S.C. July 18, 2022); *see also Jones v. Bd. of Governors of Univ. of N.C.*, 704 F.2d 713, 717 (4th Cir. 1983) (noting that while the source of procedural guarantees is found solely in the due process clause, it is well recognized that significant departures from state procedures may evince procedural due process violations).

Both VT's Student Code of Conduct (Ex. A Mot. for Prelim. Inj.) and Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence (Ex. B. Mot. for Prelim. Inj.) describe the appeal process in great detail. For instance, both provide that the grounds for appeal are (1) procedural irregularity or denial of procedural guarantees, (2) significant and relevant new information that was not available at the time of the hearing, (3) conflict of interest or bias by the Title IX Coordinator, Investigator, or hearing officer(s), which affected the outcome, and (4) unduly harsh or arbitrary findings or sanctions. (Ex. A Mot. for Prelim. Inj. at 34, Ex. B. Mot. for Prelim. Inj. at 14.) They also outline the requirements for the format of the appeal, notification to the other party, and the appeal decision letter. (Ex. A. Mot. for Prelim Inj. at 35, Ex. B. Mot. for Prelim Inj. at 14–15.) In the decision letter, the Appellate Officer must "include a rationale for the decision." (*Id.*)

Importantly, neither the Student Code of Conduct nor the Title IX Reporting and Grievance Procedures mention that Hearing Officers are permitted to submit a response to the respondent's appeal, or that the Appellate Officer may liberally borrow from that response in reaching her decision. Additionally, Johnny alleges that one of the grounds for his appeals was that the "Hearing Officers' findings against him on the issue of responsibility were 'arbitrary.'" (Compl. ¶ 329.) By alleging that Keene had *ex parte* communications with the Hearing Officers and that her letter addressed only whether the Hearing Officers employed fair procedures—which is a separate ground for appeal—Johnny has pleaded facts that, if true, would show that Keene violated VT's own policies and procedures and, concomitantly, his procedural due process rights. At this stage, then, he has stated a claim for procedural due process violations against Keene in her official capacity.

### 2. Substantive Due Process

To establish a violation of substantive due process, a plaintiff must show that a liberty or property interest was violated by an arbitrary government action. *George Mason Univ.*, 132 F. Supp. 3d at 727.

> The framework for determining whether liberty interests have been arbitrarily violated varies "[d]epending upon whether the claimed violation is by executive act or legislative enactment." [*Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999)] . . . Where, as here, the government action at issue is an executive act, "[o]nly 'the most egregious official conduct' qualifies as constitutionally arbitrary." *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 150 (4th Cir.2014) (quoting *Huggins v. Prince George's C[ou]nty.*, 683 F.3d 525, 535 (4th Cir.2012)). Egregious official conduct is that which shocks the conscience and is "unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991)[.]

*Id.*

Johnny alleges that Keene deprived him of a liberty interest "by denying his appeals based on her *ex parte* communications with the Hearing Officers" and by "issuing appellate decisions that were arbitrary, capricious, and issued in bad faith." (*Id.* ¶¶ 653–54.)

As discussed above, Johnny has adequately pleaded that he had a liberty interest in his good name and reputation. But Johnny's pleadings as to Keene's specific conduct does not rise to the level of demonstrating that it was "most egregious" or conscience shocking. Though procedural due process "is a guarantee of fair procedures, typically notice and an opportunity to be heard," substantive due process "is an absolute check on certain government actions notwithstanding the fairness of the procedures used to implement them." *Painter v. Doe*, No. 3:15-cv-369, 2016 WL 4650045, at *11 (W.D.N.C. Aug. 1, 2016) (quoting *Burch v. N.C. Dep't of Pub. Safety*, No. 4:15-cv-86, 2016 WL 223710, at *10 (E.D.N.C. Jan. 16, 2016)). In *Painter*, a similar case involving the expulsion of a university student, the court found that "the facts alleged to purportedly support Plaintiff's substantive due process claim actually support his procedural due process claim" because the essence of his claim was that the defendants' "narrowly prescribing Plaintiff['s] inquiries and evidence" and assisting his accuser was in violation of substantive due process because their conduct "shocked the conscience." *Id.* The court held that the plaintiff's argument conflated the issue because "[t]he source of [his] complaint is that he was not given the opportunity to be heard in his disciplinary hearings, which is an issue of procedural due process . . . . He cannot merely invoke the vocabulary of substantive due process to state a claim." *Id.*

That is precisely what Johnny attempts here. He used the alleged *ex parte* communications as the predicate for both his procedural and substantive due process claims, tacking on an allegation that Keene's decision was "arbitrary, capricious, and issued in bad faith." And he did so without critical factual development as to how and why her conduct was so egregious or conscience shocking—beyond, of course, that it deprived him of constitutionally adequate *procedures*, which is encompassed in his procedural due process claim. *See, e.g.*, *George Mason Univ.*, 132 F. Supp. 3d at 728 (noting that the proceeding in question "may well have been flawed, but was certainly not so egregiously flawed as to shock the conscience"). Count 28 will therefore be dismissed as to Keene in both her official and individual capacities.

