UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION

| | |
|---|---|
| * * * * * * * * * * * * * * * |  |
| JOHN DOE | * CIVIL ACTION 7:25-CV-846 |
|  | * APRIL 29, 2026 1:01 P.M. |
| Plaintiff, | * MOTION TO DISMISS/INJUNCTION |
|  | * VOLUME I OF I |
| vs. | * REDACTED |
|  | * |
| VA POLYTECHNIC | * Before: |
|  | * HONORABLE THOMAS T. CULLEN |
| Defendant. | * UNITED STATES DISTRICT JUDGE |
| * * * * * * * * * * * * * * * | * WESTERN DISTRICT OF VIRGINIA |

APPEARANCES:

For the Plaintiff: JAMES FRASER, ESQUIRE
P.O. Box 3092
Annapolis, MD 21403

PARKER A. BOWMAN, ESQUIRE
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, VA 22314

For the Defendant: NATHAN H. SCHNETZLER, ESQUIRE
Frith Anderson & Peake, PC
29 Franklin Road, S.W.
Roanoke, VA 24011

MARVIN H. MCCLANAHAN, ESQUIRE
Office of Uni. Legal Counsel, VPISU
800 Drillfield Drive
Blacksburg, VA 24061

Court Reporter: Whitney M. Stier, CVR-CM-RVRM/CCR-VA/MO
116 North Main, Room 314
Harrisonburg, Virginia 22802
(540)434-3181, Ext. 8510

Proceedings recorded by voice stenography.
Transcript produced by computer.

(Proceedings commenced at 1:01 P.M.)

THE COURT: Ms. Kemp, would you call the case for us?

THE CLERK: Yes, Your Honor. We have *John Doe v. Virginia Polytechnic Institute And State University, et al*, Civil Action Number 7:25-CV-00846.

THE COURT: All right. Who do we have for the plaintiff, John Doe?

MR. FRASER: James Fraser for the plaintiff, Your Honor.

THE COURT: All right.

MR. BOWMAN: And Parker Bowman for the plaintiff, Your Honor.

THE COURT: Okay. So Mr. Bowman and Mr. Fraser?

MR. FRASER: Yes, Your Honor. That's it.

THE COURT: All right. Thank you.

Mr. Schnetzler, good afternoon.

MR. SCHNETZLER: Good to see you, Judge.

THE COURT: Good to see you. You're here on behalf of the approximately 18 defendants?

MR. SCHNETZLER: Yes, Your Honor.

THE COURT: All right. Good to see you.

Okay. Let me note for the record the following. The plaintiff, Mr. Doe, who was suspended and then expelled from Virginia Tech after being found responsible for sexually assaulting Jane Roe and Pauline Poe -- both pseudonyms for the

alleged victims -- filed this suit against Virginia Tech, its board of visitors, its president, its vice president for student affairs, and nearly a dozen other Virginia Tech administrators who were involved in some capacity in the investigation, adjudication, and appellate review of the two sexual assault claims.

Mr. Doe seeks injunctive relief, specifically expungement, of the expulsion from his Virginia Tech transcript, both on a preliminary and then a permanent basis; a declaratory judgment, $10 million in compensatory damages and $10 million in punitive damages. All told, he brings 33 separate claims, including claims against Virginia Tech for alleged violations of Title IX and claims against numerous Virginia Tech administrators in their individual capacities for alleged violations of his procedural due process, substantive due process, and equal protection rights, as well as for violations of Virginia law.

The defendants have filed a motion to dismiss arguing, among other things, that various defendants are not subject to suit, that the Virginia tech employees sued in their individual capacities are protected under qualified immunity because the constitutional rights at issue are not clearly established in the Fourth Circuit, and that several of the plaintiff's causes of action fail to state claims upon which relief can be granted.

I also set the matter for hearing on the motion for preliminary injunction, and my plan is to take up the motion to dismiss first, and then we can talk about the preliminary injunction after that.

So with that, Mr. Schnetzler, I'll be happy to hear from you on behalf of all the defendants.

MR. SCHNETZLER: Thank you, Your Honor.

May it please the Court. Nathan Schnetzler from Frith, Anderson, and Peake on behalf of all the defendants in this case, along with my co-counsel from University Legal Counsel, Office at Virginia Tech.

Your Honor, with respect to the motions to dismiss, as you noted, there are 33 separate claims that need to be addressed -- well, excuse me, 32 separate claims that need to be addressed in light of the fact that Virginia Tech has not moved to dismiss one of the Title IX claims. That's the Title IX erroneous outcome claim.

THE COURT: Which would be reflecting counts 15 and 31? So there are two separate counts based on erroneous outcome, one as it pertains to Pauline Poe and one as to Jane Roe?

MR. SCHNETZLER: Well, there's two Title IX claims I guess with respect to each --

THE COURT: Each alleged victim?

MR. SCHNETZLER: Right.

THE COURT: So four total?

MR. SCHNETZLER: Correct, Your Honor.

THE COURT: Right.

MR. SCHNETZLER: And so we have an erroneous outcome claim as to both, and then a deliberate indifference claim as to both.

THE COURT: Right.

MR. SCHNETZLER: So four separate claims have been laid out in the complaint.

THE COURT: And as I understand it, you all concede, for purposes of 12(b)(6), that the plaintiff has plausibly stated a claim based on erroneous outcome as to those two victims, whether it's one claim or two claims?

MR. SCHNETZLER: Correct, Your Honor.

THE COURT: Okay. All right.

MR. SCHNETZLER: So, Your Honor, moving I guess in perhaps the simplest order -- or maybe not; I could be wrong -- with respect to defendant Martha Glass, we've argued that the claim against her is barred by the statute of limitations. The plaintiff's opposition claims or argues that the -- or excuse me, the opposition, I think --

THE COURT: Invokes an equitable estoppel?

MR. SCHNETZLER: Correct, Your Honor. And this just simply isn't a situation where equitable estoppel would apply, one, because there's no allegations that -- for anyone at

Virginia Tech engaging in any sort of fraud or active affirmative act to conceal any information. And I think going even a step further, Your Honor, with respect to the tolling argument, the testimony that the plaintiff tries to latch on to from a separate case doesn't even really -- doesn't involve Ms. Glass, doesn't suggest that Ms. Polidoro and Ms. Glass had communications about this case. So under the two-year statute of limitations for the 1983 claim against Ms. Glass, we would argue that's time-barred and should be dismissed.

THE COURT: All right. And I know enough from what's alleged in the complaint to make that call at this stage versus later.

MR. SCHNETZLER: Thank you, Your Honor.

Moving on to the procedural due process and substantive due process claims -- and I'll take these a bit in piecemeal because we're really looking at really separate processes that are connected, but separate processes with respect to how these complaints of a sexual assault are handled at Virginia Tech.

And the first part of that process is, once a complaint's been filed, there's an investigation. So we have allegations by the plaintiff that there were three investigators involved in this; Ms. Polidoro, Ms. Barnett, and Ms. Twigger. Based on the references and the multitude of footnotes in the complaint, Mr. Doe very much relies on the

investigation reports themselves, as well as the outcomes, as well as what happened at the hearing in this case. And so we believe the Court can properly take notice of the investigation report that we provided for both cases, obviously with the parties' -- Mr. Doe's name redacted as well as the complainants and witnesses to the extent we could.

At bottom, Your Honor, before we even get into questions about whether there was a property interest or a liberty interest at issue in this case, with respect to the investigators, one, the investigation report shows that there was one investigator involved in this whole process. John Doe knows that. Mr. Fraser knows that. And so the allegations that Ms. Polidoro and Barnett were actually actively involved in the investigation just simply aren't borne out based on I think what the plaintiff himself knows as well as his counsel.

