# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Roanoke Division

| | |
|---|---|
| JOHN DOE, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>)<br>VIRGINIA POLYTECHNIC INSTITUTE )<br>AND STATE UNIVERSITY, et al., )<br>)<br>    Defendants. )<br>) | Civil Action No. 7:25-cv-00846-TTC |

## FIRST AMENDED COMPLAINT

James Fraser (admitted pro hac vice)
P.O. Box 3092
Annapolis, Maryland 21403
Tel: (443) 254-5115
jcfraser70@outlook.com

Parker Bowman, VSB No. 100389
Lindsay R. McKasson, VSB No. 96074
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
parker@binnall.com
lindsay@binnall.com

*Counsel for Plaintiff John Doe*

# TABLE OF CONTENTS

PARTIES .................................................................................................................1

JURISDICTION AND VENUE ..............................................................................3

APPLICABLE LAW ...............................................................................................3

    A.    20 U.S.C. § 1681 ("Title IX") .........................................................3

    B.    The Fourteenth Amendment and 42 U.S.C. § 1983..............................13

    C.    Ex Parte Young...................................................................................18

VIRGINIA TECH'S INVESTIGATION AND ADJUDICATION OF THE
PAULINE POE CASE ..........................................................................................19

    A.    Pauline accuses Plaintiff of sexually assaulting her during a
         "date night" at her apartment. ...........................................................19

    B.    Without conducting any investigation, VT declares Pauline a
         "survivor" and puts Plaintiff on "interim" suspension. ........................20

    C.    A Montgomery County District Court Judge determines that
         Pauline is not a credible witness. ......................................................21

    D.    The Blacksburg Police Department and the Commonwealth's
         Attorney determine that Pauline is not a credible witness. .................22

    E.    VT's Investigators conduct an investigation that is not
         "impartial," "thorough," or "prompt." ...................................................25

    F.    VT's Hearing Officers conduct a hearing that violates Plaintiff's
         right to due process. ...........................................................................30

    G.    The Hearing Officers issue a decision which discriminates
         against Plaintiff on the basis of sex, and which violates
         Plaintiff's right to due process. ..........................................................31

    H.    VT's Office of Student Conduct violates Plaintiff's right to due
         process by allowing Pauline to submit an *ex parte* opposition to
         Plaintiff's appeal..............................................................................45

    I.    VT's Appellate Officer issues a decision which discriminates
         against Plaintiff on the basis of sex, and which violates
         Plaintiff's right to due process. ..........................................................46

VIRGINIA TECH'S INVESTIGATION AND ADJUDICATION OF THE
JANE ROE CASE ................................................................................................48

    A.    Jane Roe violates several VT Corps of Cadets regulations...................48

    B.    The Title IX Office receives Jane's first version of the events of
         September 17-18. ...............................................................................50

C. Jane learns about Pauline's allegations the same day the Corps of Cadets charges Jane with misconduct. ..............................52

D. Jane accuses Plaintiff of sexually assaulting her by having sex with her while she was "incapacitated" from alcohol. ...........53

E. VT tells the entire campus that Plaintiff sexually assaulted Jane. ...................................................................................54

F. Jane's allegations against Plaintiff give her immunity from her pending Corps of Cadets charges............................................54

G. VT's investigators do not find evidence that Jane was "incapacitated" or evidence that Plaintiff should have known that Jane was "incapacitated." ...........................................56

H. Plaintiff gives VT's Investigators text messages Jane wrote on the night in question which show that she was not incapacitated.......................................................................62

I. Plaintiff gives VT's Investigators text messages Jane wrote after the night in question that were inconsistent with Jane's allegation that Plaintiff sexually assaulted her. ...................64

J. VT's Investigators violate the 2020 Title IX Rule by withholding relevant evidence from Plaintiff. ...........................................68

K. Plaintiff gives VT's Investigators written expert testimony from Dr. Wetherill that Jane was not "incapacitated."..................70

L. VT's Investigators take 170 days to complete their investigation (nearly four times longer than VT's policy on "prompt" investigations). ........................................................................71

M. VT's Investigators issue an Investigation Report that violates Plaintiff's right to due process, the 2020 Title IX Rule, and VT's Title IX training materials.................................................72

N. VT's Office of Student Conduct and Office of University Counsel willfully violate the 2020 Title IX Rule. ...............................76

O. VT's Hearing Officers conduct hearings which violate Plaintiff's right to due process and violate VT policy. ...........................81

P. The Hearing Officers issue decisions which discriminate against Plaintiff on the basis of sex, and which violate Plaintiff's right to due process...................................................................85

Q. The Office of Student Conduct violates Plaintiff's right to due process by allowing Jane to submit an *ex parte* opposition to Plaintiff's appeal...............................................................101

R. The Appellate Officer issues decisions which discriminate against Plaintiff on the basis of sex, and which violate Plaintiff's right to due process. ..................................................................101

VIRGINIA TECH'S TITLE IX ADMINISTRATION UNDER PRESIDENT SANDS (2014 – 2024) ..................................................................102

A. VT allows Catherine Lhamon (Department of Education) to micromanage the university's Title IX program...............................104

B. VT fills its Title IX administration with officials who presume that any man accused of sexual assault is guilty. ..............................107

C. VT hires Title IX consultants who are critical of giving due process to students accused of sexual assault......................................118

D. VT's Title IX administration blames sexual assault on "masculinity" and "white male privilege."...........................................121

E. VT's Title IX administration tells students that the university is experiencing an epidemic of sexual assault. ......................................124

F. While out of office (2017-2021), Joe Biden and Catherine Lhamon stoke the campus anti-due-process fire by claiming the 2020 Title IX Rule allows students to rape "with impunity." .............127

G. VT's Title IX administration signals that it agrees with Biden and Lhamon about the 2020 Title IX Rule..........................................129

H. After returning to office, Biden and Lhamon tell schools to ignore the 2020 Title IX Rule because it will be replaced...................131

I. After returning to office, Lhamon investigates hundreds of schools, including VT, for allegedly failing to comply with civil rights statutes...................................................................................134

J. Student protestors at VT continuously demand that the university "Fix Title IX" and "Stop Protecting Rapists."....................135

CAUSES OF ACTION ..................................................................................137

COUNT I: 20 U.S.C. § 1681(a) ("Title IX")......................................137

COUNT II: 20 U.S.C. § 1681(a) ("Title IX") ....................................139

COUNT III: 42 U.S.C. § 1983 ..........................................................141

PRAYER FOR RELIEF ................................................................................143

DEMAND FOR JURY TRIAL ......................................................................143

1. Plaintiff John Doe files this First Amended Complaint against Virginia Polytechnic Institute and State University ("VT"); Dr. Timothy Sands, Ph.D., the President of VT, in his official capacity; and Dr. Frances Keene, Ph.D., VT's Vice President for Student Affairs, in her official capacity.

2. Plaintiff brings his claims against VT under 20 U.S.C. § 1681(a) ("Title IX") for discriminating against him on the basis of sex in the university's disciplinary proceedings in the Pauline Poe and Jane Roe matters. Those disciplinary proceedings resulted in Plaintiff's suspension and expulsion from VT. For his Title IX claims, Plaintiff seeks compensatory damages, injunctive relief, and costs (including attorney fees).

3. Plaintiff brings his claim against Sands and Keene under 42 U.S.C. § 1983 for their ongoing violations of federal law—*i.e.*, deprivation of Plaintiff's property and liberty interests without due process. For his section 1983 claims, Plaintiff seeks prospective equitable relief in the form of an injunction requiring Sands and Keene to vacate VT's disciplinary findings and sanctions against Plaintiff and to expunge any reference to those findings and sanctions from Plaintiff's university records, including his transcript. Plaintiff also seeks costs (including attorney fees) for his section 1983 claims.

## PARTIES

4. Plaintiff John Doe is, and was at all times relevant to this action, a citizen of the United States.

5. Defendant Virginia Tech is a university and state agency established by the General Assembly of the Commonwealth of Virginia and located in Blacksburg,

Virginia. *See* Virginia Code § 23.1-2600; *Doe v. VT,* 2020 U.S. Dist. LEXIS 47754, *11 (W.D. Va. Mar. 19, 2020).

6.      VT was at all times relevant to this action a recipient of federal financial assistance for educational programs and therefore subject to Title IX's prohibition on sex-based discrimination in those programs. *See* 20 U.S.C. § 1681(a).

7.      VT is governed by its Board of Visitors. *See* Va. Code §§ 23.1-2600, 23.1-2603; Bylaws of the Board of Visitors, art. I (last amended Aug. 28, 2024). The Board of Visitors' responsibilities include student discipline. *See* Va. Code § 23.1-2603 (stating the Board "shall regulate the government and discipline of the students").

8.      Defendant Timothy Sands is the President of VT. Sands is a citizen of Virginia, and he is named as a Defendant in his official capacity.

9.      VT's President is appointed by the Board of Visitors. *See* Bylaws of the Board of Visitors, art. II, § 1 ("The Board appoints the President to initiate proposed policies, to execute approved policies, and to administer the University."); *see also id.* at art. I, § 5 ("Much of [the Board's] authority is necessarily delegated to the President, who serves as an agent of the Board and chief executive officer of the university."). "The President is assisted in the performance of the duties of that office by other officers of the University." *Id.* at art. II, § 2.

10.      The President of VT has the authority to set aside the findings and sanctions from a university disciplinary proceeding where those proceedings deprived the respondent of a property or liberty interest without due process or where those proceedings violated a student's Title IX rights against sex-based discrimination.

2

11. Defendant Frances Keene is the Vice President for Student Affairs at VT. In that role, "she has responsibility for the University conduct system, with direct supervisory oversight of disciplinary matters assumed by the Office of Student Conduct, under the Director of Student Conduct." *See* VT Student Code of Conduct at 3 (Jun. 2025). The VP for Student Affairs is an "officer of the University." *See* Bylaws of the Board of Visitors, art. II, § 2. She is appointed by the President with ratification by the Board of Visitors. *Ibid.*

12. VT's VP for Student Affairs has the authority to set aside the findings and sanctions from a university disciplinary proceeding where those proceedings deprived the respondent of a property or liberty interest without due process or where those proceedings violated a student's Title IX rights against sex-based discrimination.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in this district.

## APPLICABLE LAW

### A. 20 U.S.C. § 1681 ("Title IX")

15. Title IX of the Education Amendments of 1972 ("Title IX") prohibits educational institutions that receive federal financial assistance from engaging in sex

discrimination in their educational programs.[1] For Title IX purposes, an institution that receives federal financial assistance is called a "recipient." 34 C.F.R. § 106.2(i).[2]

### 1. The 2020 Title IX Rule

16. The United States Department of Education administers Title IX.

17. In 2018, in accordance with the Administrative Procedure Act, the Department of Education proposed a rule setting forth detailed requirements for Title IX grievance procedures for resolving allegations of sexual misconduct. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61462 (Nov. 29, 2018).

18. In 2020, after considering over 124,000 comments to the proposed rule, the Department of Education adopted the rule with minor modifications. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (codified at 34 C.F.R. Part 106) (hereinafter, "the 2020 Title IX Rule").

19. The 2020 Title IX Rule is the first rule to include specific requirements for a recipient's grievance process. *See* 34 C.F.R. § 106.45. Many of those requirements are relevant to this action.

---

[1] *See* 20 U.S.C. § 1681(a) (stating in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal assistance.").

[2] Plaintiff cites to the Department of Education regulations in effect in 2023.

20.     *First*, the grievance process must include "an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence."  34 C.F.R. § 106.45(b)(1)(ii).

21.     The Department of Education adopted this requirement because stakeholders had "raised concerns that recipients sometimes ignore evidence that does not fit within a predetermined outcome."  83 Fed. Reg. 61462, 61473; *see also* 85 Fed. Reg. 30026, 30246 ("Several commenters shared personal experiences with Title IX investigations in which they witnessed the recipient ignoring, discounting, burying, or destroying exculpatory evidence.")

22.     *Second*, the grievance process cannot permit "credibility determinations" to "be based on a person's status as a complainant, respondent, or a witness."  34 C.F.R. § 106.45(b)(1)(ii).

23.     The Department of Education adopted this requirement because stakeholders had "raised concerns" that "investigators and decision-makers have inappropriately discounted testimony based on whether it comes from the complainant or the respondent."  83 Fed. Reg. 61462, 61473.

24.     The Department of Education also adopted this requirement because "permit[ing] status-based inferences as to a person's credibility" would "invite bias and partiality," and a process with such "bias and impartiality" would "inevitably prejudge the facts at issue rather than determine the facts based on the objective evaluation of evidence" and would "decrease the likelihood that the outcome reached would be accurate."  85 Fed. Reg. 30026, 30247.

25. *Third*, the grievance process must require that "any individual designated by the recipient as a Title IX coordinator, investigator, [or] decision-maker" receive training "on how to conduct an investigation and grievance process, including hearings [and] appeals," and "how to serve impartially, including by avoiding prejudgment of the facts at issue." 34 C.F.R. § 106.45(b)(1)(iii). Such training must include training of investigators and decision-makers on "issues of relevance." *Id.* And "any materials used to train Title IX coordinators, investigators, [and] decision-makers must not rely on sex stereotypes and must promote impartial investigations and adjudications." *Id.*

26. The Department of Education noted that "[m]any commenters supported [these requirements] because of personal experiences with Title IX campus proceedings involving perceived bias or conflicts of interest that commenters believed rendered the investigation or adjudication unfair." 85 Fed. Reg. 30026, 30249. For example, the Title IX training materials at one large university told decision-makers that "sex offenders are overwhelmingly white males" and that a "victim centered approach can lead to a safer campus." *Id.* at n.1028.

27. *Fourth*, a recipient "must make [its] Title IX training materials publicly available on its website." 34 C.F.R. § 106.45(b)(10)(i)(D).

28. *Fifth*, the grievance process must "include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." 34 C.F.R. § 106.45(b)(1)(iv).

29. The Department of Education adopted this requirement to ensure, among other things, the "impartiality by the recipient until a determination is made" and that the "burden of proof" is placed "on the recipient, rather than on the parties." 83 Fed. Reg. 61462, 61473. The Department heard from "many commentators who shared personal experiences as respondents in Title IX proceedings where the investigation process made the commenter feel like the burden was on the respondent to prove non-responsibility rather than being presumed not responsible unless the evidence showed otherwise." 85 Fed. Reg. 30026, 30258.

30. Incredibly, the Department also received "several" comments that the presumption of non-responsibility would "perpetuate the myth of false reporting" and that "the respondent should bear the burden to prove [he] is innocent." *Id.* at 30257, 30260.

31. *Sixth*, a grievance process must "include reasonably prompt time frames for the conclusion of the process." 34 C.F.R. § 106.45(b)(1)(v). The process may allow for "the limited extension of time frames for good cause with written notice to the complainant and the respondent of the delay" and "the reasons for [the delay]." *Id.*

32. The Department of Education adopted this requirement because, among other reasons, excessively lengthy grievance processes may result in the "loss of information [and] evidence," 85 Fed. Reg. 30026, 30270, including the lost "memory" of witnesses, *id.* at 30268.

33. *Seventh*, a grievance process (including the investigation phase) must "ensure that the burden of proof and the burden of gathering evidence sufficient to

reach a determination regarding responsibility rest on the recipient and not on the parties." 34 C.F.R. § 106.45(b)(5)(i).

34. The Department of Education adopted this requirement because "recipients, not complainants or respondents, must comply with Title IX, so the burden of gathering evidence relating to allegations of sexual harassment" and "determining whether the evidence shows responsibility appropriately falls to the recipient." 83 Fed. Reg. 61462, 61475.

35. *Eighth*, "throughout the grievance process," a recipient must "provide an equal opportunity for parties to present witnesses, including fact and expert witnesses," and it may "not restrict the ability of either party" to "present relevant evidence." 34 C.F.R. § 106.45(b)(5)(ii)-(iii).

36. *Ninth*, a grievance process must "give both parties an equal opportunity to review any evidence obtained as part of the investigation" so "that each party can meaningfully respond to the evidence prior to the conclusion of the investigation." 34 C.F.R. § 106.45(b)(5)(vi). This opportunity for review of and response to the evidence must occur "prior to the completion of the investigation report," and "the parties must have at least 10 days to submit a written response [to the evidence], which the investigator will consider prior to completion of the investigation report." *Id.*

37. *Tenth*, a grievance process must include the creation of "an investigative report that fairly summarizes the evidence." 34 C.F.R. § 106.45(b)(5)(vii). This report must be provided to the parties "at least 10 days prior to [the] hearing" for the parties' "review and written response." *Id.*

38.     *Eleventh*, a grievance process at a post-secondary institution "must provide for a live hearing" at which "the decision-makers must permit each party's advisor [who can be a lawyer] to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." 34 C.F.R. § 106.45(b)(6)(i).

39.     In response to a comment, the Department of Education clarified that the right to advisor cross-examination included cross-examination of an institution's Title IX investigator. *See* 85 Fed. Reg. at 30313, 30314.

40.     *Twelfth*, a grievance process must require "the decision-maker(s)" to "issue a written determination regarding responsibility" that "must include," among other things, (1) "findings of fact supporting the determination," (2) "conclusions regarding the application of the recipient's code of conduct to the facts," and (3) "a statement of, and rationale for, the result as to each allegation." 34 C.F.R. § 106.45(b)(7).

41.     This requirement puts the recipient on notice that it cannot later defend its decision on a ground that was not given by the recipient in its written decision. The requirement makes sense. The "foundational principle of administrative law" is "that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative

order must be judged are those upon which the record discloses that its action was based.").[3]

### 2. District court actions under Title IX

42. A recipient violates Title IX's prohibition on sex discrimination when it suspends or expels a student on the basis of the student's sex. *See* 34 C.F.R. § 106.31(b)(4) (stating that "a recipient shall not, on the basis of sex: … [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment").

43. A recipient also violates Title IX's prohibition on sex discrimination if it is "deliberately indifferent" to student-on-student "sexual harassment." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 632 (1999). A recipient is "deliberately indifferent" to sexual harassment when its response is "clearly unreasonable." *Id.* at 649.

44. A student deprived of his rights under Title IX may sue the recipient for injunctive relief and monetary damages.[4] A student who was suspended or expelled for sexual misconduct may pursue a Title IX suit under at least two legal theories: (1) the "erroneous outcome" theory, and (2) the "deliberate indifference" theory.

45. A plaintiff bringing a Title IX claim under the erroneous outcome theory must "allege that (1) he was subjected to a procedurally flawed or otherwise flawed

---

[3] In accordance with that principle, VT instructs its Hearing Officers that written decisions must include all the bases for their decision. *See* Writing Outcome Rationales, an ATIXA Best Practices Workshop, slide 11 (May 6, 2024) (available on the VT website) ("If relying upon evidence to make a determination, cite it in the rationale … If it is not written down, the analysis did not happen.").

[4] *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1991).

proceeding; (2) which lead to an adverse and erroneous outcome, and (3) involved particular circumstances that suggest gender bias" was "a but-for cause of the erroneous outcome." *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023).

46.     In cases where a plaintiff's burden is to show "but-for" causation, the plaintiff must "prove that [his] injury would not have occurred 'but for' the defendant's unlawful conduct." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 329 (2020).

47.     For example, the Supreme Court has held that when an African American plaintiff alleges that the defendant discriminated against him on the basis of race, the "but-for" causation inquiry would direct the jury's "attention to the counterfactual—what would have happened if the plaintiff had been white?" *Id.* at 333.  If "the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the same legally protected right as a white person," but "if the defendant would have responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right as the white person." *Id.*

48.     The Supreme Court's explanation of the "but-for" test in *Comcast* applies to Title IX cases. *See, e.g., Doe v. Samford Univ.*, 2021 U.S. Dist. LEXIS 153221, *18 (N.D. Ala. Aug. 15, 2021) (Title IX case citing *Comcast* and *Shepard* for the "but-for" test).  So, in a Title IX case in which a male plaintiff alleges that the recipient discriminated against him on the basis of sex when it found him responsible

for sexually assaulting a female student, the plaintiff must prove to the jury that the recipient would have reached a different decision under the same set of facts had the plaintiff (the accused) been a woman who was accused of sexual assault by a man.

49. Courts have identified several facts that can support a finding of sex-based discrimination in a Title IX lawsuit.

50. Those facts include the following, ***all of which are present in this action***: (1) the school failed to follow its own procedures and practices; (2) the school failed to follow the Department of Education's Title IX regulations; (3) the school's investigators and decisionmakers failed to address the complainant's inconsistent or false statements; (4) the school's decisionmakers applied a lower credibility standard to the complainant and her witnesses than they applied to the respondent and his witnesses; (5) the school's decisionmakers, without explanation, ignored the testimony of the respondent's expert witness; (6) the school's decisionmakers, without explanation, ignored the complainant's withholding or spoliation of relevant evidence; (7) the school's decisionmakers, without explanation, ignored the complainant's motive to make a false allegation; (8) the school's decisionmakers, without explanation, ignored the complainant's post-incident conduct that was inconsistent with her allegations; (9) the finding of the school's decisionmakers was "irrational," "inexplicable," or "against the substantial weight of the evidence"; (10) the school's Title IX administration has a culture that presumes male respondents are guilty; (10) the Department of Education's Office for Civil Rights, while under the leadership of Catherin Lhamon, was investigating the school during the respondent's

disciplinary proceedings; and (11) the school experienced ongoing pressure from campus activists to do more to prevent sexual assault.[5]

51. A plaintiff bringing a Title IX claim under a "deliberate indifference" theory "must show that the recipient was deliberately indifferent to the truth or falsity of the accusations of sexual misconduct against him." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1097 (2d Cir. 2024). A plaintiff "has stated a deliberate indifference claim under Title IX" if he "plausibly alleges that he was targeted by a discriminatory accusation and the recipient-imposed discipline or sanctions under circumstances that indicate deliberate indifference to the truth or falsity of the accusation." *Ibid.*[6]

**B. The Fourteenth Amendment and 42 U.S.C. § 1983**

52. The Fourteenth Amendment says that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

53. 42 U.S.C. § 1983 authorizes a plaintiff to bring a civil action against any person who, acting under color of State law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

---

[5] *See* Doc. 1, Complaint at ¶ 155 (citing cases).

[6] A student "may show deliberate indifference through allegations that the recipient's grievance process was so objectively deficient that that it cannot be said to have aimed at uncovering the truth, or that its decision was so inexplicable that the same inference could be drawn." *Schiebel*, 120 F.4th at 1097 (citations omitted). And a student "states a deliberate indifference claim when he plausibly alleges facts that raise grave doubts as to the merits of the decision itself, and that the recipient knowingly shut its eyes to the risk that it was imposing sanctions based on a malicious and therefore discriminatory accusation." *Ibid.* (cleaned up).

deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

### 1. Liberty and property interests

54. A state university deprives a student of his liberty interest in his "good name" and "reputation" when the university disciplines the student for alleged sexual misconduct and then notes that discipline in the student's university records, including his transcript. *Doe v. Univ. of North Carolina*, 133 F.4th 305, 318-19 (4th Cir. 2025).

55. The Virginia General Assembly created a property interest in a student's continued enrollment at VT when it adopted Va. Code. § 23.1-412 in March 2020. That statute requires public colleges and universities to "adopt non-academic student codes of conduct," *id.* at § 23.1-412(A), and it says that students "*shall* have the responsibilities *and rights* afforded to them by the [school's] codes of conduct and related policies and procedures," *id.* at § 23.1-412(B) (emphasis added).[7]

56. The VT Student Code of Conduct and other VT policies that were in effect during Plaintiff's disciplinary proceedings provided that a student could be suspended or expelled for non-academic reasons only if the student was found

---

[7] For Fourteenth Amendment purposes, "protected interests in property" are "created and their dimensions are defined by an independent source, such as state statutes or rules entitling citizens to certain benefits." *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975); *see, e.g. Barnes v. Zachary*, 669 F.3d 1295, 1304-05 (11th Cir. 2012) (holding that a state university student had "a property interest in his enrollment" because the university, in accordance with state law, had adopted a code of conduct that prohibited suspension or expulsion for non-academic reasons absent a finding of a code violation).

responsible for a violation of the Code of Conduct after an "impartial," "thorough," and "prompt" investigation, hearing, and appeal.[8]

57.     Even if the General Assembly had not enacted Va. Code. § 23.1-412, VT students would still have a property interest in their continued enrollment in the university. Through practices and policies that pre-date the adoption of Va. Code. § 23.1-412, VT has had a system of suspending or expelling students only after a finding of cause. For example, before VT adopted a stand-alone Student Code of Conduct, VT's student handbook, called the "Hokie Handbook," included a Student Code of Conduct that provided for suspension or expulsion for non-academic reasons only after a student had been found "responsible" for violating the Code of Conduct after an impartial, thorough, and prompt investigation, hearing, and appeal.[9]

### 2.     Due process requirements

58.     Several acts by a university can deprive a student of due process. Those acts include the following, *all of which happened in this case*.

59.     A university deprives a student of due process in a sexual misconduct case when the student has no opportunity for "cross-examination [which] will materially assist in ensuring a meaningful hearing." *Doe v. UNC*, 133 F.4th at 317.

60.      A university deprives a student of due process in a sexual misconduct case when the university allows *ex parte* communications between an accuser and a

---

[8] *See* <u>Ex. 50</u>, VT Policy No. 1025 at § 4.0 (Rev. Aug. 31, 2021); <u>Ex. 53</u>, VT Policy No. 1026 at § 2.0 (Rev. Oct. 1, 2022); <u>Ex. 54</u>, VT Student Code of Conduct at 16 (Aug. 18, 2023); <u>Ex. 55</u>, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 14 (Oct. 1, 2023).

[9] *See, e.g.*, <u>Ex. 49</u>, Hokie Handbook at 31 (Jun. 1, 2019).

decision-maker, including an appellate officer. *See Doe v. Rector and Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 618 (E.D. Va. 2016) (holding that state university appellate officers violated plaintiff's due process rights by having *ex parte* communications with plaintiff's accuser).[10]

61.     A university deprives a student of due process in a disciplinary proceeding when it finds that the student committed a policy violation even though the university does not find that student committed every element of that violation. *Cf. Jackson v. Virginia*, 433 U.S. 307, 313-316 (1979); *Doe v. Alger*, 228 F. Supp. 3d 713, 730-31 (W.D. Va. 2016) (noting that JMU violated a student's right to due process in an "incapacitation" case if its decisionmakers found him guilty even if they did not find he "knew or should have known" the complainant was incapacitated).

62.     A university deprives a student of due process in an administrative proceeding when the university finds against the student in a decision that is "arbitrary and capricious." *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985); *see also* **Ex. 54**, VT Student Code of Conduct at 20 (stating Appellate Officer can vacate a finding that is "arbitrary").

---

[10] *See also Furey v. Temple Univ.*, 884 F. Supp. 2d 223, 257, 261 (E.D. Pa. 2012) (vacating a state university's expulsion of plaintiff and ordering his reinstatement because the university violated his due process rights by, among other things, allowing the appellate officer to have *ex parte* communications with a witness); *cf. RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 357 (4th Cir. 2007) ("as a general rule, *ex parte* communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process") (cleaned up). Although the Fourteenth Amendment's due process clause does not require the government to give a party an opportunity to appeal an adverse decision, the Fourteenth Amendment's due process guarantee applies to any appellate rights the government gives to a party. *See, e.g. Shiflett v. Commonwealth of Virginia*, 433 F.2d 124, 128 (4th Cir. 1970).

