# EXHIBIT 8

**VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY
OFFICE FOR EQUITY AND ACCESSIBILITY**

| | | |
|---|---|---|
| Jane Roe , | ) | |
| Complainant, | ) | |
| | ) | Case No. 2024348902 |
| vs. | ) | |
| | ) | |
| John Doe , | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| | ) | |

## RESPONDENT'S PROPOSED SUMMARY OF RELEVANT
## EVIDENCE AND REQUEST TO EXCLUDE IRRELEVANT EVIDENCE

I, Respondent John Doe ███ ████, in accordance with 34 C.F.R. § 106.45(b)(5)(vi) and page 9 of the Virginia Tech Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence, submit this proposed summary of relevant evidence for the Title IX final investigation report and request to exclude specific irrelevant evidence from that report. To make this submission more readable, I will refer to myself in the third person throughout the remainder of the submission.

### COMPLAINANT'S ALLEGATIONS

On November 29, 2023, Ms. Deziree Twigger of the Office for Equity and Accessibility sent John Doe a letter stating that her Office had received a complaint from Jane Roe alleging Doe sexually assaulted her in violation of

JD-000008

Virginia Tech Policy 1026. The letter provided the following summary of Roe allegations:

> Roe reported that on September 17, 2023, through the morning of September 18, 2023, she and Doe were at her residential hall [sic] in Pearson Hall on the Virginia Tech Campus in Blacksburg, VA. Roe reported that when she woke up on the morning of September 18, Doe was in bed with her and informed Roe that they had sexual intercourse the prior night, including anal and vaginal penetration. Roe reported having bruising on her body and having vaginal and anal pain. Roe reported that she was incapacitated due to alcohol consumption and was unable to consent to sexual activities with Doe

The letter also stated that Doe had not been deemed responsible for any misconduct, and that Ms. Twigger and her office would conduct "a fair and thorough investigation into these allegations."

## APPLICABLE STANDARD FOR A
## FINDING OF RESPONSIBILITY

In order to find Doe "responsible" for violating Virginia Tech policy prohibiting non-consensual sexual intercourse in this matter, the Hearing Officers must find that it is more likely than not that Roe was "incapacitated" due to intoxication at any point during which Doe and Roe had intercourse. *See* Virginia Tech Policy 1026.

The mere fact that a complainant is "intoxicated" does not mean she is "incapacitated." In the context of a sexual assault case, "incapacitation" is the "physical or mental inability to make informed, rational judgments," and "includes

2

but is not limited to being asleep, being unconscious, and the inability to make decisions due to voluntary or involuntary use of alcohol." *See* Code of Conduct at 7 (Aug. 2023). Moreover, a respondent can be found responsible for sexual assault under an incapacitation theory only if he knew or should have known that the complainant was incapacitated. *See* Va. Code § 18-2-67.10(3) (defining incapacitation in the context of sexual assault as "that condition of the complaining witness existing at the time of the [alleged assault] which prevents the complaining witness from understanding the nature or consequences of the sexual act [at issue] and about which the accused knew or should have known"); *see also Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018) (noting that the "critical facts" in Title IX case were whether the complainant "was too drunk to consent to sex" and whether the respondent "knew or should have known as much").

**APPLICABLE REQUIREMENTS FOR
TITLE IX INVESTIGATIONS**

U.S. Department of Education ("DOE") regulations set forth requirements for Title IX grievance processes for formal complaints of alleged sexual assault. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. Part 106). For example, the process must include "an objective evaluation of all relevant evidence." 34 C.F.R. §106.45(b)(1)(ii).

3

JD-000010

Therefore, the process requires "an investigative report that fairly summarizes [the] relevant evidence." 34 C.F.R. §106.45(b)(5)(vii).

However, before the investigative report is finalized, all parties have a right to review all evidence gathered by the investigator and submit a written response to that evidence. 34 C.F.R. §106.45(b)(5)(vi). According to the DOE, such written responses can include a party's arguments on what evidence is relevant and what evidence is not relevant, and the investigator should consider those arguments when deciding whether to summarize that evidence in the final report. *See* 85 Fed. Reg. at 30,304.[1]

Although the DOE "regulations do not define relevance," DOE has stated that "the ordinary meaning of the word should be understood and applied." *See* 85 Fed. Reg. at 30,247 n.1018. Federal Rule of Evidence 401 states that evidence "is relevant if: (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action."

Importantly, in a Title IX investigation "relevant" evidence is not limited to each party's version of events.[2] For example, evidence of "a motive to lie on the

---

[1] Citations to the Federal Register herein are citations to the "preamble" to 34 C.F.R. § 106.45. A "preamble" includes "the basis and purpose" of a regulation. 1 C.F.R. § 18.12(a).

[2] *See* 85 Fed. Reg. at 30,319 (stating "even so-called 'he said/she said' cases often involve evidence in addition to the parties' respective narratives, and [34 C.F.R. §106.45] obligates [schools] to bear

JD-000011

part of the complainant" is relevant because it demonstrates an "evidentiary weakness" in the allegations against the respondent. *Doe v. Va. Polytechnic Inst. & State Univ.*, Case No. 19-cv-249, 2021 U.S. Dist. LEXIS 34550, *6 (W.D. Va. Feb. 24, 2021) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).[3] Indeed, in *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), then Judge (now Justice) Amy Coney Barrett found that a state university violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution because, among other things, the university failed to investigate the fact that the complainant had a motive to falsely accuse the respondent of sexual assault. *See id.* at 663-64. Of course, one of the classic motives for a witness to lie is the witness' hope to avoid or reduce punishment for her own misconduct.[4]

A complainant's post-incident behavior that is inconsistent with her allegation that the respondent sexually assaulted her is also relevant evidence in a Title IX case because it is evidence that the complainant's allegations are false. One example of

---

the burden of gathering evidence and to objectively evaluate all relevant evidence, both inculpatory and exculpatory, including the parties' own statements as well as other evidence").

[3] *See also Sigma Lambda Epsilon Sorority, Inc. v. Univ. of Va.*, 503 F. Supp. 3d 433, 450 (W.D. Va. 2020) (same); *Baum*, 903 F.3d at 582 (noting that a Title IX complainant's "potential ulterior motives" are relevant evidence).

[4] *See, e.g.*, *Moore v. Commonwealth*, No. 0981-03-1, 2004 Va. App. LEXIS 342, *2-3 (Va. Ct. App. Jul 13, 2004) ("The fact that a witness 'received lenient sentences in exchange for his testimony' against a defendant is '*highly relevant*'; it 'lays the predicate for an inference that the testimony was … biased and unreliable because induced by considerations of self-interest.'") (quoting *Shanklin v. Commonwealth*, 284 S.E.2d 611, 612 (Va. 1981)).

JD-000012

such post-incident behavior is the complainant sending friendly text messages to the respondent. *See, e.g., Purdue*, 928 F.3d at 664; *Doe v. Marymount University*, 297 F. Supp. 3d 573, 576-77, 578, 584, 585, 586 (E.D. Va. 2018). Another example of such post-incident conduct would be a complainant making positive statements about the respondent's sexual prowess. *See Marymount*, 297 F. Supp. 3d at 578 (complainant told her roommates that the respondent was "good with his tongue"); *Doe v. Roe*, 295 F. Supp. 3d 664, 668 (E.D. Va. 2018) (same).[5]

The DOE regulation's "rape shield" provision states that evidence about a complainant's "prior sexual behavior" is "not relevant" unless the evidence is "offered to prove that someone other than the respondent committed the conduct alleged by the complainant" or the "evidence concerns specific incidents of the complainant's prior sexual behavior with respect to the respondent and" is "offered to prove consent." 34 C.F.R. § 106.45(b)(6)(i). That being said, the "rape shield" provision does not apply to prior conduct that is non-sexual.

For example, as the DOE has noted, evidence that the complainant had an ongoing romantic relationship with someone other than the respondent may be relevant to show that the complainant had a motive to falsely claim that her sexual

---

[5] The *Doe v. Marymount* and *Doe v. Roe* opinions both dealt with the same lawsuit. In that lawsuit, a Title IX respondent sued Marymount University for violations of Title IX relating to the University's finding that respondent was responsible for sexual assault and he sued the complainant for defamation of character.

