# EXHIBIT 13

VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY
OFFICE OF STUDENT CONDUCT

Jane Roe ,                                    )
                    Complainant,              )
                                              )        Case No. 2024348902
            vs.                               )
                                              )
John Doe ,                                    )
                    Respondent                )
                                              )
_____      )

**RESPONDENT'S WRITTEN RESPONSE
TO TITLE IX INVESTIGATION REPORT**

A U.S. Department of Education regulation sets forth certain requirements that are applicable to this Title IX case.[1]  One of those requirements is that the parties be given an opportunity to submit a "written response" to the investigation report before the hearing.  The regulation states, in pertinent part:

> *Investigation of a formal complaint.*  When investigating a formal complaint and throughout the grievance process, a recipient must—
>
> \*       \*       \*
>
> Create an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing (if a hearing is required under this section or otherwise provided) or other time of determination regarding responsibility, send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review **and written response**.
>
> 34 C.F.R. § 106.45(b)(5)(vii) (bold emphasis added).

---

[1] The DOE's regulations are set forth in the Code of Federal Regulations ("C.F.R.").  The regulation that applies to this Title IX case is at Title 34 C.F.R. § 106.45 (May 19, 2020).  Although the DOE recently finalized amendments to its Title IX regulations, those amendments do not go into effect until August 1, 2024.

VT-000330

In accordance with his rights under the governing regulation, Respondent ██John Doe██ (hereinafter, "██Doe██" submits this response to the Office for Equity and Accessibility's Investigation Report.

**1. Response to Table of Contents (Report at 2-3).**

    **a. The Table of Contents does not accurately describe the September 17 IM text messages from ██Doe██'s phone to ██Doe██'s roommate.**

The Table of Contents describes one of the Report's attachments as "IM Text Messages from ██Doe██'s Phone to ██JB██'s Phone." (Report at 2). But the actual title of that attachment is, "IM Text Messages from ██John Doe██'s Phone to Roommate ██JB██ on 09-17-23 and 09-18-23 (including Texts written by ██Jane Roe██)." (*See* Report at 84). As the title indicates, these texts include texts that ██Roe██ sent using ██Doe██'s phone during the party in ██Roe██'s room. (*See, e.g.*, Report at 85 (messages to ██JB██ at 10:16 PM: "Hey ██JB██," "It's ██Jane Roe██," "██Doe██ is kinda fucked. He may spend the night in my room"); Report at 86 (messages to ██JB██ at 11:06 PM: "Hey ██JB██ its ██Roe██ "He's gonna spend the night"); Report at 87 (messages to ██JB██ from 11:20 to 11:22 PM: "He will be back around 6:30," "i'll get him back")).

    **b. The Table of Contents does not accurately describe the IM text messages between ██Roe██ and ██Doe██**

The Table of Contents describes one of the Report's attachments as "IM Text Messages Between ██Jane Roe██ and ██John Doe██." But the actual title of the attachment is "IM Text Messages Between ██Jane Roe██ and ██John Doe██ (Sept. 18, 2023 – October 27, 2023)." (Report at 74). In other words, the attachment includes the text messages between ██Roe██ and ██Doe██ starting on the day after ██Roe██'s party and ending on the day the Corps of Cadets formally charged ██Roe██ and the other Cadets who attended ██Roe██'s party, with underage drinking. (*See, e.g.*, Report at 79-82

VT-000331

(October 7 text message conversation between ███ and ████ regarding purchasing alcohol for another party in ███'s dorm room)).

**c. The Table of Contents does not accurately describe ███'s September 29, 2023 Venmo payment to ████**

The Table of Contents describes one of the Report's attachments as "Screenshot of Venmo Payment from ████████ to ████████ (Sept. 29, 2023)." But the actual title of that document is, "Screenshot of Sept. 29, 2023 Venmo Payment from ████████ to ████████ in Which ███ Refers to ████ as 'Sugar baby.'" (Report at 96).

**d. The Table of Contents incorrectly describes interview transcripts as "hearing" transcripts.**

The Table of Contents describes one of the Report's attachments as "Transcripts of a Corps of Cadets hearing for alcohol." But the transcripts are not from a hearing, they are from interviews conducted during the Corps of Cadets investigation of the underage drinking that occurred in ███'s room on September 17. (*See, e.g.*, Report at 171).