### G. Negligence Claims (Counts 4, 5, 9, 10, 13, 14, 21, 22, 25, 26, 29, and 30)

The court turns next to the gross and willful and wanton negligence claims as to Defendants Polidoro, Barnett, and Twigger (Counts 4 and 5); DiFillippo and Stayer (Counts 9 and 10); Haines (Counts 13 and 14); Settle and Hartman (Counts 21 and 22); Cureton and McCoy (Counts 25 and 26); and Keene (Counts 29 and 30). Johnny alleges, essentially, that these defendants were negligent in their investigation and adjudication of the allegations against him, and that they were indifferent, or recklessly indifferent, to his right to an impartial and thorough adjudication.

In Virginia, "[t]he elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of an injury, resulting in damage to the plaintiff." *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 624 S.E.2d 55, 62 (Va. 2006). Gross negligence "is a degree of negligence showing indifference to

- 38 -

another . . . that amounts to a complete neglect of the safety of such other person[,]" *Commonwealth v. Giddens*, 816 S.E.2d 290, 294 (Va. 2018), while willful and wanton negligence involves a "conscious disregard of another person's rights or acting with reckless indifference to the consequences[.]" *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 919 (Va. 2004).

Because negligence "is not actionable unless there is a legal duty[,] . . . the threshold question is whether a duty of care exists, under Virginia law, on the part of a defendant to a plaintiff." *Doe v. Wash. & Lee Univ.*, 439 F. Supp. 3d 784, 797 (W.D. Va. 2020). "A federal court is not empowered to recognize a new common law tort that has not been previously recognized by the Virginia courts." *Id.* Defendants argue that Virginia law does not recognize the existence of a special relationship between a university and its students such that the university (though its officials) owes students a duty of care in disciplinary proceedings. Johnny argues that "'the existence of a duty does not depend on proving a particular relationship, but arises from that basic and necessary regulation of civilization which forbids any person . . . [from] recklessly, heedlessly or carelessly injur[ing] another." *See Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 810 (Va. 2018) (quoting *RGR, LLC v. Settle*, 764 S.E.2d 8, 19 (Va. 2014)). Accordingly, Johnny argues, Defendants "could reasonably foresee that a lack of due care in the performance of their duties could injure [Johnny] by resulting in an erroneous finding that he committed sexual assault, in a suspension, or expulsion from VT." (Pl. Br. in Opp. Mot. Dismiss at 26.)

Johnny is correct that general negligence principles "require a person to exercise due care to avoid injuring . . . those within reach of [that person's] conduct[,]" *RGR, LLC*, 764 S.E.2d at 16–17, and that the existence of a special relationship is necessary only when a

plaintiff alleges that the defendant had a duty to protect him against harm from a third person, *Burns v. Gagnon*, 727 S.E.2d 634, 641–42 (Va. 2012). But he has not sufficiently alleged the existence of a duty under general common law principles. Courts within this circuit, applying Virginia law, have found that university officials do not owe students a common law duty to be fair in disciplinary proceedings. *See, e.g.*, *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 589 (E.D. Va. 2018) (finding that "there appears to be no Virginia law establishing a duty" to be fair or to exercise special care during disciplinary proceedings); *Owen v. Liberty Univ.*, No. 6:19-cv-00007, 2020 WL 1856798, at *9–10 (W.D. Va. Apr. 13, 2020) (holding that under Virginia law, Liberty University did not owe a duty of reasonable care in hiring and retaining qualified employees to conduct fair and impartial disciplinary investigations, nor did Liberty faculty members owe a duty of reasonable care in conducting such investigations); *Chitty v. Liberty Univ.*, No. 6:13-cv-43, 2013 WL 3877664, at *1 n.2 (W.D. Va. July 25, 2013) (rejecting a negligence claim based on an argument that Liberty University's law school breached duty of care by refusing to comply with American Bar Association rules in its treatment of plaintiff).