But going even further, there's no actual deprivation that results from the investigation in this case, or really in any case involving Virginia Tech. There have been a number of decisions that have been written about Virginia Tech's process, and the one clear point is that the investigation does not result in any sort of finding, any sort of credibility determination. It is merely a fact-gathering process. And as a result, even though this investigation report is sent to Ms. Polidoro to review and then referred over to the student conduct office, the investigator, specifically Ms. Twigger,

doesn't do anything that actually deprives Mr. Doe of a property interest or a liberty interest. That comes through a separate --

THE COURT: Hearing.

MR. SCHNETZLER: -- hearing, and that's where Mr. Doe, again, gets a meaningful opportunity to participate in a hearing as well as advance notice of the charges that are against him. So for that reason alone, we'd argue that the claims about the investigation are not sufficient to state a claim for a violation of procedural or substantive due process.

THE COURT: What about this argument the plaintiff makes that insofar as you conceded the erroneous outcome, at least that it's plausible, that he has a viable claim, you've somehow conceded that he also has constitutional 1983 claims for procedural due process, substantive due process, and equal protection that survive any qualified immunity analysis?

MR. SCHNETZLER: As we noted in our brief, Your Honor, that -- that argument simply doesn't fly. The reason is because Section 1983 is intended to protect constitutional rights, not merely just a violation of federal law. And so for that reason, the argument that we -- because we conceded for purposes of 12(b)(6) that the erroneous outcome claim can move forward, that is not sufficient to state a claim because what's at the heart of a due process claim is some violation of a liberty interest or a property interest. If that's --

THE COURT: In other words, there may be some overlap in terms of the evidence with respect to how they apply to these claims. Each claim is separate and distinct and has separate sources?

MR. SCHNETZLER: Correct, Your Honor.

THE COURT: Okay.

MR. SCHNETZLER: Absolutely.

Now, taking the procedural due process claim as to the investigators and hearing officers and the appellate officers as well, one, qualified immunity would bar those claims that really cannot genuinely be disputed in this case.

THE COURT: And that, at the end of the day, is how you analyze this. Right? In terms of procedural due process, the Fourth Circuit, let alone the Supreme Court, has never held that a university student has a property interest in continued enrollment and stop. Correct?

MR. SCHNETZLER: That's correct, but there's also another hook to this argument by the plaintiff, and that's the liberty interest that was recognized by the Fourth Circuit.

THE COURT: But after this happened?

MR. SCHNETZLER: Absolutely, Your Honor.

THE COURT: So it wasn't clearly established at the time?

MR. SCHNETZLER: Absolutely, Your Honor.

THE COURT: And that takes care -- I mean, I don't

see any way around that.

MR. SCHNETZLER: Neither do I.

THE COURT: And look. You can take issue with the Fourth Circuit who's assumed it and the Supreme Court's done the same thing. And for whatever reason, over the last decade-and-a-half, the Fourth Circuit's just not been willing to wrestle with this. And unless and until they do, like they did in *Doe*, it's not clearly established.

MR. SCHNETZLER: Correct. And in all candor, Judge Urbanski did find that a property interest existed at the summary judgment level in a separate case.

THE COURT: And Judge Dillon in the JMU/Alger case, but she did so in that case, as I understand it, because in JMU's answer, they conceded that the student -- the handbook created some property interest.

MR. SCHNETZLER: Correct. There were two levels to that issue; one was on the 12(b)(6) where she said -- what Judge Dillon said in the JMU case, I'll give you the opportunity to prove it. Very same thing Judge Urbanski did in the John Doe case that he handled with Virginia Tech. It went then to the summary judgment stage, and JMU, in their case, had conceded in their answer that there was a property interest.

So, again, qualified immunity would bar these individual capacity claims really against everyone and result in dismissal of those individual capacity claims. That sort of

-- and if I'm sort of moving out of order --

THE COURT: That's all right. So I think it logically follows then, okay, you have potentially some official capacity claims, Ex parte Young, and the key there is it would only apply to someone who has the power to fix the transcript. And looking at the plaintiff's complaint, I think that person, if anyone, is Dr. Keene, the vice president for student affairs. Okay?

So let's assume that's true, and in *Doe*, we know that you can, in this context, prospective injunctive relief is available to correct a transcript. Dr. Keene is the person who is able to do that. There are two claims against her in her official capacity related to, I believe, the appellate review of the Jane Roe matter. So I think we have to analyze that separately. And plaintiff, as I understand that allegation, essentially says Virginia Tech, in its policy, says that the appellate review is separate from the -- everything that happens before that. They're in separate departments, the hearing officers and the appellate official. And what they allege, based on that case that you all have, I believe, with Judge Dillon, in a deposition in that case, is that what Virginia Tech does is have the hearing officers write a bench memo to the appellate officer that the appellate officer then relies on to make her decision, and the allegation from that is that that violates policy because there's not a clear

separation.

MR. SCHNETZLER: I think that's -- and maybe I've not read the complaint in the same way, Your Honor, as you just described. But my understanding of the position the plaintiff's taken is not necessarily that there are -- because they are within the same office. The hearing officer and appellate office --

THE COURT: Okay.

MR. SCHNETZLER: -- sort of are in that student --

THE COURT: They're still in student affairs?

MR. SCHNETZLER: Correct, Your Honor. And so it's more along the lines of I guess an argument -- and this is going to get a little confusing -- but ex parte contacts in the context of whether Ex parte Young should apply, and I came across, in preparation for today, Your Honor, the Fourth Circuit ruled on a case that I believe involved Virginia Tech. It was *Mills v. Steger*. This is 64 F.App'x 864, 2003. And it talks about -- this is in the context of a dismissal of an employee. But what the Fourth Circuit said in *Mills* -- and this is a direct quote, Your Honor, at Page 870 -- is the fact that some of those involved in approving Mills' termination received ex parte communications does not, by itself, create a due process violation. And it goes on to cite the *Duffield v. Charleston Area Medical Center* case, a 1974 Fourth Circuit decision.

It goes on -- the court went on to say the ex parte communications are generally only due process violations when the information contained in them is both new and material, which makes sense. Right? And that's exactly what happened, I believe, in the JMU case that Judge Dillon had. That there was some additional information that the student wasn't privy to or wasn't allowed to respond to. There's no allegation that there's been new information that's been provided.

And again, trying to utilize what happened in another case years prior whereas there are no direct allegations that the hearing officers actually did have any communications with Ms. Keene in regard to the appeal that she handled, it wouldn't be sufficient to establish a due process violation under the *Mills* case because there's no allegation by the plaintiff that Ms. Keene was provided with new information that perhaps influenced her decision or that the information that she got, even if it was new, was material. So we've got a two-part test there that's got to be pled that simply hasn't been pled. And so for that reason, Your Honor, with respect to official capacity, the claim would fail.

But even more, I think from a fundamental standpoint, Your Honor, the true defendant is the state. It's Virginia Tech. Virginia Tech is the one that can change. And because, you know, you never know who you're going to run into in terms of what persons role is at the University and what authority

they have to make these changes. But the fact of the matter is, Virginia Tech has been named as a defendant. The official capacity claims are truly against Virginia Tech, not these individuals. And for that reason, we would ask that Ms. Keene be dismissed in her official capacity, as well as the other defendants as well for the reasons you already stated, Your Honor, with respect to their lack of proximity to --

THE COURT: The transcript.

MR. SCHNETZLER: -- the transcript. But the basic fact of the matter is that there's really one true defendant in this case, and that's Virginia Tech, if the due process claims can even go forward.

And so, on due process, we have to determine whether the plaintiff had notice and a meaningful opportunity to be heard with respect to these student conduct hearings. And based on the allegations in the complaint, based on the additional attachments to our motions to dismiss, there absolutely was notice and a meaningful opportunity for this plaintiff to participate in these student conduct proceedings. Due process does -- it guarantees you that notice of an opportunity to be heard. It doesn't guarantee you the right to be found innocent. And that seems to be sort of how the plaintiff is trying to put this -- trying to present this case.