1. A university's decision is arbitrary and capricious when the substance of that decision indicates that the decision-maker "did not actually exercise professional judgment." *Regents*, 474 U.S. at 224.[11]

2. An administrative decision is arbitrary and capricious when it is not "reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), such as when the decision is based on "conclusory statements," *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)

3. An administrative decision is arbitrary and capricious when "the deciding body departed from the appropriate standard in making its decision." *PharmaCann Va., LLC v. Va. Bd. of Pharm.*, 884 S.E.2d 852, 858 (Va. App. 2023).

4. An administrative decision is arbitrary and capricious when it "ignores 'evidence contradicting its position.'" *Delaware Valley Regional Center, LLC v. Dep't of Homeland Security*, 678 F. Supp. 3d 73, 87 (D.D.C. 2023) (quoting *Butte County v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010).

5. An administrative decision is arbitrary and capricious when it treats "similarly situated" persons "differently." *PharmaCann*, 884 S.E.2d at 860. Indeed, an administrative decision "is at its *most arbitrary* when it treats similarly situated people differently." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1141 (D.C. Cir. 2022) (emphasis added).

63.    A state deprives a person of due process when it fails to use the "clear and convincing evidence" standard in a civil proceeding where "the individual interests at stake" are "both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (quoting *Addington v. Texas*, 441 U.S. 418, 424 (1978)). Such proceedings include those "that threaten the

---

[11] *Regents* involved a student who was dismissed on academic grounds, not disciplinary grounds. But because "disciplinary proceedings" for alleged misconduct "require *more* stringent procedural protections than academic evaluations," *Henson v. Honor Committee of Univ. of Virginia*, 719 F.2d 69, 74 (4th Cir. 1983) (emphasis added), the *Regents* standard also applies to university disciplinary decisions.

individual involved with a 'significant deprivation of liberty' or 'stigma.'" *Santosky*, 455 U.S. at 756 (quoting *Addington*, 441 U.S. at 425, 426)).

64. Finally, under the "cumulative error doctrine," the combination of "two or more individually harmless errors" can result in a violation of due process. *See United States v. Caro*, 597 F.3d 608, 635 (4th Cir. 2010) (cleaned up).

## C.   Ex Parte Young

65. The *Ex Parte Young* exception to Eleventh Amendment immunity "allows suits against state officers for prospective equitable relief from ongoing violations of federal law." *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001) (citing *Ex Parte Young*, 209 U.S. 123 (1908)).

66. The Fourth Circuit and several other courts have recognized that such prospective equitable relief includes an injunction ordering university administrators to expunge a student's disciplinary records. *See Doe v. UNC*, 133 F.4th at 318-319 (holding that plaintiff's section 1983 claim could proceed against university chancellor and other university officials where plaintiff sought an injunction ordering the chancellor and those other officials to expunge his disciplinary record); *cf. Shepard v. Irving*, 77 Fed. Appx. 615, 620 (4th Cir. 2003) (holding that plaintiff's Americans with Disabilities Act claim against George Mason University president and a GMU dean could proceed where plaintiff sought an injunction ordering those officials to expunge an "F" from plaintiff's transcript and expunge the plaintiff's honor committee conviction for plagiarism).[12]

---

[12] *See also Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) (Barett, J.) (holding that plaintiff's section 1983 claim could proceed against university president and other university

**A.    Pauline accuses Plaintiff of sexually assaulting her during a "date night" at her apartment.**

67.    John Doe met Pauline Poe, another VT student, via a dating app during Spring Semester 2023.[13] They had sexual intercourse shortly after they met.[14] Pauline said this sexual intercourse as "very" consensual,[15] and that Johnny "was soft with her and it seemed like he really cared about her."[16]

68.    On October 12, 2023, Pauline reported to the Blacksburg Police Department ("BPD") that Johnny sexually assaulted her the previous evening in her off-campus apartment.[17] Pauline said that shortly after Johnny arrived at her apartment for a "date night," he brandished a "switchblade" knife.[18] Pauline said Johnny later violently sexually assaulted her in her bedroom for "an hour and a half"

---

officials where plaintiff sought an injunction ordering the president and those officials to expunge his disciplinary record); *Dillow v. VT*, 2023 WL 2320765, *9 n.12 (W.D. Va. Mar. 2, 2023) ("The exception in *Ex Parte Young* could permit Dillow's claims against the administrator defendants to proceed to the extent that he is seeking prospective injunctive relief in the form of reinstatement to Virginia Tech and expungement of his academic record.").

[13] **Ex. 33**, Addendum I to Pauline Poe Investigation Report ("PP-IR Addendum I") at 8.

[14] **Ex. 32**, Pauline Poe Investigation Report ("PP-IR") at VT-001329, Tr. 32:1-19.

[15] **Ex. 38**, 05/09/24 Tr. 91:15-22.

[16] **Ex. 32**, PP-IR at VT-001274.

[17] **Ex. 33**, PP-IR Addendum I at 6.

[18] *Id.* at 8.

while one of her roommates, OM, was studying in a bedroom a few feet away and another roommate was in a bedroom one floor above.[19]

**B. Without conducting any investigation, VT declares Pauline a "survivor" and puts Plaintiff on "interim" suspension.**

69. On October 26, 2023, Pauline obtained a 72-hour *ex parte* Emergency Protective Order ("EPO") against Johnny from a magistrate at the Montgomery County District Court based on the same allegations Pauline made to BPD.[20]

70. Because EPO respondents are not given an opportunity to respond to an EPO petition, Virginia law states that "the issuance of an emergency protective order shall not be considered evidence of wrongdoing by the respondent." Va. Code § 19.2-152.8(F).

71. Even though an EPO lasts for only 72 hours and is not evidence of wrongdoing, on November 2, 2023, VT placed Johnny on "interim suspension" and evicted him from his dorm room pending a Student Conduct investigation and adjudication of Pauline's allegations.[21]

72. Even though VT had not yet conducted any investigation of Pauline's allegations, VT referred to Pauline as "the survivor" in its internal email communications regarding the interim suspension.[22]

---

[19] *Id.* at 6, 8; **Ex. 32**, Pauline Poe Investigation Report ("PP-IR) at VT-001307, 11/14/23 Tr. 10:4-12; *id.* at VT-001322, Tr. 25:20 – 28:3; *see also* Doc. 1, Complaint at ¶ 121 (floor plan of apartment).

[20] Virginia District Court magistrates are not judges. *See* Va. Code §§ 19.2-33 *et seq.*

[21] **Ex. 29**, 11/02/23 VT Interim Suspension Letter.

[22] **Ex. 28**, 11/01/23 & 11/02/03 email communications at VT-000024.

73. Although VT told Johnny the interim suspension was based solely on the EPO, the internal email communications mentioned above also noted allegations that Jane Roe made against Johnny on November 1, 2023.[23]

74. On November 7, 2023, VT denied Johnny's appeal of the interim suspension.[24]

## C. A Montgomery County District Court Judge determines that Pauline is not a credible witness.

75. After the 72-hour EPO expired, Pauline petitioned the Montgomery County District Court for a two-year Protective Order.

76. Under Virginia law, a court may issue such a Protective Order only if "a preponderance of the evidence" establishes that the respondent has committed an "act of violence," including a "criminal sexual assault," against the complainant.[25]

77. A Montgomery County District Court Judge held an in-person hearing on Pauline's petition on November 14, 2023.

78. Pauline and Johnny both appeared for the hearing, and both were represented by counsel at the hearing.[26]

79. Pauline testified for over an hour, including on cross-examination by Johnny's counsel.[27]

---

[23] *Id.* at VT-000024 and VT-000025.

[24] **Ex. 31**, 11/07/23 email denying appeal of interim suspension.

[25] *See* Va. Code §§ 19.2-152.7:1, 19.2-152.9(D).

[26] **Ex. 32**, PP-IR at VT-001299, Tr. 2:3-12.

[27] *See id.* VT-0012988, Tr. 3:8 (noting that the hearing started at 1:20 p.m.); *id.* at VT-001375, 11/14/23 Tr. 78:17 (noting that the hearing ended at 2:46 p.m.).

80. After listening to Pauline's testimony, the Judge denied Pauline's petition.[28]

81. In denying the petition, the Judge said Pauline's testimony was "extremely unique, if not bizarre."[29]

82. Pauline conceded on cross-examination that Johnny never threatened her with a knife.[30]

**D. The Blacksburg Police Department and the Commonwealth's Attorney determine that Pauline is not a credible witness.**

83. In addition to petitioning the Montgomery County District Court for a Protective Order, Pauline told BPD and the Office of the Commonwealth's Attorney that she wanted to press criminal charges against Johnny.

84. BPD never arrested Johnny, and the Commonwealth's Attorney never charged Johnny.

85. The local authorities determined that Pauline was not a credible witness based on at least the following three facts:

**1. Pauline's roommate refutes key aspects of Pauline's story.**

86. Pauline told BPD that she ran to OM's room immediately after Johnny brandished a switchblade knife and told OM "multiple times that something [was] wrong and that [she] needed help and was going to be sick."[31]

---

[28] *Id.* at VT-001375, Tr. 78:9-11.

[29] *Id.* at VT-001375, Tr. 78:8.

[30] *Id.* at VT-001342, Tr. 45:8-10 (Q. "Well, he never threatened you with a knife, did he?" A. "No, sir.")).

[31] **Ex. 33**, PP-IR Addendum I at 8.

87. But OM told BPD that during that visit to her room, Pauline "was happy and laughing and being loud," and "at no time did Pauline state to her she need[ed] help or there was anything wrong."[32]

88. Pauline also told BPD that after the alleged sexual assault she went to OM's room and told her about the sexual assault.[33]

89. But OM told BPD that during the second visit to her room, Pauline said only that "she and Johnny had sex, and [that] he has been in her room for a long time and will not leave."[34]

### 2. Pauline feigns a suicide attempt after learning her roommate refuted key aspects of her story.

90. On information and belief, BPD's interview of OM occurred on November 3, 2023.[35] On information and belief, Pauline feigned a suicide attempt on November 5, 2023, because OM was not backing Pauline's story.[36]

---

[32] *Id.* at 30.

[33] *Id.* at 9, 15.

[34] *Id.* at 30.

[35] On Thursday, November 2, 2023, a BPD detective told Johnny's counsel that he planned to interview OM on Friday, November 3. On the morning of Monday, November 6, that detective updated the BPD file with his summary of his interview of OM. **Ex. 33**, PP-IR Addendum I at 30.

[36] At the VT hearing, Pauline testified that she tried to commit suicide in November 2023. **Ex. 38**, 05/09/24 Tr. 39:15-19. In response to a Virginia Freedom of Information Act request, BPD said that it has "a two-page record for a call for service related to Pauline on 11/05/23," but that BPD could not release the record because it contains "identifying information of a personal, medical, or financial nature." **Ex. 39**, VFOIA Response. On information and belief, because Deziree Twigger (a VT Office for Equity and Accessibility investigator and former BPD detective) was in contact with BPD about the Pauline case at this time, VT was aware of Pauline's purported suicide attempt.

3. **The Blacksburg PD file shows that Pauline knowingly made several false statements during her Protective Order hearing testimony.**

91. Although the Office of the Commonwealth's Attorney was not a party to the Protective Order hearing, Pauline invited one of the office's sex crimes prosecutors to attend the hearing. At the hearing, the prosecutor saw Pauline give testimony that the prosecutor knew was false based on the BPD investigation file.

92. For example, Pauline testified that she told BPD about a knife when BPD first interviewed her a few hours after the alleged sexual assault.[37] But the BPD file shows that Pauline said nothing about a knife during that first interview.

93. Indeed, the BPD officer who conducted that interview affirmatively stated in his report that the alleged incident did *not* involve a knife or any other type of weapon.[38]

94. As another example, Pauline testified that she applied for a Protective Order "as soon as" she learned she could file for one.[39] But the BPD file shows that BPD told Pauline about the Protective Order process approximately two weeks before she filed for a Protective Order.[40]

---

[37] **Ex. 32**, PP-IR at VT-001361, Tr. 64:4-15.

[38] **Ex. 33**, PP-IR Addendum I at 3.

[39] **Ex. 32**, PP-IR at VT-001360, Tr. 63:19-20.

[40] **Ex. 33**, PP-IR Addendum I at 13. Pauline applied for an Emergency Protective Order and a VT No Contact Order on October 26; she applied for a two-year Protective Order on October 30.

95. A few days after the Protective Order hearing, the prosecutor told Johnny's lawyer that the Office of the Commonwealth's Attorney would not file charges against Johnny.[41]

**E. VT's Investigators conduct an investigation that is not "impartial," "thorough," or "prompt."**

**1. A VT Investigator advises Pauline to withhold relevant evidence.**

96. Pauline provided VT with three photos of her chest and neck area that she said showed red marks caused by Johnny during the alleged sexual assault. Two of those photos were "selfies" that Pauline took of herself and that she showed to the District Court Judge during the Protective Order hearing.[42] (The Judge obviously did not find the photos to be evidence that an assault had occurred). The other photo was purportedly taken during a medical examination shortly after the alleged incident.

97. In response to the photos, Johnny provided VT with uncontradicted written expert witness testimony from Amber O'Malley, a board-certified sexual assault nurse examiner ("SANE").[43] Nurse O'Malley examined the photos and concluded that they did not show any injuries.[44]

---

[41] **Ex. 38**, 05/09/24 Tr. 150:18-21.

[42] **Ex. 32**, PP-IR at VT-001317, Tr. 20:22 – 23:15.

[43] **Ex. 37**, O'Malley written testimony and CV (May 5, 2024) and O'Malley addendum to written testimony (May 8, 2024) (Johnny provided all these documents to the Director of VT's Office of Student Conduct prior to the hearing, and the Director forwarded them to the Hearing Officers and Pauline prior to the hearing).

[44] *Ibid.*, O'Malley addendum.

98. At the VT hearing, Pauline testified that she had "48 or 50" additional photos from her medical examination.[45] When the Hearing Officers asked Pauline why she did not submit those photos to VT, Pauline responded that VT Investigator Deziree Twigger told her there was no need to submit those photos because Pauline's experience with Johnny had already been "traumatic enough."[46]

### 2. VT's Investigators ignore the university's training materials on how to conduct "impartial" and "thorough" investigations.

99. The 2020 Title IX Rule requires VT to train its Title IX investigators on how to conduct investigations that are thorough and impartial. *See* 34 C.F.R. § 106.45(b)(1)(iii). VT posts its Title IX training materials on its website.[47] VT's Investigators did not comply with those materials when investigating Pauline's allegations.

100. For example, VT's training materials say an investigator should "recreate the scene" with pictures or a floorplan of the location of the alleged incident.[48] Pictures of a floorplan of the scene would have been relevant here because Pauline alleged Johnny violently assaulted her for ninety minutes while two of her roommates were in the apartment. But VT's Investigators did not obtain pictures or a floorplan of the apartment.

---

[45] **Ex. 38**, 05/09/24 Tr. 112:5-6.

[46] *See id.* at 113:7-9.

[47] The 2020 Title IX Rule requires VT to do this. 34 C.F.R. § 106.45(b)(10)(D).

[48] *See* Doc. 1, Complaint at ¶ 141.

101. As another example, VT's training material say that investigators should use text messages and other electronic data to create a "timeline of events" with "as much detail as possible."[49]

102. VT's Investigators never created a timeline of events for the Pauline case. And they showed little interest in tracking down text messages and other electronic data that would have been invaluable in conducting a thorough and impartial investigation.

103. Pauline provided BPD with screen shots of a group chat text conversation between herself and her roommates and neighbors that began at 9:43 p.m. on the night in question—approximately an hour and forty-five minutes after Johnny arrived at her apartment and approximately ninety minutes after Johnny allegedly began sexually assaulting her.[50] Any messages that Pauline sent in that group chat between the time Johnny arrived at the apartment and the time Pauline sent the text at 9:43 p.m. would have been relevant to Pauline's allegations.

104. But at the VT hearing, Investigator Twigger testified that she did not even ask Pauline if there were any earlier messages in the group chat. According to

---

[49] *Id.* at ¶ 142.

[50] **Ex. 33**, PP-IR Addendum I at 27; *see also* **Ex. 32**, PP-IR at VT-001388 – VT-001390 (email from Johnny to Twigger with screenshots of text messages demonstrating that Johnny arrived at Pauline's apartment by 8:00 p.m.); *id.* at VT-001342 – VT-001343, Tr. 45:19 – 46:5 (Pauline testifying that she and Johnny began having sex about 20 minutes after he arrived at her apartment).

Twigger, it was not VT's job to determine whether there may be additional evidence that should be requested from Pauline.[51]

105. Twigger's failure to ask for earlier messages in the group chat cannot be chalked up to incompetence. Before becoming a Title IX investigator, Twigger was a detective for the Blacksburg PD. While on the job with BPD, Twigger learned that text messages can be important evidence in a case. In the 2018 prosecution of two VT students for homicide, the prosecution called Detective Twigger to testify about text messages that were obtained during BPD's investigation.[52]

106. VT's Investigators also denied Johnny's written request that they check VT's Canvas records for evidence that Pauline took an online quiz for one of her classes during the timeframe in which Pauline alleged Johnny sexually assaulted her.[53] Johnny explained in his written request that he believed Pauline took an online test or quiz at some point between the time he arrived at her apartment and 8:30 p.m., and therefore "any evidence showing that [Pauline] took an online quiz during the relevant timeframe would undermine her account of the events of October 11."[54] But without explanation, VT's Investigators failed to check the Canvas records.

---

[51] Twigger testified she simply allowed Pauline to decide what text messages were relevant. **Ex. 38**, 05/09/24 Tr. 32:15-17. When Johnny asked Twigger whether previous texts "would have been helpful to this investigation," Twigger responded, "I can't speculate on that. I don't know if any previous texts even occurred." *Id.* at 32:20-25.

[52] *See* Mike Gangloff, *Eisenhauer Convicted of Killing Blacksburg Teen*, Roanoke Times, Feb. 9, 2018 (discussing Detective Twigger's role at the trial); Mike Gangloff, *Keepers Trial: Defense Opened the Door for Prosecution Evidence, Judge Says*, Roanoke Times, Sept. 19, 2018 (same)).

[53] **Ex. 32**, PP-IR at VT-001281 – VT001282, VT-001388. Canvas is an on-line educational platform that VT uses that allows students to take tests and quizzes remotely.

[54] *Id.* at VT-001388.

### 3. VT's Investigation Report ignores Pauline's numerous false and inconsistent statements and misrepresents evidence.

107. VT's Investigation Report included a four-page section called "Summary of Relevant Information," and a two-page section called "Analysis of Allegations and Responses: Points of Agreement and Disagreement."[55] Neither of those sections mentioned that Pauline's roommate OM flatly refuted what Pauline told BPD about Pauline's two trips to OM's room on the night in question. Nor did either of those sections mention that the BPD report showed that Pauline falsely told the District Court that she mentioned a knife during her first interview with BPD. And even though Pauline conceded at the Protective Order hearing that Johnny never threatened her with a knife, the Analysis/Points of Disagreement section said there was disagreement on whether Johnny threatened Pauline with a knife.[56]

### 4. VT's Investigators take 148 days to complete their investigation (three times longer than VT's policy on "prompt" investigations).

108. VT's policy is for sexual assault investigations to be completed within 45 days.[57] But even though VT interviewed only one witness (Pauline), it took VT's Investigators 148 days to complete the investigation of Pauline's allegations.[58]

---

[55] *Id.* at VT-001263, VT-001267.

[56] *Id.* at VT-001267.

[57] *See* <u>**Ex. 55**</u>, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 14.

[58] The Office for Equity and Accessibility ("OEA") issued its Notice of Investigation on November 6, 2023, and it issued its Investigation report 148 days later, on April 2, 2024.

109. VT policy required the Investigators to provide Johnny with an explanation as to why the 45-day goal was not met,[59] but they never provided Johnny with such an explanation.

**F. VT's Hearing Officers conduct a hearing that violates Plaintiff's right to due process.**

110. VT's Office of Student Conduct held a Zoom hearing on Pauline's allegations on May 9, 2024. Office of Student Conduct officials Ariana DiFillippo and Sara Stayer served as the Hearing Officers.

### 1. The Hearing Officers apply the preponderance of evidence standard rather than the clear and convincing evidence standard.

111. In accordance with VT policy, the Hearing Officers applied the preponderance of the evidence standard.

112. Under Virginia statutory law, a state university disciplinary proceeding for sexual assault threatens the accused student with a "stigma" that constitutes a deprivation of his "liberty" interest in his "good name" and "reputation"—*i.e.*, a mandatory transcript notation of the disciplinary action. *See* Va. Code § 23.1-900(B); *cf. UNC*, 133 F.4th at 318-319. Therefore, VT was required to use the clear and convincing evidence standard in the Pauline Poe matter. *Santosky*, 455 U.S. at 756.[60]

---

[59] *See* **Ex. 55**, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 14.

[60] Virginia applies the clear and convincing standard for findings and sanctions against defendants in civil matters that constitute a stigma and deprivation of liberty far less severe than the stigma and deprivation of a liberty interest suffered by a college student who is suspended or expelled for sexual assault. *See* Doc. 1, Complaint at ¶ 152.

### 2. The Hearing Officers prohibit Plaintiff's attorney from cross-examining Pauline.

113. In accordance with VT's two-track system for adjudicating allegations of sexual misconduct, the Hearing Officers did not allow Johnny's attorney to cross-examine Pauline. VT told Johnny that he would have to conduct the cross-examination himself, even though he was a twenty-year-old college sophomore with no legal training. Such cross-examination does not satisfy the requirement for "cross-examination [that] will materially assist in ensuring a meaningful hearing." *Doe v. UNC*, 133 F.4th at 317.

### G. The Hearing Officers issue a decision which discriminates against Plaintiff on the basis of sex, and which violates Plaintiff's right to due process.

114. The Hearing Officers issued their written decision—called a Formal Hearing Outcome ("FHO")—on May 31, 2024. *See* <u>**Ex. 40**</u>. In their FHO, the Hearing Officers found Johnny "responsible" for violations of the Student Code of Conduct—sexual assault, abusive conduct, and dating violence—and they suspended Johnny for two years.

115. The Hearing Officers based their findings solely on their determination that Pauline was "more credible" than Johnny. *Id.* at 13. According to the FHO, Pauline was "more credible" than Johnny because (1) Johnny "was unable to articulate how consent was established and could not articulate, in detail, how the sexual encounter progressed," whereas (2) Pauline's "version of events remained the same in both the investigation and during the hearing." *Id.*

### 3. The Hearing Officers intentionally mischaracterize Plaintiff's testimony.

116. As shown in the footnote below, Johnny gave extensive testimony on how consent was established and how the sexual encounter progressed.[61]

117. The Hearing Officers' finding that Johnny "was unable to articulate how consent was established and could not articulate, in detail, how the sexual encounter progressed," is so objectively false that it demonstrates that the Hearing Officers issued their decision in bad faith.

---

[61] Johnny testified that Pauline "began kissing" him, which led to them "making out." **Ex. 38**, 05/09/24 Tr. 116:23-25. Johnny testified that while they were "making out," Pauline said something along the lines of "you are giving me the female version of blue balls" and "are you going to finish what you started?" *Id.* at 121:12-25. Johnny testified that "making out," led to "foreplay," which included "touching each other sexually." *Id.* at 125:4-8. Johnny explained that "touching each other sexually" included touching each other's genitals. *Id.* at 130:18-23 (Q. "Can you describe where Pauline touched you in regards to the foreplay?" A. "My crotch." Q. "Could you provide any additional details?" A. "She touched my penis.") *id.* at 125:9-19 (Q. "Could you describe touching each other sexually? Where were you touching each other?" A. "We each -- she touched my crotch and I touched her crotch." Q. "Is that on top of her vagina, inside, like I need more details." A. "Just vaginal, ma'am." Q. "Did you penetrate her vagina with your fingers?" A. "Yes, ma'am."). Johnny testified that he took his clothes off and Pauline took her clothes off. *Id.* at 123:24 – 124:4 (Q. "And who took your clothing off?" A. "I did ma'am." Q. "Who took Pauline's clothing off?" A. "She did ma'am."). Johnny testified that it was Pauline's idea to get condoms, and that Pauline retrieved condoms from her drawer. *Id.* at 124:13-18 (Q. "And whose idea was it to get condoms out?" A. "She did ma'am." Q. "It was her idea or she got them out?" A. "Both, ma'am."). Johnny testified that he and Pauline then engaged in sex in the "missionary" position and that they later switched positions whereby Pauline was "facing on the bed," and "then it concluded after that." *Id.* at 120:21-23; *see also* 122:7-10 (Q. "And you mentioned that you started missionary style and then later she was turned the other way, correct?" A. "Yes, ma'am."). Johnny testified that this sexual encounter lasted about "20 minutes." *Id.* at 125:20-23). Johnny testified that at no point during the sexual encounter did Pauline state that she wanted to stop. *See id.* at 130:24 – 131:9 (Q. "Do you recall Pauline saying stop at any point during your sexual encounter?" A. "She never said stop." Q. "Did it seem like she was trying to make excuses to stop the sexual interaction --" A. "No."). Johnny testified that he never smacked, hit, or choked Pauline. *See id.* at 126:21 – 127:7 (Q. "And at any point during intercourse did you smack Pauline on her buttocks?" A. "No, ma'am." Q. "What about her back?" A. "No, ma'am." Q. "At any point during intercourse did you choke Pauline?" A. "No, ma'am." Q. "Did you apply pressure using your hands around her clavicle area or neck?" A. "No, ma'am."); *id.* at 120:23-24 ("I did not shove her face into a pillow or anything like that.")).

### 4. The Hearing Officers disregard Pauline's numerous false and inconsistent statements.

118. As Johnny correctly observed in his closing argument to the Hearing Officers, "Pauline says things that are not true, even when she's under oath." **Ex. 38**, 05/09/24 Tr. 160:14-15. Indeed, through the course of the BPD investigation, the Protective Order hearing, the VT investigation, and the VT hearing, Pauline made at least 17 objectively false or inconsistent statements. Those statements included ones about things that happened before, during, and after the sexual encounter. The Hearing Officers, however, disregarded those false and inconsistent statements. Pauline's false and inconsistent statements were as follows:

119. *First*, Pauline gave inconsistent statements about the number of times she had sex with Johnny prior to the night in question, October 11, 2023. At the Protective Order hearing, Pauline first said that she had sex with Johnny only one time prior to October 11. But when Johhny's counsel reminded Pauline that she was "under oath," Pauline said she was "not too sure" if was only one time.[62] At one point in the VT hearing, Pauline said that she had sex with Johnny only one time prior to October 11.[63] But at another point in the hearing, she slipped up and conceded that it was more than one time.[64] And in a text message Pauline sent to Johnny prior to

---

[62] **Ex. 32**, PP-IR at VT-001329, Tr. 32:1-8, 32:17-19.