JD-000013

conduct with respondent was non-consensual.  *See* 85 Fed. Reg. at 30,351.  Such

evidence is not precluded by the "rape shield" provision because it is not evidence

of complainant's "prior sexual behavior."  *Id.*  As another example, evidence that a

complainant has stated that she was previously sexually assaulted in the exact same

manner as she alleges the respondent assaulted her does not fall within a "rape

shield" provision because such statements are not evidence of the complainant's

prior sexual behavior.  *See Hall v. Commonwealth*, Case No. 1001-18-4, 2019 Va.

App. LEXIS 164, *16-17 (Va. Ct. App. Jul. 16, 2019); *Brown v. Commonwealth*,

510 S.E.2d 751, 759 (Va. Ct. App. 1999).

Finally, a complainant's reputation for untruthfulness is relevant evidence in

a Title IX hearing.  *See Doe*, 297 F. Supp. 3d at 578 (noting that complainant's

roommate told investigators that complainant often "bent the truth"); *see also*

Federal Rule of Evidence 608(a) ("A witness's credibility may be attacked or

supported by testimony about the witness's reputation for having a character for

truthfulness or untruthfulness, or by testimony in the form of an opinion about that

character.").[6]

---

[6] Of course, because the DOE is an Executive Branch agency, it does not have the last say on whether a state university's disciplinary system complies with the Fourteenth Amendment's Due Process guarantee.  Federal courts have the last say on that issue.

7

JD-000014

**PROPOSED SUMMARY OF
RELEVANT EVIDENCE**

**A.     Undisputed Facts About the Parties**

1.     ▉Roe▉ is a Virginia Tech sophomore, a member of the Virginia Tech Corps of Cadets, an Air Force ROTC cadet, and the recipient of an Air Force scholarship and a Corps of Cadets Emerging Leaders Scholarship. (▉John Doe▉ Feb. 26, 2024 Statement at 2).

2.     At the time of the alleged incident, ▉Doe▉ (who goes by "▉ Doe ▉ was also a Virginia Tech sophomore, a member of the Virginia Tech Corps of Cadets, an Air Force ROTC cadet, and the recipient of a Corps of Cadets Emerging Leaders Scholarship. (▉John Doe▉ Feb. 26, 2024 Statement at 2).

**B.     Undisputed Facts About the Corps of Cadets Regulations and Disciplinary System**

3.     In addition to the Virginia Tech Student Code of Conduct, members of the Corps of Cadets are subject to the <u>Virginia Tech Corps of Cadets Regulations</u> ("VTCCR"). (▉John Doe▉ Feb. 26, 2024 Statement at 3).[7] Those regulations include several "Punitive Articles," the violation of which can result in Corps of Cadets disciplinary proceedings. *See* VTCCR at 110. The Corps of Cadets Punitive Articles are modeled on the criminal code that applies to members of the United

---

[7] The link provided is to the January 2023 edition of the VTCCR, which is the current version and the version in effect at all times relevant to this case.

JD-000015

States Armed Forces, the Uniform Code of Military Justice ("UCMJ"). *See* 10 U.S.C. §§ 877-934 ("Punitive Articles").

4. For example, Corps of Cadets Article 17 ("Alcohol Offenses") prohibits cadets (even those 21 or over) from possessing or consuming alcohol in the cadet dorms or supplying alcohol to underage cadets, and it prohibits underage cadets from possessing or consuming alcohol. *See* VTCCR at 113.

5. As another example, Corps of Cadets Article 25 prohibits conduct "unbecoming a cadet, officer, and a gentleman/lady." Such conduct would include indecent exposure. *See United States v. Edmisten*, 37 M.J. 710, 712 (Army Ct. of Military Review 1993) (noting that "indecent exposure" constitutes "conduct unbecoming an officer" under the UCMJ).

6. As another example, Corps of Cadets Article 29 ("Visitation Policy") prohibits cadets from having overnight guests in their dorm room, and it prohibits cadets from engaging in "any kind of sexual activity" while having a guest in their dorm room. *See* VTCCR at 118.[8]

7. A cadet found guilty of violating one or more punitive articles via a Corps of Cadets disciplinary proceeding is subject to a range of punishments. For example, a cadet may be placed on "military probation," which is a significant punishment. A cadet on military probation is ineligible for a Corps of Cadets

---

[8] All cadets are required to live in one of the Corps of Cadets dorms.

JD-000016

Emerging Leaders Scholarship, is ineligible to hold a leadership position, and is ineligible to participate in certain Corps of Cadets organizations that are important for a cadet's military career advancement (such as Color Guard). *See* VTCCR at 113.

8. In accordance with University policy, a cadet who makes a good-faith report of sexual assault is "immune from disciplinary action for their personal consumption of alcohol or other drugs occurring at the time of the reported incident." *See* VTCCR at 268.

**C. Undisputed Facts About Air Force ROTC ("AFROTC")**

9. In order to proceed past the second year of the four-year AFROTC program, AFROTC cadets, including those on an Air Force scholarship (such as Roe must be competitively selected to attend the Air Force Professional Officer Course (often referred to as "field training") between their sophomore and junior years. (John Doe Feb. 26, 2024 Statement at 3). That selection process, which normally occurs in the spring of the AFROTC cadet's sophomore year, is based on a numeric ranking of the sophomore AFROTC cadets at Virginia Tech (*i.e.*, only the top X percent of AFROTC cadets at Virginia Tech are selected to go to field training). (John Doe Feb. 26, 2024 Statement at 3).[9]

---

[9] The cut-off point can change from year to year.

JD-000017

10. Disciplinary actions can adversely affect an AFROTC cadet's ranking, as can an AFROTC cadet's lack of holding leadership positions or participation in organizations (such as Corps of Cadets organizations) and poor scores on the Air Force physical fitness test. (John Doe Feb. 26, 2024 Statement at 3).

**D. Undisputed Facts About Roe and Doe Relationship Prior to September 17, 2023**

11. Prior to the date of the alleged incident in this case (September 17, 2023), Doe and Roe were "friends with benefits." (John Doe Apr. 16, 2024 Statement at ¶ 1). In other words, they "made out" on several occasions and engaged in sexual activity short of intercourse on at least two occasions. (Ibid.) Specifically, on at least one occasion Roe performed fellatio on Doe and on at least one other occasion Doe stimulated Roe vagina with his fingers. (Ibid.)

12. Also prior to September 17, 2023, Roe sent provocative "selfie" photos of herself to Doe on Snap Chat. (John Doe Apr. 16, 2024 Statement at ¶ 2). Those included a photo of Roe wearing her Corps of Cadets camouflage uniform pants and a bra (with no top), a photo of Roe wearing gym shorts and a bra (with no top), and a photo showing only Roe breasts clad in a tight sweater. (Ibid.) With that last photo, Roe included the message "Def are buddy." (Ibid.) Although Doe cannot be sure, he believes that message may have been in response to him jokingly asking Roe whether her breasts were real. (Ibid.)

JD-000018

**E.    Undisputed Facts About the September 17, 2023 Party in Roe Dorm Room**

13.    On the night of Sunday, September 17, 2023, Roe Doe and three other cadets— Cadet DM (Roe roommate), Cadet MS and Cadet CP got together for a party in Roe room in Pearson Hall West, which is one of the Corps of Cadets dormitory buildings. (Jane Roe Corps of Cadets Interview Transcript at 1).

14.    All five of the cadets drank alcohol at the party, and all five were under the age of 21 at the time. (Ibid. at 2-3).

15.    The party began at some point around 8:00 p.m. (Ibid. at 2).

16.    At some point during the party, Cadet MS recognized that Doe had become heavily intoxicated. (Cadet MS VTPD Interview at 1 (stating Doe was "very inebriated and drunk")).

17.    Cadet MS "advised that Doe should be taken back to his room but Roe insisted that he stay the night and kept taking his phone so he couldn't use it." (Cadet MS Memorandum for Record).