**2. Response to "Procedural History" section (Report at 4-7).**

**a. The "Procedural History" section omits important points on how Virginia Tech analyzes the issue of "incapacitation."**

The Procedural History section of the Report notes that "consent cannot be given where a person was incapacitated due to drugs or alcohol." (Report at 4). But the report omits important points on the issue of incapacitation.

___First___, the Report omits the definition of "incapacitation." The *Student Code of Conduct* defines "incapacitation" as follows: "Physical or mental inability to make informed, rational judgments. Incapacitation includes but is not limited to being asleep, being unconscious, and the inability to make decisions due to voluntary or involuntary use of alcohol or drugs." *Student Code of Conduct* at 7 (Aug. 18, 2023).

3

VT-000332

*Second*, the Report omits the following points from the training materials that Virginia Tech uses to train its Title IX decision-makers: (1) an alcohol-induced "blackout" does not automatically equate to "incapacitation," (2) there are various factors that the hearing officers can examine to determine whether an intoxicated complainant was incapacitated, and (3) if hearing officers determine that a complainant was incapacitated, the hearing officers must then determine whether the respondent "knew or should have known" that the complainant was incapacitated. The relevant training materials are included in a PowerPoint presentation titled "Title IX Higher Education Decision-Maker, dated April 30, 2024. The PowerPoint presentation is on Virginia Tech's website, and slides relating to incapacitation are reproduced below.

4

VT-000333

# Incapacity

- What was the reason for incapacity?
  - Alcohol or other drugs (prescription or non-prescription)
  - Mental/cognitive impairment
  - Injury
  - Asleep or unconscious
- Blackouts are frequent issues
  - Blackout ≠ incapacitation (automatically)
    - Partial blackout must be assessed as well
  - Memory absent, but verbal and motor skills may still function

ATIXA © 2023 Association of Title IX Administrators

32

# Evidence of Incapacity: Potential Context Clues

- Slurred speech
- Scent of alcohol on the breath
- Shaky equilibrium; disorientation
- Passing out/unconsciousness
- Throwing up
- Known blackout
- Outrageous or unusual behavior (requires prior knowledge)

Incapacitation determination is made contextually **in light of all the available relevant evidence**



ATIXA © 2023 Association of Title IX Administrators

33

VT-000334

# Incapacity Analysis

- If the Complainant **was not** incapacitated, move to the Consent Analysis
- If the Complainant **was** incapacitated, but:
  - The Respondent did not know, **AND**
  - The Respondent would not have reasonably known of the Complainant's incapacity = no policy violation, move to Consent Analysis
- If the Complainant **was** incapacitated, and:
  - The Respondent **knew it or caused it** = policy violation
  - The Respondent **should have known it (reasonable person)** = policy violation
  - The Respondent's own intoxication cannot be used as a defense

 
# Prior Knowledge Construct

- Did the Respondent previously know the Complainant?
  - If so, was the Complainant acting differently than previous similar situations?
- Evaluate what, if anything, the Respondent observed the Complainant consuming
  - Use a timeline analysis
- Determine if the Respondent provided any substances to the Complainant

VT-000335

**b. The "Procedural History" section misstates what** Roe **told the Virginia Tech Police Department.**

The "Procedural History" section includes a purported summary of what Roe reported to the Virginia Tech PD about the alleged incident. (Report at 5). But in two respect, that summary incorrectly describes what Roe reported.

*First*, the summary incorrectly states, "Roe reported that when she woke up on the morning of September 18, Doe was in bed with her and informed Roe they had sexual intercourse the prior night." (Report at 5). As is correctly observed later in the Report, "It is not clear from the VTPD reports when Roe stated Doe told her they had intercourse." (Report at 7).

*Second*, the summary incorrectly states, "Roe reported that she was incapacitated due to alcohol consumption and was unable to consent to sexual activities with Doe (Report at 5). Neither of the summaries of the Virginia Tech PD's interviews with Roe contain any such statement. The summary of the November 1, 2023 interview states, "Jane Roe was heavily intoxicated and did not remember consenting to sex." (Report at 18). But as Virginia Tech's Title IX training materials note, an alcohol-induced "blackout" does not necessarily equate to "incapacitation."