In a very similar case to the one at bar, the plaintiff in *Doe v. Washington & Lee University*—who asserted that the university had a duty "to conduct the disciplinary process with due care"—attempted to distinguish his case from those previously described based on "general principles of ordinary negligence." 439 F. Supp. 3d at 797. The court stated that it "has addressed negligence in a nearly identical context to the one at issue and specifically rejected the idea that a duty exists under Virginia law, 'general' or otherwise, to a [p]laintiff in this position." *Id.* (citing *Jackson v. Liberty Univ.*, No. 6:17-cv-000041, 2017 WL 3326972, at *9 (W.D. Va. Aug. 3, 2017)). Noting that recognizing the plaintiff's theory "would expand

Virginia law and should be approached cautiously[,]" the court dismissed the negligence claim because the plaintiff did not sufficiently distinguish "his circumstances from existing jurisprudence which roundly rejects his theory of negligence[.]" *Id.* So too here. The negligence claims against the relevant Defendants must therefore be dismissed.

**H. Title IX Deliberate Indifference Claims against VT (Counts 16 and 32)**

Johnny alleges that VT[10] violated Title IX and advances two theories: erroneous outcome and deliberate indifference. VT challenges only the Title IX claims under the deliberate-indifference theories: Counts 16 and 32.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). A Title IX plaintiff may pursue a private cause of action against a funding recipient that "engages in intentional conduct that violates the clear terms of the statute." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). The Fourth Circuit has recognized that a plaintiff can plausibly allege a Title IX violation under various theories. In particular, in *Sheppard v. Visitors of Virginia State University*, the Fourth Circuit addressed the pleading requirements for a plaintiff asserting a Title IX claim in the context of higher education disciplinary proceedings. 993 F.3d 230, 235 (4th Cir. 2021). There, the court explained that the circuits are split on that issue between an

---

[10] Johnny brought Title IX claims against VT, the Board of Visitors, Sands, and Keene. Because the court has dismissed the claims against the Board of Visitors, Sands, and Keene, VT remains the sole defendant for the purposes of these claims. Moreover, it is well-settled that only an educational institution that receives federal funding is a proper defendant to a Title IX claim; there is no individual liability, so the claims against Sands and Keene in their individual capacities would be dismissed on this basis as well. *See Does 1–22 v. Bd. of Ed. Of Prince George's Cnty.*, 644 F. Supp. 3d 149, 157 (D. Md. 2022) ("[B]ecause school officials are not themselves recipients of federal funds, they may not be sued in their individual capacities for violations of Title IX." (citing *Jennings v. Univ. of. N.C. at Chapel Hill*, 444 F.3d 255, 268 n.9 (4th Cir. 2006))).

approach articulated by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994), and another articulated by the Seventh Circuit in *Doe v. Purdue University*, 928 F.3d 652, 667 (7th Cir. 2019). *Yusuf* provides that "'[p]laintiffs attacking a university disciplinary proceeding on the grounds of gender bias can be expected to fall generally within two categories, erroneous outcome and selective enforcement." *Sheppard*, 993 F.3d at 235 (quoting *Yusuf*, 35 F.3d at 715). The Seventh Circuit "rejected *Yusuf* as an all-inclusive doctrinal framework for student disciplinary proceedings[;]" instead, it "articulated an approach that more closely tracks the text of Title IX, asking merely 'do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?'" *Id.* (citing *Purdue*, 928 F.3d at 667–68). The Fourth Circuit ultimately adopted the Seventh Circuit's approach, stating that it saw "no need to deviate from the text of Title IX." *Id.* at 236. But the court also noted that it found "no inherent problems with the erroneous[-]outcome and selective[-]enforcement theories identified in *Yusuf*. In fact, either theory, with sufficient facts, may suffice to state a plausible claim. We merely emphasize that the text of Title IX prohibits all discrimination on the basis of sex." *Id.* Plaintiffs, therefore, need not plead a particular theory and may just advance a general Title IX claim against a recipient school. *See, e.g.*, *Ortegel*, 2023 WL 8014237, at *9.

Taking the Fourth Circuit's cues, this court will adopt the Seventh Circuit's approach that the various Title IX theories "simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Purdue*, 928 F.3d at 667. The prevailing question, then, is whether Johnny sufficiently alleged that, through the Jane Roe and Pauline Poe proceedings, VT discriminated against him on the basis of sex.