And so there was a lengthy hearing. Mr. Doe had the opportunity and took advantage of the opportunity to put

information into the record, both during the investigation as well as at the hearings.

THE COURT: Well, look. I mean, I'll stop you there. I mean, I think ultimately, if you win on this -- and I think you do -- it's because the rights at issue aren't clearly established. But set that aside. If I didn't have to contend with that -- and I think all of this is relevant for purposes of the defendants' Title IX claims, which I think are viable -- you know, the issue in terms of due process with Pauline Poe -- start with her, and then I think it applies with Jane Row as well -- is you have a young man who's accused of very serious sexual misconduct, who, from day one, vehemently protests his innocence, and marshals significant evidence, both with respect to Pauline Poe and Jane Roe, that, in my mind, would cause a neutral objective fact finder to stop and have real pause about whether these allegations and the accusers are credible.

When you're talking about Pauline Poe, you have someone who went into court and then went into the Virginia Tech process claiming that this young man pulled a knife on her. She omitted that fact from her report to the police who initially. She withheld certain evidence, she apparently doctored a text message, and there are some other, I think, glaring issues with her.

With respect to Jane Roe, I think he's got an even stronger case in that she waited five weeks to file this

complaint. She did so on the eve of her own disciplinary hearing where, according to the plaintiff, she could have been expelled or lost her scholarship through ROTC. She testified, oh, I just would have had to march on the weekend. I think the allegation is she's significantly minimizing her real exposure. So you have that. But then you have eyewitnesses, or at least one, who said, it's actually Johnny who was more intoxicated than the complainant. You have the fact that she walked another student home. She wrote coherent text messages while she did that. She changed her clothes and she got into her own bed where she had put Johnny minutes before that.

And then he had the testimony of an expert, this Ph.D. psychologist from the University of Pennsylvania Medical School, who apparently consults with the Title IX accrediting agency, who said, I've looked at all this and there's no evidence that this young lady was incapacitated as that term is defined under Virginia Tech policy. And then to boot, you have the hearing officers, who write in their written report, that the standard is we find -- here's the standard, and then they cite that correctly, but then they say, we find that she was incapacitated and that Johnny knew she was intoxicated. Right? So they used the wrong term, which, you know, cause you to question the outcome.

That's a long-winded way of saying you win, I think, on these constitutional claims because the rights aren't

clearly established. But I think your best argument is to say he necessarily got due process or a fair shake to the preceding. I mean, there's a lot here, and there was a lot in there that didn't need to be in there, and it does too much and it tries too much. But in terms of did this kid get a fair shake and was the process fair from start to finish and did he have a meaningful opportunity to try to prove that these things didn't happen? I'm not sure that's the case.

MR. SCHNETZLER: And I appreciate your comments, Your Honor, but the fact is, is due process is not result focused. It's process.

THE COURT: Sure.

MR. SCHNETZLER: And so while yes, Mr. Doe has plenty to complain about with respect to how he believes these cases were mishandled, again, the result -- and this -- taking us a step back probably is that the purposes of this case and bringing these types of cases is not to relitigate a student conduct matter that university administrators handled. And they're charged with making credibility determinations. If they got that wrong, it doesn't necessarily lead to the separate conclusion that Mr. Doe didn't have notice of the charges against him and the opportunity to be heard.

THE COURT: That's a fair point.

MR. SCHNETZLER: And I think that's where, you know, really this claim -- these claims in this case are really more

directly funneled under a Title IX erroneous outcome lens rather than a constitutional violation, because we really are talking about very different substantive rights when we're talking about the Constitution versus Title IX.

And so I agree with you on individual capacity. I think the Court can really dispense with those claims very, very quickly and efficiently. But we'll still have to somewhat wrestle with this official capacity claim. And I'm focused on procedural due process right now, but we'll have to wrestle with that, if I'm understanding correctly, probably with Ms. Keene.

THE COURT: That's how I see it. I don't see any other official, in terms of Ex parte Young, who's in a position or has a connection to the enforcement action.

MR. SCHNETZLER: And so that then -- Your Honor, you know, the allegations as to Ms. Keene are just focused on the appeal. And so we're really looking at a different lens of the process --

THE COURT: Sure.

MR. SCHNETZLER: -- or a different capacity of the process as well. And really, the only allegation with respect to Ms. Keene and the other appellate officer, Ms. Haines, is plaintiff's believe that they just didn't review the appeal and his disagreement with their affirming the appeal even though it's clear that the appeals aren't a *de novo* review. There

isn't any -- there are very limited bases that these appeals can be asserted. And so for that reason, we don't believe that the official capacity claim could go forward as to Ms. Keene as well.

THE COURT: What about equal protection? I mean, this is an interesting claim, and I would characterize it as novel and, unfortunately for the plaintiff, because it's novel, I don't think it's clearly established that you're entitled to the same standards in off-campus sexual assault investigations as you are with on-campus for purposes of a constitutional claim.

But essentially, what's alleged is, in 2020, the Department of Education promulgated new guidance, right, from the first Trump administration, and what plaintiff says is the administrators at Virginia Tech didn't like that and they wanted a workaround. They understood that nearly 100 percent of respondents in these cases are men, so they created this two-track system where they afforded the men who are accused of sexual misconduct off-campus with fewer protections, including no right to have the attorney or student advisor cross-examine, and no presumption of innocence.

Interestingly, the plaintiff immediately goes to rational basis, and you latch onto that quickly, smartly. But why isn't how that is initially framed, why is it necessarily rational basis? I mean, isn't this essentially, like,

gender-neutral on its face and they're alleging discriminatory intent, so you look at the *Arlington Heights* and all of that? They've essentially conceded it's rational basis, so maybe I'm reading too much into this.

MR. SCHNETZLER: Well, and I don't think my argument was as cogent as I would have liked on this issue in my brief. But with respect to equal protection, there first has to be some showing that the difference of the result is discriminatory animus, even before we get to what, you know, review we're going to look through, look at this issue here. And there's no allegations of -- that would support any suggestion that there was really discriminatory animus because the parties are treated the same, you know? In the Title IX proceedings, they both have the right to an advisor, they have a right to the advisor doing cross-examination. They're not treated differently in the non-Title IX gender-based violence context is how I like to think of these sort of -- for example, Pauline Poe was off-campus. It didn't --

THE COURT: Right.

MR. SCHNETZLER: Didn't qualify under Title IX.

THE COURT: Except that you can't have an attorney cross-examine the accuser, and that's a significant deal.

MR. SCHNETZLER: And that, number one, Your Honor, the *Doe* case from the -- the University of North Carolina case from 2025, that was the first time the Fourth Circuit even

recognized the right to cross-examination.

THE COURT: Right.

MR. SCHNETZLER: And that's cross-examination generally, not just even through an attorney. The Fourth Circuit's precedent is still clear that you don't have a right to an attorney, or at least a constitutional right to an attorney, in these types of cases. But then the UNC court really left open how we're going to evaluate --

THE COURT: What does that mean?

MR. SCHNETZLER: -- what is meaningful cross-examination? Can it be accomplished through hearing officers? Can it be accomplished by the -- you know, by student, him or herself? Does it necessarily require an attorney, or even a non-attorney advisor? I mean, these are questions that are still left open under the UNC case. But again, going back, I think before we even reach some of these questions, the Fourth Circuit, just last month in *Anderson v. Crouch* -- this is 169 F.4th 474.

And Judge, this was looking at some legislation that had to do with transgender and bans on certain treatment, and the Fourth Circuit lays out the initial question very, very clearly. To prevail on the equal protection claim, plaintiffs must first show that the challenge exclusion discriminates because of sex or transgender status. And because they failed to do that in that case, the court really didn't need to get

into whether -- you know, whether it was rational or not, because if we don't have discriminatory animus, there's no reason to get into whether or not there's a rational reason for why they do that.