[63] **Ex. 38**, 05/09/24 Tr. 148:12-13 ("we had a sexual encounter once prior to this incident").

[64] *Id.* at 91:15-20 (Q. "And Pauline, had you previously had sex with Johnny prior to October 11?" A. "Yes." Q. "Could you share how consent was established *those times*?" A. "Yes. So *those times* it was yes, very, consensual.") (emphasis added).

October 11, Pauline mentioned that she and Johnny had sex "twice."[65] (As discussed below, Johnny provided that text message to VT during the investigation; Pauline withheld that text message from VT).

120.    _Second_, Pauline gave inconsistent statements about how many times she spoke with Johnny on the phone in the days leading up to October 11. At the Protective Order hearing, she testified that she spoke to him on the phone only "once."[66] But at the VT Hearing, she testified she spoke with him on the phone "two or three" times.[67]

121.    _Third_, in her sworn testimony at the Protective Order hearing and her testimony at the VT hearing, Pauline falsely testified that when she first met with BPD she told them Johnny brought a knife to her apartment.[68] The BPD summary of the first interview of Pauline said nothing about a knife,[69] and the BPD officer who conducted the first interview affirmatively stated in his report that the alleged incident did not involve a weapon of any kind, including a knife.[70]

---

[65] **Ex. 32**, PP-IR at VT-001393 (screenshots of 10/09/23 text messages between Pauline and Johnny in which Pauline says that she and Johhny had "practiced [making babies] twice").

[66] _Id._ at VT-001302, Tr. 5:18-20 (Q. "Did you speak on the telephone at any time between August and October 11?" A. "Once, yes.").

[67] **Ex. 38**, 05/09/24 Tr. 93:13-22 (Q. "How did you communicate with Johnny that you didn't want to have sex during or after the movie?" A. "Are you relating to the October 11?" A. "Yes, sorry. Thank you." A. "Okay. So it was established. I know we had, I think, like two or three phone calls talking about everything.").

[68] **Ex. 32**, PP-IR at VT-001361, Tr. 64:4-15; **Ex. 38**, 05/09/24 Tr. 75:1-6.

[69] **Ex. 33**, PP-IR-Addendum I at 6.

[70] _Id._ at 3.

122. *Fourth*, although Pauline later told BPD that Johnny had "a very big knife that looked like a switchblade,"[71] she admitted at the Protective Order hearing that she does not know what a switchblade looks like.[72]

123. *Fifth*, Pauline falsely told BPD that when she first went to OM's room on the night in question (immediately after Johnny allegedly brandished a switchblade), she told OM "multiple times that something [was] wrong and that [she] needed help and was going to be sick."[73] But according to OM, Pauline was "was happy and laughing and being loud," when she first came to OM's room, and "at no time did [Pauline] state to her [that] she need[ed] help or there was anything wrong."[74]

124. *Sixth*, Pauline gave inconsistent statements about watching a movie with Johnny on October 11. Pauline originally told BPD that she and Johnny started watching the movie on her laptop in her bed, and that she briefly left the bedroom to get her charger from the first floor living room when the laptop ran out of power.[75] But when Pauline gave a written statement to BPD and was interviewed again by BPD several days later, she said that she retrieved both the laptop and the charger

---

[71] *Id.* at 8.

[72] **Ex. 32**, PP-IR at VT-001306, Tr. 9:1-3 ("And I'm not too familiar with knives, I don't know if it was a switchblade, anything like that.").

[73] **Ex. 33**, PP-IR Addendum I at 8.

[74] *Id.* at 30.

[75] *Id.* at 6 (stating Pauline told BPD that "the laptop died while they were watching the movie" and that Johnny "made her go downstairs to get the charger to the laptop so they could stay in her room").

from the first floor bedroom *before* she and Johnny started watching the movie.[76] And at the Protective Order hearing, she testified that her laptop was already in her room and already out of power before she and Johnny started watching the movie.[77]

125. **_Seventh_**, Pauline gave inconsistent statements about who took her clothes off when she and Johnny were watching the movie in her bed. She told BPD that when she and Johnny started getting physical, she took her pants off "so they would not get ruined."[78] But during direct examination by her lawyer at the Protective Order hearing, Pauline testified that Johnny took her pants off.[79]

126. **_Eighth_**, Pauline gave inconsistent statements about whose idea it was to use condoms. She told BPD and the VT Investigators that Johnny ordered her to get condoms from her dresser drawer.[80] But at the VT hearing, she boasted that she decided to get condoms from her drawer so that the sex would "happen in the safest way possible for both of us."[81]

127. **_Ninth_**, Pauline gave inconsistent statements on whether she got undressed before or after she got the condoms from her drawer. She told BPD and the VT Investigators that she got the condoms *after* she got undressed.[82] But at the

---

[76] *Id.* at 8, 14.

[77] **Ex. 32**, PP-IR at VT-001305, Tr. 8:14-18; *id.* VT-001338, Tr. 41:3-10.

[78] **Ex. 33**, PP-IR-Addendum I at 9.

[79] **Ex. 32**, VT-001309, Tr.12:7-9 (Pauline stating, "I put [condoms] down on the bedside table next to him, and at that point he started to undress himself and he took my pants off"); *id.* at 12:19-21 (Q. "When he had taken your pants off, did he take all of your clothes off?" A. "Yes.").

[80] **Ex. 33**, PP-IR-Addendum I at 9, 14; **Ex. 32**, PP-IR at VT-001276.

[81] **Ex. 38**, 05/09/24 Tr. 83:22 – 84:9.

[82] **Ex. 33**, PP-IR-Addendum I at 9 ("He told me to take off my pants, and I did so they wouldn't get ruined. He then told me to get condoms …"); **Ex. 32**, PP-IR, VT-001276 ("Pauline stated,

Protective Order hearing, Pauline testified that she got the condoms *before* she got undressed.[83]

128.    *Tenth*, Pauline gave wildly inconsistent statements about how long the alleged sexual assault lasted. She told BPD that it lasted "for an hour and a half."[84] But at VT hearing, she testified that the sexual assault was 45 minutes, and that the other 45 minutes of the "hour and a half" consisted of the time she spent going to her roommate OM's room and writing a text message to her roommates and neighbors.[85] But that testimony was inconsistent with her previous testimony that her visits to OM's room totaled no more than five minutes and that she wrote the text message quickly.[86]

129.    *Eleventh*, Pauline gave inconsistent statements and testimony about where Johnny was when she wrote and sent a group chat text message to her roommates and neighbors. She told BPD and the Montgomery County District Court Judge that Johnny was sitting next to her when she sent the text.[87] But at the VT

---

'when she walked over to the dresser after Johnny told her to get condoms, she was completely naked at that point and just reached into her dresser drawer and pulled one out, but it was still connected to another one, so she took them both.").

[83] **Ex. 32**, PP-IR, VT-001309, Tr. 12:5-9 ("So I went to by beside table to grab, two condoms came out when I just grabbed at my beside table, and I put them down on the bedside table next to him, and at that point he started to undress himself and he took my pants off.")

[84] **Ex. 33**, PP-IR Addendum I at 6.

[85] **Ex. 38**, 05/09/24 Tr. 95:18-21 ("I think I touched upon that it was like an hour and a half but … like half that time [was when] I went and spoke to my roommate or was texting her").

[86] **Ex. 32**, PP-IR at VT-001345, Tr. 48:23-24 (discussing first visit to OM's room: "I was in her room for maybe a minute or two"); *id.* at VT-001313, Tr. 16:19-20 (discussing second visit to OM's room: "I was there maybe two or three minutes"); **Ex. 38**, 05/09/24 Tr. 101:24-25 ("And that's when I was able to just grab my phone, issue a little text.").

[87] **Ex. 33**, PP-IR Addendum I at 9 ("I told him to give me a second, so I made him get off from on top of me. During this time, I frantically texted 5 of my roommates and my other three

hearing, she testified that Johnny was on top of her and holding her down when she wrote and sent the text.[88]

130. *Twelfth*, Pauline gave inconsistent statements about whether OM called her on the phone after receiving Pauline's text or whether OM simply knocked on Pauline's bedroom door after receiving the text. Pauline told OEA that OM called her and that she answered OM's call, and that OM only knocked on the door after becoming concerned that Pauline had not come out of the bedroom.[89] But Pauline told BPD that OM immediately responded to the text by knocking on Pauline's door.[90]

131. *Thirteenth*, Pauline falsely told BPD that she told OM about the alleged sexual assault when she went to OM's room after OM knocked on her door.[91] OM told BPD that Pauline said nothing about a sexual assault when Pauline came to her room.[92]

---

roommates"); **Ex. 32**, PP-IR at VT-001312, Tr. 15:11 – 16:4 (Q. "Were you able to get him off you when he wanted [sic] back?" A. "Yes, that second time I had gotten out from under him and I went, I sat on my bed and I grabbed by phone that was on my bedside table and I texted … my neighbors and my roommates …" Q. "What happened after you sent that message?" A. "After I sent that message, I'm not too sure if he saw that message or not, but he tried to get on top of me again …"); *id.* at VT-001356, Tr. 59:5-9 (Q. "Okay, and so you got your phone in your hand and started texting people?" A. "Correct, yes." Q. "Where was Johnny at this point?" A. "He was on the left side of me …").

[88] **Ex. 38**, 05/09/24 Tr. 100:7-19 (Q. "So was he still penetrating you when you were texting?" A. "No, but he was still touching me on my body holding me down. But kind of like I said, he was holding me down from like my chest, neck, and shoulders. And when a body is on you, it's hard to also like get up. So I was kind of just texting …. And I was at this time on my back …")).

[89] **Ex. 32**, PP-IR at VT-001277.

[90] **Ex. 33**, PP-IR Addendum I at 9, 15.

[91] *Id.* at 9, 15.

[92] *Id.* at 30.

132. *Fourteenth*, Pauline gave inconsistent testimony on whose idea it was to go to the hospital after the alleged sexual assault. Pauline told BPD that OM recommended she go to the hospital, and that OM did not make that recommendation until after Pauline returned from driving Johnny to the bus stop.[93] But at the VT hearing, Pauline testified it was her idea to go to the hospital. According to Pauline, when she got dressed immediately after the alleged sexual assault, she had the foresight to make sure nothing wiped Johnny's bodily fluid from her arm because she planned to have the hospital conduct a DNA test on that fluid.[94]

133. *Fifteenth*, Pauline gave inconsistent statements about who went with her to the hospital. She told BPD that only OM went with her.[95] But at the VT hearing, she testified that OM and one other roommate went with her.[96]

134. *Sixteenth*, Pauline gave inconsistent statements on the medications the hospital gave her. She told BPD that the hospital gave her "pain management meds" because she was in "so much physical pain."[97] But at the Protective Order hearing, she testified that the hospital only gave her "antibiotics" to protect against sexually transmitted infections.[98]

---

[93] *Id.* at 9; *see also id.* at 30.

[94] **Ex. 38**, 05/09/24 Tr. 105:7-13.

[95] **Ex. 33**, PP-IR Addendum I at 15.

[96] **Ex. 38**, 05/09/24 Tr. 145:2-15.

[97] **Ex. 33**, PP-IR Addendum I at 10.

[98] **Ex. 32**, PP-IR at VT-001316, Tr. 19:19 – 20:6 ("Q. Were you given any medication?" A. "I was given antibiotics just as a preventative measure for STIs or anything I would have contracted.").

135. *Seventeenth*, at the Protective Order hearing, Pauline falsely testified that she applied for a Protective Order "as soon as" she learned she could file for one.[99] The BPD file shows that BPD told Pauline how to file for a Protective Order 13 days before she filed for an Emergency Protective Order and 17 days before she filed for a Protective Order.[100]

### 5. The Hearing Officers disregard the fact that Pauline withheld and spoliated relevant evidence.

136. In addition to disregarding Pauline's numerous false and inconsistent statements, the Hearing Officers disregarded Pauline's withholding and spoliating evidence.

137. *First*, Pauline withheld the video from the security camera on the outside of the front door of her apartment from the night at issue.[101] That video was relevant evidence because (1) it would have shown Pauline's demeanor toward Johnny when she left the apartment to drive Johnny to a bus stop shortly after the alleged sexual assault occurred; (2) it would have recorded anything Pauline and Johnny said to each other as they left the apartment; and (3) it would have shown Pauline's demeanor when she returned from driving Johnny to the bus stop.

138. *Second*, Pauline withheld the records from her medical exam from the night at issue.[102] Those records were relevant because they would have included what

---

[99] *Id.* at VT-001360, Tr. 63:16-20.

[100] **Ex. 33**, PP-IR Addendum I at 13.

[101] **Ex. 32**, PP-IR at VT-001262; **Ex. 38**, 05/09/24 Tr. 13:19 – 15:6, 65:22 -66:1, 166:16 – 167:2.

[102] **Ex. 38**, 05/09/24 Tr. 113:7-9.

Pauline told hospital personnel about the alleged assault and the hospital's medical findings.

139.    *Third*, Pauline withheld nearly all the text messages she and Johnny exchanged with each other in the days leading up to the alleged sexual assault. Those text messages showed that she and Johnny had sex two times prior to the night at issue (not once, as she claimed at the Protective Order hearing),[103] and that Johnny first told Pauline about Jane Roe's potential Title IX complaint against him two days before Johnny went to her apartment (not after they had sex in her apartment, as Pauline told BPD).[104]

140.    *Fourth*, Pauline altered one of the few text messages that she did produce. Pauline told BPD and the Montgomery County District Court that she and Johnny planned to make dinner as part of a "date night" when he came to her apartment on the night at issue.[105] But a text conversation between Johnny and Pauline from earlier that night showed that Johnny had dinner before he went to

---

[103] **Ex. 34**, PP-IR Addendum II at 7-8. (By October 11, 2023, Plaintiff was concerned that Jane Roe was going to file a Title IX complaint against him. Jane's roommate, Cadet DM, had told Plaintiff that Jane was "blackout drunk" when she had sex with Plaintiff and therefore Jane did not consent to the sexual encounter. *See* **Ex. 3**, 11/17/23 VTPD summary of interview of Cadet DM.).

[104] **Ex. 34,** PP-IR Addendum II at 11 (Johnny: "My career might be fucked … idk what to do and I'm terrified rn."  Pauline: "Who even is this chick[?] … Like is there beef now[?]"); **Ex. 33**, PP-IR Addendum I at 9, 13.

[105] **Ex. 32**, PP-IR at VT-001303, Tr. 6:1-4 (Q. "Did you have plans with Johnny on October 11?"  A. "Yes, we were going to make dinner and watch a movie."); *accord* **Ex. 33**, PP-IR Addendum I at 8, 14.

Pauline's apartment. So, Pauline deleted that portion of the text exchange before she produced it.[106]

### 6. The Hearing Officers disregard evidence that explains why Pauline falsely accused Plaintiff of sexual assault.

141. The Hearing Officers disregarded evidence that provided at least three reasons why Pauline would have falsely accused Johnny of sexual assault.

142. *First*, there is evidence in the record that Pauline was upset with Johnny because he did not want an exclusive relationship with her. Prior to the night in question, Pauline said that Johnny had "screwed her over" in the past by having sex with her while he was pursuing other women, and that she was worried he was going to "screw her over again."[107] And when Johnny was at Pauline's apartment on the night in question, Pauline saw Johnny send text messages to another female student, including a message from Johnny saying he would see that student in the Corps of Cadets dormitory later that night.[108]

143. *Second*, there is evidence in the record that Pauline suffers from mental illness. Pauline injected her mental health issues into the case. She told a VT Investigator that she returned to her bedroom (where Johnny was waiting) after the alleged knife incident because she was worried about her "registered Emotional

---

[106] **Ex. 38**, 05/09/24 Tr. 164:24 – 165:25; *compare* **Ex. 34**, PP-IR Addendum II at 14 (screenshot of text provided by Johnny) *with* **Ex. 33**, PP-IR Addendum I at 17-18 (screenshots of texts provided by Pauline); **Ex. 41**, Appeal at 32 (side-by-side comparison of screenshots).

[107] **Ex. 38**, 05/09/24 Tr. 68:17 – 69:15; **Ex. 34**, PP-IR-Addendum II at 11.

[108] *See* **Ex. 38**, 05/09/24 Tr. 52:21 – 53:13; **Ex. 36**, 10/11/23 text messages.

Support Animals" in the room.[109] According to the Department of Housing and Urban Development, "emotional support animals provide very private functions for persons with mental and emotional disabilities."[110] And at the VT hearing, Pauline testified that she had been undergoing "regular therapy" in the months prior to the alleged incident.[111]

144. Moreover, the evidence in the record demonstrates that Pauline exhibits at least four of the criteria for a diagnosis of Histrionic Personality Disorder ("HPD")—a psychiatric condition characterized by attention-seeking behavior, including making up stories about being sexually assaulted.[112]

145. Johnny notes that he remained respectful when raising Pauline's mental health issues during the VT hearing. Addressing the Hearing Officers, Johnny stated:

> Again, I'm trying to be respectful, and I recognize that some may argue that the mental health issue should be off limits. But when factfinders such as you are being asked to reach a decision that may label a 20-year-old as a rapist for the rest of his life, [it] is fundamentally unfair for the factfinders to ignore relevant evidence simply because it is uncomfortable to consider that evidence.[113]

---

[109] **Ex. 32**, PP-IR at VT-001275.

[110] *Pet Ownership for the Elderly and Persons with Disabilities*, 73 Fed. Reg. 6384, 6386 (Oct. 27, 2008); *see also* **Ex. 38**, 05/09/24 Tr. 53:19-25 (discussing criteria for using emotional support animals).

[111] **Ex. 38**, 05/09/24 Tr. 63:25 – 64:3.

[112] *See* Doc. 1, Complaint at ¶¶ 191-196.

[113] **Ex. 38**, 05/09/24 Tr. 53:25 – 54:8.

146. *Third*, at the VT hearing, Pauline demonstrated that she is an incredibly immature person.

147. That allegation may seem harsh, but it's not nearly as harsh as the things Pauline said about Johnny at the VT hearing. *See, e.g.*, **Ex. 38**, 05/09/24 Tr. 43:20 (calling Johnny "sick and twisted"); *id.* at 40:5-7 (saying Johnny "is not only a threat to campus safety as a whole being a repeat offender but [also] to society.").

148. In any event, during the VT hearing Pauline attacked Johnny's lawyer for helping Johnny with pre-hearing written filings.[114] Pauline also accused Johnny of trying to use his "privilege" to avoid responsibility for his actions.[115] And Pauline (falsely) accused Johnny's lawyer of having a prior relationship with one Johnny's expert witnesses.[116]

149. With respect to that last accusation, Johnny aptly responded in his closing argument as follows: "[Pauline's] conspiracy theory is not only insulting to [my lawyer] and Ms. Collins, who are both veterans, it is also ridiculous and frankly quite immature. It really calls into question whether anything she says is credible."[117]

---

[114] *Id.* at Tr. 41:11-19 (accusing Johnny's lawyer of providing Johnny with "legal jargon" to "try and intimidate and distract from the facts of this case" and "bombard all parties with evidence to take away from the horrific act that he did").

[115] *Ibid.*

[116] *Id.* at 40:17 – 41:7, 60:2-7.

[117] *Id.* at 05/09/24 Tr. 173:24 – 174:4.

**7. The Hearing Officers treat Pauline and Plaintiff differently when evaluating their credibility.**

150. Considering this Complaint's detailed analysis of Pauline and Johnny's testimony and of this Complaint's analysis of documentary evidence, it is clear the Hearing Officers treated Pauline and Johnny differently by applying a lower credibility standard to Pauline than they applied to Johnny. The Hearing Officers mischaracterized Johnny's testimony; they disregarded Pauline's numerous false and inconsistent statements; they disregarded the fact that Pauline withheld evidence and spoliated evidence; and they disregarded evidence that would reasonably explain why Pauline made false allegations against Johnny.

**H.  VT's Office of Student Conduct violates Plaintiff's right to due process by allowing Pauline to submit an *ex parte* opposition to Plaintiff's appeal.**

151. VT policy provides that either party to a disciplinary case may appeal the Hearing Officers' findings on various grounds, including that the findings were "arbitrary," and that either party may file an opposition to another party's appeal.[118]

152. Johnny timely appealed the Hearing Officers' findings against him. When doing so, he told the Director of VT's Office of Student Conduct, Mr. Rohsaan Settle: "If Pauline does submit a response [to my appeal], please send a copy of her response to me."[119]

---

[118] **Ex. 54**, Student Code of Conduct at 20. The term "arbitrary" is generally understood as encompassing the terms "arbitrary and capricious" and "bad faith" *See, e.g.* Black's Law Dictionary 104 (defining the term "arbitrary" as including an act "done capriciously" and stating that "'arbitrary' is synonymous with bad faith").

[119] **Ex. 42**, 06/11/24 & 06/13/23 Email Communications.

153. Approximately one week after Johnny filed his appeal, Pauline sent Mr. Settle a three-page, singe-spaced opposition to the appeal.[120] In her opposition, Pauline said she had additional evidence (which had not been presented to the Hearing Officers) to support her allegations.

154. Settle included Pauline's opposition with the materials he forwarded to the Appellate Officer for the case.[121]

155. Settle told the Appellate Officer that Pauline's opposition should be the final document read before deciding the appeal.[122]

156. VT did not provide Johnny with a copy of Pauline's opposition until March 2026, when VT began producing documents responsive to Plaintiff's request for production in this litigation.

## I. VT's Appellate Officer issues a decision which discriminates against Plaintiff on the basis of sex, and which violates Plaintiff's right to due process.

157. Dr. Chelsea Haines, Ph.D., served as the Appellate Officer for the Pauline matter.

158. VT assigned Dr. Haines to serve as an Appellate Officer ostensibly because her educational and work history indicates she will exercise the professional judgment one would expect from a decision-maker in a university sexual misconduct proceeding.

---

[120] **Ex. 43**, 06/11/23 & 06/12/24 Email Communications; **Ex. 44**, Pauline Poe's *Ex Parte* Opposition to John Doe's Appeal.

[121] **Ex. 45**, Index of Documents Sent by the Office of Student Conduct to Appellate Officer.

[122] *Ibid.*

159. To wit, Dr. Haines is the Chief of Staff in the Office of Student Affairs.[123] In addition to her Ph.D. in Higher Education, Dr. Haines has an M.B.A.[124] "As an educational researcher," Dr. Haines "explores the intersections of P-12 and higher education policy and finance, academic labor, graduate education, and assessment of student learning."[125] She has received research funding from the National Science Foundation, and her research has been published in the Journal of Higher Education, Journal of Education Human Resources, Journal of Education Finance, and the International Journal of STEM Education.[126]

160. But Dr. Haines exercised no professional judgment when denying Johnny's appeal. Although the appeal was as thorough and detailed as this Complaint in arguing that the Hearing Officers' decision was "arbitrary,"[127] Dr. Haines denied the appeal via a letter that was less than one page.[128] Dr. Haines did not address the substance of any of Johnny's arguments. Instead, in conclusory fashion, Haines said: "I do not find evidence that the hearing officers acted in an unduly harsh or arbitrary manner when determining the outcome of your case."

161. Moreover, on information and belief, Dr. Haines read only the section headers in the appeal.

---

[123] *See* https://students.vt.edu/leadership/Chelsea_Haines.html (last accessed May 15, 2026).

[124] *Ibid.*

[125] *Ibid.*

[126] *Ibid.*

[127] *See* **Ex. 41**, Appeal.

[128] **Ex. 46**, Appeal Denial.

162. Dr. Haines' denial letter says: "Your appeal stated, 'Johnny provided additional evidence that contradicts Paulines story.' However, I do not feel that your appeal includes relevant new information that would have changed the outcome of the hearing had it been available at the time of the hearing."[129] In other words, Dr. Haines was under the impression that Johnny's appeal included new evidence that he had not provided to VT prior to the hearing.

163. But the appeal did *not* assert that Johnny was submitting new evidence. The language that Haines quotes from the appeal was a subsection header in the "Factual and Procedural Background" section of the appeal. The subsection discussed evidence that Johnny submitted to OEA and the Office of Student Conduct *before* the VT hearing (all of which was given to the Hearing Officers). Haines would have known this if she read the substance of that subsection, rather than just the header.

164. Dr. Haines read Pauline's *ex parte* opposition to the appeal.

165. Dr. Haines considered Pauline's *ex parte* opposition to the appeal when Haines denied the appeal.

**VIRGINIA TECH'S INVESTIGATION AND**
**ADJUDICATION OF THE JANE ROE CASE**

**A.**    **Jane Roe violates several VT Corps of Cadets regulations.**

166. On the night of September 17, 2023, Jane Roe and four other VT students, including Jane's roommate and Johnny, drank alcohol in Jane's dormitory

---

[129] *Ibid.*

room.[130] All five of the students were members of the VT Corps of Cadets and were under 21 years old at the time.[131]

167.  Jane and Johnny were "friends with benefits"—*i.e.,* friends who on occasion engaged in sexual activities with each other.[132] One of those occasions was in a VT classroom.[133] And around midnight on September 17, after Jane's party ended, Jane and Johnny had sex in Jane's room.[134]

168.  At approximately 2:00 a.m. the next morning, a cadet who lived in the same dormitory saw Jane walking to the women's community bathroom, which was approximately ten feet from Jane's room.[135] Jane was holding a white shirt in front of her chest but was otherwise not wearing any clothes.[136] Jane was also holding her student ID, which when coupled with a 4-digit code serves as a dorm room key card.[137]

169.  Members of the Corps of Cadets are subject to the Corps of Cadets Regulations, including several "Punitive Articles," the violation of which can result in Corps of Cadets disciplinary proceedings.[138]  The Punitive Articles prohibit, among

---

[130] **Ex. 9**, Jane Roe Investigation Report ("JR-IR") at 7.

[131] *See id.* at 25.

[132] **Ex. 16**, 06/24/24 Tr. 194:23-24, 195:4-7, 172:1-3, 172:11-13.

[133] *See id.* at 06/24/24 Tr. 34:23 – 35:25, 240:5-22.

[134] **Ex. 9**, JR-IR at 14.

[135] *Id.* at 67.

[136] *Ibid.*

[137] **Ex. 16**, 06/24/24 Tr. 104:7-14.

[138] *See* **Ex. 8**, Doe's 34 C.F.R. § 106.45(b)(5)(vi) Response at 8. The Corps of Cadets Punitive Articles are modeled on the Uniform Code of Military Justice ("UCMJ")—the criminal code that applies to members of the Armed Forces. *Ibid.* (citing 10 U.S.C. §§ 877-934 ("Punitive Articles")).

other things, underage drinking, having overnight guests in a Corps of Cadets dorm room, and having sex in a Corps of Cadets dorm room.[139]

170.   Jane's act of walking to the bathroom while not fully clothed violated Article 25, which prohibits conduct "unbecoming a cadet, officer, and a gentleman/lady."[140]

171.   Cadet SJ, the cadet who saw Jane walking to the bathroom, reported the incident to the Corps of Cadets leadership.[141] When Cadet SJ was asked if Jane appeared "intoxicated," Cadet SJ responded that "she did not speak with Jane," but Jane "appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner."[142]

**B.     The Title IX Office receives Jane's first version of the events of September 17-18.**

172.   On September 21, Cadet Student Leader SK and Keely Arbenz-Smith (a Corps of Cadets Residential Well-Being Advisor) spoke with Jane about the hallway incident.[143]

173.   Jane provided Cadet SK and Arbenz-Smith an account of the incident designed to minimize the possibility that Jane would face a Corps of Cadets disciplinary action:

---

[139] *Id.* at 9 (discussing Articles 17 and 29).