18.    At 10:16 p.m., using Doe's phone, Roe sent text messages to Doe roommate Cadet JB to let Cadet JB know that Doe was going to spend the night in Roe room because he was too drunk to walk home. That text conversation between Roe and Cadet JB reads as follows:

Roe    Hey Cadet JB

JD-000019

Its **Jane Roe**

**Cadet JB** Yeah everything ok?

**Roe** **Doe** is kinda fucked. He might spend the night in my room
Just letting you know
Just cover for him and he'll be back in the morning.[10]

19. At 11:06 p.m., again using **Doe's** phone, **Roe** sent an update about **Doe** to **Cadet JB**. That text conversation between **Roe** and **Cadet JB** reads as follows:

**Roe** Hey **Cadet JB** its **Roe**
Hes gonna spend the night
Thank you for the help
I appreciate you

**Cadet JB** Cool what time do you think he'll head over tmr?[11]

20. At 11:20 p.m., again using **Doe's** phone, **Roe** responded to **Cadet JB** 's question about what time **Doe** would be home the next morning. That conversation between **Roe** and **Cadet JB** (which occurred from 11:20 p.m. to 11:22 p.m.) reads as follows:

**Roe** He will be back around 6:30.
Is that ok?

**Cadet JB** Yup sounds good

---

[10] (IM Text Messages from **John Doe's** Phone to Roommate **Cadet JB** on 09-17-23 and 09-18-23 (Including Texts Written by **Jane Roe** at 2).

[11] (Ibid. at 3).

JD-000020

**Roe** Perfect thank you ill get him back[12]

21. At some point in the evening, **Roe** walked **Cadet CP** back to his dorm room in Pearson Hall East (another Corps of Cadets dorm). (**Cadet DM** Title IX Interview at 1).

22. As of the date in question (September 17), **Roe** and **Cadet CP** had some sort of relationship in which they were more than "just friends." (*See* **Cadet MS** Title IX Interview at 3 (stating **Roe** and **Cadet CP** were "kind of a thing," and that they "were intimate with each other [although] they had not had intercourse")).

23. When **Roe** walked **Cadet CP** to his room, she took **Doe's** phone with her. (**Cadet DM** Title IX Interview at 3 (stating that **Roe** "grabbed **Doe's** phone when she left")).

24. According to **Cadet MS** **Roe** seemed "normal." (**Cadet MS** VTPD Interview at 2). She could "walk fine," was "not slurring her speech," and "knew what [she] was doing." (**Cadet MS** Title IX Interview at 3).

25. When **Cadet CP** was later asked what **Roe** "demeanor was like" when **Roe** walked him to his room, he said **Roe** was "a little 'loose and giggle.'" **Cadet CP** Interview at 2).

26. **Cadet DM** later stated that **Roe** did not appear "intoxicated" at the party, but the fact that **Roe** took **Doe's** phone when she walked **Cadet CP** to his dorm

---

[12] (Ibid).

JD-000021

room made Cadet DM think that Roe was in fact intoxicated. (Cadet DM Title IX Interview at 3). However, there is no evidence that Cadet DM was aware that Roe had been trying to keep Doe's phone from him and had been using Doe's phone to send texts to Doe roommate, Cadet JB.

27. Moreover, just like Roe did, Doe kept his "Hokie Passport" (student I.D. card) in a sleeve on the back of his phone. (John Doe Apr. 16, 2024 Statement at ¶ 4). Hokie Passports issued to members of the Corps of Cadets can be used to access any of the Corps of Cadets dormitory building. (Ibid.) So, when Roe took Doe's phone with her instead of her own phone when she walked Cadet CP back to his room, she did so knowing that she would be able to use Doe Hokie Passport to get back into her dormitory building. (Ibid.)

28. Cadet MS Doe and Cadet DM remained in Roe and Cadet DM's room when Roe walked Cadet CP back to his room. (Cadet DM Title IX Interview at 1 (stating that Cadet MS left the room after Roe returned and while Roe was changing into her pajamas and Cadet DM was brushing her teeth); Cadet MS Memorandum for Record (stating he left the room after Roe returned from walking Cadet CP home)).

29. Cadet MS remained in the room while Roe was walking Cadet CP back to his room because both Doe and Cadet DM "passed out" and Cadet MS wanted "to make sure that Doe and Cadet DM didn't do anything stupid." (Cadet MS Title IX Interview at 2).

JD-000022

30. When Roe returned to her room, Cadet DM woke up and vomited on the floor and in a trash can. (Cadet MS Title IX Interview at 3). Cadet DM says that vomiting "made her sober up a lot." (Cadet DM Title IX Interview at 3). But according to Doe expert witness, Dr. Reagan Wetherill, Ph.D., vomiting does not sober up an intoxicated person. (Wetherill Report at 7).[13]

31. Indeed, Roe had to clean Cadet DM's vomit from the floor. (Cadet MS Title IX Interview at 3).

32. After Roe cleaned up the vomit, she washed her hands and then changed her shirt in front of Cadet MS (Cadet MS Title IX Interview at 3). Cadet MS looked away out of respect because Roe took her shirt off without warning. (Ibid.)

33. Roe then told Cadet MS she "would take care of Doe and would get him back to his room by 6:30 a.m." (Cadet MS Title IX Interview at 3). According to Cadet MS Roe "seemed normal" when he left Roe room and went back to his dorm room. (Cadet MS VTPD Interview at 2).

---

[13] Dr. Wetherill notes that "Cadet DM's statement that vomiting caused her to sober up is not accurate." (Ibid.) "When a person vomits during or after alcohol consumption, the alcohol in the person's stomach is purged from the body; however, the alcohol that has already been absorbed into the bloodstream or is being metabolized remains." (Ibid.) "As such, the person is not 'sobering up,' but rather, the person's blood alcohol level will not increase as high as it would have from the alcohol that was previously in the stomach." (Ibid.)

JD-000023

**F.    Undisputed Facts About** Roe **2:00 a.m. Trip to the Women's Bathroom**

34.    Cadet Cadet SJ lives on the same floor as Roe (Cadet SJ Title IX Interview at 1). Cadet SJ knows Roe "not as a friend but as an acquaintance," and does not know Doe (Ibid.)

35.    At approximately 2:00 a.m. on Monday, September 18, 2023, Cadet SJ got up to use the women's community bathroom on the floor of her dorm. (Cadet SJ Title IX Interview at 1). The bathroom is approximately 10 feet from Roe room (John Doe Apr. 16, 2024 Statement at ¶ 5).

36.    While approaching the bathroom, Cadet SJ saw Roe walk out of her room and into the bathroom. (Cadet SJ Title IX Interview at 1). Roe was not wearing any clothes at the time and was holding a white shirt. (Ibid.)

37.    When Cadet SJ got into the bathroom, Roe was already in one of the stalls. (Cadet SJ Title IX Interview at 1). As Cadet SJ was washing her hands, Roe came out of the stall and returned to her room. (Ibid.)

38.    Cadet SJ and Roe did not speak to one another during this incident. (Cadet Title IX Interview at 1).

39.    When asked if Roe "gave any indication that she may have been intoxicated," Cadet SJ stated that she would not know because "she did not speak with Roe but that "Roe appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner." (Cadet SJ Title

JD-000024

IX Interview at 1-2). Cadet SJ added, "The only thing that would have made her think Roe may have been intoxicated was that she did not say anything about her appearance and actions." (Ibid. at 2.)

40. During the investigation, Cadet SJ was not asked if Roe was carrying her Hokie Passport. However, in order to get back into her dorm room, Roe would have needed to use her Hokie Passport and 4-digit access code. (John Doe Apr. 16, 2024 Statement at ¶ 4).

41. At some point later that morning, Cadet SJ submitted an "incident report" about what she had seen to the Corps of Cadets leadership. (Cadet SJ Title IX Interview at 2).

**G. Undisputed Expert Report that Roe Alcohol Consumption and Behavior Were Not Consistent with Alcohol-Associated Incapacitation and Can be Explained by Alcohol-Associated Memory Loss.**

42. Roe contends that because of her alcohol consumption on September 17 she has no memory of the events that occurred starting shortly before she walked Cadet CP back to his room up until the time she woke up in her bed with Doe the next morning. (Jane Roe Corps of Cadets Interview Transcript at 1).

43. Roe further contends that because she has no memory of having sex with Doe on the night of September 17 or early morning of September 18, she was "incapacitated" and therefore incapable of consenting to sex. (*See* Notice of Investigation at 1).

JD-000025

44.     Dr. Reagan Wetherill, Ph.D., has submitted an expert report on **Doe**

behalf in this case.   In her report, Dr. Wetherill opines that **Roe** was not

"incapacitated" by alcohol and that **Roe** reported memory loss is consistent with

that of an individual who experienced an alcohol-induced blackout.   (Wetherill

Report at 6-7).