**c. The "Procedural History" section demonstrates that the investigator misunderstood the governing Title IX regulation when excluding the first 37 pages of** Doe **'s "Proposed Summary of Relevant Evidence and Request to Exclude Irrelevant Evidence."**

Doe 's 10-day response included a document titled "Respondent's Proposed Summary of Relevant Evidence and Request to Exclude Irrelevant Evidence" (hereinafter "Proposed Summary"). The Proposed Summary notes that evidence "is relevant if: (a) it has a tendency to

7

VT-000336

make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[2]

The Proposed Summary notes that federal courts have held that "relevant" evidence in Title IX hearings is not limited to the parties' respective narratives of the sexual activity at issue, and that "relevant evidence" in Title IX hearings also includes evidence that (1) the complainant had a motive to lie about the alleged incident; and (2) the complainant engaged in post-incident behavior inconsistent with her allegation that the respondent sexually assaulted her, such as sending friendly text messages to respondent or making positive statements about the respondent's sexual prowess. (*See* Proposed Summary at 4-6).

The Proposed Summary then sets forth 29 pages of undisputed facts, in chronological order, that are established by the evidence collected by the investigator, and it includes citations to the precise piece or pieces of evidence that establish each fact. (*See* Proposed Summary at 8-37). For example, the Proposed Summary sets forth the undisputed facts that (1) in accordance with University policy, a cadet who makes a report of sexual assault is immune from disciplinary action for their personal consumption of alcohol occurring during the time of the reported incident, (2) Roe made her report against Doe a few days after the Corps of Cadets notified her that she would face a disciplinary hearing for her underage drinking at her September 17 party, and (3) the Corps of Cadets indefinitely postponed Roe's hearing immediately after the Corps learned of Roe's report against Doe (*See* Proposed Summary at 10, 31-33). As another example, the Proposed Summary notes the undisputed fact that Cadet MS (one of the Cadets who attended Roe's party)

---

[2] (*See* Proposed Summary at 4 (quoting Federal Rule of Evidence 401); *see also Virginia Tech Title IX Reporting and Grievance Procedures for Sexual Harassment and Violence* at 8 (stating that evidence is "relevant" if it "makes a fact more or less probable to have occurred" and "the fact is of consequence to determining whether a policy violation may have occurred")).

VT-000337

told the Title IX investigator that at some point in October 2023 ▮Roe▮ told ▮Cadet MS▮ and others that "[she] and ▮Doe▮ had better intercourse that night [September 17] than what she had with another guy from the Corps." (Proposed Summary at 35).

The Proposed Summary then identifies various passages of the witness statements that the investigator should exclude from the Report in accordance with Page 9 of the *Virginia Tech Title IX Reporting and Grievance Procedures* because they are "irrelevant" and/or "statements of personal opinion, rather than direct observations or reasonable inferences from the facts." (*See* Report at 38-50). For example, the Proposed Summary notes that Residential Well-Being Coordinator Keely Arbenz-Smith's opinion that "she truly believes ▮Roe▮ does not know what all went on in [Ella's] room" is irrelevant because, "The fact that Keely 'believes' ▮Roe▮ does not know what happened in that room does not make it more likely or less likely that ▮Roe▮ knows what happened." (Report at 163).

The investigator excluded the first section (the first 37 pages) of the Proposed Summary on the grounds that it "summarizes information already contained in the report," it "is not new information and not a response to any collected information," and it is merely "a proposal of what information should be deemed relevant." (Report at 6). ▮Doe▮ respectfully submits that the investigator's decision to exclude that section indicates that the investigator does not fully understand the federal regulation that governs this Title IX investigation, 34 C.F.R. § 106.45 (May 2020).

When federal agencies such as the DOE issue regulations (also called "rules"), they do so in accordance with the "rule making" process spelled out in the Administrative Procedure Act ("APA").[3] Under that process, (1) the agency publishes its bases for the proposed regulation

---

[3] *See* 5 U.S.C. §§ 551, *et. seq.* ("APA").