Johnny relies on a Second Circuit case, *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1097 (2d Cir. 2024), as a roadmap for stating a Title IX deliberate-indifference claim. *Schiebel* provides that "[p]rocedural irregularities such as the recipient's failure to comply with its own grievance policies or with applicable Title IX regulations provide probative evidence of deliberate indifference, and a 'wholesale failure to employ established procedures for investigating sexual harassment complaints' might establish it[.]" *Id.* at 1095 (quoting *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211 (D.N.H. 2009)). The Second Circuit has also held that "a false accusation of sexual misconduct qualifie[s] as [sex] discrimination[,]" and therefore found that the deliberate-indifference theory can apply to the respondent in a university disciplinary proceeding. *Id.* at 1097.[11] The court further explained:

> In *Menaker [v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019)], we explained that when a complainant accuses the respondent not "of just any misconduct" but "of sexual misconduct," the "choice is significant, and it suggests that [the respondent's] sex played a part in her allegations." "A rational finder of fact could therefore infer that such an accusation was based, at least in part, on [the respondent's] sex." *Id.* Indeed, we said that "courts may find it easy to draw an inference of sex discrimination 'in most male-female' scenarios of malicious allegations of sexual harassment . . . because 'it is reasonable to assume those allegations would not have been made concerning someone of the same sex.'" *Id.* at 38 n.88 (alterations omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).
>
> The malicious accuser's sex-based discriminatory "intent may be imputed to [the recipient]" when the recipient "controlled . . . the very complaint process by which she sought to effectuate her allegedly discriminatory intent" and the recipient effectively "implemented" the accuser's "discriminatory design." *Menaker*,

---

[11] Originally, the deliberate-indifference test in the Title IX context applied to situations where a student complained to their school that they were being sexually harassed by a third party—such as a teacher, coach, or another student—and the school failed to take proper action to respond to the complaint. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

> 935 F.3d at 39. If a respondent plausibly alleges that he was
> targeted by a discriminatory accusation, and the recipient
> imposed discipline or sanctions under circumstances that indicate
> deliberate indifference to the truth or falsity of the accusation, the
> respondent has stated a deliberate indifference claim under Title
> IX.

*Id.* at 1097. The court stated that "a respondent may show deliberate indifference through allegations that the recipient's grievance process was so 'objectively deficient' that it cannot be said to have aimed at uncovering the truth, or that its decision was so 'inexplicable' that the same inference could be drawn." *Id.* (cleaned up) (quoting *Roe v. St. John's Univ.*, 91 F.4th 643, 655 (2d Cir. 2024)). Accordingly, the Second Circuit formulated a test for deliberate indifference in this context: A respondent must plausibly allege "facts that raise 'grave doubts as to the merits of the decision itself,' and that the recipient knowingly 'shut[] [its] eyes to [the] risk' that it was imposing sanctions based on a malicious and therefore discriminatory accusation." *Id.* at 1097–98 (cleaned up) (first quoting *St. John's Univ.*, 91 F.4th at 656, then quoting *Delgado v. Stegall*, 367 F.3d 668, 671 (2d Cir. 2004)).

The court agrees with the Second Circuit that, in some instances, false accusations of sexual assault are a form of sex discrimination, and that a university's objectively deficient grievance process can give rise to a Title IX claim.[12] Under the *Schiebel* test, Johnny has adequately pleaded facts that raise "grave doubts" about the merits of the two allegations made

---

[12] Prior to the Fourth Circuit's decision in *Sheppard*, the court had applied the Title IX deliberate-indifference theory only in the sexual harassment context. *See, e.g.*, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 694 (4th Cir. 2007). But because the *Sheppard* court concluded that the heart of the Title IX inquiry is whether a university discriminated against a plaintiff on the basis of sex and does not require strict boundary lines between the different theories, this court finds no issue in allowing Johnny to utilize the deliberate-indifference theory in his Title IX claim and in adopting the *Schiebel* framework as one way to prove sex discrimination.

against him and that VT knowingly shut its eyes to the risk that it was punishing Johnny based on false accusations.

As to the Pauline Poe matter, Johnny pointed to Pauline's roommate refuting much of her story; a state-court judge describing Pauline's testimony as "bizarre" and denying her request for a protective order; Pauline's various false or inconsistent statements during the investigations and hearing, including whether Johnny raped her at knifepoint; and her withholding or materially altering evidence, such as written records from her medical exam from the night at issue, nearly all text messages with Johnny in the days leading up to the alleged assault, and the full text exchange with Johnny from that night. (Compl. ¶¶ 27–28, 36, 125–27, 130–31, 164–81, 182–86.) As to the Jane Roe matter, Johnny pointed to expert witness testimony that Jane was not "incapacitated;" Cadet MS's testimony that Jane did not appear incapacitated from his observations of her conduct right before she went to bed; Jane's text messages following the incident that demonstrated that she and Johnny remained on good terms for weeks and saw each other again; and the fact that Jane received immunity from her own disciplinary proceeding after accusing Johnny. (*Id.* ¶¶ 46–47, 223, 235–39, 242–51, 295–97.)