THE COURT: And I guess the argument would be that you can't just use the 40 pages of the general atmosphere on campus and the dear colleague letter and the fact that the lady -- I can't remember her name -- who was the head of OCR in the Obama administration comes back. That's not enough. You have to point to something more than that specific to the individuals involved.

MR. SCHNETZLER: And really specific for purposes of similarly situated. You know, how it's applied. You know, if you're claiming it's based on gender, where's the allegation that people of the opposite sex in these non-Title IX cases are being treated differently? That's the -- that's the lens that we believe the Court has to look at that issue.

The other aspect of the equal protection claim that the plaintiff asserts is that there's no presumption of non-responsibility.

THE COURT: And I read the affidavit that you all submitted in response where -- was it Dr. Keene, or I don't know, somebody said --

MR. SCHNETZLER: It was Mr. Settle.

THE COURT: Mr. Settle said yes, there is. But then

I went and read the actual policy, and I don't see it. It's not in there. So in the language favorable to you, I guess what he's saying is that it's implied, but it's not stated directly in the policy.

MR. SCHNETZLER: It's not, and I wouldn't ask the Court to consider Mr. Settle's declaration for purposes of the motion to dismiss. I think that would be going too far afield.

THE COURT: Right.

MR. SCHNETZLER: But the fact of the matter is, is there is an allegation that Virginia Tech actually presumes they're responsible. So I think going a little -- requiring the plaintiff to show that there is some sort of agreement or conspiracy to we're going to not follow this presumption of non-responsibility in these cases that I think just really stretches too far when you don't have any sort of allegations of the conduct or some sort of concerted effort to hold these people responsible until proven otherwise.

For that reason, we don't believe the equal protection claim would fly, either. And as Your Honor noted, the qualified immunity is another issue that you have to wrestle with in context with this, and neither of those would be with respect to the right to cross-examination and the presumption have not been clearly established.

Now, turning back to due process, Your Honor, the plaintiff's also attempted to allege substantive due process

claims. I think that's a very clear-cut issue as well for Your Honor to handle. And basically, it's black letter law, and the Supreme Court in the *Dobbs* case has recently -- you know, has stated that, you know, these are very narrow types of claims and rights that we're going to protect. And the liberty interest really is what is primarily the focus for these substantive due process claims. Not entirely, but the interest at issue really needs to come from either the Bill of Rights or it needs to come from some deeply-rooted historic aspect of our nation's tradition.

And where we are on that issue, again, and qualified immunity would apply with respect to the liberty interest not being clearly established, but just the fact of the matter that the interest in good name and reputation has not been the type of claim that would be subject to a substantive due process analysis. And I think there's cases in the employment law context like public employees. The Fourth Circuit has taken that position as well. You might have a property interest for purposes of a procedural due process claim as a public employee, but it's not so -- even if it's going to come with some sort of stigma, it's not the type of case that rises to the level of substantive due process protection.

And so, Your Honor, we'd ask that those -- those claims as well be dismissed against those defendants that have been named for those claims.

I want to talk about Title IX deliberate indifference next. This is also another novel claim, I believe.

THE COURT: Well, I mean, it's novel insofar as the Fourth Circuit hasn't explicitly recognized it.

You know, the way I look at this, now Justice Barrett, when she was on the Seventh Circuit, wrote the *Purdue* opinion, and she said that erroneous outcome, deliberate difference, antiquated assumptions, and selective enforcement, she referred to them as doctrinal tests. Right? These are ways that a plaintiff can prove a Title IX violation. And for purposes of essentially a 12(b)(6), what matters is whether the alleged facts accepted as true give rise to a plausible inference that the University discriminated on the basis of sex.

So as I -- I mean, as I look at this at the threshold, I think for sure -- and you can see erroneous outcome for purposes of 12(b)(6) -- Johnny has stated a claim for a Title IX violation, both as it pertains to Pauline Poe and Jane Roe. How he proves that I think is yet to be determined. And if it were up to me, I'd say, you know, you go through discovery, we have summary judgment, and at that point, you tee up, you know, his theory is erroneous outcome and deliberate indifference. Can he pursue both, has he proven both, et cetera. But I would be happy to hear you now on if you don't that's a viable option at this point.

MR. SCHNETZLER: And I don't, and really, because when the plaintiff affirmatively tries to couch these claims, I think we have to look at them individually and determine whether or not they state a claim. And Judge Dillon has addressed this issue very clearly as well in the *Ortegel* case. You know, in that case, the plaintiff didn't try to use the -- sort of any doctrinal test. Just sort of said this is discrimination under Title IX, you know, Count One or whatever count it was.

THE COURT: Right.

MR. SCHNETZLER: And despite having some vigorous back and forth with Judge Dillon, she said that's enough. He doesn't have to rely on erroneous outcome. Those are -- if he takes that step to go down that road, well, fine. We'll look at that. But if the plaintiff is just broadly alleging a violation of Title IX, well, we're going to then look at all the totality of the circumstances.

And so here, where the plaintiff's affirmatively pled and pigeonholed these claims in terms of erroneous outcome and deliberate indifference, well, what is the point of a deliberate indifference claim? And that is to establish that the University ignored some sort of sexual harassment against the plaintiff. And there just aren't facts to support that theory that is pled here. And the argument --

THE COURT: Or I would characterize it as he turned a

blind eye to a false accusation of sexual assault. Right? I think that's what Scheible, right, would say that's how you would define.

MR. SCHNETZLER: Right. And that is how the Second Circuit has looked at it. And I just -- I believe the factual allegations are just, one, materially different from Scheible and the allegations in this case. You know, you don't really have -- while John Doe certainly vigorously defended himself throughout all these proceedings, he's not claiming that he's being harassed or retaliated against and the University's doing nothing about it. I mean, and plus, the University was doing something. The University conducts lengthy investigations, holds lengthy hearings in these cases.

THE COURT: Yeah, but I think the counter to that -- and the plaintiff essentially makes it in that 200-page complaint -- is that, you know, he's putting forth this evidence that he says is exculpatory and that he says impeaches the complainants until he's blue in the face, and at every turn, there's this apparent refusal in the light most favorable to the plaintiff to really wrestle with that, right, to address it in a meaningful way some of this evidence, like I would, like you would, you know, like a lawyer would. You can't just, you know, set it aside and conclusory state that I find this person more credible than that when there's all these reasons why that might not be the right outcome.

MR. SCHNETZLER: I understand. And maybe it's a better issue to address on summary judgment as to whether that theory will fly going forward.

THE COURT: Yeah. And I think one of the points you made is this fails because you've got to allege that Virginia Tech had notice. He didn't file his own Title IX complaint. Therefore, they didn't have notice. Isn't the counter to that, protesting your innocence is probably sufficient notice? Like, you don't have to actually file. I mean, that certainly would do it, but is that required?

MR. SCHNETZLER: It's a position someone could take, but I think that the cases really -- the deliberate indifference case law that we have is based on these situations where the University really has ignored, like, a student. And in all candor, I mean, the majority of the deliberate indifference cases stem from the complainant. Right? It's the complainant who's saying, hey, the University didn't do anything when I reported X, Y, or Z.

THE COURT: Sure.

MR. SCHNETZLER: And so, again, there are two aspects to this, and it's, one, whether or not I guess the conduct at issue that is being accused of the sexual assault matters is sufficient in and of itself to give rise to deliberate indifference if you're protesting your innocence. But two, did the University do anything in response to your protest?

And the University did in this case, and that's where, you know, they allowed Mr. Doe to submit lots of submissions and evidence and make arguments and various other attempts to prove his -- to demonstrate his innocent of these allegations. And so that is not ignoring the -- that's not ignoring the plaintiff's protestations. That's actually engaging with the -- with the respondent and providing them that opportunity to participate. And so that, again, would be -- if we're looking at it from what we commonly know as deliberate indifference, which is definitely a higher standard than negligence, then you have to show that they ignored the plaintiff, and that's just not borne out in the allegations and the complaint, even in the light most favorable, Your Honor, from our position.