[140] *Ibid.* (citing *United States v. Edmisten*, 37 M.J. 710, 712 (Army Ct. of Military Review 1993) (noting that "indecent exposure" constitutes "conduct unbecoming an officer" under the UCMJ)).

[141] **Ex. 9**, JR-IR at 67.

[142] *Id.* at 68.

[143] **Ex. 2**, Title IX Community Report Form at VT-000031.

1. Jane admitted that she drank alcohol on the night of September 17. But she said she drank because of "stress" caused by "home life, difficulties from the Corp (Band)," and lack of "time for self-care."[144]

2. Jane admitted that she allowed a male cadet to spend the night in her room.[145] But she did not admit that she and the male cadet had sex.

3. Jane said that the male cadet went to sleep on the floor when she and her roommate, Cadet DM, went to bed.[146]

4. Jane said that while Cadet DM "was in a deep sleep," the male cadet climbed into Jane's bed "and tried to start something."[147]

5. Jane said she "felt uncomfortable," with the male student's actions and that to "get out of the situation" she "grabbed a shirt and ran across the hallway" to the bathroom.[148]

6. Jane said that the male student's actions were "not a big deal," that she "had been through worse situations," and that she "did not want to get anyone in trouble."[149]

7. Jane said that she did not have a complete memory of the incident, and that her incomplete memory may have been due to alcohol or "trauma from previous situations."[150]

174. On September 22, Cadet SK submitted a Title IX Community Report Form ("CRF") to the Office for Equity and Accessibility (the Title IX Office) which detailed the information that Jane provided to her and Arbenz-Smith.[151]

---

[144] *Id.* at VT-000131 – VT-000132.

[145] *Id.* at VT-000131.

[146] *Ibid.*

[147] *Ibid.*

[148] *Ibid.*

[149] *Id.* at VT-000132.

[150] *Id.* at VT-000131.

[151] *Ibid.*

**C.** **Jane learns about Pauline's allegations the same day the Corps of Cadets charges Jane with misconduct.**

175. On October 27, 2023, Jane learned about Pauline's Emergency Protective Order against Johnny.[152]

176. Less than one hour later, the Corps of Cadets served written charges on Jane (and the other cadets who attended her party) for violations of several Punitive Articles.[153]

177. According to Cadet DM, Jane was worried that she would lose her Air Force scholarship if she was found guilty of the Corps of Cadets charges. *See* **Ex. 16**, 06/24/24 Tr. 78:15-17 ("She had just got on scholarship, so she was worried about losing her Air Force scholarship.").

178. On or about October 30, Jane spoke directly to Pauline about Pauline's allegations against Johnny.[154] Even though the Commonwealth's Attorney never brought criminal charges against Johnny, Pauline told Jane that Johnny had an upcoming court date on criminal charges.[155]

---

[152] *See* **Ex. 16**, 06/24/24 Tr. 50:20-24.

[153] **Ex. 9**, JR-IR at 111 (Corps of Cadets charge sheet); *see also id.* at 99 (Email from Lt. Col. Russell stating that the charges would be served at 2:00 p.m. on October 27).

[154] **Ex. 2**, Title IX Community Report Form at VT-000034.

[155] VTPD's summary of its November 6 interview of Jane says, "Jane was under the impression that Johnny was facing charges for the other incident through the Blacksburg Police Department and stated that Johnny told her he had to go to court on 11.14.23." **Ex. 9**, JR-IR at 20. But Johnny was never criminally charged. The court date (November 14) was on Pauline's petition for a two-year Protective Order. But Johnny could not have told Jane about the court date by November 6 because Johnny did not learn about the court date until November 8 (and Johnny had no communications with Jane after she texted him over the weekend of October 28-29).

**D. Jane accuses Plaintiff of sexually assaulting her by having sex with her while she was "incapacitated" from alcohol.**

179.    On November 1, 2023—the day before the Corps of Cadets hearing was scheduled to take place—Jane filed a Title IX complaint against Johnny.[156]

180.    According to Jane, Johnny sexually assaulted her in her Corps of Cadets dorm room at some point between 11:45 p.m. on September 17 and 1:30 a.m. on September 18.[157]

181.    Jane said that she and Cadet DM hosted three male cadets (Johnny, MS, and CP) in their room to drink alcohol on September 17.[158] Jane said that when she woke up in the morning, Johnny was in her bed and told her they had sex.[159]

182.    Jane said she "was heavily intoxicated" when she went to bed "and did not remember consenting to sex."[160] Jane said "the last thing she remembered was sitting on her floor listening to music and talking with" Johnny and Cadets DM, MS, and CP.[161] Jane said that because she could not remember much about the party, she got most of her information about what happened at the party from Cadet DM.[162]

---

[156] **Ex. 9**, JR-IR at 4-5.

[157] *Id.* at 18.

[158] *Id.* at 18-19.

[159] *Id.* at 18.

[160] *Ibid.*

[161] *Id.* at 19; *see also id.* at 171 (transcript of Corps of Cadets 10/16/23 interview of Jane) ("[T]he last thing I remember was just kind of sitting down in a circle in our room, just like talking and having a good time. I was told that, and then I just woke up the next morning. That's pretty much all I remember.").

[162] *Id.* at 21 ("I asked Jane what her understanding of what her roommate, Cadet DM, remembered about that night. Jane said that Cadet DM has a much better memory of that night and that much of what she knows about what happened that night she heard from Cadet DM.").

**E.    VT tells the entire campus that Plaintiff sexually assaulted Jane.**

183.    The same day that Jane made her report to VT, the VTPD sent a campus-wide email about her report.[163] Although the email did not identify Jane or Johnny by name, it referred to Jane as "the survivor" and Johnny as "the offender."[164]

**F.    Jane's allegations against Plaintiff give her immunity from her pending Corps of Cadets charges.**

184.    Seventy minutes after VTPD sent its November 1 campus-wide email, the Corps of Cadets indefinitely postponed its November 2 hearing on the charges pending against Jane and the other cadets who attended her party.[165]

185.    On or about January 24, 2024, in accordance with Virginia law and VT policy, VT gave Jane an immunity letter for her pending Corps of Cadets charges because she had alleged Johnny sexually assaulted her.[166] Also on or about January 24, 2024, the Corps of Cadets proceeded with the disciplinary actions against the two other cadets from Jane's party who were still enrolled at VT, Cadets MS and DM.[167] Both cadets pleaded guilty.[168]

186.    On February 8, 2024—about two weeks after receiving her immunity letter—Jane bragged to a conference room full of cadets that she was up for some

---

[163] *Id.* at 100 (VTPD email).

[164] *Ibid.*

[165] *Id.* at 103 (11/01/23 Email from Lt. Col. Russell to Jane and other cadets).

[166] **Ex. 16**, 06/24/24 Tr. 134:23 – 135:25 (Cadet DM testimony).

[167] **Ex. 9**, JR-IR at 37, 37 n.29, 115.

[168] *Id.* at 115.

more underage drinking, and that she had no concerns about getting into trouble because she "got away with it once" and "would do it again."[169]

187. On April 2, 2024, Air Force ROTC announced that Jane had been competitively selected to attend the Air Force Professional Officer Course, but that Cadets MS and DM had not been selected to attend.[170] That course is generally a pre-requisite to continue in Air Force ROTC after sophomore year, even for students who are on an Air Force ROTC scholarship, like Jane.[171]

188. But pride comes before a fall. By the end of spring semester, Jane resigned from the Corps of Cadets and the Air Force ROTC program while under investigation for violating the Corps of Cadets Honor Code, which states simply: "A cadet will not lie, cheat, or steal, nor tolerate those who do." The investigation was of an allegation that Jane falsified her self-reported time for the 1.5-mile run portion of an Air Force PT test.[172] (Satisfactory PT scores are also a requirement to remain in good standing in Air Force ROTC).

---

[169] **Ex. 16**, 06/24/24 Tr. 163:21 – 164:21 (Cadet MS testimony); **Ex. 9**, JR-IR at 66-67 (OEA summary of 03/20/24 interview of Cadet MS).

[170] **Ex. 9**, JR-IR at 42.

[171] *Id.* at 27. Cadets MS and DM had to leave the Air Force ROTC program.

[172] In its Responses to Plaintiff's First Set of Requests for Admission, VT admitted the following facts are true: "During the Spring Semester of 2024, Jane Roe resigned from the Virginia Tech Corps of Cadets while under a Corps of Cadets investigation for violating the Corps of Cadets Honor Code," RFA No. 240; "The Corps of Cadets Honor Code says: "A cadet will not lie, cheat, or steal, nor tolerate those who do," RFA No. 241; and "The Corps of Cadets investigation was of an allegation that Jane falsified her self-reported time for the 1.5-mile run portion of an Air Force ROTC physical fitness test," RFA No. 242.

189.    According to one of the witnesses in the Honor Code investigation (another female cadet), this was the second time Jane falsified her run time on an Air Force PT test.[173]

### G.    VT's investigators do not find evidence that Jane was "incapacitated" or evidence that Plaintiff should have known that Jane was "incapacitated."

190.    Based on Jane's allegations, VT's Investigators had the obligation to investigate two issues: (1) whether Jane was "incapacitated" when she had sex with Johnny, and (2) whether Johnny "knew or should have known" that Jane was incapacitated at that time.

191.    Under VT policy, Johnny could be found responsible for sexual assault only if the evidence showed that the answer to both those questions was yes. Here is a relevant PowerPoint slide from VT's Title IX training materials that were on VT's website at the time of the investigation.

---

[173] *See* Doc. 1, Complaint at ¶ 225. The previous cheating incident occurred in October 2023. *See* **Ex. 9**, JR-IR at 62 (VTPD summary of 02/05/24 interview Cadet MS) (stating that during fall semester 2023, Jane "cheated on an Air Force fitness test," and ROTC sanctioned her by requiring her to "give an extra presentation in class"); **Ex. 16**, 06/24/24 Tr. 146:9 – 147:10, 155:3-10. So, a Corps of Cadets disciplinary action for Jane's alcohol violations at her party would have been a second offense that fall and would likely have cost Jane her scholarship. On information and belief, AFROTC did not make Jane repay her scholarship for the 2023-24 academic year because Jane falsely told the Air Force that she was resigning from the Corps of Cadets and AFROTC because of the alleged sexual assault, not because of the pending Corps of Cadets investigation of her Honor Code violation. **Note**: Even though Johnny put the VT Investigators on notice that Jane was motivated to file a false Title IX claim to save her Air Force scholarship, *see* **Ex. 9**, PP-IR at 25, the Investigators refused to investigate or obtain documents relating to Jane's motive to lie.



192. VT policy does not equate "incapacitation" with mere "intoxication." Rather, it defines "incapacitation" as the "physical or mental inability to make informed, rational judgments."[174]

193. VT trains its investigators that "incapacity" is not the same thing as "impaired, drunk, intoxicated, or under the influence," and that a person is "incapacitated" when she is "unable to understand who, what, when, where, why, or how." Here is a relevant PowerPoint slide from VT's Title IX training materials that were on VT's website at the time of the investigation.

---

[174] **Ex. 54**, Student Code of Conduct at 7 (Aug. 18, 2023).



194.     Since at least 2017, the Association of Title IX Administrators ("ATIXA") has advised VT that the fact a complainant does not remember a sexual encounter that occurred while she was intoxicated does not mean the complainant was "incapacitated" when the encounter occurred. *See, e.g., The ATIXA Playbook: Best Practices for the Post-Regulatory Era* at 45-46 (Apr. 2017).

195.     ATIXA bases this advice on the work of Reagan Wetherill, Ph.D., of the University of Pennsylvania School of Medicine. *See, e.g., ATIXA Playbook* at 44 n.59.[175] According to the Penn School of Medicine's website, "Dr. Wetherill is an internationally recognized expert in alcohol-induced memory impairments, specifically alcohol-induced blackouts, and serves as an expert consultant/witness for the Penn Title IX office."[176]

---

[175] *See also, e.g.,* **Ex. 9**, JR-IR at 132 (Dr. Wetherill's Curriculum Vitae) (listing "Invited Talks" as including *Alcohol-Induced Blackouts: What Happened?  How Did We Get Here?,* Association of Title IX Administrators, Philadelphia, PA (2019)).

[176] *See* https://www.med.upenn.edu/apps/faculty/index.php/g275/p8543432 (last visited May 10, 2026).

196. Dr. Wetherill explains that an alcohol-induced blackout" is "amnesia, or memory loss, for all or part of a drinking episode." *See* Wetherill, et al., *Alcohol-induced blackouts: A review of recent clinical research with practical implications and recommendations for future studies*, 40 Alcohol Clin. Exp. Res. 922 (May 2016). "During a blackout, a person is able to actively engage and respond to their environment; however, the brain is not creating [long-term] memories for the events." *Ibid.*

197. Because "short-term memory remains intact during an alcohol-induced blackout," an "intoxicated person" experiencing a blackout "is able to engage in a variety of behaviors, including having detailed conversations and other more complex behaviors like driving a vehicle, but information about these behaviors is not transferred from short-term to long term memory." *Ibid.* This "leads to memory deficits and memory loss for these events." *Ibid.* An alcohol-induced blackout can occur in someone with a breath alcohol concentration ("BrAC") as low as 0.06 (which is below the legal limit to operate a vehicle in Virginia), and thus "blackouts can occur at BrACs well below the level of incapacitation." *Id.* at 923, 931.

198. Because an alcohol-indued blackout is not synonymous with "incapacitation," the VT Title IX training materials (which were on VT's website at the time of the investigation) say it is important for investigators and decision-makers to determine whether the complainant displayed behaviors that should have put the respondent on notice that the complainant was incapacitated at the time of the sexual encounter. Such behaviors include "slurred speech," "shaky equilibrium,"

"disorientation," "passing out," and "throwing up." Here is a relevant PowerPoint slide.



199. OEA and VTPD interviewed Cadets MS, CP, and DM—all of whom saw Jane within the hour before Jane got into bed with Johnny.

200. None of those witnesses said that Jane engaged in conduct indicative of "incapacitation."

201. Cadet MS told an investigator that it was Johnny, not Jane, who appeared to have had too much to drink at the party.[177] Cadet MS "offered to take Johnny back to his room, but for some reason Jane did not want [Johnny to leave] and [she] kept taking Johnny's phone from him."[178] So, Johnny went to sleep in Jane's bed.[179]

---

[177] **Ex. 9**, JR-IR at 60.

[178] *Ibid.*

[179] *Ibid.*

202.    After Johnny went to sleep in Jane's bed, Jane walked Cadet CP back to his dorm room, which was in a different building.[180] Cadet MS told an investigator that when Jane left with Cadet CP, she "could walk fine" and was "not slurring [her] speech."[181]

203.    Cadet CP told an investigator that he and Jane "walked back together to [his dorm], sat outside and talked briefly, rode the elevator up to his room together, and then said goodbye."[182] Cadet CP said that according to his room access key card records, he and Jane left her room between 11:15 and 11:20 p.m., and they arrived at his room at about 11:30 p.m.[183] When the investigator "asked Cadet CP what Jane's demeanor was like during this time," Cadet CP responded that she "she was a little 'loose and giggl[y].'"[184]

204.    Cadet MS was still in Jane's room when Jane returned from walking Cadet CP home.[185] Cadet MS said Jane seemed "perfectly fine" when she got back to her room.[186] And he said that "she seemed normal" when he left for the night a few minutes later (which was when Jane was preparing to go to bed). *See id.* at 61 (OEA Summary of interview of Cadet MS) ("I asked Cadet MS how Jane seemed when he left, and he replied that she seemed normal.").

---

[180] *Ibid.*

[181] *Id.* at 65.

[182] *Id.* at 70.

[183] *Id.* at 69.

[184] *Ibid.*

[185] *Id.* at 61, 65.

[186] *Id.* at 61, 65.

205. Cadet DM—Jane's roommate—told a VTPD investigator that she and Jane both turned in for the night after Jane returned from walking Cadet CP home.[187] Cadet DM also told the investigator that she and Jane had the same amount to drink, and that by the time DM went to bed she did not feel intoxicated.[188]

206. VTPD's interview summary recounted Cadet DM's description of Jane's behavior as Jane got into bed with Johnny. That description, which is shown below, gives no indication that Jane was incapacitated:

> I asked Cadet DM what the last thing she remembered Johnny and Jane doing before Cadet DM put on her headphones and went to sleep. Cadet DM stated that she remembered Johnny being asleep, Jane leaving the room to put on her pajamas, and asking Jane when she returned if she was okay with Johnny being in her bed. Cadet DM stated that Jane told her it was fine and that they were just sleeping.[189]

## H. Plaintiff gives VT's Investigators text messages Jane wrote on the night in question which show that she was not incapacitated.

207. As mentioned above, Cadet MS told an investigator that Jane did not want Johnny to leave the party and that Jane kept taking Johnny's phone. After OEA opened its investigation, Johnny discovered that on the night at issue Jane had used Johnny's phone to send several text messages telling one of Johnny's roommates, Cadet JB, that Johnny would be spending the night with her.

---

[187] **Ex. 3**, VTPD summary of 11/17/23 interview of Cadet DM at 1-2. (Although OEA included other VTPD interviews it its Investigation Report, OEA did not include the VTPD interview of Cadet DM).

[188] *Id.* at 1-2.

[189] *Id.* at 2.

208. Based on the text messages' time stamps, Jane sent the first of those texts at 10:16 p.m., and she sent the last of those texts at 11:22 p.m.—*i.e.*, while she was walking Cadet CP home, about a half hour before Jane went to bed.

209. Johnny provided the text messages to OEA.[190] Those messages, which are shown below, demonstrate that Jane was not "incapacitated" when she went to bed with Johnny.





---

[190] **Ex. 9**, JR-IR at 84-87. (The screenshots in the Investigation Report have date-stamps showing the messages were sent on September 17, 2023.)

## I. Plaintiff gives VT's Investigators text messages Jane wrote after the night in question that were inconsistent with Jane's allegation that Plaintiff sexually assaulted her.

210. Johnny also provided VT's Investigators with other electronic communications that Jane sent in the weeks following the alleged incident that were inconsistent with her allegation that Johnny had sexually assaulted her.

211. For example, one week after the alleged sexual assault, Jane sent a text message to Johnny's older cousin, AL, in which she introduced herself as "Johnny's friend Jane," and in which she arranged to hang out with Johnny and AL when AL visited Johnny during the first weekend of Thanksgiving break.[191] Here is the text message conversation:





---

[191] **Ex. 9**, JR-IR at 89.

212.    As another example, less than two weeks after the alleged sexual assault, Jane referred to herself as Johnny's "sugar baby" when she sent him money via the Venmo payment app to repay him money he loaned to her during an ROTC field trip earlier that day.[192]

213.    "Sugar baby" is a slang term that means "a younger person who provides romantic companionship or sexual intimacy to a wealthy older person in return for gifts or financial support."[193] Here is Jane's Venmo payment.



[192] *Id.* at 97.

[193] *See* https://www.dictionary.com/browse/sugar-baby; *accord Doe v. Lee*, 2019 U.S. Dist. LEXIS 8331, *2 (N.D. Ill. Jan. 17, 2019) (describing a "sugar baby" as one "who enters into relationships with affluent men in exchange for gifts, travel, and a life of luxury").

214.    As another example, approximately three weeks after the alleged sexual assault, Jane had Johnny over to her dorm room again to drink alcohol.[194]

215.    Here is a text message conversation that occurred between Jane and Johnny as they were obtaining the alcohol and sneaking it into Jane's dorm room.

 

[194] **Ex. 9**, JR-IR at 79-82.



216.     As another example, approximately three weeks after the alleged sexual assault, Jane sent a photo of Johnny to AL (Johnny's cousin) via text message.[195] Over the following three days, Jane and AL made good-natured jokes about Johnny to each other via text messages.[196]

217.     Here is that text message conversation (complete with multiple "tears of laughter" emojis from Jane).

---

[195] **Ex. 9**, JR-IR at 91.

[196] *Id.* at 91-92.




218.    Finally, over the weekend of October 28-29, 2023, Jane sent Johnny a friendly text message saying that she had just met a VMI cadet (named MR) who went to high school with Johnny.[197]

**J.    VT's Investigators violate the 2020 Title IX Rule by withholding relevant evidence from Plaintiff.**

219.    The 2020 Title IX Rule requires universities to give the parties a ten-day period in which to review "any evidence obtained as part of the investigation that

---

[197] *Id.* at 36. (Because the text was sent via Snapchat, it self-deleted after Johnny read it. *Ibid.* Johnny also notes that on October 27, 2023, he visited Jane in her room (at Jane's invitation) and told her about Pauline's allegations against him. Jane advised Johnny to speak with Cadet JM—another male cadet who had been falsely accused of sexual assault. *See id.* at 36, 94-95.

is directly related to the allegations raised in the formal complaint" and submit a response to that evidence before the investigator issues her written report. *See* 34 C.F.R. § 106.45(b)(5)(vi).

220.    Although OEA gave Johnny access to most of VT's evidence relevant to Jane's allegations, OEA withheld two pieces of relevant evidence that would have been helpful to Johnny.

221.    ***First***, OEA withheld the September 22, 2023, Title IX Community Report Form ("CRF")—the form which documented Jane's September 21 statements to Cadet Student Leader SK and Keely Arbenz-Smith.

222.    The CRF would have been helpful to Johnny, as it showed that Jane's original version of the events of September 17 differed from the version she gave in her November 1 Title IX complaint.

223.    OEA's failure to provide the CRF to Johnny was deliberate.  During the 10-day review period, Johnny sent an email to OEA stating:

> Your summary of your interview with Keely Arbenz-Smith seems to indicate that Ms. Arbenz Smith met with Jane on two occasions at some point after September 17, 2023. However, the summary does not provide the dates on which Arbenz-Smith allegedly met with Jane. Are you able to provide those dates?[198]

224.    Although the CRF included the dates for both of Jane's meetings with Arbenz-Smith,[199] OEA told Johnny that it did not know the dates on which the meetings occurred.[200]

---

[198] **Ex. 7**, 04/11/24 & 04/15/24 Emails between John Doe and Deziree Twigger at JD-000007.

[199] **Ex. 2**, Title IX Community Report Form at VT-000031, VT-000033.

[200] **Ex. 7**, 04/11/24 & 04/15/24 Emails between John Doe and Deziree Twigger at JD-000006.

225. And in his 10-day response, Johnny demanded to know why he had not been provided with purported "documentation" of the meetings between Jane and Keeley. *See* **Ex. 8**, Doe's 10-Day Response at 46 (asking, "why was that alleged documentation not provided to Respondent?"). But VT never responded to Johnny's question.

226. *Second*, OEA withheld the VTPD summary of the November 17 interview of Cadet DM. As discussed above, that summary recounted Cadet DM's description of Jane's behavior as Jane got into bed with Johnny, and that description gives no indication that Jane was incapacitated.

### K. Plaintiff gives VT's Investigators written expert testimony from Dr. Wetherill that Jane was not "incapacitated."

227. During the ten-day review period, Johnny sent Dr. Wetherill the evidence to which OEA had given Johnny access. Johnny also sent Dr. Wetherill a copy of the VT Student Code of Conduct, which includes VT's definition of "incapacitation."

228. After reviewing the evidence, as well as VT's definition of "incapacitation," Dr. Wetherill provided written expert testimony that the evidence did not support a finding that Jane was "incapacitated."[201]

229. Dr. Wetherill explained that an alcohol-induced blackout occurs when alcohol prevents the brain from making long-term memories, but that during such a

---

[201] *See* **Ex. 9**, JR-IR at 123 ("Based on my review as discussed in this report, it is my opinion that the Complainant was not incapacitated by alcohol on the night of September 17 into the morning of September 18, 2023. The Complainant's behavior and reports of memory loss are consistent with an individual who experienced an alcohol-associated blackout.").

blackout the brain can still make short-term memories that allow the person to interact with and respond to others.[202] Dr. Wetherill also explained that, according to the witness statements from persons who saw Jane during the relevant time, Jane engaged in a number of actions that were inconsistent with a finding of "incapacitation" because the actions demonstrated "decision-making," "cognitive planning," and "motor skills."[203] According to Wetherill, Jane's actions "indicate that [she] was not incapacitated" and that she "had the physical and mental ability to make informed, rational decisions despite consuming alcohol."[204]

230. Johnny sent Dr. Wetherill's written testimony and CV to OEA.[205]

## L. VT's Investigators take 170 days to complete their investigation (nearly four times longer than VT's policy on "prompt" investigations).

231. VT policy says that OEA should complete the investigation and the written report within 45 days.[206] But even though OEA interviewed only four witnesses, it took OEA 170 days to complete the investigation and issue its report regarding Jane's allegations.[207] VT policy required OEA to provide Johnny with an

---

[202] *Id.* at 122.

[203] *Id.*

[204] *Id.* at 123.

[205] *See id.* at 117-125 (testimony), 125-143 (CV).

[206] *See* **Ex. 55**, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 14.

[207] OEA issued its Notice of Investigation on November 29, 2023, and it issued its investigation report on May 17, 2024.

explanation as to why the 45-day goal was not met.[208] But OEA never provided Johnny with such an explanation.

**M.  VT's Investigators issue an Investigation Report that violates Plaintiff's right to due process, the 2020 Title IX Rule, and VT's Title IX training materials.**

232.  The Title IX regulations require a school to issue "an investigative report that fairly summarizes the relevant evidence." 34 C.F.R. § 106.45(b)(5)(vii).  OEA's Investigation Report violated Johnny's right to due process, 34 C.F.R. § 106.45(b)(5)(vii), and/or VT's Title IX training materials in at least four ways.

233.  *First*, the Investigation Report did not include the September 22 Title IX Community Report Form or the specific information contained in the form.

234.  OEA's failure to include the form or the specific information therein was deliberate. The "Procedural History" section of the Investigation Report noted that OEA "first received a report regarding and a possible gender-based issue involving Jane on September 22, 2023."[209]

235.  *Second*, even though the Investigation Report included summaries of VTPD's interviews of Cadets MS and Cadet CP, the Report did not even mention the VTPD interview of Cadet DM.

236.  As discussed above, Cadet DM was the last person to see Jane and Johnny before the alleged sexual assault. And Cadet DM's statement to VTPD gave no indication that Jane was incapacitated when she went to bed.

---

[208] *See* **Ex. 55**, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 14.

[209] **Ex. 9**, JR-IR at 4.

237. ***Third***, the Investigation Report did not properly set forth the elements of the alleged offense.

238. The Report said that sexual assault included having sex without the complainant's consent and that consent could not be given by a complainant who was "incapacitated due to drugs or alcohol."[210] But the Report did not define "incapacitation." Nor did the Report say that even if a complainant was incapacitated, a respondent can be found responsible for sexual assault only if he knew or should have known that the complainant was incapacitated.