45.     Dr. Wetherill is an Associate Professor of Psychiatry at the University

of Pennsylvania's Perelman School of Medicine.  (Wetherill Report at 2).  She has

a B.S. in Neuroscience from Vanderbilt University and a Masters and Ph.D. in

Clinical Psychology from the University of Texas at Austin.  (Ibid.)

46.     Dr. Wetherill's dissertation and research have focused on the effects of

alcohol use, intoxication, memory processes, and alcohol-related consequences

(*e.g.*, alcohol-associated blackouts).  (Wetherill Report at 2).  Her professional

responsibilities as an Associate Professor of Psychiatry include assessing and

treating patients with alcohol and substance use disorders, and conducting research

on the effects of alcohol and substance use on the brain, body, and behavior.  (Ibid.)

47.     Dr. Wetherill has served as a consultant/expert witness on civilian and

military cases involving alcohol and drug effects on the brain, behavior, cognition,

and memory loss for over 10 years.  (Wetherill Report at 2).  She has provided her

report in this case for free, and she will testify in the hearing in this case in

accordance with her report.  (Ibid.)

JD-000026

48.     In her report, Dr. Wetherill explains that an alcohol-associated blackout is defined as memory loss for all or part of a drinking episode.  (Wetherill Report at 6).  During an alcohol-associated blackout, an individual is able to interact and respond to their environment; however, due to alcohol's effects, memories for these interactions and responses are not adequately or not encoded into memory.  (Ibid.)

49.     In order for a memory to be created, information from the environment is perceived and held briefly in short-term memory and then transferred to long-term memory for consolidation.  (Wetherill Report at 6).  Alcohol interferes with the transfer of information from short-term memory to long-term memory.  (Ibid.) Thus, during an alcohol-associated blackout, an individual is able to interact and respond to their environment.  (Ibid.)

50.     Based on her review of the documents the Title IX investigator has collected in this case, including the statements by ▮Cadet SJ▮ and ▮Cadet DM▮ ▮▮▮▮▮ Dr. Wetherill notes that ▮Roe▮ made numerous decisions and interacted with her environment throughout September 17-18, 2023.  (Wetherill Report at 6).

51.     Dr. Wetherill points out that on the night of September 17 everyone stopped drinking at about 11:00 p.m., and that once a person stops drinking there is 30-45 minutes of alcohol absorption where a person's blood alcohol reaches its peak level. (Wetherill Report at 6).  Given that fact, ▮Roe▮ peak blood alcohol level would have been reached by 11:45 p.m. and then would have steadily decreased.  (Ibid.)

JD-000027

52. Dr. Wetherill also points out that after **Roe** returned from walking **Cadet CP** home, according to **Cadet DM** **Roe** went to the restroom to get ready for bed, changed into her pajamas, returned to her room, and tried to wake **Doe** up. (Wetherill Report at 6). These processes involved cognitive planning (e.g., selecting and carrying pajamas to the restroom, remembering to bring a dorm room key card, motor skills involved in walking and putting on clothes, climbing into a lofted bed, talking to and trying to wake someone up). (Ibid. 6-7).

53. In addition, **Cadet SJ** saw **Roe** leave her dorm room carrying a white shirt in front of her and walk to the restroom and then return to her dorm room. (Wetherill Report at 7). Again, these behaviors involve decision making, planning, and motor skills (e.g., climbing down from the lofted bed, knowing and deciding to use the restroom, bringing and using a dorm room key card, and climbing back into a lofted bed again). (Ibid.)

54. Although **Roe** does not remember doing any of these acts, they are all ways in which a person interacts with their environment by making decisions, planning, and behaving accordingly. (Wetherill Report 7). Together, these facts indicate that **Roe** was not incapacitated but had the physical and mental ability to make informed, rational decisions despite consuming alcohol. (Ibid.)

21

JD-000028

**H.      Undisputed Subsequent Events During the week of September 17, 2023.**

55.      At 5:32-5:33 a.m. on Monday, September 18, Doe texted his roommate Cadet JB: "Im alive" and "Ill be back at 6:20."[14]

56.      Doe needed to be back to his room by 6:20 a.m. to get ready for the Corps of Cadets daily "morning formation" at 6:50 a.m. (John Doe Apr. 16, 2024 Statement at ¶ 6).

57.      During morning formation, Roe got called in to talk to the Corps of Cadets leadership because of the "incident report" that Cadet SJ filed. (Cadet D Title IX Interview at 1). This Title IX investigation has not obtained evidence about what Roe told the Corps of Cadets leadership at that time.

58.      At 1:09 p.m. on Monday, September 18, Doe texted Roe to ask her if she wanted to help him with two Corps of Cadets projects; Roe responded, "Sure." (IM Text Messages Between Jane Roe and John Doe at 2).

59.      On Tuesday, September 19, Doe texted Roe "Lemme know when ur done with [uniform inspection] shit." (IM Text Messages Between Jane Roe and John Doe at 3). Roe responded, "Just finished." (Ibid).

60.      On Wednesday, September 20, Roe texted Doe to ask him if he would stand in for her as pho (physical fitness officer) that day; Doe responded "yeah." (IM Text Messages Between Jane Roe and John Doe at 3).

_____

[14] (IM Text Messages from John Doe's Phone to Roommate Cadet JB at 4).

JD-000029

**I.      Undisputed Events During the week of September 24, 2023.**

61.      On or about Sunday September 24, 2023, [Doe] mentioned to [Roe] that [Doe] cousin [AL] (who lives in Pittsburgh and was 23 years old at the time) would be visiting [Doe] in Blacksburg on the weekend of November 18-19 (the first weekend of Thanksgiving break). ([John Doe] Apr. 16, 2024 Statement at ¶ 7). [Roe] asked [Doe] if [AL] would be willing to give her a ride to the airport in Roanoke early on the morning of the 19th. (Ibid.) [Doe] told [Roe] that he thought that [AL] would be willing to give her a ride, but [Doe] gave [AL]'s contact information to [Roe] so that she could ask [AL]. (Ibid.) [Doe] also told [Roe] that he and [AL] planned to get a hotel room for the night of November 18 and [Doe] asked [Roe] if she wanted to stay with them in the hotel room so that [AL] and [Doe] would not have to burn time picking [Roe] up from her from her dorm room on the morning of the 19th. (Ibid.) [Roe] said she would be fine with that plan. (Ibid.)

62.      Later that day, [Roe] contacted [AL] via text. The text conversation between [Roe] and [AL] reads as follows:

> [Roe] Hey! This is [Doe] friend [Roe] He and I were talking about y'all possibly giving me a ride to Roanoke to the airport on November 19th when you're here that weekend. I'm totally ok with paying for gas money. Sorry this is so random. And you can totally say no. Just need to see if I gotta ask someone else lmao
>
> [AL]: Hey! That shouldn't be a problem, [Doe] said it's not far so I don't mind at all. We are probably going to

JD-000030

be booking the whole thing over the next day or two so once we have that fully confirmed I'll let u know for sure. He said you'll probably be hanging out with us right?

Roe I'd be down if y'all let me lmao
Don't wanna fw anything y'all got planned tho
But thank you sm I appreciate it :)

AL : Yeah no problem! Just work with Doe on planning some good places for us to eat at. Should be fun

Roe Yeah absolutely, what kinda food you like?

AL Anything really but if u guys have either a good wing place or Mexican place that would be awesome

Roe Easy I'll clutch up dw[15]

63. On Friday, September 29, Roe sent Doe $5.00 via the Venmo payment app to repay Doe for money Doe lent to her during an AFROTC field trip that day. In the comment line to the transaction, Roe wrote "Sugar baby." (Venmo Payment from Jane Roe to John Doe

## J. Undisputed Relevant Events During the week of October 1, 2023

64. On Saturday, October 7, at 7:41 p.m., Roe sent a photo of Doe via Instagram to Doe cousin AL .[16]

65. Also on October 7, beginning at 9:13 p.m., Roe and Doe engaged in an extended conversation via text in which they discussed obtaining alcohol. (IM

---

[15] (IM Text Messages Between Jane Roe and AL ).
[16] (IM Text Messages Between Jane Roe and AL ).

JD-000031

Text Messages Between [Jane Roe] and [John Doe] at 6-9). [Roe] and [Doe] were successful in their efforts, and they drank alcohol together that night in [Roe] dorm room. ([John Doe] Apr. 16, 2024 Statement at ¶ 8).