VT-000338

(called a "preamble") and the text of the proposed regulation in the Federal Register and invites the public to submit comments to the proposed regulation; (2) the agency then evaluates the public's comments; and (3) if the agency decides to adopt the regulation, it publishes its responses to the public's comments (the responses are also called a "preamble") and the text of the finalized regulation in the Federal Register.[4] Although statements in a preamble are not officially part of a finalized regulation, they are an authoritative interpretation of the regulation.[5]

The preamble to the finalized version of the Title IX regulation applicable to this case, 34 C.F.R. § 106.45 (May 2020), states that one of the purposes of the 10-day review and response period is to give the parties the opportunity "to argue about whether [particular evidence] is relevant" so that the investigator can "then consider the parties' viewpoints" on the relevance of the evidence and "whether to summarize that evidence in the investigative report."[6] In short, the investigator was simply wrong in her understanding about what 34 C.F.R. §106.45 allows to be included in a party's 10-day review response. That regulation allows for ██Doe██'s Proposed Summary (including the first 37 pages of the Proposed Summary). So, the investigator erred in excluding the first 37 pages of the Proposed Summary.

In any event, the preamble also states that a "party who believes the investigator reached the wrong conclusion about the relevance of the evidence may argue again to the decision-maker (*i.e.*, as part of the party's response to the investigative report, and/or at a live hearing) about

---

[4] *See* 5 U.S.C. § 553 ("Rule Making"); 1 C.F.R. §18.12 ("Preamble Requirements").

[5] *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (stating that courts should defer to an agency's interpretation of its own regulation when the interpretation is, among other things, in a document that reflects "the official position of the agency").

[6] *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026, 30024 (May 19, 2020).

VT-000339

whether the evidence is actually relevant").[7]  And the investigator has made the entire Proposed

Summary (including the first 37 pages) "available electronically for the parties and the hearing

officers to review."  (Report at 6).  █Doe█ urges the hearing officers to read the entire Proposed

Summary because it synthesizes the relevant facts in chronological order and cites to the evidence

that establishes each of those facts.

   d.  **The "Procedural History" section inaccurately describes the other document that the investigator excluded (and the relevancy of the document is obvious).**

   In her November 6, 2023 interview with the VTPD, █Roe█ said she was "under the impression

that █Doe█ was facing charges for" another "incident through the Blacksburg Police Department"

and that █Doe█ "had to go to court on 11.14.23."  (Report at 20).  As part of his 10-day response,

█Doe█ submitted a court order, dated November 14, 2023, that shows that the November 14

proceeding was not a criminal proceeding, but was instead a hearing on a petition for a protective

order against █Doe█ filed by a woman named █Pauline Poe█, and that the court denied

█Poe█' petition.  (*See* Nov. 14, 2023 Court Order).  █Doe█ also discussed the November 14

protective order hearing in one of his pre-10-day response written statements to the investigator.

(*See* Report at 36 (█Doe█'s February 26, 2024 Supplemental Statement, noting that when the Judge

denied █Poe█'s petition for a protective order he said that █Poe█'s testimony was "incredible

as a matter of law" and "extremely unique, if not bizarre").

   The "Procedural History" section describes the court order as a "dismissal of a protective

order," states that the "protective order was not requested or issued to the complainant in this case,"

and states that "no reasoning was provided by █Doe█ for the inclusion of its relevancy."  (Report

at 7).  But as noted above, the order was not a "dismissal of a protective order," it was a "denial"

_____

[7] 85 Fed. Reg. at 30304.

VT-000340

of a petition for a protective order.  Moreover, the order is relevant because it refutes ■Roe■'s

statement that ■Doe■ "had to go to court on 11.14.23" because of "criminal charges."[8]

**3. Response to "Summary of the Investigation" (Report at 7-13).**

**a. The Report's summary of ■Doe■'s submissions misstates some of the facts asserted in those submissions, and omits other relevant facts submitted by ■Doe■**

The "Summary of the Investigation" says that "■Doe■ submitted photos of statements he

reported were given to him during the Corps of Cadets hearing."  (Report at 9).  But those

statements were not given to ■Doe■ at a "hearing."  They were given to ■Doe■ ■Roe■ and others

on October 27 when the Corps of Cadets charged ■Doe■ ■Roe■ and others with alcohol violations

and told each of the cadets that there would be a hearing on the charges on November 2.  (*See*

Report at 36).