Johnny's complaint also raises a panoply of issues as to the adequacy of the procedures employed before, during, and after the proceedings. For instance, Johnny points to various issues with Defendants Polidoro, Barnett, and Twigger's[13] investigations of both the Pauline

---

[13] At oral argument, VT claimed that Twigger was the sole investigator for the Pauline Poe and Jane Roe matters and that Johnny was aware of that fact. Even if true, this contention is not relevant because (1) the court considers the allegations as pleaded in the complaint, and (2) the Title IX claim applies only to VT, not to any individual university-official defendant, provided that *some* university official acted with deliberate indifference, that action is imputed to VT.

Poe and Jane Roe matters, such as: not creating a timeline of events for either case; declining Johnny's request to check VT's Canvas for evidence that Pauline took an online quiz within the timeframe of the alleged assault; Twigger telling Pauline not to submit the 48–50 additional photos from her medical examination because her experience with Johnny had already been "triggering enough[;]" Twigger declining to ask Pauline for text messages from earlier in the night of the alleged assault; the Investigation Report in the Pauline Poe matter omitting Pauline's false and inconsistent statements; and the Investigation Report in the Jane Roe matter giving "short shrift" to critical expert testimony. (*Id.* ¶¶ 137–48, 253–62.) Additionally, Johnny alleges that Defendants DiFillippo and Stayer, the Hearing Officers in the Pauline Poe proceeding, mischaracterized his testimony; disregarded at least 17 objectively false and/or inconsistent statements; disregarded that Pauline withheld or altered material evidence; and ignored evidence pointing to plausible motivations for Pauline to falsely accuse Johnny of assault. (*Id.* ¶¶ 162–201.) As to the Jane Roe proceeding, Johnny alleges that Defendants Cureton and McCoy, the Hearing Officers: allowed Jane to opt out of the cross-examination well before it was completed; ignored expert testimony, testimony from fellow students who were in her dorm the night of the alleged assault, and text messages after that night–all of which pointed to Jane's lack of incapacitation; and mischaracterized Johnny's testimony and incorrectly recited an element of the alleged offense in their written decision. (*Id.* ¶¶ 283, 285–309.) Finally, Johnny raises issues with the handling of his appeals in both matters: particularly, that Defendants Haines and Keene, the respective appellate officers, had *ex parte* communication with the Hearing Officers by (unbeknownst to Johnny) allowing them to submit briefs responding to his appeal; that Haines offered no explanation for her decision;

- 46 -

and that Keene used an incorrect standard of review in her determination that the Hearing Officers' decision in the Jane Roe matter was not arbitrary. (*Id.* ¶¶ 206–11, 329–35.)

In sum, Johnny has alleged a litany of facts that, taken together, (1) raise grave doubts as to the merits of the university officials' decisions concerning the merits of Pauline Poe's and Jane Roe's accusations; (2) illustrate procedural defects from the investigations, proceedings, and appeals; and (3) demonstrate that the university—through its investigators, hearing officers, and appellate officers—"knowingly shut its eyes" to the risk that it was punishing Johnny based on false and malicious accusations. The court will deny VT's motion to dismiss Counts 16 and 32.

## V.  CONCLUSION

Accordingly, the court will grant the motions to dismiss in part. Specifically:

1. The Board of Visitors and Defendant Sands as parties from this matter;

2. Count 33;

3. Counts 1–14 and 17–30 as to the university official defendants' individual capacities; and

4. Counts 1–3, 6–9, 11–12, 17–18, 23–24, and 28 as to the university officials defendants' official capacities.

The court will deny VT's motion to dismiss Counts 16 and 31 and Defendant Keene's motion to dismiss Count 27 in her official capacity. Therefore, all Title IX claims (Counts 15, 16, 31, and 32) and a single official-capacity procedural due process claim may proceed.[14]

---

[14] Because Johnny's motion for a preliminary injunction is based only on claims that the court has dismissed—
Counts 6, 7, 23, 24, and 33 (Pl. Mot. Prelim Inj. at 1)—Johnny cannot establish a likelihood of success on the

Because the Fourth Circuit does not require separate Title IX claims based on different theories, the court will recognize two (rather than four) claims of Title IX violations—one for the Pauline Poe matter and one for the Jane Roe matter—and, as the case develops, Johnny is free to use the deliberate-indifference, erroneous outcome, and/or any other appropriate theories to substantiate his Title IX claims.

The Clerk is directed to forward a copy of this memorandum opinion and the accompanying Order to the parties.

**ENTERED** this 21st day of May, 2026.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

merits for those claims. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Therefore, the court will also deny Johnny's motion for preliminary injunction.