THE COURT: I think that leaves the state law, the negligence-related claims.

MR. SCHNETZLER: It does. I believe so. I'm trying to look at my roadmap here. I've got -- it's like trying to look at the roads around New York and figure out where you are.

But with respect to the state law claims, there are no ordinary negligence claims asserted, I think, for good reason. But in any event, so there are gross negligence claims and willful and wanton negligence claims. And at the very outset, Your Honor, there's been no -- no court has recognized any sort of duty of care a university official owes to a

student. And so for that reason, we believe the negligence claim fails, particularly as to Ms. Hartman who is an Assistant Attorney General and was representing her client. That, had I been representing a private entity, would have probably resulted in a Rule 11 letter. But in any event, she certainly owes no duty of care to the plaintiff; she owes a duty to her client, the University.

And so then similar to what I just argued with respect to deliberate indifference, even if the courts would assume that there were a duty, the Court has to look at the gross negligence law under Virginia law, which is pretty -- it's a pretty highly hurdle. The exercise of some care will eliminate a gross negligence claim. And here, I believe that it's, again, borne out, just as with to deliberate indifference, that there were actions taken to try to give Mr. Doe an opportunity to prove his innocence.

And so -- and I think specifically -- and Judge Urbanski just issued a decision a couple of weeks ago, I believe -- Milne v. Move Freight Trucking. The LEXIS cite is 2026 U.S. District LEXIS 71242 -- talking about gross negligence. That was a trucking case on I-81, Your Honor, so I understand completely different factual scenario. But the analysis is applicable because, looking at some care, what that driver did in those circumstances amounted to some care.

And what's key there is that Judge Urbanski keyed in

on the fact that if you have gross negligence -- if you can't state a claim for gross negligence or can't prove gross negligence, you can't establish willful and wanton as well. So we believe the willful and wanton would fail, really for kind of two reasons, one being can't establish -- or three. No duty, can't establish gross negligence because of the exercise of some care by these individual defendants, and then four (sic), even if the Court disagreed and said, you know, there's no exercise of some care, there's really no allegations of the malice and ill-will necessary for a willful and wanton claim under state law.

And then lastly, Your Honor, this is a bit of the tail wagging the dog, but there is a separate count for declaratory relief, and we've argued that's a remedy, not a cause of action --

THE COURT: It's a separate cause of action.

MR. SCHNETZLER: -- and ought to be dismissed.

And, you know, I think it's important as well, Your Honor, that a lot of these issues really weren't opposed in the briefing. You know, there were several arguments we raised that just simply weren't responded to, first being that the Board of Visitors is not a party that's subject to suit. The plaintiff didn't oppose our argument that Virginia Tech is the real defendant for the official capacity claims such that they could possibly survive in the Title IX claims. It's been, you

know, unopposed that the property and liberty issue at issue were not clearly established. The plaintiff did not engage with our argument that the investigators did provide due process in the investigation, even if that could serve as a basis for a due process claim. Or that they had caused any deprivation in that sense.

And so, by not opposing those, Your Honor, we believe that they should be deemed conceded because they were never really raised in the briefing before the hearing, Your Honor.

So for those reasons and the reasons on brief, we would ask that all the claims be dismissed with prejudice, of course, with the exception of the Title IX erroneous outcome claim against Virginia Tech.

THE COURT: Thank you, Mr. Schnetzler.

MR. SCHNETZLER: Thank you, Your Honor.

THE COURT: Mr. Fraser?

MR. FRASER: Thank you, Your Honor.

I'll be quite upfront with you -- and I appreciate your candor today in talking about the various claims because it is helpful to me to see where we need to go.

THE COURT: I've spent considerable time on this. And this is your first appearance before me, but I try to get right to what I believe are at heart of the issues.

MR. FRASER: Again, I appreciate that, Your Honor.

THE COURT: And look, let me just say with respect, I

mean, you have a whole host of individual capacity claims, the procedural due process, the substantive due process, and equal protection claims. In my mind -- and, you know, we do these cases all the time. *Doe*, as to substantive due process, was not decided until after this happens. For whatever reason, the Fourth Circuit has never held that you have a property interest in continued enrollment. And I think the equal protection claim in terms of one track, two track, is so novel it's certainly not clearly established. You can't look to Title IX to make it. So if I were to say you plausibly stated those claims over the qualified immunity arguments of these defendants, what will happen is Mr. Schnetzler is going to file an interrogatory appeal and he's going to win, but it's going to take two years, and then you're going to be back here in the same position as you are right now.

MR. FRASER: I appreciate that. And I'll tell you, Your Honor, I think Mr. Schnetzler has been doing this a lot longer than I have. I will tell you, prior to October of 2023, I had never dealt with Title IX or any of this. I can tell you -- and this is part of the reason that this complaint is so long -- is that in that two-and-a-half years, I have tried to learn as much as I possibly can. And I think it probably comes across in the complaint, but one of the frustrations that plaintiffs in these cases have, these young men who go through this process, is a lot of courts just sort of throw up their

hands and say, well, there's nothing we can do; too bad.

And I put a quote from Judge Wilkinson at the front of the brief from the oral argument in the North Carolina case, and I can tell you, I listened to the entire oral argument. He made that comment after the University of North Carolina's lawyers kept repeatedly saying, oh, this young man, he got an opportunity, he was given the charges, he got an opportunity to have his say, and it doesn't matter that the complainant got up and left the hearing halfway through the hearing, and there was no opportunity to finish the cross-examination. And that's where Judge Wilkinson sort of threw his hands up and said, you are holding rump proceedings that are ruinous to lives.

THE COURT: And I wholeheartedly agree with that sentiment, and I will tell you this. I mean, if we didn't have the clearly-established issue and the limits on cross-examination could support a viable claim, it's a real claim, particularly with respect to Jane Roe. As I understand it, you were the representative in that matter. I listened to that entire hearing, and she shut it down as soon as you got to the meat of cross-examination in terms of prior inconsistent statements, her biases, her interest, the text messages, the fact that she invited the young man back over to her apartment. She shut it down at that point.

In any other tribunal, if a witness said, I'm done, what happens? You strike the witness's testimony. That

doesn't happen in these proceedings, and I understand why that's enormously frustrating. The problem is that because of the state of the law in the 1983 space, you don't have individual capacity claims for those deficiencies. But I think I've made it pretty clear that you've got viable Title IX claims given, start to finish, how this was conducted and some of these irregularities and challenges and impediments.

I'll tell you this, too, Mr. Fraser. Before I had this job, I used to represent young men in Title IX proceedings. And this is back pre-2020 when student representatives had to sit there like, you know, a bump on a log. Right? So it's gotten better, but I take your point that it's still not nearly where it should be.

MR. FRASER: I think I had a back channel communication with somebody in Venable who might have worked with you on those types of things. I can't recall the name.

But in any event, getting back to that, I still think on the procedural due process claim -- so, first, two things. Let's talk about the property right, because something that Virginia Tech has not addressed, nobody has addressed this Virginia statute that the legislature passed in 2020 that said schools have to have a student code of conduct, and students shall have the rights that are provided for in that student code of conduct. I Shepardized the statute again this morning. Nobody has ever cited it. I don't know why.

But if the test for, is there a property interest created, you have to look to whether the legislature has done something. I would submit that they have. Here's the thing. The legislature has passed the statute that says schools have to have a student code of conduct, and the students shall have the rights afforded to them under that code of conduct. What is the purpose of this? Is that just a meaningless statute that, you know, the legislature was just sort of passing a statute and there was supposed to be nothing that -- the students would not benefit from that?

And if you look at the Eleventh Circuit case I cited in our briefing and in the complaint, the Eleventh Circuit looked at the same situation in Georgia. The state university, because the legislature required it to adopt a statute that gave students these rights, it says you've created a property interest.