239. OEA's decision to omit the elements from the Investigation Report was deliberate. Johnny's written submission to OEA at the end of the 10-day review period, which he submitted more than a month before OEA issued the Investigation Report, set forth the elements of the alleged offense.[211] But according to OEA, Johnny's discussion of the elements of the alleged offense was not a proper response to the evidence. So, OEA refused to include that portion of the response in the Investigation Report.[212]

240. ***Fourth***, the Investigation Report did not include any timeline of relevant events. As discussed above, VT's own Title IX training materials say that such a timeline is important, especially in cases involving alcohol and consent, and that such a timeline should include any relevant text messages.

---

[210] *Ibid.*

[211] *See* **Ex. 8**, Doe's 10-Day Response.

[212] **Ex. 9**, JR-IR at 6 (noting exclusion of portions of Doe's 10-Day Response); **Ex. 10**, 05/20/24 email communications between Kristen Barnett and Doe.

241. OEA did not want the Hearing Officers to have such a timeline. Johnny's 10-day response included a timeline that was twenty-eight pages long and consisted of over one hundred numbered paragraphs.[213] Every factual assertion in the timeline included a precise citation to evidence in the record (*e.g.*, text messages) supporting the assertion. But according to OEA, such a timeline was not a proper response to the evidence. So, OEA excluded the timeline from the Investigation Report.[214]

242. ***Fifth***, the Investigation Report included evidence that should have been excluded because it was irrelevant and prejudicial.

243. VT policy allows the Title IX investigator to redact inadmissible evidence from documents included with the Investigation Report.[215] So, Johnny's 10-day response included a 12-page chart that (1) quoted passages from various witness statements that should be redacted and (2) provided an objection to the admissibility of each passage.[216]

---

[213] **Ex. 8** at 8-33, ¶¶ 1-102.

[214] **Ex. 9**, JR-IR at 6; **Ex. 10**, 05/20/24 email communications between Kristen Barnett and Doe. OEA told Johnny that he was free to read his timeline to the Hearing Officers during the hearing. *See* **Ex. 10**. But OEA did not explain how Johnny could be expected to read a 100-paragraph document to the Hearing Officers during the hearing. OEA also told Johnny that his timeline would be stored in a secure intranet site accessible to the Hearing Officers, and that before the hearing he could submit a written statement to the Hearing Officers asking them to read the timeline. *Ibid.* But as discussed below, the Office of Student Conduct refused to let Johnny submit any additional documents to the Hearing Officers.

[215] *See* **Ex. 55**, VT Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence at 9

[216] **Ex. 9**, JR-IR at 153-166.

244. For example, the chart included Keely Arbenz-Smith's statement that she "truly believes Jane does not know what went on in that room."[217] Johnny objected to the admissibility of this statement because: "The fact that Keely 'believes' that Jane does not know what happened in the room does not make it more likely or less likely that Jane knows what happened."[218]

245. As another example, the chart included various vague and inconsistent statements about bruises allegedly observed on Jane during the week following her party.[219] Johnny objected to the admission of those statements because there was no evidence that someone with medical training had determined the cause of the alleged bruises and therefore there was "no basis upon which the Hearing Officers [could] determine the cause of" the alleged bruises.[220]

246. Not only did OEA refuse to redact irrelevant and prejudicial passages from the witness interview summaries included with the Report, OEA also highlighted some of those statements in the sections of its Report titled "Summary of the Investigation" and "Analysis of Allegations and Responses."

247. For example, the "Summary of the Investigation" section included Arbenz-Smith's statement that "she believes Jane 'does not know what all went on in that room.'"[221] As another example, the "Analysis of Allegations and Responses"

---

[217] *Id.* at 163.

[218] *Ibid.*

[219] *Id.* at 154, 158-60, 163.

[220] *See, e.g., id.* at 154-55.

[221] *Id.* at 11.

section said that the parties disagreed "on whether bruises were present on Jane [the day after the party], and if so, whether they were caused by non-consensual sexual activity."[222] But neither Jane nor anyone else ever said that the bruising was caused by sexual activity of any kind, let alone non-consensual activity.

### N. VT's Office of Student Conduct and Office of University Counsel willfully violate the 2020 Title IX Rule.

248. After OEA issued its Investigation Report but before VT held the hearing on Jane's allegations, Johnny had numerous communications with the Roshaan Settle, the Acting Director of the Office of Student Conduct, and Kristina Hartman, a lawyer in the Office of University Counsel. Through those communications, Settle and Hartman willfully violated the 2020 Title IX Rule and VT's Title IX training materials in at least three ways.

249. *First*, Settle and Hartman refused to allow Johnny to submit his written response to OEA's Investigation Report to the Hearing Officers.[223] In fact, they refused to do so even though Plaintiff explained to them, in writing, that the 2020 Title IX Rule says a school must, "at least 10 days prior to a hearing … send each party and the party's advisor, if any, the investigation report … for their review and *written response*." 34 C.F.R. § 106.45(b)(5)(vii) (emphasis added).[224]

---

[222] *Id.* at 14.

[223] *See* **Ex. 10**, 05/20/24 Email from John Doe to Hartman at VT-000415 ("Please let me know … if you are sending my written response to the Investigation Report to the Hearing Officers"); *id.*, Hartman Response at VT-000414 (stating that Plaintiff's response to the Investigation Report "will not be considered at the hearing").

[224] *See* **Ex. 12**, 06/17/24 Letter from John Doe to Settle and Hartman at 1.

250. Neither Settle nor Hartman identified any basis for excluding Plaintiff's response to the Title IX Report. Nor could they. Everything in the response was proper under 34 C.F.R. § 106.45(b)(5)(vii).[225]

251. ***Second***, Settle and Hartman ruled that Plaintiff's attorney would not be permitted to cross-examine the OEA investigators at the hearing.

252. Plaintiff explained to Settle and Hartman, in writing, that the Title IX Rule says that schools "must permit each party's advisor to ask the other party and ***any witness*** all relevant questions and follow-up questions." 34 C.F.R. § 106.45(b)(6)(i) (emphasis added).[226]

253. Plaintiff also directed Settle and Hartman to a portion of the preamble to the 2020 Title IX Rule demonstrating that the Department of Education interprets the rule as meaning that a party's advisor must be permitted to cross-examine any investigator who appears at a hearing. *See* 85 Fed. Reg. 30026, 30314 (stating that section "106.45(b)(6)(i) already contemplates parties' equal right to cross-examine any witness, which could include an investigator").[227]

254. Plaintiff also showed Settle and Hartman that VT's own Title IX training materials say, "The Investigator may be questioned and subjected to cross-examination by all parties' Advisors."[228]

---

[225] *See* **Ex. 13**, John Doe's 34 C.F.R. § 106.45 written response to VT's Title IX Investigation Report.

[226] **Ex. 12,** 06/17/24 Letter from Johnny to Settle and Hartman at 5-6.

[227] *Id.* at 7.

[228] *Id.* at 6 (reproducing PowerPoint slide).

255. Settle and Hartman, however, refused to change their minds on this issue. In an email to Plaintiff's counsel, Hartman said VT had "a legal basis" for its refusal to allow a party's advisor to cross-examine the OEA Investigators.[229]

256. Hartman never provided Plaintiff or his counsel with such a "legal basis" because VT has no such "legal basis."[230]

257. OEA Investigator Twigger interviewed Cadet DM, Cadet MS, Cadet SJ, and Ms. Arbenz-Smith. And Twigger's interview summaries were included as "evidence" in the Investigation Report. To be sure, Twigger's summaries were hearsay. But a hearsay witness is, by definition, a "witness."

258. On information and belief, at some point between Joe Biden's inauguration as President and OEA's issuance of the Investigation Report for the Jane Roe matter, VT decided to violate the 34 C.F.R. § 106.45(b)(6)(i) requirement that advisors be permitted to cross-examine investigators because (1) VT fears that attorney cross-examination of investigators will benefit respondents, nearly all of whom are men; and (2) VT believed that the Biden Administration would allow recipients to violate the regulation.

259. At the first Title IX hearing on Jane's allegations, Johnny asked Twigger whether she had ever been cross-examined by a party's advisor at a VT hearing.[231]

---

[229] **Ex. 15**, 06/21/24 Email from Hartman to Plaintiff's counsel at VT-000414.

[230] *Id.*, 06/21/24 Email from Plaintiff's counsel to Hartman at VT-000412 ("Thank you for letting me know that Virginia Tech has a 'legal basis' for its interpretation of the Title IX regulation as not requiring schools to allow advisors to question investigators. But I do not understand why you are unable to tell me what that 'legal basis' is.").

[231] **Ex. 16**, 06/24/24 Tr. 21:5-14.

But the Hearing Officers, after consulting with Hartman, refused to allow Twigger to answer Johnny's question.[232]

260.    *Third*, Settle and Hartman refused to allow Johnny to submit additional written expert testimony to respond to OEA's mischaracterization of the evidence.

261.    OEA's Investigation Report said that the parties disagreed on whether bruises allegedly seen on Jane in the days following the alleged sexual assault "were caused by non-consensual activity."[233] But the report included no medical record or photos of bruises, let alone evidence that any alleged bruises "were caused by non-consensual activity." Indeed, neither Jane nor anyone else claimed that the alleged bruises were caused by non-consensual sexual activity. So, OEA's statement about a disagreement on the cause of alleged bruises was objectively false. Moreover, there was evidence in the record that Jane had fallen out of her bed (which was lofted about five feet above the floor) a few days before the alleged incident and on the night of the alleged incident, and that Jane had bruises from PT.[234]

262.    After Johnny received the Investigation Report, he had Amber O'Malley (the nurse discussed earlier in this Complaint), review the Report, including all the Report's references to alleged bruising. O'Malley provided Johnny with written expert testimony about the alleged bruising. In O'Malley's opinion, "the causal mechanism

---

[232] *Id.* at Tr. 21:21-24. Of course, Plaintiff's counsel will explore this issue during depositions of current and former VT employees. One or more of those employees would likely know if VT ever allowed advisor cross-examination of Title IX investigators.

[233] **Ex. 9**, JR-IR at 14.

[234] *See, e.g., id.* at 55.

of [the alleged bruises] could not be determined," and the alleged bruising "could have been the result of a fall either a few days prior to the night of the alleged incident, a fall the night of the alleged incident, consensual sexual contact, or anything else, such as PT."[235]

263. Settle and Hartman refused to forward O'Malley's written testimony to the Hearing Officers. Hartman claimed that VT policy does not allow parties to submit evidence after OEA has issued its Investigation Report. [236]

264. But even if that is VT's policy, the policy violates the 2020 Title IX Rule because the rule guarantees a party's right to submit evidence "throughout the grievance process"—*i.e.*, even after the investigation report is issued. *See* 34 C.F.R. § 106.45(b)(5) & (b)(5)(ii); *accord Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78, 90-91 (N.D. Tex. 2022) (finding that the university violated the 2020 Title IX Rule by excluding evidence that the respondent submitted after the investigation report was finalized; "TCU's argument that it may exclude evidence submitted after it had closed the 'investigation' ignores the plain text of the regulation").[237]

*     *     *

---

[235] <u>Ex. 14</u>, O'Malley expert report for Jane Roe case.

[236] <u>Ex. 15</u>, 06/21/24 Email from Hartman to Plaintiff's counsel at VT-000414.

[237] The real reason Settle and Hartman would not allow Johnny to submit O'Malley's written testimony in Jane's case is that O'Malley's testimony had been effective for Johnny in Pauline's case. The word "bruise" does not appear anywhere in the FHO for Pauline's case because the Hearing Officers recognized that they would look biased if they found that Pauline's photos showed bruises when someone with O'Malley's qualifications said the photos did not. So, Settle and Hartman decided that excluding O'Malley's testimony from Jane's case would allow the Hearing Officers in that case to credit statements by Jane, Cadet DM, and Arbenz-Smith about alleged bruising on Jane. The Settle-Hartman plan worked. The FHO for Jane's case mentions "bruises" eight times.

265. Settle and Hartman also initially denied Plaintiff's request that the Hearing Officers be instructed that an element of the alleged offense was that the respondent "knew or should have known the complainant was incapacitated." Settle and Hartman told Johnny that he was free to encourage the Hearing Officers to adopt "knew or should have known" as an element of the offense.[238] But a few weeks later, after Johnny pointed out that Title IX training materials that VT had recently posted on its website say "knew or should have known" is an element of the offense, Hartman said it was VT's "current practice" to instruct the Hearing Officers that "knew or should have known" is an element of the offense.[239]

266. On information and belief, VT had not been including the "knew or should have known" element in incapacitation cases up to that point in time. On information and belief, members of VT's Title IX administration (including Settle) do not believe that "knew or should have known" should be an element of the offense in incapacitation cases.[240]

O. **VT's Hearing Officers conduct hearings which violate Plaintiff's right to due process and violate VT policy.**

267. The Office of Student Conduct held Zoom hearings on Jane's allegations on June 24 and September 20, 2024.[241] Dr. Quintavis Cureton, Ph.D. and Sarah McCoy, M.S., both from the Office of Student Conduct, served as the Hearing Officers.

---

[238] **Ex. 11**, 05/30/24 Email from Settle to Plaintiff at JD-000059.

[239] **Ex. 15**, 06/21/24 Email from Hartman to Johnny's counsel at VT-000414.

[240] Plaintiff's counsel will explore this issue during depositions of current and former VT employees.

[241] The September hearing was necessary because, during the June hearing, Johnny discovered that OEA withheld relevant evidence from its Investigation Report. OEA's

1. **The Hearing Officers apply the preponderance of the evidence standard rather than the clear and convincing evidence standard.**

268. In accordance with VT policy, the Hearing Officers applied the preponderance of evidence standard. For the reasons discussed earlier in this Complaint, application of the preponderance of evidence standard rather than the clear and convincing evidence standard violated Plaintiff's right to due process under the Fourteenth Amendment.

2. **The Hearing Officers allow Jane to opt out of full cross-examination by Plaintiff's counsel.**

269. The Hearing Officers allowed Jane to opt out of cross-examination by Johnny's lawyer before he had conducted his full cross-examination. *See* <u>Ex. 16</u>, 06/24/24 Tr. 242:13-20 (McCoy: "Jane, are you saying that you will not be answering any more questions from [Johnny's lawyer] today?" Jane: "Yes, ma'am." McCoy: "Okay." Jane: "I think I've said what I need to say about my truth." McCoy: "Okay. Great. Thank you."). Plaintiff was therefore deprived of his right to "cross-

---

Investigation Report included a summary of OEA's interview of Jane's roommate, Cadet DM. But at the June hearing, while Cadet DM was answering questions from the Hearing Officers, Cadet DM mentioned that VTPD had also interviewed her about Jane's allegations. <u>Ex. 16</u>, 06/24/24 Tr. 64:22-23, 73:20-22. DM's mention of a VTPD interview should have raised a red flag for the Hearing Officers. After all, OEA's Investigation Report included summaries of VTPD interviews of Jane and two other witnesses, but it made no mention of a VTPD interview of Cadet DM. The Hearing Officers, however, said nothing about the fact that Cadet DM's testimony indicated that OEA had withheld evidence from the Investigation Report. When Plaintiff's counsel had his turn to question Cadet DM, he asked Cadet DM follow-up questions to confirm that she had, in fact, been interviewed by VTPD a few weeks after the alleged incident. *Id.* at 91:17 – 92:10. Plaintiff's counsel then informed the Hearing Officers that OEA's Investigation Report made no mention of VTPD's interview of Cadet DM. *Id.* at 92:11-17. The Hearing Officers decided they would produce the withheld interview with their FHO and that Plaintiff could address the withheld interview in his appeal. *Id.* at 253:19-23.

examination [that would] materially assist in ensuring a meaningful hearing." *Doe v. UNC*, 133 F.4th at 317.

270. The fact that Jane answered questions from the Hearing Officers and some questions from Plaintiff's counsel does not mean that Plaintiff was able to conduct meaningful cross-examination. The Hearing Officers did not ask Jane about several issues that raised questions about her credibility, and Jane opted out of cross-examination before Plaintiff's counsel could ask Jane questions about those issues.[242]

### 3.    The Hearing Officers allow Jane to violate VT's Rules of Decorum.

271. At the start of the hearings, the Hearing Officers set forth the "Rules of Decorum for All Participants in Formal Title IX Hearings." As the Hearing Officers explained, those rules require that participants "use respectful language that is not demeaning, derogatory, or disrespectful." **Ex. 16**, 06/24/24 Tr. 7:24-25.[243] The Hearing Officers also said that "if anyone violates these rules of decorum, we will give a warning" and that they could "stop the hearing" if the violation of the rules continued. **Ex. 16** at 8:6-8.

272. At both hearings, Jane used language toward Johnny that was "demeaning, derogatory," and "disrespectful." *See, e.g., id.* at 23:6-8 (alleging Johnny's "willingness to submit bold untruths gives ample evidence of the weak nature of his character"); *id.* at 25:13-14 (alleging Johnny told "habitual lies" about

---

[242] See Doc. 32 at 15-17 (discussing issues that the Hearing Officers did not address when questioning Jane and that Plaintiff's counsel was unable to address before Jane opted out of cross-examination).

[243] *See also*, VT Rule of Decorum for All Participants in Formal Title IX Hearings, Doc. 32-3 at 8.

her); *id.* at 28:9-11 (alleging Johhny's efforts to defend himself were "childish"); *id.* at 28:23 – 29:3 (stating: "My hope is that this body will consider the desperate lies submitted by the Respondent as evidence of his character. If he can lie so easily about everything having to do with me, it is probable that he's lying about this attack."); *id.* at 249:13 (saying, "Johnny Doe, you are a rapist"); **Ex. 22**, 09/20/24 Tr. 7:17-21 (stating, "I have the distinct privilege and responsibility to continue to combat the respondent and his vain attempts to salvage [his] reputation"); *id.* at 8:20 (accusing Johnny of spinning a "web of lies"); *id.* at Tr. 8:20-24 (alleging Johnny was "fully immersed in slandering [her], forcing this hearing body into believing his sick delusion").

273. The Hearing Officers simply sat on their hands while Jane violated the Rules of Decorum. Not once did the Hearing Officers give Jane a warning for her violations.[244]

### 4. The Hearing Officers question Plaintiff about evidence VT withheld from him.

274. Although the Title IX Investigation Report mentioned that OEA had received the September 22 Community Report Form ("CRF"), the Investigation Report did not include any details about the CRF.[245] To make matters worse, the

---

[244] As he did in the Pauline Poe hearing, Plaintiff complied with the Rules of Decorum in the Jane Roe hearings. *See, e.g.*, **Ex. 16**, 06/24/24 Tr. 249:18-21 (Hearing Officer: "At this time, Johnny, you may offer your closing statement whenever you're ready." Johnny: "My closing argument will address evidence, not personal attacks.").

[245] *See* **Ex. 9**, JR-IR at 4.

Hearing Officers questioned Plaintiff about the CRF, and they did so while misrepresenting the contents of the CRF.

> So, you said … the timing of [Jane's Title IX complaint] was interesting because she made the complaint on November 1st, before the [Corps of Cadets] hearing [that] was supposed to take place on November 2nd.  However, in the report it says that Title IX *was aware of what happened* on September 22nd based on Jane's conversation with Keely.  Can you kind of talk to me about that?

> <u>Ex. 16</u>, 06/24/24 Tr. 217:10-17 (emphasis added).

275.    Of course, as of September 22, Jane's story was that Plaintiff had only "tried to start something" with her, not that Plaintiff had raped her.[246]  Moreover, questioning a respondent about a document the respondent has never seen is the opposite of affording the respondent with "due process."

276.    In any event, in response to the Hearing Officer's attempt to play "gotcha," Plaintiff aptly noted that it was not until well after September 22 that the Corps of Cadets charged Jane with alcohol infractions for the night at issue.[247]

**P.    The Hearing Officers issue decisions which discriminate against Plaintiff on the basis of sex, and which violate Plaintiff's right to due process.**

    **1.    The Hearing Officers make an *ex post facto* change to the elements of the alleged offense.**

277.    In the FHO, the Hearing Officers initially acknowledged that their job was to "determine if" (1) "Jane was incapacitated" at the time she had sex with Johnny, and (2) "if Johnny should have known that Jane was incapacitated."[248]

---

[246] <u>Ex. 2</u>, Title IX Community Report Form at VT-000031.

[247] <u>Ex. 16</u>, 06/24/24 Tr. 217:19-22.

[248] <u>Ex. 17</u>, Formal Hearing Outcome I ("JR-FHO I") at VT-000786.

278. But without explanation, on the very next page of their decision, the Hearing Officers changed the second element of the offense by finding that Johnny violated the VT sexual assault policy because (1) Jane was "incapacitated" and (2) Johnny should have known that Jane was "intoxicated."[249]

279. The Hearing Officers did not find that Johnny should have known that Jane was "incapacitated" at any point on the night of September 17 or the early morning hours of September 18, let alone that Johnny should have known that Jane was "incapacitated" when he and Jane had sex.

280. The due process requirement prohibits finding that a defendant committed an offense absent a finding that the defendant committed every element of the offense. And an administrative decision is "arbitrary and capricious" if the deciding body departed from the appropriate standard in making its decision.

281. Moreover, the Hearing Officers acted in bad faith when making their *ex post facto* change to the second element of the offense. The Hearing Officers understood the second element of the offense is that the respondent knew or should have known that the complainant was "incapacitated," and the Hearing Officers

---

[249] *Id.* at VT-000787. The Hearing Officers wrote: "Given Johnny was present throughout the entirety of Jane's drinking period, and because they were drinking in a small residence hall room in very close proximity, it is more likely than not that Johnny should have known that Jane was ***intoxicated*** and unable to consent." *Ibid.* (emphasis added). And the Hearing Officers wrote: "In summary, because it's more likely than not that Jane was incapacitated due to alcohol consumption, she lacked the capacity to consent. Despite Johnny's statement that he was unaware of Jane's alcohol intake, his presence while she consumed alcohol throughout the night means that it is more likely than not he should have known that Jane was ***intoxicated***." *Ibid.* (emphasis added).

understood that a respondent cannot be found to have committed the offense if he only knew or should have known that the complainant was "intoxicated."

282. As shown above, a PowerPoint slide for one of VT's Title IX training classes says, "incapacity ≠ impaired, drunk, intoxicated, or under the influence." And just a few months before the August 1 decision was issued, Hearing Officer Cureton— the ranking Hearing Officer on the case—posted his certificate of completion for that class on his LinkedIn profile. Cureton's certificate of completion is shown below.



283. Moreover, on information and belief, Kristina Hartman, the legal advisor to the Hearing Officers,[250] told the Hearing Officers that the second element of the alleged offense was that the respondent knew or should have known that the complainant was "incapacitated." Three days before the June 24 hearing, Hartman assured Plaintiff's lawyer via email that the second element of the alleged offense was that the respondent knew or should have known that the complainant was

---

[250] *See* **Ex. 16**, 06/24/24 Tr. 3:14-18.

"incapacitated," and that the Hearing Officers would apply the second element when making their decision.[251]

### 2. The Hearing Officers disregard extensive evidence that Jane was not "incapacitated."

284. In finding that a preponderance of the evidence showed Jane was incapacitated, the Hearing Officers disregarded extensive evidence that Jane was not incapacitated.

285. *First*, the Hearing Officers did not even mention Dr. Wetherill's expert testimony.

286. *Second*, the Hearing Officers did not even mention Cadet MS's statements and testimony that Jane did not appear to be intoxicated on the night in question.

287. For example, at the June 24 hearing, in response to questioning from Plaintiff's lawyer, Cadet MS testified that Jane did not exhibit the potential signs of "incapacitation" identified in one of the VT Title IX PowerPoint training slides shown above—slurred speech, shaky equilibrium, passing out, and throwing up.[252]

---

[251] **Ex. 15**, 06/21/24 Email from Hartman to Plaintiff's counsel at VT-000414. It would be shocking if Hartman advised the Hearing Officers that they were free to make an *ex post facto* change to the second element of the alleged offense. Even if VT were correct that Virginia common law allows a university hearing officer to intentionally makes such an *ex post facto* change, Hartman—as an Assistant Attorney General of the Commonwealth—had an obligation to ensure that the Hearing Officers did not make such a change. *See, e.g.*, Va. Code § 49-1 (requiring Officers of the Commonwealth to take an oath to "support the Constitution of the United States").

[252] *See* **Ex. 16**, 06/24/24 Tr. 158:4-10 (Q. "At any point did it seem like she was not able to understand what people were saying to her?" A. "She looked like she was able to comprehend everything that anybody was saying to her."); 158:11-17 (Q. "And I think you wrote in your written statement that she was not slurring her speech; is that correct?" A. "She was not slurring her speech that night."); 158:18-23 (Q. "And did you see her ever having trouble

288.     The PowerPoint slide mentioned in the previous paragraph is from the same training class for which Dr. Cureton posted his certificate of completion. Cureton cannot claim he forgot about that PowerPoint slide. Johnny reminded him of it during closing argument. *See* **Ex. 16**, 06/24/24 Tr. 249:24 – 250:20.

289.     ***Third***, without explanation, the Hearing Officers disregarded the fact that during the sixty minutes prior to getting into bed with Johnny, Jane performed several acts that showed she had full "situational awareness." As discussed in another one of the VT Title IX PowerPoint slides shown earlier in this Complaint, "incapacitation" includes "insufficient situational awareness." That PowerPoint slide is also from the same training for which Hearing Officer Cureton posted his certificate of completion.

290.     Jane's acts showing that she had full "situational awareness" included the following: (1) Jane walked CP to his dorm room, which was in a different building than Jane's dorm room; (2) while walking CP to his dorm room, Jane texted coherent messages to Johnny's roommate saying that Johnny would be spending the night with her; (3) after walking CP to his dorm room, Jane walked back to her dorm room by herself; (4) when Jane got back to her room, she cleaned Cadet DM's vomit off the dorm room floor; (5) after Jane cleaned the floor, she changed into her pajamas; and (6) after Jane changed into her pajamas, she climbed into her bed, which was lofted about five feet above the floor.

---

walking?"  A. "No, I did not see any trouble in her walking."); 158:24 – 159:3 (Q. "Did you ever see her passing out?"  A. "No, I did not."); 159:4-8 (Q. "Did you ever see her throwing up?"  A. "No, I did not.").

**3. The Hearing Officers disregard Jane's post-incident actions that were inconsistent with her allegation that Plaintiff sexually assaulted her.**

291. Without explanation, the Hearing Officers disregarded evidence that Jane engaged in numerous acts after the night in question that were inconsistent with her claim that Johnny had sexually assaulted her.

292. Those acts included the following: (1) one week after the alleged assault, Jane sent a text message to Johnny's older cousin AL in which she introduced herself as "Johnny's friend Jane" and in which she arranged to hang out with Johnny and AL when AL visited Johnny during Thanksgiving break; (2) two weeks after the alleged assault, Jane referred to herself as Johnny's "sugar baby" when she sent money to him via the Venmo payment app; (3) approximately three weeks after the alleged assault, Jane hosted Johnny in her dorm room again for more drinking; and (4) approximately three weeks after the alleged assault, Jane initiated another lengthy text message conversation with Johnny's cousin AL in which she and AL made good natured jokes about Johnny.