**K.      Undisputed Relevant Events During the week of October 8, 2023**

66.    On Sunday, October 8, [Doe] cousin [AL] responded to [Roe] regarding the photo of [Doe] [Roe] had sent to [AL] via Instagram the day before. The October 8 conversation between Andrew and [Roe] about [Doe] reads as follows:

> [AL]:      Whoa!  I wasn't ready for such an ugly face to pop up on my screen!

> [Roe]      Love a good [Doe] jump scare. (emoji of smiling face with tears from laughing so hard)

> [AL]:      It's blinding how white his face is!

> [Roe]      He gotta hop in a tanning bed sometime.  Or get his hermit ass outside.  (emoji of smiling face with tears from laughing so hard).

> [AL]:      Exactly!  He nerds out too much, he needs to go out and learn what the sun is

> [Roe]      Definition of an iPad kid fr[17]

67.    At some point on or about October 9, [Doe] heard that [Roe] was making a "Title IX" allegation against him with respect to his spending the night in her room on September 17. ([John Doe] Feb. 26, 2024 Statement at 10).

---

[17] (IM Text Messages Between [Jane Roe] at [AL] ).

JD-000032

68. On October 10 and 11, **Doe** told another Virginia Tech female student, named **Poe** about the potential **Roe** Title IX issue. (**John Doe** Feb. 26, 2024 Statement at 11).

69. On Wednesday October 11, **Roe** and **AL** continued their Instagram conversation about **Doe** as follows:

> **AL** Definitely, just an all around absolute nerd, he figured out the working out thing, but barely any athletic coordination

> **Roe** (Heart emoji)

> **Roe** Shiii really (two emojis of smiling faces with tears from laughing so hard)[18]

70. Also on Wednesday October 11, **Roe** provided the Corps of Cadets a written "statement for the Incident Report passed up three weeks ago" (*i.e.*, the report that **Roe** had been seen walking to the bathroom naked at approximately 2:00 a.m. on September 18).[19] In that statement, **Roe** admitted that on September 17 she and **Cadet DM**, **Cadet CP** **Cadet MS** and **John Doe** "consumed alcohol while in the dorms."[20] **Roe** statement did not mention that **Doe** had spent the night in her room.

---

[18] (IM Text Messages Between **Jane Roe** at **AL**).

[19] (**Jane Roe** Memorandum for Record).

[20] (Ibid.)

JD-000033

71.     On October 12, **Cadet DM** provided the Corps of Cadets with a written "statement for the Incident Report passed up three weeks ago."[21]  In her statement, Cadet DM admitted that she, Roe Cadet MS **Cadet CP** and **Doe** drank alcohol in her and Roe room on September 17.[22]  She also stated that at some point that night Roe walked Cadet CP "back to his room, and upon her return, I went to sleep." Cadet DM's statement did not mention that **Doe** had spent the night in her room.[23]

72.     Also on October 12, at 6:03 p.m., Roe sent an email to **Doe** saying, Hey how are you doing[?]" (IM Text Messages Between Jane Roe and John Doe at 10).

**L.      Undisputed Relevant Events During the week of October 15, 2023**

73.     On Monday, October 16, **Doe** submitted a written statement to the Corps of Cadets admitting that he (along with Roe Cadet DM Cadet MS and Cadet CP drank alcohol in Roe room on the night of September 17 and that he spent that night in Roe room.  (John Doe Memorandum for Record).    **Doe** statement noted, "While [Cadet MS offered to take me back to my dorm room, I feared the

---

[21] (Ibid.)

[22] (Ibid.)

[23] (Ibid.)

JD-000034

repercussions if I were to be caught. I remember [**Roe** **Jane Roe**] insisted that I stayed

[sic] behind to be taken care of and not get hurt." (Ibid.)

74. Also on October 16, a Corps of Cadets staff member interviewed **Roe** about her October 11 written statement. During that interview, when **Roe** was asked to explain everything that happened on the night of September 17 until she woke up the next day, **Roe** said:

> From the last thing I remember was kind of sitting down in a circle in our room, just like talking and having a good time. I was told that—and then I just woke up the next morning. That's pretty much all I remember. I was told the next morning that I walked **Cadet CP** back to his room, he lived in [Pearson Hall] East, and then that was about it, all I was told from the night.[24]

75. When later asked in the interview whether anyone had stayed in her room past curfew (2:00 a.m.), **Roe** said "[**Doe**] did just because he was too inebriated to leave, and we thought it was best for him to spend the night."[25]

76. On October 17, **Cadet MS** submitted a written statement to the Corps of Cadets admitting that he (along with **Roe** **Cadet DM** **Cadet CP** and **Doe**) drank alcohol in **Roe** room on the night of September 17. (**Cadet MS** Memorandum for Record). **Cadet MS** noted, "I advised that **John Doe** should be taken back to his room but **Roe** **Jane Roe** insisted that he stay the night and she kept taking his phone so he

---

[24] (**Jane Roe** Corps of Cadets Interview Transcript at 1).

[25] (Ibid. at 2).

28

JD-000035

couldn't use it." (Ibid.) **Cadet MS** also stated that (1) at one point in the evening **Cadet DM** "fell asleep on her floor seeming that she drank too much," (2) **Roe** walked **Cadet CP** back to his room, (3) when **Roe** got back to her room, **Cadet DM** "woke up and threw up onto the floor," and (4) once **Cadet DM** seemed ok and went to bed, he walked back to his room. (Ibid.)

77. Also on October 17, **Cadet CP** exercised his right to refuse to make a statement or answer questions. (**Cadet CP** Memorandum for Record) ("I reserve the right to not make a written statement and answer any questions.")).

78. On October 18, a senior member of the Corps of Cadets in **Doe** chain of command told **Doe** that **Roe** was not making a Title IX claim against him. (**John Doe** Feb. 26, 2024 Statement at 11).

79. Three days later, on Saturday, October 21, **Roe** texted **Doe** "You going to McDonald's[?]" (IM Text Messages Between **Jane Roe** and **John Doe** at 10). **Doe** responded, "Yeah whu." (Ibid.)

**M.  Undisputed Relevant Events During the week of October 22, 2023**

80. On Wednesday, October 25, Lieutenant Colonel Donald Russell, the Deputy Commandant of Cadets for 2nd Battalion, sent an email to **Roe** **Doe** **Cadet MS** and **Cadet CP** telling them to report to his office at 2:00 p.m. on Friday, October 27, to receive copies of the written charges against them, and that a hearing to adjudicate charges related to their alleged roles in an alcohol-related

29

incident on September 17-18 would be conducted the following week on Thursday, November 2.[26]

81.     Because of her class schedule, ▮Cadet DM▮ was scheduled to receive her charges at a different time than the other cadets.

82.     On Thursday, October 26, the above-mentioned ▮Poe▮ applied for and obtained an *ex parte* 72-hour Emergency Protective Order ("EPO") against ▮Doe▮ from a magistrate (not a judge) at the District Court for Montgomery County, Virginia. (▮John Doe▮ Feb. 26, 2024 Statement at 11).   In applying for the EPO, ▮Poe▮ alleged that ▮Doe▮ sexually assaulted her on October 11 and told her that "he had a sexual assault/rape case that was going on since August 2023 with a female in the Corps." (▮Poe▮ Statement).

83.     Pursuant to Virginia law, ▮Doe▮ was not given an opportunity to respond to ▮Poe▮ application for an EPO.  Because EPO respondents are not given an opportunity to respond to an EPO application, Virginia law states that "the issuance of an emergency protective order shall not be considered evidence of wrongdoing by the respondent." Va. Code. § 192-152.8(F).

---

[26] *See* PDF of email with subject line: "ACTION: Notification of Charges / Deputy Commandant Hearing – C/▮Jane Roe▮ ▮Doe▮, ▮Cadet CP▮, ▮Cadet MS▮" (Oct. 25, 2023).  (Because of her class schedule, ▮Cadet DM▮ was told to report at a different time to receive her charges).

JD-000037

84. **Doe** was served with the EPO in his dorm room on the afternoon of October 26. (**John Doe** Feb. 26, 2024 Statement at 11). The EPO papers included **Poe** written allegations against **Doe** (Ibid.)

85. On October 27, **Doe** told **Roe** about the Emergency Protective Order and told **Roe** that **Poe** allegations were false. (**John Doe** Feb. 26, 2024 Statement at 12). During this conversation, **Roe** recommended that **Doe** speak with Cadet ▮▮▮▮ because ▮▮ had also been the subject of false allegations of sexual assault. (Ibid.) Based on **Roe** recommendation, **Doe** spoke with ▮▮ later that day. (Ibid).