The "Summary of the Investigation" says that "■Doe■ stated that it 'appears ■Roe■ obtained

a significant benefit by accusing [■Doe■ of sexual assault."  (Report at 9).  But the Report fails

to identify that "benefit."  The evidence indicates that the "benefit" came in the form of ■Roe■

receiving no punishment from the Corp of Cadets for the party she hosted on September 17 even

though the Corps of Cadets punished the other two cadets who attended the party and who were

still enrolled at Virginia Tech during Spring semester.  (*See* Report at 66, 114-115).[9]

The "Summary of the Investigation" also omits the fact that ■Doe■ notified the investigator

that it is his understanding the Virginia Tech Air Force ROTC program recently dropped ■Roe■ from

the program because she intentionally submitted false results for her Air Force physical training

---

[8] As ■Doe■ noted in his February 26, 2024 Supplemental Statement, on October 26, 2023, a magistrate (not a judge) granted ■Poe■'s request for a 72-hour Emergency Protective Order ("EPO") against ■Doe■ but because respondents are not given an opportunity to oppose such EPO requests, Virginia law says EPOs "are not to be considered evidence of wrongdoing by the respondent."  (Report at 11-12 & footnote 20 (quoting Va. Code § 192-152.8(F)).

[9] Neither ■Doe■ nor ■Cadet CP■ were enrolled at Virginia Tech during Spring 2024.

12

VT-000341

("PT") test and that ██Roe██ resigned from the Corps of Cadets while under investigation for violating the Corps of Cadets Honor Code by submitting the false PT test results. (*See* Report at 146-147).

Finally, although the "Summary of the Investigation" mentions the written report from ██Doe██ 's expert witness, it omits the fact that the expert, Dr. Reagan Wetherill, Ph.D., is a faculty member at an Ivy League medical school (the University of Pennsylvania Perelman School of Medicine), and that Dr. Wetherill's report (which is dated April 15, 2024) is consistent with the above-mentioned Virginia Tech Title IX training materials on alcohol-induced blackouts (which are dated April 30, 2024). The "Summary of the Investigation" also fails to note that Dr. Wetherill refutes ██Cadet DM██ 's claim that ██Cadet DM██ "sober[ed] up a lot" when she threw up at the end of ██Roe██'s party. (*See* Report at 53-54). Dr. Wetherill notes that throwing up does not cause an intoxicated person to sober up.[10]

**b. The "Summary of the Investigation" omits facts that refute ██Cadet DM██'s statements about ██Roe██ falling out of bed.**

The "Summary of the Investigation" says "██Cadet DM██ stated she did not believe ██Doe██ when he told her ██Roe██ fell out of the bed because," among other things, if ██Roe██ had fallen out of the bed, the noise would have woken up ██Cadet DM██ (Report at 10). But the "Summary of the Investigation" omits the fact that ██Cadet DM██ was wearing "noise-cancelling headphones" at the time, (Report at 20, 21), and that ██Cadet DM██ also said that ██Roe██ had in fact fallen out of bed a few days before the party, (Report at 55).

**c. The "Summary of the Investigation" omits one of ██Cadet CP██' statements about ██Roe██'s level of intoxication.**

---

[10] Dr. Wetherill states: "When a person vomits during or after alcohol consumption, the alcohol in the person's stomach is purged from the body; however, the alcohol that has already been absorbed into the bloodstream or is being metabolized remains. As such, the person is not 'sobering up,' but rather, the person's blood alcohol level will not increase as high as it would have from the alcohol that was previously in the stomach." (Report at 123).

13

VT-000342

The "Summary of the Investigation" notes that ▮Cadet CP▮ told VTPD that "both ▮Doe▮ and ▮Roe▮ seemed like they had obviously been drinking and were intoxicated to some degree." (Report at 13, 14). But the "Summary of the Investigation" omits the fact that ▮Cadet CP▮ also told VTPD that ▮Roe▮'s "demeanor" when she walked him home was "a little 'loose and giggle.'" (Report at 70).

**4. Response to "Points of Agreement and Disagreement" (Report at 14-15).**

The "Points of Agreement and Disagreement" says there "is disagreement between the parties on whether bruises were present on ▮Roe▮ the following day, and if so, whether they were caused by any non-consensual activity." (Report at 14). However, ▮Roe▮ does not allege that ▮Doe▮ (or anyone else) caused the purported bruises, let alone that the bruises were caused by sexual activity (consensual or non-consensual).

Dated: June 17, 2024

Respectfully submitted,

▮John Doe▮
Respondent

14

VT-000343