THE COURT: And I think you're right. I think you probably have the right argument. The problem is no court, let alone the Fourth Circuit, has looked at that statute and said, yes, this provides, right, the substantive property right. You combine that with the handbook, and he has a property right in continued enrollment. I could say that in this case, but I'd be the first one to say it, and my saying it doesn't make it clearly established, let alone three years ago. That's the problem. I think you could be right, but until the Fourth

Circuit has said that, and they had to have said it before this happened to John.

MR. FRASER: And so -- but getting back to the UNC case -- and I'll tell you that I -- that case, I believe, is going to trial somewhat very shortly --

THE COURT: Is it?

MR. FRASER: Yes. I know -- this is one of the things, when you get into this area, you start following the people who write on this. Summary judgment was denied sometime in the last two to three weeks. At the time, it was just an order. There was no opinion. So, I'm not sure why. But it's going forward to trial.

But in any event, I believe that -- and I probably -- and I will tell you, and I sort of -- I've let Virginia Tech know this -- that I do plan on filing an amended complaint, and I'm going to try to bring a complaint that -- it's important. The Fourth Circuit sent the case back and said, there is a procedural due process right here, a violation. This student was deprived of a liberty interest, and he can seek his injunctive relief. And that's what I'm trying to do here. And, obviously, the right to cross-examination wasn't clearly established then, so the Court said, well, there's -- you know, there's qualified immunity for the individual claims.

And it's important to know that, you know, the -- the defendant, Ms. Keene, was the appellate officer for the -- the

Jane Roe case. And this -- this was all put to her as well in the appeal. So I do think that I can still move forward at least on the Ex parte Young for the Jane Roe case to get that. At the end of the day, that's one of the -- that's the big relief that the plaintiff really wants here, to be honest.

THE COURT: Expungement of the transcript?

MR. FRASER: Exactly. Exactly.

THE COURT: So let's talk about in terms of Title IX. You know, I asked Mr. Schnetzler. I cited the *Purdue* case. In terms of a Title IX claim, you have these doctrines, these doctrinal tests, erroneous outcome, deliberate indifference, archaic assumptions, and the like.

The question I asked him is I essentially view those as ways you prove a Title IX claim. Right? It's a theory. If it was Title VII, we'd say it's like a *McDonnell Douglas* paradigm or test. In my mind, there's no question the plaintiffs -- the defendants have conceded you stated a valuable Title IX claim. They couch it in terms of erroneous outcome, they don't think you should be able to pursue a deliberate indifference claim, and that if you are, you haven't really set forth a plausible theory of deliberate indifference. Do you want to talk about that, briefly?

MR. FRASER: Sure. I think the Second Circuit opinion that I cite, I think, is well reasoned.

THE COURT: Scheible. Yes.

MR. FRASER: Yes. And I agree that no court in the Fourth Circuit has adopted it. I've said I haven't had a lot of experience in this area, but I do have a lot of experience in litigation and going to trial. Normally, it's been in the context of a defense attorney, so as a defense attorney, I have learned that one thing a plaintiff wants to have when it goes to a jury is as many counts on the verdict sheet as possible.

THE COURT: Sure.

MR. FRASER: Because you've got the jury back there and they start horse trading and they'll come up with something. I really think, at the end of the day, this comes down to, if we get to -- well, we'll get to the summary judgment stage. We've got evidence. And I can point to evidence that I think falls under either different -- either theory or maybe some other theory that I haven't thought of yet.

THE COURT: But that's the opportunity --

MR. FRASER: That's the opportunity --

THE COURT: -- where you flesh it out.

MR. FRASER: -- opportunity at the trial stage when we have -- when we have a verdict form.

THE COURT: All right. I won't interrupt you any more. You can argue as you had planned.

MR. FRASER: No, I appreciate it, Your Honor.

I mentioned the liberty interest. I will tell you

that I mentioned filing an amended complaint for a couple of reasons. The complaint, right now, alleges ex parte communications between the hearing officers and the appellate officers. That was --

THE COURT: And you base that on the concession in the deposition in the other case? I mean, that's the --

MR. FRASER: Concessions in other cases, yes. They were in transcripts that were filed with summary judgment.

THE COURT: That the process is the hearing officers write this bench brief to the appellate official.

MR. FRASER: Yeah.

THE COURT: Essentially, this is how you should rule.

MR. FRASER: Yeah. We have started discovery, and Virginia Tech has produced some documents. And right now, there are no documents showing that the hearing officers had ex parte communications with the appellate officers. However, the documents produced show that, after we filed the appeals in both cases, the complainants were allowed to submit oppositions to the appeal that went to the appellate officers. I saw those for the first time during Virginia -- when Virginia Tech produced them a few weeks ago. It's not in the record right now. It will be.

When we submitted the appeal for the Pauline Poe case, which was the first appeal submitted, submitted to defendant Mr. Settle, that if Pauline Poe submits an opposition

to this appeal, please send a copy to us. I never heard anything, and I just assumed that there were no oppositions to the appeals filed. But both of the young women did file oppositions to the appeal.

And I'll be perfectly up front. The one from Pauline Poe is the more problematic because she goes through my client's appeal page by page saying, that's not true, that's not true. I've got evidence that says this, I've got evidence that says that. And I will tell you there's two federal district court opinions, one from Judge Cullen on the Eastern District of Virginia, another from the Eastern District of Pennsylvania. I'll give you the citations in a minute, Your Honor, but it will be in the supplemental -- or the amended complaint.

Where procedural due process -- there were findings of procedural due process in student conduct cases where this happened, and this was just, to be honest, really concerning. And this is something -- and I understand a lot of times, these schools like to say, well, we're just, you know, an educational institution. We can't possibly be expected to do all of this. In the complaint, I put that Virginia Tech has a two billion-dollar-a-year budget. That was for a reason because, as I said, as I've learned about this and see how schools defend themselves in this, they try to paint this picture like they're the one-room schoolhouse on *Little House*

*on the Prairie* and they can't possibly be expected to do all of these things to protect the rights of young men in these situations. This is pretty basic. You would never allow somebody to submit an opposition to a motion or an opposition to an appeal from an agency as you're sitting in an APA case and not give the --

THE COURT: The opportunity to respond.

MR. FRASER: -- to respond. So that's coming.

THE COURT: And that's based on some discovery that --

MR. FRASER: Yes, Your Honor.

And there's one other -- well, two other documents that are coming. Mr. -- first, let's talk about Dr. Glass and the statute of limitations and there's no allegation that she was told about the Title IX claim -- or the Title IX complaint that had been filed. The documents produced show an email John basically going to Dr. Glass for the interim suspension for plaintiff, and the email chain mentions that there's also another Title IX claim filed against this young man. Not that it matters, but the email chain refers to Pauline Poe as the, quote-unquote, survivor, which is a little concerning, as --

THE COURT: Similar to the campus-wide alert that was sent on November 2 --

MR. FRASER: In fact --

THE COURT: -- where they used the terms offender and

survivor before any investigation has occurred?

MR. FRASER: Yeah. And in fact, the email chain is by, I believe, the -- I don't know if it's the head of the Virginia Tech Police Department or whoever was part of the decision-making process for the interim suspension refers to Pauline Poe as the survivor.

One other document that's coming in the amended complaint is Jane Roe -- I'll tell you, if you -- if you look at the Title IX investigation report for the Jane Roe case, it has a procedural background section, and it says something to the effect of, on September 22, the Title IX office learned of a potential Title IX issue regarding Jane Roe.