293. In addition to being evidence of arbitrary and capricious conduct, the Hearing Officers' unexplained disregard of Jane's actions listed in the previous paragraph is evidence of sex-based discrimination against Johnny in violation of Title IX.[253]

---

[253] *See Purdue Univ.*, 928 F.3d at 664 (evidence of bias included decisionmakers' failure to consider complainant's post-incident conduct that was "inconsistent with [her] claim of sexual assault," including that complainant "texted and talked to [respondent], sent his family a package of homemade Christmas cookies, and invited him to her room when they returned to school in January").

### 4. The Hearing Officers treat Pauline and Plaintiff differently when evaluating their credibility.

294. At the June 24 hearing, Johnny testified about how he and Jane both consented to their sexual activities with each other on the night in question.[254] Before Jane decided to opt out of cross-examination, she testified "that she was incapacitated and, therefore, could not give consent."[255] In finding Johnny responsible for sexual misconduct, the Hearing Officers said they found "Jane's version [of events] more credible."[256]

295. But the following facts demonstrate that the Hearing Officers applied a lower credibility standard to Jane than they applied to Johnny.

296. *First*, the Hearing Officers intentionally and in bad faith mischaracterized Johnny's testimony. Although the Hearing Officers conceded that Johnny's testimony included specific details about the sexual encounter with Jane that would preclude any finding that Jane was incapacitated or otherwise did not consent, the Hearing Officers then said Johnny "*claimed to remember nothing else from that night or the following morning, citing that it occurred nine months ago.*" **Ex. 17**, JR-FHO I at VT-000786 (emphasis added).

297. The Hearing Officer's statement quoted in the previous paragraph is false.

---

[254] **Ex. 16**, 06/24/24 Tr. 39:14 – 41:7.

[255] **Ex. 17**, JR-FHO-I at VT-000786.

[256] *Id.* at VT-000787.

298. As shown in the testimony quoted in the footnote below, Johnny answered at least eighteen separate questions from the Hearing Officers about the pre-sexual-encounter events of September 17 and the events of the next morning.[257]

299. With respect to the pre-sexual encounter events of September 17 and the events of the following morning, there were *only two* topics about which Johnny said he could not remember details due to the passage of time. Johnny said he could not remember a conversation *other people* had during the party,[258] and he said he

---

[257] *See* **Ex. 16**, 06/24/24 Tr. 209:10-15 (Q. "How much alcohol did you consume on the evening of September 17th?" A. "I do not remember exactly how much I had to drink that night, but it was around three seltzers, two to three beers, and some of a BuzzBall."); *id.* at 210:3-6 (Q. "Did you know that Jane was intoxicated the night of the incident?" A. "I knew that she consumed alcohol, but I did not know that she was drunk."); *id.* at 211:9-19 (Q. "How did you get into Jane's bed?" A. "I went up a ladder." Q. "So did – did Jane help you in any way, or did anybody else in the room help you get into the bed?" A. "She was near me. She did not help me, but she was there close by." Q. "So you – you got in the bed by yourself?" A. "Yes."); *id.* at 219:24 – 220:9 (Q. "Do you remember Jane walking Cadet CP back [to his room]?" A. "Yes, I remember when they left the room together." Q. "Was there a conversation that was had about Jane walking him back or what he did that – did they – what did that look like?" A. "They said they were going to walk back to [his] room, and that's really it."); *id.* at 211:20 – 212:2 (Q. "You said that Jane fell out of bed. Can you talk to me about that?" A. "I recall her falling out of the bed in the middle of the night. I did not see it happen, but I heard it happen."); *id.* at 212:7-12 (Q. "Where – where were your bodies [in the bed when Jane fell out of the bed]?" A. "I'm on the innermost side of the bed closest to the wall."); *id.* at 212:20 – 213:4 (Q. "So she fell out of a lofted bed and you heard it and just went back to sleep? You didn't think to check on her or ask any questions, or anything like that?" A. "She got back into the bed after she fell out and fell back to sleep." Q. "You didn't ask her if she was okay?" A. "I did ask her if she okay, and then I went back to sleep."); *id.* at 213:8-10 (Q. "Was this before or after the two of you had sexual intercourse?" A. "This was after."); *id.* at 216:20 – 215:3 (Q. "Do you remember Jane leaving the room in the middle of the night?" A. "Yes. I heard her clock back into her room." Q. "Did you hear her leave?" A. "Yes, but I was also half asleep at the time."); *id.* at 217:23 – 218:7 (Q. "The next morning it was reported that you asked Jane if she was okay. Did you see any bruises on her body?" A. No, I did not." Q. "Did she mention any soreness to you?" A. "No, she did not." Q. "Did she ask you about what happened the night before?" A. "No, she did not."); *id.* at 218:17-22 (Q. "Well, tell me about the conversation that took place that morning?" A. "I just asked if she was hungover. We had not talked very much that morning because we had to both go to formation.").

[258] *See* **Ex. 16**, 06/24/24 Tr. 210:18 – 211:8 (Q. "You stated that Cadet MS suggested that he take you back to your room and that Jane insisted on you spending the night. Can you walk me through that part of the evening?" A. "As stated in the previous statements, I was pretty

could not remember "exactly" what he and Jane said to each other after they woke up in the morning.[259]

300.   *Second*, the Hearing Officers disregarded Jane's unexplained inability to recall details about relevant events that occurred after the night of the alleged sexual assault. As shown in the extensive footnote below, Jane testified that she was unable to recall details regarding conversations and interactions she had with Johnny and others after the night of the alleged incident—*i.e.*, conversations and interactions she had when she had not been drinking.[260] In finding Jane "more credible" than Johnny, the Hearing Officers simply ignored that Jane could not recall those details.

---

intoxicated, and it was unsafe for me to go back to my dorm room in fear of getting caught for being – for consuming alcohol. And so other people at the party made the decision for me; I was not the person making the decision there." Q. But do you remember that conversation or what happened there?" A. "No. It was nine months ago.").

[259] *See id.* at 06/24/24 Tr. 218:17 – 219:1 (Q. "Well, tell me about the conversation that took place that morning." A. "I just asked if she was hungover. We had not talked very much that morning because we both had to go to formation." Q. "So what exactly was – was said?" A. This was nine months ago. I can't remember exact statements said."); *id.* at 219:14 ("I assume that we talked about getting ready for formation and just getting ready for the day, but I cannot list specifics.").

[260] For example, although Jane remembered going out to dinner with Johnny the first or second week after the night of the alleged incident, she could not remember anything that she and Johnny talked about while they were having dinner. *Id.* at 06/24/24 Tr. 223:4-16 (Q. "Did you go to the Waffle House with Johnny after this incident?" A. "I do remember us going. I don't remember if it was the week of or the week after, but I do remember sometime we had gone to the Waffle House." Q. "And then do you remember anything about that conversation or what you guys talked about?" A. "Not that I can think of. Sorry. Not that I can think of."). As another example, Jane testified that although she and Johnny drank alcohol together on a recent occasion other than the night of the alleged incident, she could not recall whether that other occasion occurred before or after the night of the alleged incident. *Id.* at Tr. 176:6 – 177:5; s*ee also id.* at 198:12-18 (Q. "Can you talk to me about what the [later] conversation [with Johnny] looked like? Was that in person or on Snap Chat? What was that?" A. "Like I said, I don't particularly remember because it was so long ago, and I've had a lot of conversations with a lot of people since then. But I think it was a mix of both."); *id.* at 199:24-25 ("I don't remember word-for-word verbatim what I did say"); *id.* at

301. ***Third***, the Hearing Officers said that Johnny engaged in "selective disclosure," even though Jane was the only party that engaged in such conduct.

302. According to the Hearing Officers, Johnny engaged in "selective disclosure" by waiting until the hearing to discuss the details of the sexual interaction with Jane rather than giving those details to OEA during the investigation stage of the case.[261]

303. But during the OEA investigation, Investigator Twigger told Johnny that he was free to decide what, if any, information to provide to OEA. *See, e.g.*, **Ex. 5**, 12/19/23 & 01/22/24 emails from Twigger to Johnny at 1 ("As previously mentioned it is entirely up to you how you would like to be involved in this process."). And after Johnny provided a written statement and other information to OEA, Twigger told Johnny that he was under no obligation to provide additional information to OEA. *See id.* at 2 ("If you do not want to answer further questions or provide additional statements, that is fine; you do not have to."). So, Plaintiff was well within his rights to wait until the hearing to provide details about his sexual interaction with Jane.

304. Moreover, the following facts show that it was Jane who engaged in "selective disclosure" throughout the investigation and the hearing:

1. Jane told VTPD that she was only "friends with [Johnny] and was never in a relationship with him."[262] That was "selective disclosure" because, as Jane conceded at the hearing, she and Johnny were actually "friends

---

229:10-22 (Jane testifying that she did not know "for sure" who told her that she walked Cadet CP back to his room, but that she believes it was either Cadet CP or Cadet DM).

[261] **Ex. 17**, FHO-I at VT-000786.

[262] **Ex. 9**, JR-IR at 19.

with benefits"—*i.e.*, friends who engaged in sexual activities with each other.[263]

2. Jane told VTPD that she did not have any of her text messages with Johnny because all those messages were sent on Snapchat—an app that self-deletes texts within 24 hours of being read.[264] That was "selective disclosure" because Jane and Johnny also sent texts to each other via the iPhone "Messages" app, which does not self-delete messages. As shown above, Johnny produced those texts to OEA.

3. Jane told VTPD that she did not want them to question Cadets CP or MS as part of the investigation.[265] That was "selective disclosure" because, as discussed earlier, neither Cadet MS nor Cadet CP supported Jane's claim that she was "incapacitated" on September 17.

4. Although Jane learned of the VTPD's interview of Cadet DM on the same day it happened (November 17, 2023), Jane did not notify OEA that the record of that interview was missing from OEA's evidence during the 10-day review period.[266]

5. As discussed earlier, Jane opted out of cross-examination when Plaintiff's counsel started to ask difficult questions. Such action is a paradigmatic example of "selective disclosure."

\* \* \*

### 5. The Hearing Officers treat Cadet DM (a black female) and Cadet MS (a white male) differently when evaluating their credibility.

305. In finding that Jane was "incapacitated," the Hearing Officers cited the hearing testimony of Cadet DM, Jane's roommate, that Jane seemed to be "intoxicated" while all the cadets were drinking.[267] According to the Hearing Officers,

---

[263] **Ex. 16**, 06/24/24 Tr. 194:23-24, 195:4-7, 172:1-3, 172:11-13.

[264] **Ex. 9**, JR-IR at 21.

[265] *Id.* at 19, 21.

[266] *See* **Ex. 16**, 06/24/24 Tr. 73:1-22 (Cadet DM testifying that when she returned to her room after her VTPD interview, she told Jane about that interview); **Ex. 9**, JR-IR at 6 ("Jane did not respond with any additional information during the 10-day review.").

[267] **Ex. 17**, JR-FHO I at VT-000787.

Cadet DM testified that "Jane appeared disoriented, not her usual self, occasionally zoning out and staring at things, including the floor when not engaged in conversation."[268]

306. But the Hearing Officers disregarded the fact that Cadet DM testified Jane did not display three of the signs of "incapacitation" listed in VT's Title IX training materials—slurred speech, shaky equilibrium, and vomiting. *See* **Ex. 16**, 06/24/24 Tr. 78:25-79:2 ("[Jane] could walk, so mentally I thought that since she could still walk decent she wasn't that intoxicated."); *id.* at 79:16-21 ("Q. At any point when you were talking, did Jane ever like have slurred speech?" A. "Not that I can remember. I, again, was also intoxicated, but I don't think so."); *id.* at 110:19-23 (Q. "Did anyone [other than you] throw up that night?" A. No, not that I saw.").

307. In any event, the following facts demonstrate that when the Hearing Officers relied on Cadet DM's testimony to find that Jane was incapacitated, they applied a lower credibility standard to Cadet DM than they applied to Cadet MS because Cadet DM is a black female who supported Jane (a white female) and Cadet MS is a white male who supported Johnny (a white male).

308. *First*, whereas Cadet MS was not intoxicated on the night at issue,[269] Cadet DM was heavily intoxicated at the most important point in the evening—when

---

[268] *Id.* at VT-000786.

[269] *See* **Ex. 9**, JR-IR at 54 (OEA summary of interview of Cadet DM) ("Cadet DM stated that Cadet MS had 2, maybe 3 Busch Lights and 1 high noon, be he did not seem intoxicated at all."); **Ex. 3**, VTPD summary of 11/17/24 interview of Cadet DM ("I asked Cadet DM how Cadets CP and MS seemed when they left [the party] and she replied that CP seemed really intoxicated and MS seemed fine."); **Ex. 9**, JR-IR at 61 (VTPD summary of interview of Cadet MS) ("[I] asked if he felt like his memory of that night was impacted by alcohol. He stated that he was fine that night and able to walk around and talk that night without any ill effects

Jane returned from walking Cadet CP to his dorm room and she got into bed with Johnny.

309. At about that time, Cadet DM threw up because she was so intoxicated. In fact, she threw up on her dorm room floor and in a trashcan because she was too intoxicated to make it to the sink in her room or the women's bathroom (which was only a few feet down the hall).[270] And she was so intoxicated that she later was unable to remember that Cadet MS was still in the room when Jane returned from walking Cadet CP home.[271]

---

from alcohol."); **Ex. 16**, 06/24/24 Tr. 140:18-19 (Cadet MS testimony) (Q. "Would you consider yourself intoxicated that night?" A. "No, not at all.").

[270] *See* **Ex. 16**, 06/24/24 Tr. 108:21 – 109:5, 110:5-18, 142:1-14, 151:6 – 152:11. Jane's dorm room was across the hall and two doors down (approximately ten feet) from the women's community bathroom. *See id.* at 98:9-10, 159:9-21; **Ex. 9**, JR-IR at 40.

[271] **Ex. 9**, JR-IR at 168; (transcript of Corps of Cadets interview of Cadet DM) ("We drank. Maybe I'd say two hours later my roommate walked Cadet CP back to his room. And then Cadet MS left the room while my roommate was gone."); **Ex. 3**, VTPD summary of 11/17/23 interview of Cadet DM ("Cadet DM stated that around 23:00 Jane walked Cadet CP back to his room and Cadet MS left before Jane returned."). The Hearing Officers never explained how they were able to find Cadet DM's testimony credible despite her heavy intoxication. The Hearing Officers only response to the fact that Cadet DM could not remember who was in the room was that "whether Cadet MS left before or after Jane returned from walking Cadet CP home is not relevant in determining responsibility of the charges." **Ex. 23**, JR-FHO II at VT-000733. That response was so absurd that it is evidence of bad faith and a lack of professional judgment (especially for Hearing Officers who each have at least one advanced degree).

310. At the June 24 hearing, Cadet DM conceded that her intoxication on the night at issue adversely affected her memory of that night.[272] Indeed, she testified that she was "out of it" and had "brain fog" from drinking.[273]

311. *Second*, Cadet DM's June 24th hearing testimony about Jane's demeanor was inconsistent with the two statements she gave during the investigation—one to VTPD on November 17, 2023, the other to OEA on December 7, 2023.

312. When VTPD and OEA asked Cadet DM about Jane's demeanor, Cadet DM told both investigators that the *only* reason she thought Jane may have had too much to drink was that Jane took Johnny's phone with her when walking Cadet CP home.[274] Cadet DM said nothing about Jane being disoriented, zoning out, *etc.* Cadet DM even reviewed Twigger's draft of the interview summary and told Twigger that the summary was correct.[275]

---

[272] *See* **Ex. 16**, 06/24/24 Tr. 85:1-7 (Q. "So your – your memory from that night is affected by the fact that you were intoxicated? A. "Yes. Pertaining to the – how much I drank.")

[273] *Id.* at 100:4-12, 101:21-24. Cadet DM claimed that vomiting made her "sober up a lot." **Ex. 9**, JR-IR at 54 (Twigger summary of interview of Cadet DM). But Dr. Wetherill testified that vomiting would not have made Cadet DM sober up. *Id.* at 123.

[274] *See* **Ex. 3**, VTPD 11/17/23 interview summary at 1 ("Cadet DM stated that she did not think Jane was very intoxicated until Jane walked Cadet CP back to his room and accidentally took Johnny's phone instead of her own."); **Ex. 9**, JR-IR at 54 (OEA interview summary) ("Cadet DM stated she didn't think Jane was that intoxicated until she ended up walking Cadet CP back to his dorm. Cadet DM explained that Jane keeps her [student ID] on the back of her phone, and she grabbed Johnny's phone when she left. Cadet DM stated that when she realized what Jane did, she knew Jane needed to stop drinking because she took the wrong phone.").

[275] **Ex. 16**, 06/24/24 Tr. 93:4-18 (Q. "Did Ms. Twigger e-mail you a copy and give you a chance to make any corrections?" A. "Yes." Q. "Did you make any corrections?" A. "I did not." Q. "Did you review it to see if it needed to be corrected?" A. I did."). Incredibly, the Hearing Officers said that it does not matter if a witness is unable to give a consistent *basis* for a lay opinion, so long as the witness maintains the same *ultimate* opinion. **Ex. 23**, JR-FHO II at

313. *__Third__*, Cureton—the senior Hearing Officer on the case—is biased in favor of black witnesses over white witnesses.

314. On his LinkedIn banner, Cureton says his motto is: "Amplify Black Voices." Here is the banner as it appeared before Cureton left VT to go to another school.



315. According to his Ph.D. thesis and his resume, Cureton is an advocate of Critical Race Theory ("CRT").[276]

316. As another former VT Office of Student Conduct Hearing Officer has written, CRT's "goal is to investigate [events] through the lens of race."[277] And as Judge Richard Posner has explained, CRT "turns its back on the Western tradition of

---

VT-000723 ("While the words Cadet DM used to describe Jane were different, Cadet DM stated in the Title IX interview, VTPD interview, and the formal hearing that she thought Jane was intoxicated on the night of the incident.").

[276] *See* Quintavis Marquel Cureton*, When They See Us: The Lived Experiences of Tenured Black Male Faculty at Research 1 Institutions* at 37 (2023) (stating, "Critical Race Theory ("CRT") serves as a conceptual guide for this study").

[277] DaShawn Dilworth, *Elephants in the Room: Examining and Understanding the Black Assembly Line*, 16 Journal of Student Affairs 83, 84 (2020).

rational inquiry, foreswearing analysis for narrative."[278] In other words, "rather than marshal logical arguments and empirical data, critical race theorists tell stories" that are "designed to expose the pervasive and debilitating racism of America today."[279]

### 6. The Hearing Officers fabricate evidence about Jane's size to find that Jane drank enough alcohol to render her "intoxicated."

317. In the first FHO, the Hearing Officers said that Jane had eight to ten drinks on the night in question, and that this fact supported a finding that Jane was "incapacitated."[280] At the September 20 hearing, however, Johnny pointed out that Jane had testified that she had only six to eight and a half drinks.[281]

318. In the second FHO, the Hearing Officers said, "The amount of alcohol that Jane consumed in two hours, whether 6 or more, is still considered a large amount of alcohol and could be enough for Jane to be considered *intoxicated, given her size*." **Ex. 23**, JR-FHO II at 1 (emphasis added).

319. But the issue was not whether Jane was "intoxicated," it was whether Jane was "incapacitated." Moreover, neither the Investigation Report nor the hearings included evidence regarding Jane's size (including her weight). The hearings were conducted via Zoom, and neither the video feed nor the photos of Jane in the Investigation Report would have allowed the Hearing Officers to reliably

---

[278] Posner, *The Skin Trade*, The New Republic 40, 42 (Oct. 13, 1997).

[279] *Ibid.*

[280] **Ex. 17**, JR-FHO I at VT-000787.

[281] **Ex. 23**, 09/20/24 Tr. 41:16 – 42:1.

estimate Jane's size or weight. So, the Hearing Officers made up the reference to Jane's "size."[282]

**Q. The Office of Student Conduct violates Plaintiff's right to due process by allowing Jane to submit an *ex parte* opposition to Plaintiff's appeal.**

320. Johnny filed timely appeals of both FHOs.

321. Mr. Settle allowed Jane to submit an *ex parte* opposition to at least one of Johnny's appeals.[283]

322. On information and belief, Mr. Settle told the Appellate Officer that Pauline's opposition should be the final document read before deciding the appeal.

323. VT did not provide Johnny with a copy of Jane's *ex parte* opposition until March 2026, when VT began producing documents responsive to Plaintiff's request for production in this litigation.

**R. The Appellate Officer issues decisions which discriminate against Plaintiff on the basis of sex, and which violate Plaintiff's right to due process.**

324. Dr. Keene served as the Appellate Officer for the Jane Roe matter.

325. VT assigned Dr. Keene to serve as an Appellate Officer ostensibly because her educational and work history indicates she will exercise the professional judgment one would expect from a decision-maker in a university sexual misconduct proceeding. Keene has a Ph.D. in Higher Education from VT. In fact, her doctoral dissertation was about how university hearing officers and appellate officers can

---

[283] **Ex. 20**, Jane Roe's *ex parte* opposition to Johnny's appeal.

perform their jobs more effectively.[284] Dr. Keene also has a master's degree from UVA and a bachelor's degree from William and Mary.[285] Before becoming VP for Student Affairs, she served in several other positions dealing with student discipline.[286]

326. But Dr. Keene exercised no professional judgment when denying Johnny's appeals, which argued that the Hearing Officers' findings of responsibility were "arbitrary." Although the appeals were as thorough and detailed as this Complaint,[287] Dr. Keene denied the appeals via letters that were barely a page long.[288] Dr. Keene did not address the substance of any of Johnny's arguments that the Hearing Officers' findings were arbitrary. Instead, Dr. Keene simply noted that the hearings involved the questioning of witnesses and that the Hearing Officers offered explanations for their findings and cited some evidence in the record.[289]

327. Dr. Keene read Jane's *ex parte* oppositions to the appeals.

328. Dr. Keene considered Jane's *ex parte* oppositions when Keene denied the appeals.

## VIRGINIA TECH'S TITLE IX ADMINISTRATION
## UNDER PRESIDENT SANDS (2014 – 2024)

329. In April 2023—six months before Pauline and Jane filed their complaints against Johnny—the most prominent feminist group at VT put President

---

[284] *See* F. Keene, *Fostering Self-Authorship in the Student Conduct Environment* (Aug. 1, 2016).

[285] *See* https://students.vt.edu/leadership/Frances_Keene.html.

[286] *Ibid.*

[287] *See* **Exs. 18 & 24**, Appeals.

[288] **Exs. 21 & 25**, Appeal Denials.

[289] **Ex. 21**, Denial of first appeal at VT-000623; **Ex. 25**, Denial of second appeal at VT-000702.

Sands on a "Wanted Poster" and offered a six-figure award for his capture.[290] The group claimed that Sands did not care about "supporting survivors and preventing sexual violence" at VT.[291]

330. Sands became VT's President in June 2014. So, a person reading the 2023 poster may have concluded that VT had spent the previous nine years ignoring the purported problem of sexual assault at VT. But the exact opposite is true.

331. Starting in 2014, in response to pressure from the Department of Education, VT began building a Title IX administration that presumes any man accused of sexual assault is guilty. And the administration repeatedly and falsely tells the student body that sexual violence is a "huge" problem at VT.

332. But VT's own data show that the university has a low rate of sexual assault.[292]

333. By stoking the false campus "rape epidemic" narrative, however, VT's Title IX administration misleads female students into believing there is a rapist around every corner, and that it's only a matter of time until they are a victim. And, ironically, the actions of VT's Title IX administration have convinced campus activists that the Title IX administration is pro-rapist.

334. Female VT students have said publicly that the administration is "complicit in rape culture" and that it "lets assaulters and rapists walk free and still

---

[290] See Doc. 1, Complaint at ¶ 65 (displaying poster).

[291] *Ibid.*

[292] For example, in 2022 there were 28 reports of sex crimes by students at VT's Blacksburg campus, which has approximately 37,000 students. *See* VT 2022 Cleary Act Report at 103 (Sept. 2023). That equates to a sexual assault rate of approximately 0.0007%.

attend school." And campus protesters routinely demand that the administration "Fix Title IX at VT" and "Stop Protecting Rapists."

335. Here is a more detailed discussion of VT's Title IX administration under the Sands presidency.

## A. VT allows Catherine Lhamon (Department of Education) to micromanage the university's Title IX program.

336. When Sands arrived at VT in June 2014, the Department of Education's Office for Civil Rights ("OCR") was investigating a complaint that VT had failed to adequately respond to a female student's allegation of sexual assault.[293]

337. Sands had not planned on dealing with an OCR Title IX investigation when he took the helm at VT. As he recently noted in a book chapter that he authored, his "strategic imperatives" when he arrived in Blacksburg included addressing the fact that, in his view, VT had too many white male students from middle class families.[294]

338. VT resolved OCR's Title IX investigation by entering a "Voluntary Resolution Agreement" with OCR a few months after Sands became President.[295] The VRA gave OCR the right to micromanage VT's Title IX compliance for at least two years.

---

[293] *See* **Ex. 48**, Department of Education Letter to Tim Sands at 1 (Oct. 28, 2014).

[294] *See* Tim Sands, *Now is Not the Time to Wait*, printed in *Dear Higher Education; Letters from the Social Justice Mountain* at 24 (Menah Pratt, et al. editors 2024). Available at https://open.lib.umn.edu/dearhighereducation/.

[295] *See* **Ex. 47**, Voluntary Resolution Agreement ("VRA") (Oct. 22, 2014).

339. For example, VT agreed to develop training programs for its Title IX personnel and allow OCR to veto those training programs for any reason, including the content of program or the persons selected to conduct the program.[296] As another example, VT agreed to "provide OCR with documentation regarding any events it has held to raise Title IX awareness on campus."[297] And VT agreed to "submit to OCR copies of all Title IX grievances filed by students or on behalf of students, alleging sexual harassment," as well as "documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigation reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals."[298]

340. The fact that VT entered the agreement did not mean that the university had been failing to comply with its Title IX obligations. VT likely entered the agreement because Catherine Lhamon oversaw OCR.[299] (Lhamon was also in charge of OCR during VT's investigations and adjudications of the Pauline Poe and Jane Roe cases).

341. Lhamon (a lawyer) believes that sexual assault is so pervasive on college campuses that (1) students accused of sexual assault should not be given due process,

---

[296] *Id.* at 4.

[297] *Id.* at 5.

[298] *Id.* at 7.

[299] Lhamon's title was Assistant Secretary for Civil Rights at the Department of Education. Assistant Secretaries at the Department of Education are nominated by the President and confirmed by the Senate.

and (2) universities being investigated by OCR for failing to comply with their Title IX obligations are not entitled to due process either.

342. In 2022, Virginia's Attorney General (and 16 other state attorneys general) sent a letter to the Department of Education saying that Lhamon created a "regulatory and constitutional mess" by "pressur[ing] schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability."[300] That same year, Virginia's Secretary of Education sent a letter to President of the United States and the Department of Education stating that Lhamon endorsed the use of "kangaroo courts" by schools to resolve allegations of sexual misconduct.[301] In 2015, Virginia's Governor sent a letter to the U.S. Department of Education saying that an ongoing OCR (Lhamon) investigation of UVA's Title IX compliance was depriving UVA of "the very requirements of due process—adequate notice and an opportunity to be heard by an impartial tribunal."[302] And in 2016, an Assistant Virginia AG wrote that the time and expense of OCR enforcement proceedings "discourages many recipients from pursuing legal action and instead forces [them] to tolerate the constitutional infirmities in OCR's process."[303]

---

[300] **Ex. 51**, Letter from Seventeen State Attorneys General to the U.S. Secretary of Education at 28, 32 (Sept. 12, 2022).