86. Also on Friday, October 27, **Roe** **Doe** **Cadet MS** and **Cadet CP** ▮▮▮▮ each received an individual Corps of Cadets charge sheet regarding their involvement with September 17 party.[27] During the course of this Title IX investigation, **Doe** provided the Title IX office with a copy of the charge sheet. The charges against **Doe** were as follows:

> Article 3: Conspiracy, to wit, conspired to attend a social gathering in the cadet residence where all present consumed alcohol under the legal drinking age.
>
> Article 9: Failure to Obey Order or Regulation, to wit, Annex A, Corps of Cadets Alcohol Policy.
>
> Article 17: Alcohol Offenses, to wit, consumed alcohol underage in the Cadet Residence Hall, to a high level of intoxication, and demonstrated a general disregard for

---

[27] *See* Notification of Charges to **John Doe** (Oct. 27, 2023).

31

JD-000038

good order and discipline while under the influence of alcohol, on/about 17-18 Sep 23.

Article 25: Conduct Unbecoming a Cadet, to wit, gross violations of several Cadet Regulations policies, as it relates to these matters.

Article 26: General Article, to wit, detracted from good order and discipline and brought great discredit to yourself, Oscar [Company], Air Force ROTC, and the Corps of Cadets, by actions on/about 17-18 Sep 23.

Article 29: Visitation Violation, to wit, failed to depart a female cadet's room by 0200 curfew, spending the night, under the auspices of avoiding detection for heavy intoxication.[28]

87. Consistent with the email that Doe and the others had received on October 25, the charges also stated that Doe was to report to Lt. Col. Russell for a Deputy Commandant Hearing on these charges the following Thursday, November 2, in the Court Room in the Corps Leadership and Military Sciences Building for a hearing on the charges. (Ibid.)

88. The Title IX investigator did not obtain a copy of the Corps of Cadet charges that were served on Roe

**N. Undisputed Relevant Events During the week of October 29, 2023**

89. On Wednesday, November 1 (*i.e.*, the day before the scheduled Corps of Cadets hearing), Roe filed a report with the Virginia Tech Police Department

---

[28] (Ibid.)

JD-000039

alleging that [Doe] sexually assaulted her when he stayed the night in her room on September 17. ([Jane Roe] VTPD Interview #1). [Roe] told the police that she did not wish to press charges against [Doe] (Ibid.)

90. That same day, at 5:53 p.m., the Virginia Tech PD sent out a campus-wide email about [Roe] report.[29]

91. Less than one hour later (at 6:49 p.m.), Lt. Col. Russell sent an email to [Roe] [Doe] [Cadet DM] [Cadet MS] and [Cadet CP] stating: "After consultation with the Commandant, the Deputy Commandant Hearing(s) scheduled for tomorrow, 11/2, are postponed. If and when it is able to be re-scheduled, I will coordinate a date and time with you." ([John Doe] Feb. 26, 2024 Statement at 13).

**O.  Undisputed Relevant Events During the week of November 5, 2023**

92. On Monday, November 6, [Roe] met with the Virginia Tech Police again. ([Jane Roe] VTPD Interview #2). During this meeting, [Roe] told the VTPD that she had met with [Poe] and that she was under the impression that [Doe] was "facing charges" and had to go to court on November 14, 2023. (Ibid at 3). [Roe] also told the VTPD that she would like them to open an investigation into her allegations. (Ibid. at 4).

---

[29] *See* PDF of Virginia Tech Police Department campus-wide email (subject line: Crime Alert – Sexual Assault – Content Warning) sent on November 1, 2023 at 5:53 p.m.

JD-000040

93. **Roe** was incorrect in her assertion that **Doe** was facing criminal charges stemming from **Poe** allegations. **Doe** has never been arrested or criminally charged with respect to either **Poe** allegations or **Roe** allegations. (Nor has **Doe** ever been arrested or criminally charged for anything else). (**John** **Apr. 16, 2024 Statement ¶ 9**).

94. On Wednesday, November 8, **Doe** learned that **Poe** had filed a petition for *a permanent* protective order against him, and that a hearing on that petition would be held before a District Court judge on November 14. (**John Doe** Apr. 16, 2024 Statement at ¶ 10). Presumably this is the court date to which **Roe** was referring to when she met with VTPD two days earlier.

**P.** **Undisputed Relevant Events During the week of November 12, 2023**

95. On Tuesday, November 11, the District Court conducted a hearing on **Poe** request for a permanent protective order. (**John Doe** Feb. 26, 2024 Statement at 12). Both **Doe** and **Poe** were represented by lawyers at the hearing. (Ibid. at 12, n.22).

96. To obtain a permanent protective order under Virginia law, the petitioner has the burden to prove "by a preponderance of the evidence" at a hearing that the respondent subjected her "to an act of violence, force, or threat." Va. Code. § 19.2-152.9(D).

JD-000041

97.     After listening to **Poe** testify for over an hour (including cross-examination by **Doe** lawyer), the judge denied **Poe** petition. (John Doe Feb. 26, 2024 Statement at 12; District Court Order dated Nov. 14, 2023).  When denying the petition, the judge intimated that **Poe** testimony was "incredible as a matter of law" and the judge stated that **Poe** testimony was "extremely unique, if not bizarre." (John Doe Feb. 26, 2024 Statement at 12).

**Q.     Other Undisputed Relevant Facts**

98.     At some point in October 2023, Roe told **Cadet MS** and others that "[she] and **Doe** had better intercourse that night [September 17] then what she had with another guy from the Corps." (Cadet MS Title IX Interview at 1).  [Note: the "rape shield" provision should not exclude this evidence because this is evidence of a statement, not of conduct.] Cadet MS found it odd that Roe "was bragging about being sexual with **Doe** (Ibid.)

99.     **Cadet DM** stated that Roe allegations against **Doe** (i.e., that he had sex with her while she was "incapacitated," is the fifth time that Roe has claimed that something like this has happened to her.  (Cadet DM Title IX Interview at 5).  [Note: evidence that a complainant has stated that she was previously sexually assaulted in the exact same manner as she alleges the respondent assaulted her does not fall within a "rape shield" provision because such statements are not evidence of the complainant's prior sexual behavior.  *See Hall v.*

35

*Commonwealth*, Case No. 1001-18-4, 2019 Va. App. LEXIS 164, *16-17 (Va. Ct. App. Jul. 16, 2019); *Brown v. Commonwealth*, 510 S.E.2d 751, 759 (Va. Ct. App. 1999).

100. In January 2024, the Corps of Cadets held disciplinary hearings for Cadet MS and Cadet DM with respect to their involvement with underage drinking on September 17, 2023. (John Doe Feb. 26, 2024 Statement at 13). Cadet MS's and Cadet DM's punishments included, among other things, military probation for spring semester. (Ibid.)

101. It is unclear what, if any, punishment Roe received relating to the party that she hosted on September 17. (John Doe Feb. 26, 2024 Statement at 14). However, at some point after Cadet MS and Cadet DM received their punishments, Roe posted a picture of herself on SnapChat in which she gives the middle finger to the camera and says "another great day of not being black barred" (*i.e.*, demoted for underage drinking). (Cadet MS VTPD Interview at 1). Roe also bragged at a Corps of Cadets event about the fact that she "got away with" underage drinking. (Cadet MS Title IX Interview at 5).

102. On April 2, 2024, Air Force ROTC announced the Virginia Tech students who were selected to attend field training this coming summer. (John Doe Apr. 16, 2024 Statement at ¶ 15). Roe was selected; neither Cadet MS nor Cadet DM were selected. (Ibid.)