And in fact, at the hearing -- this is in the transcript -- when my client was being questioned by the hearing officers, the hearing officer sort of had this gotcha question about this, well, she waited until the day before the student -- the Corps of Cadets hearing before pulling the trigger. What about that? Do you want to talk about that? That's what she said to my client. Problem is, we were never provided what that information was until about two weeks ago. Virginia Tech produced, from its Title IX office, that that was based on another cadet came in and said, I just had breakfast with Jane and she told me that she got up into the bed and John was up there -- or I'm sorry. She told me John was supposed to

sleep on the floor. In the middle of the night, he got up there, he tried to start something. I felt uncomfortable so I grabbed a shirt and ran to the bathroom to get away from him. Completely different than what we -- I've heard for the last two-and-a-half years. A document in the possession of the Title IX office. Imagine they hay I could have made with that on cross-examination.

So I would ask, Your Honor, I think, you know, we have a trial date. I believe it's March of 2027?

MR. SCHNETZLER: Got a lot of time.

MR. FRASER: Discovery does not end until I think December 26. I think technically it's December 25.

THE COURT: You want leave to amend --

MR. FRASER: I --

THE COURT: -- whatever I do on this motion to?

MR. FRASER: I would very much appreciate that, Your Honor, and I could make the motion, the amended complaint, much tighter, to be honest. And I will tell you, my plan is to attach as exhibits -- and Virginia Tech has already produced these on some, they've attached some but they're hard to read because they redact names and things like that, but they don't -- they don't have a label on it to tell you who's -- who's under the redaction. So I will -- I will do redactions with the pseudonyms put on there so that you can understand them.

But I think that's important because, you know, a lot of these facts -- a lot of these facts here are not really in dispute, and I will tell you, I've been a bit frustrated so far in discovery. I've done requests for admissions and can't get admissions about basic facts. You know, admit that plaintiff submitted an expert report from Dr. Reagan Wetherill of the University of Pennsylvania, and the response is, we don't have enough information to respond. And I guess they think I created a forgery?

Admit that the plaintiff was never arrested or charged by the Commonwealth of Virginia for these allegations. We don't have enough information to answer that. Their co-counsel is an Assistant Attorney General, two of them, for the Commonwealth of Virginia. So I -- I think that's the other reason I want to do an amended complaint, because attached documents to the complaint, I think we can move, hopefully, forward a lot quicker.

If you give me a second to look at my notes.

THE COURT: Sure. Go ahead. Go ahead. And then we'll hear from Mr. Schnetzler to close the loop on the motion to dismiss, and then I'll have some questions, pointed questions, for you on the injunction.

MR. FRASER: Okay. Thank you, Your Honor.

THE COURT: Because I think that may go -- there are some issues there that may go with an amended complaint.

MR. FRASER: I would just point out on -- and this will be in the forthcoming filings, Your Honor -- but we cite the case of *Doe v. Miami University* -- 882 F.3d 579, Page 604 -- where -- that's a Sixth Circuit case -- did not find qualified immunity for hearing officers for the University personnel involved in the case and said there was no qualified immunity because the -- not all of the evidence that the University relied on had been provided to the student and said it is clearly established, in *Goss v. Lopez*, the Supreme Court's first due process case on student misconduct, that you're entitled to have the evidence that the University is using against you.

And unless there's any other questions on the motion to dismiss?

THE COURT: Not at this time. Thank you, Mr. Fraser.

Mr. Schnetzler, any final thoughts on this? I know you probably want to -- you don't want to give the plaintiff an opportunity to amend. I saw that in your final reply.

MR. SCHNETZLER: Thank you, Your Honor. Yes. And that issue is twofold at this point now, because there's a scheduling order in this case with a deadline for motions to amend that has expired, so I think the plaintiff now has a burden of showing excusable neglect to try to establish that he should be permitted to amended at this point.

THE COURT: Well, I think the argument there is I had

absolutely no idea -- I've now got what he would characterize as a smoking gun, a really inconsistent statement by Jane Roe that they should have had access to and didn't.

MR. SCHNETZLER: And it may be important as to when that production was actually made vis-a-vis the scheduling order's deadline, because I know Mr. Fraser's been saying for weeks that he plans to amended and hasn't done it, which, of course, makes it frustrating to try to go through this whole process again when we can kind of do it in one kit and caboodle if there's a proposed --

THE COURT: Well, he says he's going to be very targeted this time.

MR. SCHNETZLER: I think we have different definitions of targeted.

But in any event, with respect to the *Doe v. Miami University* case, I'm going to kind of go in reverse order, Your Honor. They may have said that there was no qualified immunity because that student was entitled to have whatever the evidence it was, but that skips over the initial question of property right and liberty interest.

THE COURT: Clearly established.

MR. SCHNETZLER: There was a lot of discussion about what could be an amended complaint and very little responding to the arguments that we've made. And I think, with respect to what's actually before the Court, is really what needs to

guide, obviously, how Your Honor's going to look at these motions to dismiss.

THE COURT: Sure.

MR. SCHNETZLER: But with respect to the argument on due process and the Virginia statute providing a property right, again, we keep running into qualified immunity every step of the way in this case. And that's why I think -- you know, I don't know if this is why, but it doesn't kick the plaintiff out of court because he's got this Title IX avenue that he can take. Again, the beef here is with the University, not with these individuals.

I just did -- I did want to touch on the allegations about Jane Roe stopping her testimony. You know, as we noted to the Court, she testified in response to hearing officer questions for well over an hour. I think Mr. Fraser's cross-examination was 50 minutes long before she got -- got to the heart of it -- or before she got to the point of shutting down. But the --

THE COURT: Well, I mean, part of that is because you have to go through the hearing officers to ask your questions. Right? So they take twice as long for back-and-forth as ordinarily if you could have a direct colloquy with the witness. I mean, but I listened to that carefully, and you had this long list of things, if you were cross-examining this young lady, that you would want to get into, and he didn't

really even get to start before she shut it down. And maybe he should have started sooner, but there was a lot to work with, questions that should have been asked that he wasn't allowed to ask because she wasn't willing to answer those questions.

MR. SCHNETZLER: Well, we just don't know whether she would have answered them if they had been --

THE COURT: Right.

MR. SCHNETZLER: -- right out the gate.

THE COURT: And I don't know what the answer is. And Judge Wilkinson didn't give us an answer. It has to be meaningful. What does that mean? I'm not sure. I don't think, though, based on what's alleged here at this early stage, I can say that he had a meaningful opportunity to do that for purposes of the due process claim. It doesn't matter, because of the clearly established issue. I'm just making --

MR. SCHNETZLER: Well, and -- and even still, I mean, she has that right under Title -- I mean, the University is kind of in an impossible position. She's got the right to stop her testimony under Title IX, and the 2020 regs and the guidance that came out afterward, you know, post-DR has had to say, we can't enforce this one provision in -- in the procedures that says that if they stop testifying, you can't consider, because it was struck down by another federal court. So, it is -- it is a very difficult sort of situation, obviously, but again, the -- the opportunity to -- to ask some

of those key questions was there.

And the last thing I want to say, you know, obviously, the -- the plaintiff would have plenty of fodder to use for cross-examination on credibility, but a lot of these things don't really get to the actual heart of the issue. You know, in Pauline Poe's case, yes, there may have been a statement by the complainant about -- that didn't say anything about a knife. But John Doe -- or Johnny Doe, whatever we're referring to him as, he never contested the fact that he had a knife out and he put it on the table, you know? So it's sort of like, well, that's not really the heart of the credibility question here. Right? It's whether or not they began engaging in sexual intercourse and she decided to revoke her consent. That was the heart of the matter in that case.

And so -- and then, certainly, as I've seen, as I know you've seen, we see testimony all the time that you think, man, no juror in the world is going to believe a single thing that person says, and then the verdict comes out and everybody's just sort of blown away. And credibility determinations are hard, and we're putting a lot of onus on these administrators to -- to try to make those decisions and try to get the right result.

THE COURT: I think what the plaintiff would say is that perhaps it shouldn't be those administrators who are hearing this evidence --

MR. SCHNETZLER: You know, Your Honor --

THE COURT: -- and making those judgments. Maybe it ought to be a jury of student peers.