[301] **Ex. 52**, Letter from the Virginia Secretary of Education to the President of the United States and the U.S. Secretary of Education at 2 (Sept. 12, 2022).

[302] *See* Farnaz Farkish Thompson, *Eliminating a Hostile Environment Towards Colleges and Universities: an Examination of the Office for Civil Rights' Unconstitutional Process and Practices*, 28 Regent Univ. L.R. 225, 235 (2016).

[303] *Ibid.*

343. During the Lhamon era, a college administrator told University of Miami Law Professor Tamara Lave that even if an accused student is "truly innocent, the reality is that OCR wants you to take action against [him] because underreporting is such a huge problem."[304] A former OCR attorney said he saw cases in the Lhamon era "where it basically didn't matter what evidence there was," and where "[t]he college was going to find against, the male defendant, no matter what."[305] Former U.S. district court judge (and Harvard Law Professor) Nancy Gertner said that Lhamon's OCR "effectively create[d] a presumption in favor of the woman complainant" because "if you find against [the woman], you will see yourself on *60 Minutes* or in an OCR investigation where your funding is at risk."[306] And a Senior Vice President of the American Council on Education (an organization to which VT belongs) described OCR under Lhamon's leadership as "a Court of Star Chamber."[307]

**B. VT fills its Title IX administration with officials who presume that any man accused of sexual assault is guilty.**

344. To appease Lhamon's OCR, VT staffed its Title IX administration with officials who presume that any man accused of sexual assault is guilty. Here are examples of such officials.

---

[304] Tamara Rice Lave, *Ready, Fire, Aim: How Universities are Failing the Constitution in Sexual Assault Cases*, 48 Ariz. St. L.J. 637, 655 (Fall 2016).

[305] Richard Bernstein, *Legal experts say Biden's pushing ahead to the Obama past on campus rape could be a mistake*, RealClearWire (Dec. 16, 2020).

[306] Nancy Gertner, *Sex, Lies, and Justice*, the American Prospect at 35 (Winter 2015).

[307] Juliet Eilperin, *The problem that drove Biden to anger, action*, Daily Press (Newport News, VA), Jul. 25, 2016.

### 7. Frank Shushok

345. Shushok is considered the architect of VT's Title IX administration during the Sands presidency. Shushok spearheaded the "daunting process" of restructuring VT's Title IX operations "to align with" OCR's demands.[308] He was later promoted to the position of VP for Student Affairs—the position currently held by Dr. Keene.[309]

346. In 2017, after working for several years as VT's Deputy Title IX Coordinator, Shushok penned an op-ed in the Washington Post in which he said his "heart is broken" because 20% of female VT students are sexually assaulted during their time in college.[310] And he indicated that VT's efforts to combat sexual assault had been fruitless.[311]

347. Shushok also said that any man accused of sexual assault is presumably guilty. According to Shushok, although "there are unfortunate instances of false reporting, all evidence is that the occurrence is rare—very rare," so people should "quit victim blaming."[312]

---

[308] Frank Shushok, Jr., *'I had no idea': Sexual assault awareness begins on campuses*, Washington Post (Apr. 6, 2017).

[309] In her Ph.D. dissertation, Keene referred to Shushok as her "role model." *See* F. Keene, *Fostering Self-Authorship in the Student Conduct Environment* at iii (Aug. 1, 2016) (stating, "Frank Shushok, you are such a role model to me, and you have been an incredible supervisor").

[310] Shushok, *'I had no idea': Sexual assault awareness begins on campuses*, Washington Post (Apr. 6, 2017).

[311] *Ibid.* ("While many would argue that Title IX has bolstered awareness and reporting of sexual violence, few insiders think it has affected the prevalence of this behavior on campus.").

[312] *Ibid.*

348. Shushok also recommended that people who want to educate themselves about sexual assault on college campuses should read the John Krakauer book, *Missoula: Rape and Justice in a College Town* (2016) ("*Missoula*")—a book about two University of Montana football players accused of sexually assaulting female students.[313]

349. Shushok's recommendation of *Missoula* is emblematic of the "believe all women," anti-due process culture of VT's Title IX administration. *Missoula* says that "the harm done to a rape victim who is disbelieved can be ***at least as*** devastating as the harm done to an innocent man who is unjustly accused of rape." *Missoula* at 377 (emphasis added). Of course, that view contradicts "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

350. Indeed, *Missoula* skewers the American legal system, especially lawyers who represent defendants in sexual assault cases. *See Missoula* at 268 (saying that in the "[American legal] system, it's more important to follow legal procedure than speak the truth" because "due process trumps honesty"); *id.* at 267 (saying that "the [American legal] system promotes chicanery, outright deceit, and other egregious misconduct by trial lawyers"); *id.* at 266 (saying it's "common for lawyers to deliberately make untrue statements in court, and they usually get away with it, *especially defense counsel*") (emphasis added).

---

[313] *Ibid.*

351. *Missoula* also notes with approval that the University of Montana "tries to minimize the role of lawyers" in sexual assault cases "to prevent legalistic quibbling from obscuring evidence,"[314] and that a federal judge denied a motion by one of the accused University of Montana students for a TRO to stop the university from proceeding with its Title IX hearing.[315] But *Missoula* omits the fact that the judge made the following statement when denying the TRO motion:

> Today's ruling is not a finding that the process employed by the university in this case is immune from legal challenge. Indeed, from a normative perspective, the process applied to Plaintiff Doe and the behavior of university officials in investigating and prosecuting this matter offends the Court's sense of fundamental fairness and appears to fall short of the minimal moral obligations of any tribunal to respect the rights and dignity of the accused.[316]

352. The accused student later reached a settlement with the University of Montana in which the school agreed to pay him nearly a quarter of a million dollars over its handling of his Title IX case. The Washington Post (and several other media outlets) ran a story about that settlement *over a year before* Shushok wrote his op-ed praising *Missoula*.[317] Given the publicity about that settlement (especially in the

---

[314] *Id.* at 94-95.

[315] *Id.* at 203.

[316] *Doe v. Univ. of Montana,* No. 12-cv-00077, slip op. at 12 (D. Mont. May 10, 2012), ECF 20-1 at Page 196; *see also* KC Johnson & Stuart Taylor, Jr., *The Campus Rape Frenzy: the Attack on Due Process at America's Universities* at 129 (2018 ed.) ("In Missoula's 349 pages, Krakauer never mentioned this devastating assessment—by an Obama-nominated judge—of how university officials whom the author so praised actually handled a sexual assault case.").

[317] *See* Michael Miller, *Montana quarterback receives $245K settlement for university's 'unfair and biased' rape investigation*, Washington Post (Feb. 17, 2016).

universe of Title IX administrators), Shushok likely read about the settlement. But his op-ed made no mention of it.[318]

### 2. Katie Polidoro

353. Polidoro joined VT's Title IX Office as a "Title IX Investigator & Gender-Based Violence Prevention Specialist" in 2015, a few months after VT entered its "Voluntary Resolution Agreement" with OCR. Polidoro replaced Shushok as the Deputy Title IX Coordinator in 2017, and she served as the Title IX Coordinator from 2018 until September 2024.

354. By hiring a person with Polidoro's background, VT made clear to OCR that the university's Title IX investigations would be conducted with a "female-victim-centered" approach. Polidoro minored in Women's Studies as an undergraduate.[319] She then worked as a legislative aid to the Vermont Governor's Commission on Women.[320] Between graduating from law school and joining the staff at VT, she (1) worked in a legal aid clinic that provided free legal services to victims

---

[318] The fact that Shushok was not involved in Johnny's cases does not render facts about Shushok's views irrelevant to this action. *See Doe v. Regents of Univ. of Cal.,* 23 F.4th 930, 939 (9th Cir. 2022) (evidence of bias can include "statements by pertinent university officials, not just decision makers" which "suggest[] that [the school's] Title IX officials held biased assumptions against male respondents"); *Texas Christian Univ.,* 601 F. Supp. 3d at 93 (evidence of "gender bias" included "institutional messaging, both implicit and explicit," even if that messaging did not come from someone involved with plaintiff's case). Indeed, VT claims that the university suffers from "systemic racism." *See* Melody Warnick, *Teaching the teachers how to resist racism,* Virginia Tech News (Jan. 9, 2024) (quoting a VT associate vice provost of diversity education and engagement as saying, "Accelerating an end to systemic racism requires new ways of thinking and learning."). So, VT should not be heard to say that the systemic anti-male sexism within its Title IX administration is irrelevant to this action.

[319] Deposition of K. Polidoro Tr. 7:11-20 (Jul. 30, 2021), *Jacob Doe v. VT,* No. 19-cv-00249 (W.D. Va.), Doc. 83-3 (filed Sept. 14, 2021).

[320] *Id.* at 8:1-10.

of sexual assault; (2) worked as a counselor in Hawaii for families in which a member was experiencing physical abuse; and (3) worked as the Transitional Housing Program Coordinator at the Women's Resource Center of the New River Valley (Radford, Virginia), where she helped women who were leaving abusive relationships to find housing.[321]

355. In a 2021 deposition, Polidoro testified that she read *Missoula*.[322] And she seemed to agree with *Missoula*'s disdain for the legal system, at least when it comes to sexual assault cases. Polidoro testified that when a Title IX accuser testifies about the underlying incident in a parallel court proceeding, that testimony is not relevant in the Title IX investigation. *See id.* at 73:24 – 74:3 (Q. "So [complainant's] statements made in court wouldn't have been relevant to you?" A. "At that time I guess, no, I'd made that decision."). According to Polidoro, an accuser's statement made to a third person outside the Title IX investigation is relevant only if the accuser "confided in [that third person] soon after [the incident] occurred."[323]

356. Polidoro's definition of "relevant" is wrong in that it is far too narrow. Any of a complainant's prior statements about an alleged incident is relevant evidence at a disciplinary hearing about that incident. Polidoro's overly narrow definition of "relevant" is designed to make it harder for respondents (nearly all of whom are male) to defend themselves. It also explains why the Investigation Report

---

[321] *Id.* at 11:15-10, 16:16-21:22.

[322] *Id.* at 27:6-14.

[323] *Id.* at 73:1-3.

that OER wrote for the Pauline Poe matter did not mention the numerous false and inconsistent statements that Pauline made to the judge at the Protective Order hearing. All that said, OEA's September 22, 2023, CRF about Jane Roe falls well within Polidoro's definition of "relevant" evidence. So, VT cannot deny that the CRF was "relevant" evidence.

### 3. Kristen Barnett

357. Barnett joined VT as its "Senior Title IX Investigator" in 2018. Prior to coming to VT, she was a Title IX Investigator at the University of Arkansas.

358. While at Arkansas, Barnett conducted the Title IX investigation at issue in *Doe v. University of Arkansas*, 974 F.3d 858 (8th Cir. 2020). That investigation resulted in the university finding that a male student had sexually assaulted a female student. During the male student's subsequent lawsuit challenging the university's findings, the university conceded that the local police had reviewed Barnett's Title IX investigation report and found that her report failed to mention "several inconsistencies" in the complainant's allegations.[324]

359. As discussed earlier in this Complaint, the Investigation Reports for the Pauline and Jane matters—which were co-authored by Barnett—contained material misstatements of evidence (all of which favored the accuser) and omitted certain

---

[324] *See Univ. of Arkansas*, 974 F.3d at 862; *compare* Complaint at ¶ 102, *Doe v. Univ. of Arkansas*, No. 18-cv-5182 (W.D. Ark. Sept. 14, 2018), Doc. 1 *with* Answer at ¶ 102, *Doe v. Univ. of Arkansas*, No. 18-cv-5182 (W.D. Ark. Oct. 5, 2020), Doc. 37. After the Eighth Circuit found that the accused student had adequately plead a claim against the university for violating his rights against sex-based discrimination under Title IX, the university agreed to settle the case for an undisclosed amount. *See* Stipulation of Dismissal, *Doe v. Univ. of Arkansas*, No. 18-cv-05182 (W.D. Ark. Apr. 21, 2021), Doc. 43.

evidence and information that favored Johnny. Barnett's history at Arkansas is further evidence that OEA's misstatements and omissions in the Pauline and Jane matters were deliberate and made in bad faith.

### 4.     Rohsaan Settle

360.    Settle was named Director of the Office of Student Conduct at VT in July 2014, during the OCR investigation that resulted in VT's "voluntary resolution agreement" with OCR. He served as the Director until October 2018 and returned as Interim Director in October 2023.

361.    In his first stint as Director, Settle served as a Hearing Officer in a Title IX case that was later the subject of attention in the campus newspaper and on the Instagram page of the group that circulated the "Wanted Poster" discussed earlier in this Complaint. The complainant in that case, Maya Garcia, alleged that (1) she "blacked out" from alcohol while she and the respondent were naked and kissing in a bedroom, (2) when her blackout ended, she discovered that the respondent was having sex with her, and (3) she then "froze" rather than tell respondent to stop.[325]

362.    Ms. Garcia told the Office of the Commonwealth's Attorney that the respondent raped her. But according to a social media post by Ms. Garcia, the Office declined to charge the respondent because it concluded the evidence did not show respondent committed a crime.[326] Ms. Garcia did not provide additional information about what the Office told her. But presumably the Office concluded it could not prove

---

[325] Jessica Brady, et al., *Rapist Should be Expelled*, Collegiate Times (Jan. 21, 2019).

[326] Post by Maya Garcia on Instagram page of the United Feminist Movement of VT (Aug. 31, 2020).

Ms. Garcia was "incapacitated" and/or it could not prove the respondent "knew or should have known" Ms. Garcia was "incapacitated."

363. Settle and his fellow Hearing Officers, however, concluded that the respondent did rape Ms. Garcia. When a campus newspaper reporter asked a spokesperson for the Commonwealth's Attorney why the prosecutor reached a different conclusion than VT, the spokesperson said one reason may have been that VT defines "rape" differently than does the Commonwealth of Virginia.[327]

364. Indeed, at that time the VT Student Code of Conduct provision on sexual assault did not even mention the word "incapacitation," let alone define that word. It said only that "rape" included having intercourse with a person "where [that] person is incapable of giving consent due to the victim's use of drugs or alcohol."[328] And the Student Code of Conduct did not say that respondent could be found to have committed rape only if the evidence showed he "knew or should have known" that the complainant was incapable of giving consent, even though that is the standard under Virginia law,[329] federal law,[330] and most other universities' student codes of conduct.[331]

365. To make matters worse, well before the time of the Garcia case, ATIXA told VT that (1) its sexual misconduct policy should be based on "incapacitation," not

---

[327] Jessica Brady, et al., *Rapist Should be Expelled*, Collegiate Times (Jan. 21, 2019).

[328] Virginia Tech Hokie Handbook at 18 (2017-2018).

[329] *See* Va. Code §§ 18.2-61(A) & 18.2-67.10(3).

[330] *See, e.g.*, *United States v. Rouillard*, 740 F.3d 1170, 1171 (8th Cir. 2014).

[331] *See, e.g.*, *Doe v. Univ. of Arkansas*, 974 F.3d at 863; *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 584 (6th Cir. 2018).

"intoxication," (2) "incapacitation is a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the 'who, what, when, where, why, or how' of their sexual interaction)," and (3) "the most straight-forward way to compose a policy on incapacity is with the following language: 'Having sex with someone whom you know to be, or should know to be, incapacitated (mentally or physically) is a violation of the sexual misconduct policy.'"[332] Also well before the Garcia case, ATIXA explained to VT that a person experiencing a blackout is not necessarily "incapacitated."[333]

366. As the Director of the Office of Student Conduct, Settle served as the Chair of the Student Code of Conduct Review Committee.[334] So he could have recommended that the Board of Visitors revise the Student Code of Conduct's definition of rape to bring it in line with how that term is typically defined and with ATIXA's recommendations. But there is no evidence that he ever did so.

367. In fact, VT did not add a definition of the term "incapacitation" to its Student Code of Conduct until August 2023, when the Board of Visitors required a definition of that term be added.[335] On information and belief, Settle and many of the other VT employees involved in the Jane Roe matter were opposed to that revision.

---

[332] See The ATIXA Playbook: Best Practices for the Post-Regulatory Era at 43, 44, 46.

[333] Id. at 46 (stating that a person experiencing a blackout "may be able to do the same activities they could do under normal circumstances, but they are not creating memories for the events that occur during the blackout," and "to others, they may appear to be fully functional").

[334] Deposition of R. Settle Tr. 19:5-16 (Jul. 26, 2021), Doe v. VT, No. 19-cv-00249 (W.D. Va.), Doc. 83-52 (filed Sept. 14, 2021).

[335] See Resolution to Approve Revisions and Update to the 2023-2024 Virginia Tech Student Code of Conduct (June 2023).

### 5. Martha Glass

368. Glass currently serves at the Assistant Vice President for Student Affairs and Chief Appellate Officer for Title IX cases. VT's selection of Glass as its Chief Appellate Officer shows that it wants Title IX appeals to be decided with a "female-victim-centered" approach.

369. Glass is a member of the Coalition for Women's Identities ("CWI"), an organization that "supports, develops, and empowers the spectrum of women- and female-identified people and those in solidarity with [them] through advocacy and activism."[336] CWI "serves to examine the subtle manifestations of power, privilege, and oppression including but not limited to sexism."[337] In 2020, Glass won the CWI's "Wise Woman Award," which is selected based on the recipient's history of "contributions toward women or female identified individuals in student affairs."[338]

370. Prior to joining VT, Glass worked at two other universities, where her roles included providing leadership for a "women's center," planning "gender-based educational events," developing "crisis management plans" related to "women's issues," coordinating "sexual assault educational efforts," and "creat[ing] the [university's] Clothesline Project"—an event that seeks to "to help with the healing

---

[336] *See* https://myacpa.org/groups/cwi/.

[337] *Ibid.*

[338] *Ibid.* CWI is one of the "Identity Groups" in the American College Personnel Association ("APCA"). Glass is also a member of the ACPA. The APCA's Identity Groups also include, *inter alia*, a "Coalition on Men & Masculinities" ("CMM"), which "sets about its work from a feminist framework" and which seeks to combat "hegemonic masculinity." *See* https://myacpa.org/groups/cmm/.

process for those who have directly and personally been affected by violence against women."[339]

### C. VT hires Title IX consultants who are critical of giving due process to students accused of sexual assault.

371. Because the 2014 "Voluntary Resolution Agreement" allowed OCR to veto any aspect of a VT Title IX training program, including the persons selected to conduct the program, VT selected Title IX consulting firms that would pass muster with Catherin Lhamon.

372. For example, VT hired the Margolis Healy firm. Publicly available documents show that Katie Polidoro and Frances Keene attended Margolis Healy training.[340] On information and belief, other VT employees involved in the Jane Roe and Pauline Poe matters have attended Margolis Healy training.

373. Margolis Healy training materials say that an investigator should "start by believing" the accuser and that a Title IX investigation report should not include any "inconsistencies with her story."[341] Training materials such as those help explain why OEA withheld the Title IX Community Report Form in the Jane matter and why OEA's Investigation Report in the Pauline matter did not mention the numerous inconsistencies in Pauline's story.

374. VT also hired Brett Sokolow as a Title IX consultant. In 2014, Sokolow published a whitepaper for Title IX administrators at VT and other universities

---

[339] Glass LinkedIn profile; https://sites.radford.edu/~nrvnews/news/clothesline.html.

[340] *See Virginia Tech Student-on-Student Sexual Harassment and Sexual Violence Annual Report for 2014-2015* at 4.

[341] Johnson & Taylor, *The Campus Rape Frenzy* at 150.

urging them to favor female accusers in sexual assault cases.[342] Sokolow said that universities had been too focused on "legalisms" designed to protect the rights of male students accused of sexual assault—"legalisms" such as the "presumption of innocence," the "right[] to an attorney," and the "right[] to remain silent."[343] According to Sokolow, the focus on those "legalism" had rendered women on college campuses akin to African Americans in the South during Reconstruction, when "equity required not equality, but advantage, to attempt to right historically derived oppression."[344]

375. VT also hired Peter Lake as a Title IX consultant. Lake is a lawyer and a law professor at Stetson University. His Title IX training courses at VT have included ones called *Title IX Coordinator* and *Title IX Decision-Makers and Student Conduct Administrators*. According to a VT document filed with this Court in another action, Katie Polidoro attended the *Title IX Coordinator* course in 2020.[345] On information and belief, all the other VT employees and former employees involved in the Jane Roe and/or Pauline Poe matters underwent at least one of the Lake training programs before their involvement in those matters.

376. The Lake programs taught VT's Title IX administrators that federal court decisions in Title IX lawsuits finding against universities and in favor of accused male students are "judicial activism."[346]

---

[342] *See* S. Lewis, S. Shuster, B. Sokolow, and D. Swinton, *Equity is Such a Lonely Word* (2014).

[343] *Id.* at 5.

[344] *Id.* at 4.

[345] *See Jacob Doe v. VT*, No. 19-cv-00249, ECF 77-1 at 6 (Sept. 14, 2021).

[346] *See* Doc. 1, Complaint at ¶ 395 (screenshot of Lake PowerPoint slide).

377. VT hired other Title IX consultants who trained the university's Title IX personnel that there should be a presumption that men accused of sexual assault are guilty, and that investigators should do their best to make sure there is a guilty finding. During discovery in another lawsuit, VT produced the training materials used by those other consultants.

378. According to those materials, accusers were to be considered "victims" or "survivors."[347]

379. The training materials also advised investigators to make sure there were no "surprises" that a respondent may use to challenge the complainant's credibility, such as post-incident text messages from a complainant that appear inconsistent with the complainant's allegations. The training materials stated, "We are able to explain why victims engaged in certain behavior if we know!"[348] That's the advice you give to someone whose job is to advocate for the complainant. It's not the advice you give to someone whose job is to serve as a neutral investigator.

380. Training materials such as those help explain why OEA withheld the Title IX Community Report Form in the Jane matter and why Cureton, McCoy, and Keene simply ignored Jane's post September 17 actions that were flatly inconsistent with her allegations against Plaintiff.

381. With respect to students accused of sexual assault, the training materials advised VT investigators to lull the student into a false sense of security by

---

[347] *See id.* at ¶ 398 (screenshots of PowerPoint slides).

[348] *See id.* at ¶ 399 (screenshots of PowerPoint slide).

"minimiz[ing] the crime/violation" as "not that big a deal." The materials also advised investigators to "lock respondent into a story."[349]

## D. VT's Title IX administration blames sexual assault on "masculinity" and "white male privilege."

382. VT's Title IX administration tells students that "masculinity" and "white male privilege" lead to sexual assault.

383. For example, in 2019, after finding that a male student had sexually assaulted a female student, Defendant Rohsaan Settle told the accuser that the assault happened because of "toxic masculinity."[350]

384. As another example, in 2021, after finding that a white male member of the Corps of Cadets had sexually assaulted a black female member of the Corps of Cadets, VT Hearing Officers issued sanctions that included requiring the male cadet to read a book by the actor Justin Baldoni, *Man Enough: Undefining my Masculinity* (2021).[351]

385. The sanction also required the male cadet to write a paper "detail[ing] at least two themes [he was] learning from each chapter" and "tangible ways [he would] incorporate what [he] was learning from the book into [his] own life."[352] One

---

[349] *See id.* at ¶ 401 (screenshots of PowerPoint slides).

[350] Post by Maya Garcia on Instagram page of the United Feminist Movement of VT (Aug. 31, 2020).

[351] The panel also levied additional sanctions against the student.

[352] VT Hearing Officers' Findings and Sanctions at VT001523, *Ortegel v. VT*, No. 22-cv-00510, Doc. 48-14 (filed May 16, 2025).

chapter is entitled, "Privileged Enough: The Reality of My Racism and White, Male Privilege."[353]

386. In a recent deposition, one of the Hearing Officers testified that VT assigned the Baldoni book because the accused student was a male member of the Corps of Cadets. According to the Hearing Officer, the Corps of Cadets is a very "masculine space" that "revolves around" the "idea of sexual violence."[354] The Hearing Officer offered no support for his claim that the Corps of Cadets revolves around the idea of sexual violence.

387. In any event, by requiring the male student to read Baldoni's book, VT sent the following message: white, heterosexual, biological males live a life of privilege that results in bad things happening to everyone else, including women.[355] Here are some passages from the book.

1. "So, let's get a couple of things straight: I'm straight. I'm also cisgender. And white."[356]

2. "For the first time in more than thirty-five years, I am recognizing that my socialization as a man cannot be separated from my socialization as a white person."[357]

---

[353] Baldoni at 141.

[354] Deposition of D. Dilworth Tr. 144:8-18 (Apr. 11, 2025), *Ortegel v. VT*, No. 22-cv-00510, Doc. 48-16 (filed May 16, 2025) (Q. "What was the purpose in assigning that book as a sanction to Mr. Ortegel?" A. "I think we were trying to identify what's like a good book for someone who is in the Corps of Cadets, which is a heavily masculine space, who is in a situation that revolves around, sort of, this idea of sexual violence.").

[355] In the Ortegel matter, there was no evidence or allegation that the male student's alleged conduct had anything to do with the female complainant's race.

[356] Baldoni at 2.

[357] *Id.* at 143.

3. "The system doesn't just benefit me because I am a man; the system also benefits me because I am a white man (not to mention, an able-bodied heterosexual cis white man from a middle-class family)."[358]

4. Race fundamentally changes masculinity. We need to think about masculinity as a deeply racial issue."[359]

5. "I cannot write a book, live a life of integrity, and openly discuss wrestling with my masculinity without simultaneously wrestling with my racial bias, prejudices, and discrimination that coexist in my socialization within this culture."[360]

6. "I cannot learn about how sexism and gender inequality have benefitted me at the cost of women, trans, and nonbinary people without also educating myself on how racism and racial inequality has benefited me at the cost of Black people, Indigenous people, and other people of color."[361]

7. "I was not taught to see white privilege, just like I wasn't taught to see male privilege."[362]

8. "Like male privilege, white privilege is an invisible force that gives me advantages that are not given to everyone."[363]

9. "If you are feeling triggered by my saying 'male privilege' and 'white privilege,' then that means one thing: we need to talk about it."[364]

10. "There is part of me that feels ashamed that it has taken me as long as it has to intersect my journey with masculinity and male privilege to white privilege and racism."[365]

---

[358] *Ibid.*

[359] *Ibid.*

[360] *Id.* at 144.

[361] *Ibid.*

[362] *Id.* at 157.

[363] *Ibid.*

[364] *Ibid.*

[365] *Id.* at 172.

388. On information and belief, VT has issued sanctions in other sexual misconduct disciplinary proceedings that included reading books and other written materials that discuss "male privilege," "white privilege," "white male privilege," or that discuss "masculinity" in a negative way.