36

JD-000043

103. There are several inconsistencies in the statements made by ▮Roe▮ and ▮Cadet DM▮ For example:

a. On November 1, 2023, ▮Roe▮ told the VTPD that when she and ▮Doe▮ woke up on September 18 he told her they had had sex. (▮Jane Roe▮ VTPD Interview # 1).

b. At some point, ▮Roe▮ told ▮Cadet DM▮ that ▮Doe▮ first told her they had had sex later in the day on September 18 when ▮Doe▮ returned to ▮Roe▮ room to ask ▮Roe▮ if she was on birth control. (▮Cadet DM▮ Title IX Interview at 6).

c. On November 1, 2023, ▮Roe▮ told the VTPD that ▮Doe▮ told her that they had had vaginal and anal sex. (▮Jane Roe▮ VTP Interview #1).

d. At some point, ▮Roe▮ told ▮Cadet DM▮ that she and ▮Doe▮ had only anal sex. (▮Cadet DM▮ Title IX Interview at 6).

e. ▮Cadet DM▮ says that when ▮Doe▮ and ▮Roe▮ were still in bed on the morning of September 18 ▮Doe▮ said that ▮Roe▮ had fallen out of the bed. (▮Cadet DM▮ Title IX Interview at 4).

f. ▮Roe▮ says that ▮Doe▮ first told her that she had fallen out of bed via a text message later in the day on September 18. (▮Jane Roe▮ VTPD Interview # 2 at 2).

JD-000044

# EVIDENCE THAT IS IRRELEVANT AND SHOULD
# BE EXCLUDED FROM THE FINAL REPORT

Page 9 of Virginia Tech Title IX Reporting and Grievance Procedures states that "the investigator may redact information [in witness statements, etc.] that is irrelevant or immaterial" and "may also redact statements of personal opinion, rather than direct observations or reasonable inferences from the facts." Respondent proposes the following redactions from the interview statements of Cadet SJ Jane Roe Cadet DM and Kelly Arbenz-Smith.

## Cadet SJ

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| 1 | "Cadet SJ stated Roe 'didn't seem cognitive or not, the way Roe did not say hi or attempt to explain yes I am naked.'" | Cadet SJ is a college student, not a neurologist. And there is no evidence that she has any training or experience that would render her qualified to offer an opinion on whether another person is "cognitive." Therefore, the quoted text is irrelevant. |
| 2 | "Cadet SJ stated she returned to her room after this interaction and really thought 'she [Roe didn't remember.'" | Cadet SJ is not a mind reader. She is not capable of determining whether Roe remembered going to the restroom the morning of September 18. Therefore, the quoted text is irrelevant. |

38

JD-000045

**Roe** **Jane Roe** **Statement to VTPD (Nov. 1, 2023)**

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| 1 | "She stated that she had bruising on her arm" | Only a witness with proper medical training (*i.e.*, an expert witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of **Roe** alleged bruise on her arm, there is no basis upon which the Hearing Officers can determine the cause of that alleged bruise. Therefore, the quoted text is irrelevant. |

**Jane Roe** **Statement to VTPD (Nov. 6, 2023)**

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| 1 | "she had bruises on her wrists and chest as if someone had grabbed her and" | Only a witness with proper medical training (*i.e.*, an expert witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, |

JD-000046

| Page | Text that should be redacted | Bases for Objection |
|------|------------------------------|---------------------|
| | | Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of Roe alleged bruises, there is no basis upon which the Hearing Officers can determine the cause of those alleged bruises. Therefore, the quoted text is irrelevant. |
| 1/11-12 | "Jane Roe stated that she was also told later that she had walked out of her room around 01:30 hours in only a t-shirt in order to get away from that situation but she had no memory of that." | The quoted text is irrelevant because Roe does not identify the person who allegedly told her that she left her room "to get away from that situation," let alone how that unidentified person had a basis for making that statement. At a minimum, the Title IX investigator should ask Roe to identify who made this statement so that the investigator can follow up with that person to ask that person the basis for the statement. Respondent respectfully submits |

40

JD-000047

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| | | that it would be improper for the Title IX investigator to respond to this objection by merely stating that Respondent "can ask █Roe█ about it at the hearing." It is the Title IX investigator's burden, not Respondent's burden, to gather relevant evidence. *See* 34 C.F.R. § 106.45(b)(5)(i). A Title IX investigator does not satisfy that burden by submitting rank hearsay from unidentified witnesses to the Hearing Officers and leaving it to Respondent to cross-examine Complainant about the hearsay (especially when the Complainant is not required to attend the hearing or submit to cross-examination at the hearing). |
| 4/12-13 | "I thanked █Jane Roe█ for sharing what she did with me and told her that what she is reporting may meet the elements for the crime of rape under Virginia law." | The quoted text is irrelevant because law enforcement officials are not permitted to testify that a person's conduct constituted a crime. *See, e.g., United States v. Noel*, 581 F.3d 490, 496 (9th Cir. 2009) (holding it was improper for a detective to testify that defendant's conduct violated the law). |

JD-000048

**Cadet DM** **Interview with D. Twigger**

| Pg | Text to be redacted | Bases for Objection |
|---|---|---|
| 1 | "Cadet DM stated that she did not believe Doe when he told her Roe fell out of the bed because of how Roe bed is situated; if she fell out of the bed, she would have hit her head on the desk, and Roe would have knocked over the refrigerator if she fell out of the other side of the bed." | It is well settled that a witness is not allowed to testify that she "believes" another person's statement. *See, e.g., United States v. Preston*, 873 F.3d 829, 839 (9th Cir. 2017) (holding it was "plainly erroneous for the district court to allow [a police officer] to testify that he did not believe [the defendant's] denial of [the complainant's] allegations"). After all, evidence is relevant only if "it has a tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). The fact that Cadet DM did not "believe" Doe when he allegedly said that Roe fell out of the bed does not make it more or less probable that Roe fell out of the bed. Moreover, Cadet DM is a college sophomore, not an expert in accident reconstruction. Therefore, her opinion that Roe would have hit her head or knocked over the refrigerator if she fell out of the bed is irrelevant. *See Travelers Property Casualty Co. v. Ocean Reef Charters, LLC*, 71 F.4th 894, 907 (11th Cir. 2023) ("a hypothesis about causation is outside a lay witness's competency"). |
| 1 | "Cadet DM stated that when Roe woke up, she did have bruises. | Only a witness with proper medical training (*i.e.*, an expert |

JD-000049

| Pg | Text to be redacted | Bases for Objection |
|---|---|---|
|  | `Cadet DM` stated she doesn't remember shapes or sizes, but she does recall `Roe` saying and showing her bruises when `Doe` left the room." | witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of `Roe` alleged bruises, there is no basis upon which the Hearing Officers can determine the cause of those alleged bruises. Therefore, the quoted text is irrelevant. |
| 2 | "`Cadet DM` said she had her suspicions that it was `Doe` | A witness's "suspicions" are not relevant evidence. After all, evidence is relevant only if "it has a tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). And a witness's suspicion that a fact is true does not make that it more or less probable that a fact is true. |

JD-000050

| Pg | Text to be redacted | Bases for Objection |
|---|---|---|
| 4 | "Investigator Twigger reviewed what ██ Cadet DM ██ stated about seeing bruising on ██ Roe ██ but not remembering the shape or size. Investigator Twigger asked ██ Cadet DM ██ if she could remember where the bruises were on ██ Roe ██ body. ██ Cadet DM ██ stated she had one on her arm and one on her leg, but she believes the bruise on her leg was from PT [physical training] because ██ Roe ██ told her so." | Only a witness with proper medical training (*i.e.*, an expert witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of ██ Roe ██ alleged bruises, there is no basis upon which the Hearing Officers can determine the cause of those alleged bruises. Therefore, the quoted text is irrelevant. |
| 4 | "██ Cadet DM ██ stated [██ Roe ██ had fallen out of the bed a few days before and hit the microwave and refrigerator unit, knocking everything off the microwave; so she did believe ██ Doe ██ but she stated she was skeptical because nothing had fallen off the microwave." | It is well settled that a witness is not allowed to testify that she "believes" another person's statement. *See, e.g., United States v. Preston*, 873 F.3d 829, 839 (9th Cir. 2017) (holding it was "plainly erroneous for the district court to allow [a police officer] to testify that he did not believe [the defendant's] denial |