MR. SCHNETZLER: Or, you know, there -- maybe there ought to be -- and Mr. McClanahan and I have joked about this. Maybe there should be some Fourth Circuit, you know, student court, you know, that handles all these cases and they actually have a judge who has a law degree and -- and all those sorts of things. But the process is what we have right now. But in any event, before I digress any further, Your Honor, just, again, we would ask that the claims be dismissed but for the Title IX erroneous outcome claim.

THE COURT: All right. Thank you, Mr. Schnetzler.

Why don't we -- we've been going a little while -- take a ten-minute recess and then we'll briefly take up the motion for preliminary injunction and finish up for today's purposes.

(A recess was taken from 2:14 until 2:28)

THE COURT: All right. So let's talk about, Mr. Fraser, the motion for preliminary injunction, and let me get right to where I think it falls apart. So as it's presently constituted, you're seeking a preliminary injunction -- I'm going to ask you exactly what it is you want me to enjoin in just a minute, because I think that matters -- but you base it on a handful of your 1983 claims; the

violations of procedural due process related to not allowing Johnny's attorney to cross-examine Pauline; officials violated procedural due process rights by not affording him presumption of innocence at the off-campus disciplinary proceeding; officials violated procedural due process, substantive due process rights by making the ex post facto change to the elements of the offense, intoxicated of incapacitated; officials violated procedural due process rights by allowing Jane to opt out of her cross-examination before you were finished; and plaintiff violated -- or the defendants violated procedural due process rights by applying the preponderance of the evidence standard at both hearings.

If all of these claims are subject to dismissal, then there's no legal predicate upon which to enter a preliminary injunction. That's how I see it. Why didn't you seek, as an alternative bases, the preliminary injunction based on the Title IX? You didn't.

MR. FRASER: I didn't. Probably should have. As I'm thinking through this, I was thinking probably this, Your Honor, is because the Title IX -- when you look at the way the cases look at those and the erroneous outcome, it's like all these different factors that can get you past summary judgment. But that's still a jury question at the end of the day, and I -- I think it would be hard to satisfy the requirement of likely to succeed on that basis maybe, was probably my

thinking, but I -- to be honest, I'm not sure why I --

THE COURT: Sure.

MR. FRASER: -- didn't at this point.

THE COURT: Okay. And there's nothing -- I mean, I don't know what I would do. I don't know what the defendant's position would be. But, I mean, I'm going to rule on the motion to dismiss. I'm not doing it today. I'm going to issue an opinion shortly doing that. You'll have an opportunity, I think, to amend, in some respects, although the claims subject to qualified immunity may be dismissed with prejudice. I think that's the standard. But I think you did want an opportunity to amend some claims that are still viable. Perhaps you could refile a motion for preliminary injunction based on Title IX.

I mean, as I see it, that's your strongest claim. I mean, they've conceded it. It survives. I've gone on the record saying I think it's viable. I don't know what the outcome is. I don't know if it rises to the level of likelihood of success on the merits. But as it stands, I mean, the way I see it, the legal predicates for the preliminary injunction are toast, and if they are toast, then I can't issue an -- enter a preliminary injunction.

But let me ask you this, just so I understand it. If I were to issue and enter a preliminary injunction, all you're seeking is expungement of the transcript? In other words, it seems like it would necessarily follow, if the expulsion was

expunged, then Johnny would effectively be restored and he could return to campus. Is that what you're seeking? Would he go back to Virginia Tech? Because then I think, setting aside these other problems, Virginia Tech has a greater interest and could argue, you know, balance of the equities. That's a problem for them.

MR. FRASER: Sure. No, under no circumstances will my client return to Virginia Tech.

THE COURT: Okay. You just want a clean transcript?

MR. FRASER: Clean transcript, and -- you know, that's the only injunctive relief we could ask for. So I understand the Court's position on that. I think the Court -- I do have a fair amount of experience with injunctions, believe it or not, and I am aware that, you know, win or lose, on preliminary injunction, there can be an immediate appeal.

THE COURT: Sure.

MR. FRASER: And that just sort of drag things out. I'm dealing with one of those right now in another circuit. So I appreciate your being upfront.

On the amended complaint, I went back and checked my notes. I believe the Court's scheduling order said amendments needed to be made by March 7 unless there was good cause. These new documents we received, I got them on March 17. So I believe there is good cause, and under Rule 15 or whatever. And at this point, Virginia Tech's not prejudiced. You know,

these are -- these -- all of these claims are out of the same body of facts. The case doesn't change at all, really. It just depends on what relief is in terms of -- and obviously, you know, Title IX, you're limited -- damages are pretty limited and there's no punitives. I understand that.

So I'm just -- I've got nothing else, Your Honor, but --

THE COURT: Okay.

MR. FRASER: -- I appreciate your honesty. It makes it a lot easier for me to do my job.

THE COURT: Sure. Thank you, sir.

MR. FRASER: Thank you.

THE COURT: All right. Mr. Schnetzler? Probably don't have a lot to say on this.

MR. SCHNETZLER: I don't believe so, Your Honor. May I confer with my co-counsel very quickly?

THE COURT: Sure.

MR. SCHNETZLER: Thank you, Your Honor. I don't think I have any comments on the injection issue based on the Court's statements. Thank you.

THE COURT: All right. Thank you all.

Okay. I appreciate very much the arguments this afternoon on both sides. Good counsel on both sides. I'm going to take the matter under advisement. I hope to issue a decision on the motion to dismiss within the next two weeks,

and I'll be able to deal with the preliminary injunction within that opinion and then we'll go forward. If we get an amended complaint, I'll set forth the requirements of that and what needs to be done there and we'll do that.

Let me ask you this. I know it's early, but you'll have spent considerable time on this. I certainly have. I kind of foresee how this is going to go. It's going to include a lot of fights over a lot of documents and correspondence and communications internally related to all these matters. It's going to take a long time. And I'm not prejudging anything, but I think there's some issues here. And at the end of the day, the plaintiff's going to have a leg to stand on in terms of a Title IX claim and perhaps get past summary judgment.

Does it make sense to have an early mediation at this point, given, as I understand it, kind of what the plaintiff is really seeking? I don't know that that's something that Tech's willing to consider at this juncture to save everyone a lot of time and other things that go along with it. What's your thought about that, Mr. Schnetzler? I see Mr. McClanahan back there.

MR. SCHNETZLER: I do need to consult with my client.

THE COURT: Of course you do.

MR. SCHNETZLER: -- obviously, but it has always been my experience in all the years I've been representing Virginia Tech that they're always open to having conversations about

potential resolutions.

THE COURT: All right.

Mr. Fraser, is that something you would be willing to do?

MR. FRASER: Absolutely, Your Honor.

THE COURT: Okay. So I'm going to go ahead and do that. I'm going to give you my ruling on the motion to dismiss, and then you'll get a separate order saying contact Judge Memmer for a session, and perhaps she can get this thing resolved, which may be in everyone's best interest.

Okay. Anything else, Mr. Fraser, we need to do today?

MR. FRASER: No. Thank you for your time, Your Honor. I appreciate it.

THE COURT: Thank you.

MR. FRASER: So does my client.

THE COURT: Thank you, sir.

Mr. Schnetzler?

MR. SCHNETZLER: Nothing further, Your Honor.

THE COURT: All right.

Mr. McClanahan, good to see you.

MR. MCCLANAHAN: Thank you, Your Honor.

THE COURT: All right. And remind me your name?

MS. RAY: Sorry. I'm Aisha Ray (ph.). I'm his law fellow.

MR. MCCLANAHAN: She's brand new. Newly minted lawyer in the office.

THE COURT: Well, good. It's good to have you. I'm sure we'll see you on this and other things down the road.

All right. You all have a good rest of the week. We'll be adjourned for the day.

(Proceedings concluded at 2:37 P.M.)

CERTIFICATE

I, Whitney M. Stier, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Whitney M. Stier Date: 05/04/2026