389. VT's institutional messaging about "white male privilege" certainly breaks through to the student body. At the VT hearings, both Pauline and Jane accused Johnny of relying on his "privilege."[366]

**E. VT's Title IX administration tells students that the university is experiencing an epidemic of sexual assault.**

390. In his 2017 Washington Post op-ed, Frank Shushok said "national statistics" show "one in five" female college students are sexually assaulted while in college.[367] Four years later, when he was in charge of the entire student conduct system at VT, Shushok testified that the 20 percent figure was still accurate, and that it applied to VT.[368]

391. The twenty percent figure is based on 2007 study by Christopher Krebs,[369] and it has been widely discredited.[370] Indeed, if twenty percent of female VT

---

[366] **Ex. 38**, 05/09/24 Tr. 41:14; **Ex. 16**, 06/24/24 Tr. 249:3.

[367] Shushok, *'I had no idea': Sexual assault awareness begins on campuses.*

[368] *See* Deposition of F. Shushok Tr. 26:11-14 (Jul. 26, 2021), *Jacob Doe v. VT*, No. 19-cv-00249, Doc. 90-18 (filed Oct. 5, 2021) (Well, what I would tell you is that I think the one in five number is a reasonable and researched number, and that I would suggest that Virginia Tech follows a similar pattern.").

[369] *Id.* at 23:9-21; OCR "Dear Colleague" Letter at 2, n.3 (Apr. 4, 2011).

[370] *See, e.g.* Emily Yoffe, *The College Rape Overcorrection*, Slate (Dec. 7, 2014) ("I asked [Krebs] whether [his study] represents the experience of [all female college students]. His answer was unequivocal: 'We don't think one in five is a nationally representative statistic.' It couldn't be, he said, because his team sampled only two schools. 'In no way does that make the results nationally representative.'"); *see also* Emily Yoffe, *The Problem with Campus*

students were sexually assaulted during their time in college, the university would warn the parents of prospective female students that their daughters have a one-in-five chance of being sexually assaulted over the next four years if they attend VT.[371]

392. But VT does not provide such a warning. VT knows that the incidence of sexual assault of female students at VT is far below 1%. Nevertheless, VT's Title IX administration tells the student body that colleges and universities, including VT, are experiencing an epidemic of sexual assault.

393. For example, the VT Women's Center, which is part of the Title IX administration, frequently hosts screenings of a "documentary" called *The Hunting Ground*. According to the Women's Center, *The Hunting Ground* "portrays how prevalent sexual assault on campus is" and "capture[s] the epidemic of sexual assault on campuses."[372]

394. *The Hunting Ground* has been widely criticized for including several factual inaccuracies.[373] The movie's directors do not address the substance of any

---

*Sexual Assault Surveys*, Slate (Sept. 24, 2015) (noting that the authors of another study warn that their findings cannot be generalized to all campuses nationwide).

[371] About one month after the above-referenced Shushok deposition, Plaintiff attended a VT informational session for prospective students and their parents. The session, which was held in one of the luxury suites at VT's football stadium, included presentations by several university officials. None of those officials told the prospective students *or their parents* that women who attend VT have a 20 percent chance of being sexually assaulted during their four years in Blacksburg.

[372] *See* Doc. 1, Complaint at ¶ 413 (screenshots from Women's Center Instagram page).

[373] *See, e.g.*, Emily Yoffe, *How 'The Hunting Ground' Blurs the Truth*, Slate (Jun. 1, 2015) (stating that "a closer look at one of [the movie's] central cases suggests the filmmakers put advocacy ahead of accuracy"); Wendy McElroy, *Is 'The Hunting Ground' Documentary or Propaganda?*, The Hill (Dec. 7, 2015) ("The film is rife with misrepresentations and outright lies."); Ivan B. Levingston, *Film 'The Hunting Ground' Misrepresents Harvard Sexual Assault Statistics*, The Harvard Crimson (Mar. 28, 2015) (stating that the movie "misrepresents statistics on instances of reported sexual assault at Harvard"); Jane Taylor,

allegations of factual inaccuracies. Instead, the directors claim that people criticize the film because it is "a threat to dominant white male power."[374]

395. The Women's Center also tells the student body that *all* men accused of sexual assault are guilty. For example, the Women's Center's Instagram page says that (1) if a man you respect is accused of sexual assault, you need to accept the fact that the man is a rapist, (2) if you believe someone accused of sexual assault is innocent, you are ignorant and engaged in victim blaming, and (3) if you do not believe *every* woman who accuses a man of sexual assault, you do not believe *any* woman who accuses a man of sexual assault.[375]

396. VT's Title IX administration also pushes the false campus "rape epidemic" narrative by repeatedly announcing that the prevalence of sexual assault on campus is requiring the university to spend more money to combat the problem.

397. For example, in a January 2016 "VT News" story on the university's website, Frank Shushok said he had recently hired Katie Polidoro and one other person to work as "gender-based violence prevention specialists" because sexual

---

*Variety Critics Pick Their Least Favorite Films of 2015*, Variety (Dec. 31, 2015) (calling the movie "shoddy journalism" and "a loaded piece of agitprop that plays fast and loose with statistics"); Press Release from 19 Harvard Law Professors (Nov. 11, 2015) (calling the film "propaganda" and a "purported documentary" that "provides a seriously false picture" of "the general sexual assault phenomenon at universities").

[374] Robby Soave, *Makers of 'The Hunting Ground' Are in Denial About Their Film's Flaws*, Reason (Dec. 31, 2015). That claim about critics of the movie is objectively absurd. The film's critics included female Harvard law professors, a former federal judge (who is a woman), and a black lawyer who represented Anita Hill during the Clarence Thomas Senate confirmation hearings. See Press Release from 19 Harvard Law Professors.

[375] *See* Doc. 1, Complaint at ¶ 417 (screenshots from Women's Center Instagram page).

assault was "pervasive" at VT.[376] But just a few years later, VT announced that it was, *for the first time*, hiring a sexual assault prevention specialist. *See* J. Robertson, *Chelsea Cleary named Virginia Tech's first sexual assault prevention specialist*, VT News (May 11, 2022).

398. In its announcement, VT said, "Cleary is the first sexual assault prevention specialist at Virginia Tech and is another important piece of the university's ongoing efforts to address sexual violence." *Ibid.* VT quoted Cleary as saying that sexual violence is a "huge" problem at VT. *See ibid.* (quoting Cleary as saying, "This culture of violence is not just unique to Virginia Tech … So, when we think about this huge culture of violence, it can feel like, 'Wow, how do I even begin to tackle this?'").

**F. While out of office (2017-2021), Joe Biden and Catherine Lhamon stoke the campus anti-due-process fire by claiming the 2020 Title IX Rule allows students to rape "with impunity."**

399. When the 2020 Title IX Rule was adopted, Joe Biden was his party's presumptive nominee for President, and Catherine Lhamon was among the former Obama Administration officials likely to serve at the Department of Education during a Biden Administration.

400. In response to the 2020 Title IX Rule, Biden issued a statement saying, "Trump's Education Department" was "trying to shame and silence survivors" and was giving "colleges a green light to ignore sexual violence and strip survivors of their

---

[376] *See Cultural change is the next step in preventing sexual assault on campus*, VT News (Jan. 21, 2016).

rights."[377] "It's wrong," Biden added. "And it will be put to a quick end in January 2021, because, as President, I'll be right where I've always been throughout my career—on the side of survivors, who deserve to have their voices heard, their claims taken seriously and investigated, and their rights upheld."[378]

401. Biden also described critics of the Department of Education during the first Lhamon era as "cultural neanderthals," and he urged activists to "shame" universities that sought to protect the rights of students accused of sexual assault.[379]

402. For her part, Lhamon claimed that the 2020 Title IX Rule gave male students the right to "rape" female students "with impunity." Lhamon's statement (which she posted on Twitter by "tagging" the then Secretary of Education) is shown below.

[377] Bianca Quilantan, *Biden Vows "quick end" to DeVos' sexual misconduct rule*, Politico (May 6, 2020).

[378] *Ibid.*

[379] *See* Emily Yoffe, *Joe Biden's Record on Campus Due Process Has Been Abysmal. Is it a Preview of His Presidency?*, Slate (Nov. 12, 2019).



### G. VT's Title IX administration signals that it agrees with Biden and Lhamon about the 2020 Title IX Rule.

403. In September 2020, VT announced that it had "adopted new Title IX policies" in "an effort to comply with the [2020 Title IX Rule]."[380]

404. The VT announcement was apologetic in tone. For example, the announcement quoted the head of OEA as saying, "We recognize that these changes may be confusing and difficult for members of our community."[381] The announcement reassured students that despite the changes in policy "the university's commitment to address all reports of sexual violence and harassment remains as strong as ever."[382] The announcement also said that although VT was changing its policies because of the 2020 Title IX Rule, the university "remain[ed] committed to upholding Virginia

---

[380] Mark Owczarski, *Virginia Tech implements new Title IX regulations*, VT News (Sept. 2, 2020).

[381] *Ibid.*

[382] *Ibid.*

Tech's Principles of Community and maintaining a campus environment that is safe and inclusive for every member of the university community."[383]

405. Katie Polidoro oversaw the development of the new policies.[384] One of VT's Title IX consultants recommended that universities "find clever workarounds" to limit the due process protections the 2020 Title IX Rule afforded to students accused of sexual assault.[385] VT (and several other universities) followed that advice. *See* Samantha Harris & Michael Thad Allen, *Universities Circumvent New Title IX Regulations*, National Review (Sept. 7, 2020) ("It's no secret that schools fought the new regulations tooth and nail. Now they are outdoing each other to circumvent them.").

406. One "workaround" that VT and other schools adopted was a "two-track" system for adjudication of allegations of sexual assault: one track for allegations of on-campus conduct (for which the school would purport to apply the 2020 Title IX Rule) and another track for allegations of off-campus conduct (for which the school would provide accused students far fewer procedural rights).

407. Under VT's two-track system, a student accused of on-campus sexual assault is purportedly presumed to be "not responsible" (*i.e.*, innocent) until completion of the adjudicatory process, whereas there is no presumption of non-responsibility for a student accused of off-campus sexual assault.

---

[383] *Ibid.*

[384] *Ibid.*

[385] Brett Sokolow, *OCR is About to Rock Our Worlds*, Inside Higher Ed (Jan. 14, 2020).

408. Under VT's two-track system, students accused of on-campus sexual assault are given the opportunity to review and submit a written response to the evidence collected by the investigator before the investigator writes her report, whereas students accused of off-campus sexual assault are not given that opportunity.

409. Under VT's two-track system, a student accused of on-campus sexual assault is allowed to have his advisor (which can be a lawyer) cross-examine the accuser, whereas a student accused of off-campus sexual assault is prohibited from having his advisor conduct any cross-examination (or otherwise say anything) at the hearing.

## H. After returning to office, Biden and Lhamon tell schools to ignore the 2020 Title IX Rule because it will be replaced.

410. Within weeks of taking office as President, Joe Biden issued an Executive Order requiring the Department of Education to review the 2020 Title IX Rule and consider "publishing for notice and comment proposed rules suspending, revising, or rescinding" that Rule.[386]

411. Biden's Executive Order also required the Department of Education to "consider taking additional enforcement actions" against universities for failing to uphold Title IX's guarantee of "an educational environment free from discrimination

---

[386] *See Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation and Gender Identity*, 86 Fed. Reg. 13803 (Mar. 11, 2021). A federal agency must follow the APA's notice-and-comment rulemaking process to suspend, revoke, or revise an existing legislative rule, such as the 2020 Title IX Rule. *See* 5 U.S.C. §§ 551(5), 553(b), (c). So, the Biden Administration could not repeal or replace the 2020 Title IX Rule by executive fiat.

on the basis of sex, including discrimination in the form of sexual harassment [and] sexual violence."[387] Such enforcement actions can result in the loss of federal financial assistance. *See* 20 U.S.C. § 1682.

412. One of VT's "Title IX consultants" publicly advised universities that Biden's Executive Order was a message to the Department of Education "to try to figure out the most expedient way to wiggle out of or around the 2020 [Title IX Rule]."[388]

413. About two months after issuing the above-mentioned Executive Order, Biden nominated Catherine Lhamon to return to her post as the head of OCR.[389] (Her nomination was later confirmed by the Senate by a vote of 51-50, with the Vice President casting the tie-breaking vote).

414. In July 2022, the Department of Education proposed a new Title IX Rule (hereinafter, the "Lhamon Rule").[390]

415. As Virginia's Secretary of Education aptly observed, the Lhamon Rule would have created "kangaroo courts" by "eliminating due process" for students accused of sexual assault.[391]

---

[387] 86 Fed. Reg. 13803.

[388] Brett A. Sokolow, *EO, EO, It's Off to Work We Go*, ATIXA Blog (Mar. 8, 2021).

[389] *See President Biden Announces His Intent to Nominate Catherine Lhamon for Assistant Secretary for Civil Rights at the Department of Education*, White House Press Release (May 13, 2021).

[390] *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41390 (Jul 12, 2022).

[391] **Ex. 52**, Letter from the Virginia Secretary of Education to the President of the United States and the U.S. Secretary of Education at 2 (Sept. 12, 2022).

416.    Here are some highlights of the Lhamon Rule.

1. Under the Lhamon Rule, an accused student would not even have the right to a hearing, let alone the right to cross-examine his accuser. The Lhamon Rule would have allowed schools to use the "single-investigator" model for resolving allegations of sexual assault—*i.e.*, a single Title IX investigator would conduct separate interviews of the parties and witnesses, collect and review other evidence, decide whether the accused student was guilty, and expel the accused student based on a guilty finding. *See* 87 Fed. Reg. at 41577-78.

2. The Lhamon Rule would have eliminated a student's right to examine all the evidence collected during the investigation. A student would only be guaranteed "equitable access" to evidence that the investigator deemed "relevant to the allegations." *See* 87 Fed. Reg. at 41577.

3. The Lhamon Rule would have eliminated a student's right to present expert witnesses. *Ibid.*

417.    Fortunately, the Lhamon Rule never went into effect because the Virginia AG and several other plaintiffs successfully challenged the Rule on statutory and constitutional grounds.[392].

418.    Nevertheless, by proposing to eliminate the 2020 Title IX Rule's due process provisions, Biden and Lhamon made it clear that they did not intend to fully enforce those provisions.[393]

419.    Indeed, although the 2020 Title IX Rule remained in effect throughout the Biden Administration, one of VT's Title IX consultants said that it was "possible,

---

[392] *See Tennessee v. Cardona*, 762 F. Supp. 3d 615, 621 (E.D. Ky. 2025).

[393] *See* Fact Sheet: U.S. Department of Education's 2022 Proposed Amendments to its Title IX Regulations at 1 (Jul. 12, 2022) (stating that the proposed Lhamon Rule "will restore vital protections for students in our nation's schools which were eroded by controversial regulations [that were] implemented during the previous Administration" and that "weakened protections for survivors of sexual assault").

perhaps even likely," that the Biden Department of Education would simply not enforce the 2020 Title IX Rule.[394]

### I.  After returning to office, Lhamon investigates hundreds of schools, including VT, for allegedly failing to comply with civil rights statutes.

420. During Lhamon's second stint at the Department of Education (November 2021 – January 2025), OCR publicly opened hundreds of Title IX investigations of colleges and universities, including VT.

421. According to the screenshot from Department of Education's website shown below, during the entirety of the VT's disciplinary proceedings against Johnny (October 2023 – November 2024), OCR was conducting at least eight investigations of VT.

---

[394] Sokolow, *EO, EO, It's Off to Work We Go*, ATIXA Blog (Mar. 8, 2021).



Displaying 1 - 8 of 8 records

**J.      Student protestors at VT continuously demand that the university "Fix Title IX" and "Stop Protecting Rapists."**

422.   The "Wanted Poster" discussed above was not an isolated incident of students accusing VT of doing nothing to protect students from sexual assault. Here are examples of statements by female VT students in letters to the editors of newspapers during the Sands presidency:

> 1.  "During [a student's] time [at VT], there will be approximately 2,465.8 female victims and 1,051.25 male victims of sexual assault or attempted sexual assault."[395]

---

[395] Letter to the Editor, *I believe you, but there's nothing I can do*, The Collegiate Times (Nov. 22, 2017).

2. "We must face the reality that rape culture is real and is prevalent on college campuses – including our own … Institutions, especially college campuses, are complicit in rape culture."[396]

3. "[Because of] the prevalence of sexual violence at Virginia Tech, and subsequent outrage from students, action is needed now more than ever."[397]

4. "There are rapists and assaulters walking around on our campus."[398]

5. "Who wants to go to a school that lets sexual assaulters and rapist walk free and still attend the school?"[399]

6. "[There is an] ongoing threat of sexual violence that plagues our campus."[400]

7. "I'm tired of not trusting anyone. I'm tired of being scared of coworkers, of male friends, of people I pass on the sidewalk. I used to smile at strangers, but I don't anymore."[401]

8. "How can I call VT home when I don't feel safe here?"[402]

9. "I don't think [VT] does a good enough job of making survivors feel safe on our campus, especially when you see frats with known rapists in them, and they're still getting direct funding from the university. It's just not acceptable."[403]

---

[396] Donia Momenian et al., *Feminists movements promote healthy dialogue, inclusivity and social justice*, The Collegiate Times (Sept. 5, 2018).

[397] Letter to the Editor, *Virginia Tech must prove its commitment to survivors*, Collegiate Times (Sept. 11, 2020).

[398] Letter to the Editor, *Virginia Tech needs to care about making campus safe*, The Roanoke Times (Oct. 31, 2021)

[399] *Ibid.*

[400] Letter to the Editor, *Virginia Tech must do more to prevent sexual assault*, The Roanoke Times (Oct. 19, 2021).

[401] *Ibid.*

[402] Abigale Evans, *Students Protest Sexual Assault at Virginia Tech*, The Collegiate Times (Sept. 30, 2021) (quoting sign held by student during campus protest).

[403] Bethany Hansel, *Take Back the Night protestors demand a safer, more accountable campus*, Collegiate Times (Apr. 30, 2020) (quoting a female Virginia Tech student).

10. "Sexual violence … is a huge problem on our campus."[404]

423. Photos in campus and local newspapers and posted on student organization social media sites show that campus activists send various messages to VT's Title IX Administration, including the following: "Boys Will Be Held Accountable," "Fix Title IX at VT," "Protect Survivors, Not Rapists," "Sexual Assault Should Not Be Part of the College Experience," "I Cannot Believe We Still Have to Protest This," "My Rapist Should Not Be in Charge of a Fraternity," "Stop Protecting Rapists," "Accountability Now," "Stop Protecting Assailants," "Anything Less Than a Sober Yes is No," "Virginia Tech's culture is deeply rooted in patriarchy," "Sexual violence is a pervasive issue on our campus," "Protect Your Students, Not Your Reputation," "How Many Abusers Walk Free at VT?" and "Am I Next?"[405]

424. Indeed, campus protestors became so enraged at VT's Title IX administration that members of the administration needed armed police escorts to meet with protestors to accept a list of "demands" from those protestors.[406]

### CAUSES OF ACTION

### COUNT I: 20 U.S.C. § 1681(a) ("Title IX")
### Pauline Poe Matter
### Defendant Virginia Tech

425. In accordance with Federal Rule of Civil Procedure 10(c), all previous paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

---

[404] Luke Weir, *Virginia Tech efforts continue to combat sexual violence*, The Roanoke Times (Nov. 20, 2022).

[405] *See* Doc. 1, Complaint at pages 154-163 (photos).

[406] *Id.* at pages 164-65 (photos).

426. At all times relevant to this Complaint, VT was a recipient of federal financial assistance under 20 U.S.C. § 1681.

427. Plaintiff did not commit any of the violations of the Student Code of Conduct for which he was charged in the Pauline Poe matter.

428. VT affirmatively discriminated against Plaintiff because of his sex in its official actions leading to finding him responsible for violations of the Student Code of Conduct in the Pauline matter and placing him on a two-year suspension.

429. In the Pauline matter, VT subjected Plaintiff to a procedurally flawed or otherwise flawed proceeding which led to an adverse and erroneous outcome and involved particular circumstances that suggest gender bias was the but for cause and the proximate cause of the erroneous outcome.

430. Pauline's allegations that Plaintiff sexually assaulted her were false.

431. False allegations of sexual assault are a form of sex discrimination.

432. VT affirmatively discriminated against Plaintiff because of his sex in that the university was deliberately indifferent to the truth or falsity of Pauline's allegations against Plaintiff.

433. VT's grievance process in the Pauline matter was so objectively deficient that it cannot be said to have aimed at uncovering the truth.

434. VT's Formal Hearing Outcome and appellate decision in the Pauline matter were so inexplicable that they cannot be said to have aimed at uncovering the truth.

435. VT knowingly shut its eyes to the risk that it was imposing findings and sanctions against Plaintiff in the Pauline matter that were based on malicious and therefore discriminatory (based on sex) accusations.

436. VT's deliberate indifference was the but for cause and the proximate cause of the university's finding Plaintiff responsible for violations of the Student Code of Conduct in the Pauline matter and placing him on a two-year suspension.

437. The finding of responsibility and two-year suspension in the Pauline matter injured Plaintiff by depriving him of his property interest in his continued enrollment at VT.

438. The finding of responsibility and two-year suspension are noted in Plaintiff's VT records, including his transcript, and therefore injure Plaintiff by depriving him of his liberty interest in his good name, reputation, honor, and integrity.

## COUNT II: 20 U.S.C. § 1681(a) ("Title IX")
### Jane Roe Matter
### Defendant Virginia Tech

439. In accordance with Federal Rule of Civil Procedure 10(c), all previous paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

440. At all times relevant to this Complaint, VT was a recipient of federal financial assistance under 20 U.S.C. § 1681.

441. Plaintiff did not commit any of the violations of the Student Code of Conduct for which he was charged in the Jane Roe matter.

442. VT affirmatively discriminated against Plaintiff because of his sex in its official actions leading to finding him responsible for a violation of the Student Code of Conduct in the Jane matter and expelling him.

443. In the Jane matter, VT subjected Plaintiff to a procedurally flawed or otherwise flawed proceeding which led to an adverse and erroneous outcome and involved particular circumstances that suggest gender bias was the but for cause and the proximate cause of the erroneous outcome.

444. Jane's allegations that Plaintiff sexually assaulted her were false.

445. False allegations of sexual assault are a form of sex discrimination.

446. VT affirmatively discriminated against Plaintiff because of his sex in that the university was deliberately indifferent to the truth or falsity of Jane's allegations against Plaintiff.

447. VT's grievance process in the Jane matter was so objectively deficient that it cannot be said to have aimed at uncovering the truth.

448. VT's Formal Hearing Outcomes and appellate decisions in the Jane matter were so inexplicable that they cannot be said to have aimed at uncovering the truth.

449. VT knowingly shut its eyes to the risk that it was imposing findings and sanctions against Plaintiff in the Jane matter that were based on malicious and therefore discriminatory (based on sex) accusations.

450. VT's deliberate indifference was the but for cause and the proximate cause of the university's finding Plaintiff responsible for a violation of the Student Code of Conduct in the Jane matter and expelling him.

451. The finding of responsibility and expulsion in the Jane matter injured Plaintiff by depriving him of his property interest in his continued enrollment at VT.

452. The finding of responsibility and expulsion are noted in Plaintiff's VT records, including his transcript, and therefore injure Plaintiff by depriving him of his liberty interest in his good name, reputation, honor, and integrity.

**COUNT III: 42 U.S.C. § 1983**
**Due Process—Pauline Poe and Jane Roe Matter**
**Defendants Sands and Keene (official capacities)**

453. In accordance with Federal Rule of Civil Procedure 10(c), all previous paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

454. The Fourteenth Amendment prohibits a State from depriving any person of liberty or property without due process.

455. The findings of responsibility and sanctions from the Pauline Poe and Jane Roe matters are noted in Plaintiff's VT records, including his transcript, and constitute an ongoing deprivation of Plaintiff's property interest in his continued enrollment at VT and his liberty interest in his good name, reputation, honor, and integrity because members of the Office for Equity and Accessibility, Office of Student Conduct, and Office of Student Affairs—all acting under color of Virginia law—deprived Plaintiff of his right to due process in the Pauline Poe and Jane Roe matters. To wit:

1. OEA advised Pauline to withhold relevant evidence during the investigation.

2. OEA withheld relevant evidence from Plaintiff in the Jane Roe matter.

3. The Hearing Officers in both matters applied the preponderance of evidence standard rather than the clear and convincing evidence standard.

4. The Hearing Officers in both matters did not provide Plaintiff with an opportunity to conduct cross-examination of the accusers that would materially assist in ensuring a meaningful hearing.

5. The Hearing Officers in both matters issued Formal Hearing Outcomes that were arbitrary and capricious and issued in bad faith.

6. The Hearing Officers in both matters issued Formal Hearing outcomes that were biased against Plaintiff because of his sex.

7. The Hearing Officers in both matters issued Formal Hearing outcomes that were biased against Plaintiff because he was the respondent.

8. The Hearing Officers in the Jane Roe matter made an *ex post facto* change to the elements of the alleged offense.

9. The Director of the Office of Student Conduct allowed Pauline and Jane to submit *ex parte* oppositions to Plaintiff's appeals.

10. The Appellate Officers in both matters denied Plaintiff's appeals via decisions that were arbitrary and capricious and issued in bad faith.

11. The Appellate Officers in both matters denied Plaintiff's appeals via decisions that were biased against Plaintiff because of his sex.

12. The Hearing Officers in both matters denied Plaintiff's appeals via decisions that were biased against Plaintiff because he was the respondent.

13. The Appellate Officers in both matters considered the *ex parte* oppositions to the appeals.

456. Defendant Sands, in his official capacity as President of Virginia Tech, has the authority to vacate the findings and sanctions against Plaintiff in the Pauline

Poe and Jane Roe matters and expunge those findings and sanctions from Plaintiff's university records, including Plaintiff's transcript.

457. Defendant Keene, in her official capacity as VT's Vice President for Student Affairs, has the authority to vacate the findings and sanctions against Plaintiff in the Pauline Poe and Jane Roe matters and expunge those findings and sanctions from Plaintiff's university records, including Plaintiff's transcript.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff John Doe prays for relief against Defendants as follows:

(1) A judgment for Plaintiff and against VT for compensatory damages for VT's violations of Plaintiff's rights under Title IX.

(2) A permanent injunction ordering the President of Virginia Tech and the Virginia Tech Vice President for Student Affairs to vacate the findings and sanctions in the Pauline Poe and Jane Roe matters and expunge those findings and sanctions from Plaintiff's university records, including Plaintiff's transcript.

(3) A judgment for Plaintiff and against all Defendants for Plaintiff's costs in bringing this action, including his attorney fees.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all issues so triable.

Dated: June 10, 2026

Respectfully submitted,

*/s/* Parker Bowman

Parker Bowman, VSB No. 100389
Lindsay R. McKasson, VSB No. 96074
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
parker@binnall.com
lindsay@binnall.com

James Fraser (admitted pro hac vice)
P.O. Box 3092
Annapolis, Maryland 21403
Tel: (443) 254-5115
jcfraser70@outlook.com


*Counsel for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

I certify that on June 10, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Parker Bowman
Parker Bowman, VSB No. 100389

*Counsel for Plaintiff John Doe*