JD-000051

| Pg | Text to be redacted | Bases for Objection |
|---|---|---|
| | | of [the complainant's] allegations"). After all, evidence is relevant only if "it has a tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Whether ▮Cadet DM▮ "believed" ▮Doe▮ or was "skeptical" of ▮Doe▮ is irrelevant because that belief or skepticism does not make it more likely or less likely that ▮Roe▮ fell out of the bed. Moreover, ▮Cadet DM▮ is a college sophomore, not an expert in accident reconstruction. Therefore, her opinion that ▮Roe▮ would have hit her head or knocked over the refrigerator if she fell out of the bed is irrelevant. *See Travelers Property Casualty Co. v. Ocean Reef Charters, LLC*, 71 F.4th 894, 907 (11th Cir. 2023) ("a hypothesis about causation is outside a lay witness's competency"). |
| 4-5 | "▮Cadet DM▮ stated that when ▮Roe▮ showed her bruises on her arms, ▮Roe▮ told her that must have been what it was from. Investigator Twigger asked ▮Cadet DM▮ if she could remember where the bruises were, and ▮Cadet DM▮ stated that she thought the bruises were on her forearm area. Investigator Twigger asked if she remembered if which arm or was it both arms, and ▮Cadet DM▮ stated that she was | Only a witness with proper medical training (*i.e.*, an expert witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. |

JD-000052

| Pg | Text to be redacted | Bases for Objection |
|---|---|---|
| | not sure, she did not remember. Investigator Twigger asked Cadet DM if she could remember where the bruises were on Roe legs, and she stated one was on the back of her leg and one was on the side of her leg. Cadet DM stated she believed the one on the side of Roe leg was where she fell out of the bed before. Investigator Twigger asked Cadet DM where these bruises were on Roe leg and Cadet DM said it was Roe upper thigh area." | App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of Roe alleged bruises, there is no basis upon which the Hearing Officers can determine the cause of those alleged bruises. Therefore, the quoted text is irrelevant. |

## Keely Arbenz-Smith Interview with D. Twigger

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| 1 | "Keely stated Roe came to her office, and that's when she formally documented everything Roe reported." | This should text should be redacted because it is wholly unhelpful. When did Roe come to Keely's office? After Roe knew she was being investigated for underage drinking? And what was documented? And why was that alleged documentation not provided to Respondent? |
| 1 | "Keely stated 'Roe was putting little things together and realizing that she was likely being manipulated.' Keely stated Roe gave her the impression that she felt as if Doe was covering her tracks saying all the right things to her.'" | Here, Keely is vouching for Roe ability to read minds. In other words, Keely is saying that she believes that Roe correctly believes that Respondent intended to "manipulate" Roe and Respondent was "covering his tracks." Keely's statement does not even come close to |

JD-000053

| Page | Text that should be redacted | Bases for Objection |
|------|------------------------------|---------------------|
| | | meeting the definition of relevant evidence.  In other words, the fact that Keely believes that ▮Roe▮ correctly believes that Respondent intended to "manipulate" ▮Roe▮ and that Respondent intended to "cover his tracks" does not make it more likely that those allegations about Respondent's intent are true.  Fed. R. Evid. 401(a). |
| 1 | "Keely stated that one thing that she 'thought was very weird was that ▮Roe▮ initially reported that she fell out of bed.'  Keely stated that was 'weird' because all cadets must loft their beds.  Keely stated that ▮Roe▮ desk is under her lofted bed, so she would have landed on the desk if she had fallen out of bed.'" | The fact that Keely thinks something was "weird" is flatly irrelevant because it does not make it more likely or less likely that ▮Roe▮ fell out of the bed.  Moreover, there is no evidence that Keely has expertise in accident reconstruction.  Indeed, Keely does not explain how ▮Roe▮ falling out of the bed on the night in question was unlikely when it is undisputed that ▮Roe▮ fell out of her bed a few nights prior to the night in question.  Respondent respectfully submits that the Title IX investigator's response to this objection should not be that Respondent "can ask Keely about this at the hearing."  It is the Title IX investigator's job to weed out irrelevant evidence such as Keely's baseless opinions, and Respondent's attorney should not be forced to waste time at the hearing cross-examining a Residential Well- |

47

JD-000054

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| | | Being Coordinator as to how she is able to discount the possibility that ▮Roe▮ fell out of her bed. |
| 1 | "Keely stated that when ▮Roe▮ lifted her arm, she saw what looked like a 'thumbprint bruise on ▮Roe▮ right wrist,' appearing as if she was grabbed by 'someone's hand or fingerprint.' Keely stated that piece stuck with her because ▮Roe▮ just seemed to dismiss it and Keely thought if someone fell out of the bed and hit that area, it wouldn't bruise like that." | Only a witness with proper medical training (*i.e.*, an expert witness) can offer an opinion about the cause of a bruise. *See* Advisory Committee Notes, Federal Rule of Evidence 701 (stating "a witness would have to qualify as an expert before he could testify that bruising around the eyes is indicative of skull trauma"); *In re K.S. v. M.N.W.*, 713 S.W.2d 858, 864 (Mo. Ct. App. 1986) ("Dr. Salanski's opinion as to the nature of the marks and bruises found on the children together with his observations as to whether they were caused by trauma were certainly within the normal area of expertise possessed by a practicing physician."). Without expert testimony as to the cause of ▮Roe▮ alleged bruises, there is no basis upon which the Hearing Officers can determine the cause of those alleged bruises. Therefore, the quoted text is irrelevant. |
| 2 | "Keely stated that she truly believes ▮Roe▮ 'does not know what all went on in that room.'" | The fact that Keely "believes" that ▮Roe▮ does not know what happened in the room does not make it more likely or less likely that ▮Roe▮ knows what happened. |

48

**JD-000055**

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| | | Therefore, Keely's belief is, by definition, irrelevant. |
| 2 | "Keely stated most of the cadets hung their robes in their wardrobes, so if they were exiting in a hurry, the robe was right there. Keely stated it didn't make sense for ▉Roe▉ to not grab her robe and for her to enter the hallway unclothed." | Keely does not know whether ▉Roe▉ had a robe handy when she ran to the bathroom. So her opinion that it did not make sense for ▉Roe▉ to not grab her robe is irrelevant. |
| 2 | "Keely stated that she felt like all these are the 'pieces that seem to be the most valuable coming from her because she saw her afterward, and she saw the bruise, and none of it made a lot of sense.'" | None of this makes a fact of consequence in this case more likely or less likely. So it's all irrelevant. The Hearing Officers should not be basing their decision in this case (which could have life altering consequences for Respondent) based on Keely's testimony about what she thinks "makes sense." |
| 2 | "Keely stated that there was a 'big difference' with how ▉Roe▉ came back to her and was talking, so she really 'pushed ▉Roe▉ towards Rebecca Jarvis for that reason.' Keely explained that Rebecca 'has been a good resource.' Keely stated that she thought ▉Roe▉ was 'pushing things to the side at first and thought if ▉Roe▉ could talk things out with Rebecca it would help.' Keely stated after ▉Roe▉ met with Rebecca that was 'probably a big reason she came back and told her about what happened.'" | Keely is trying to convey several messages here, none of which are relevant. Those messages are (1) Keely thinks ▉Roe▉ was sexually assaulted; (2) Keely thinks ▉Roe▉ needed to talk to Rebecca Jarvis to come to the realization that she was sexually assaulted; (3) Rebecca Jarvis thinks ▉Roe▉ was sexually assaulted; and (4) Rebecca Jarvis correctly made ▉Roe▉ come to the realization that she was sexually assaulted. No judge would allow this type of testimony (just like no judge would allow a witness |

JD-000056

| Page | Text that should be redacted | Bases for Objection |
|---|---|---|
| | | to testify that he thinks a woman alleging sexually assault is lying). |
| 2 | The entire last full paragraph on page 2 (starting with "Investigator Twigger" and ending with "clearly not okay." Should be redacted. | About half of this paragraph is Keely recounting what she remembers from the incident report filed by ██Cadet SJ██  If the Hearing Officers want to know what ██Cadet SJ██ reported, they can read the summary of the interview of ██Cadet SJ██  Other portions of this paragraph include Keely opining on what she thinks "makes sense." Again, Keely's views on what "makes sense" are not relevant evidence. Finally, Keely claims "coms staff" were critical of ██Cadet SJ██ for not engaging with ██Roe██ because ██Roe██ "was clearly not okay." But Keely does not identify what "coms staff" member determined that ██Roe██ was clearly not ok, let alone whether the staff member was qualified to make such a judgment. |
| 3 | "Keely stated that the things we've discussed were 'all things that didn't sit right with her.'" | This statement is irrelevant. The fact that there were things that "didn't sit right with her" does not make it more likely or less likely that the Respondent is responsible for the alleged violations of the Student Code of Conduct. |

50

JD-000057

April 16, 2024

Respectfully Submitted,

John Doe

JD-000058