# EXHIBIT 18

**VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY**
**OFFICE OF STUDENT AFFAIRS**

| | | |
|---|---|---|
| Jane Roe , | ) | |
| Complainant, | ) | |
| | ) | Case No. 2024348902 |
| vs. | ) | |
| | ) | |
| John Doe , | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| | ) | |

## (CORRECTED) APPEAL OF FINAL HEARING OUTCOME IN
## TITLE IX/OFFICE OF STUDENT CONDUCT CASE

I, Appellant/Respondent John Doe , submit this appeal of the Final Hearing Outcome ("FHO") finding that I am responsible for violating the Virginia Tech Title IX policy on sexual assault. The grounds for this appeal are (1) the FHO's findings are arbitrary; (2) the Office of Student Conduct recently provided me with significant and relevant new information that was not available at the time of the hearing; and (3) the Office of Student conduct denied me at least two of my procedural guarantees. Based on these grounds, the Appellate Officer should vacate the FHO's finding against me.

To make this submission easier to read, I will refer to myself in the third person (as " Doe and I will refer to the Complainant, Jane Roe , as 'Roe."

### INTRODUCTION

It is undisputed that Roe and Doe engaged in sexual intercourse in Roe 's dorm room late on the night of September 17, 2023, after they and three other students had been drinking in the dorm room. But Roe claims to have no memory of the incident, and therefore claims that she must

1

VT-000580

have been "incapacitated" and unable to provide consent, whereas Doe claims that Roe gave verbal consent to the sexual intercourse.

To find Doe responsible for the alleged policy violation (sexual assault – rape), the Hearing Officers had to find by a preponderance of the evidence that (1) Roe was "incapacitated" at the time of the sexual intercourse, and (2) Doe "should have known that Roe was 'incapacitated'" at the time of the sexual intercourse.

Although the FHO finds Doe responsible, the Appellate Officer should vacate that finding because it is arbitrary for at least four reasons.

*__First__*, the finding that Roe was "incapacitated" is arbitrary because it ignores evidence contradicting its position. For example, the FHO ignores the statements and testimony of Cadet MS ▇, the only party attendee who said he was not intoxicated at the party, that Roe did not appear to be intoxicated, let alone "incapacitated." As another example, the FHO ignores the unrebutted written statement from Doe 's expert witness, a faculty member at an Ivy League medical school, that the evidence in this case does not support a finding that Roe was "incapacitated."

*__Second__*, the finding that Roe was "incapacitated" is arbitrary because it is not reasonably explained. The FHO finds that Roe was "incapacitated" based on a combination of factors. But the FHO does not explain why any of those factors (let alone a combination of those factors) established by a preponderance of the evidence that Roe was "incapacitated."

*__Third__*, the finding of responsibility is arbitrary because it does not find that Doe should have known that Roe was "incapacitated." The FHO finds that Doe should have known that Roe was "intoxicated." But that is not the applicable standard under Virginia Tech policy. Moreover, even if that was the applicable standard, the FHO does not reasonably explain why Doe should have known that Roe was "intoxicated."

2

VT-000581

*__Fourth__*, the finding is arbitrary because it holds the male witnesses who testified to a higher standard for credibility than it holds the females witnesses who testified. For example, the FHO ignores the testimony of Cadet MS (who was sober at the party and who testified that Roe did not appear intoxicated, let alone incapacitated) while it fully credits the testimony of Cadet DM (who was so drunk at the party that she threw up and who gave testimony at the hearing on the key issue (Roe's demeanor) that flatly contradicted the two statements she gave to investigators).

The Appellate Officer should also vacate the FHO because the Office of Student Conduct has provided Doe with significant and relevant new information that was not available to him at the hearing. During the hearing, it was discovered that the Office for Equity and Accessibility (OEA) had failed to include in its Investigation Report a statement that Cadet DM made to the Virginia Tech Police Department (VTPD) about the alleged incident. The Office of Student Conduct provided the statement to Doe when it provided the FHO to him. That statement would have been helpful to Doe at the hearing because it indicates that Roe had less to drink on the night in question than she claimed, it contradicted Cadet DM's hearing testimony as to why Cadet DM believed Roe was intoxicated, and it shows that Cadet DM could not accurately recall who was in the room at the point in time when Roe went to bed (which increases the likelihood that Cadet DM was so intoxicated at that point that her testimony is not credible)

Finally, the Appellate Officer should vacate the finding of responsibility because Doe was denied at least two procedural guarantees: (1) the right to have his Advisor question all the witnesses who testified at the hearing; and (2) the right to present evidence, including a witness.

VT-000582

**APPLICABLE POLICY**

Virginia Tech policy defines "rape" as including "penetration, no matter how slight, of the vagina or anus of a person with any body part … without the consent of the victim."[1] Virginia Tech policy states that "consent" cannot be given by a person who is "incapacitated."[2]

Virginia Tech policy defines "incapacitation" as follows: "Physical or mental inability to make informed, rational judgments. Incapacitation includes but is not limited to being asleep, being unconscious, and the inability to make decisions due to the voluntary or involuntary use of alcohol or drugs."[3] In other words, and as the Appellate Officer knows from her Title IX decision-maker training, "incapacity" is not synonymous with "intoxicated." *See* PowerPoint presentation titled "Title IX Higher Education Decision-Maker, Virginia Polytechnic and State University" (hereinafter "Decision-Maker PowerPoint") at slide 31 (Apr. 30, 2024) (stating, "Incapacity $\neq$ impaired, drunk, intoxicated, or under the influence").[4]

Moreover, the fact that a complainant has no memory of an incident does not mean that the complainant was "incapacitated." *See* Decision-Maker PowerPoint at slide 32 (stating, "Blackout $\neq$ incapacitation (automatically)"). Therefore, decision-makers must determine if there is other "evidence of incapacity." *Id*. at slide 33. Such evidence can include "slurred speech," "shaky equilibrium; disorientation," "passing out/unconsciousness," and "throwing up." *Id.*

---

[1] Policy No. 1026, *Policy on Title IX Sexual Harassment and Responsible Employee Reporting* at 5 (Nov. 1, 2022 Rev.).

[2] *Id.* at 4.

[3] *Student Code of Conduct* at 7 (Aug. 18, 2023).

[4] In accordance with federal law, *see* 34 C.F.R. § 106.45(b)(1)(iii) (Aug. 14, 2020), this PowerPoint presentation is posted on Virginia Tech's website. *See* https://oea.vt.edu/title-ix-vawa/titleix_training.html (last accessed Aug. 3, 2024). And because "decision-makers" include Hearing Officers and Appellate Officers, *see* 34 C.F.R. § 106.45(b)(8)(iii)(B) (Aug. 14, 2020), the PowerPoint presentation is not "new information." Rather, it is information the Hearing Officers and Appellate Officer learned during their training to be decision-makers in Title IX cases.

4

VT-000583

A respondent cannot be held responsible for violating the "rape policy" on a finding that the complainant was "incapacitated" unless the respondent knew or reasonably should have known that the complainant was "incapacitated." *See* Decision-Maker PowerPoint at slide 34 (stating there is "no policy violation" if "the respondent did not know, and the respondent would not have reasonably known of the complainant's incapacity").[5]

Finally, Virginia Tech Hearing Officers use the "preponderance of the evidence" standard "to determine whether or not the respondent is responsible for the alleged conduct."[6] Under that standard, the respondent cannot be found responsible unless the "information presented in the investigation report and at the hearing" establishes that "it is more likely than not that a violation occurred."[7]

---

[5] Of course, it is inconceivable that Virginia Tech would have a policy that could label a respondent a "rapist" where the respondent neither knew nor should have known that the complainant was incapacitated. Under both federal and state law, an accused cannot be found to have committed rape based on allegations that the purported victim was incapacitated unless the accused knew or should have known that the purported victim was incapacitated. *See* Va. Code. § 18-2-67.10(3) (defining incapacitation in the context of sexual assault as "the condition of the complaining witness existing at the time of the [alleged assault] which prevents the complaining witness from understanding the nature or consequences of the sexual act [at issue] ***and about which the accused knew or should have known***") (emphasis added); *United States v. Rouillard*, 740 F.3d 1170, 1171 (8th Cir. 2014) (holding that accused could not be found to have violated the federal rape statute under an incapacitation theory unless "the defendant knew that [the purported victim] was incapable of appraising the nature of conduct"). And a federal court would likely find that such a policy violates a student's rights to due process under the United States Constitution and Virginia Constitution. *See Baum v. Doe*, 903 F.3d 575, 585 (6th Cir. 2018) (noting the "critical facts" in a Title IX case were whether the complainant was "too drunk to consent to have sex" and whether the respondent "knew or should have known as much").

[6] Policy No. 1026 at 8.

[7] *Ibid.*

5

VT-000584

**UNDISPUTED FACTS**

**A.** ██Roe██ **and** ██Doe██ **'s relationship prior to September 17, 2023.**

██Doe██ and ██Roe██ met during their freshmen year at Virginia Tech, which was the 2022-23 school year. They were both enrolled in the Corps of Cadets and the Air Force ROTC program. (Investigation Report at 6).

Although they never "dated," ██Doe██ and ██Roe██ described their relationship as "friends with benefits." (██Doe██ Testimony, Tr. 208:14-19; ██Roe██ Testimony, Tr. 194:16-24).[8] This included ██Doe██ and ██Roe██ "making out," ██Roe██ performing fellatio on ██Doe██ in a classroom on campus, and ██Doe██ stimulating ██Roe██'s vagina with his hand. (██Doe██ Testimony, Tr. 34:23 – 35:25; ██Roe██ Testimony, Tr. 240:5-22). ██Roe██ also texted to ██Doe██ "selfie" photographs of herself wearing only a bra and her Corps of Cadets camouflage pants. (Photos, Investigation Report at 150).

**B. The party in ██Roe██'s dorm room on September 17, 2023.**

On the night of Sunday, September 17, 2023, ██Roe██ hosted a party in her Corps of Cadets dorm room. (██Roe██ Statements, Investigation Report at 105, 171). The party was attended by four other persons, all of whom were also members of the Corps of Cadets—██Cadet DM██ (██Roe██'s roommate), ██Cadet MS██, ██Cadet CP██, and ██Doe██ (██Roe██ Statement, Investigation Report at 171). ██Roe██ and all her guests were under 21 years old at the time. (██Roe██ Statement, Investigation Report at 173).

All the cadets drank alcohol while at ██Roe██'s party. (██Roe██ Statement, Investigation Report at 172). ██Cadet DM██ and ██Doe██ became intoxicated. (██Cadet DM██ Testimony, Tr. 79:20; ██Doe██ Testimony,

---

[8] Citations to "Tr." are citations to the transcript of the Title IX hearing in this case. "Tr. 194:16-24" means page 194, lines 16 to 24. The same format for citations to the transcript are used throughout the remainder of this appeal. (The transcript is not "new information." It is simply a written version of the information that is included on the audio recording of the hearing. The transcript was prepared by a professional court reporting service at ██Doe██'s request).

6

VT-000585

Tr. 37:21). [Cadet DM] vomited in the dorm room (not a bathroom). ([Cadet DM] Testimony, Tr. 97:8 – 98:10). And [Roe] used [Doe]'s phone to send text messages to one of [Doe]'s roommates to tell him that [Doe] was going to spend the night in her room because he was too drunk to walk back to [Doe]'s room, which was in a different dorm. ([Roe] Testimony, Tr. 177:6 – 177:10; [Cadet DM] Testimony; Tr. 58:13-15; Text Messages, Investigation Report at 84-87).

Before going to bed for the night, [Roe] walked [Cadet CP] back to his dorm. ([Roe] Statements, Investigation Report at 105, 171). [Cadet MS] remained in [Roe]'s room with [Doe] and [Cadet DM] while [Roe] walked [Cadet CP] home. ([Cadet DM] Testimony, Tr. 109:24 – 110:4). Shortly after [Roe] returned, [Cadet MS] left the room and went back to his dorm room. ([Cadet MS] VTPD Statement, Investigation Report at 60). Shortly after [Roe] returned to her room, she got into her bed with [Doe] and [Cadet DM] got into her own bed. ([Cadet DM] OEA Statement, Investigation Report at 51). [Cadet DM] wore noise-cancelling headphones (called "beats") with music playing so that she would not hear any noise in the room. ([Cadet DM] Statement VTPD at 2).[9] After [Cadet DM] fell asleep, [Doe] and [Roe] had sexual intercourse. ([Doe] Testimony, Tr. 39:14 – 41:7).

**C. [Roe]'s 2:00 a.m. trip to the bathroom.**

[Roe]'s dorm room was across the hall and two doors down (approximately ten feet) from the women's community bathroom. ([Cadet DM] Testimony, Tr. 98:9-10; [Cadet MS] Testimony, Tr. 159:9-21; [Doe] Statement, Investigation Report at 40).

---

[9] [Cadet DM]'s statement to VTPD was not included in the Title IX Investigation Report. [Doe] did not learn that VTPD had interviewed [Cadet DM] until [Cadet DM] mentioned the interview during her hearing testimony. ([Cadet DM] Testimony, Tr. 91:17 – 92:19). The Office of Student Conduct provided a copy of the VTPD's summary of the interview to [Doe] on the day it sent the FHO to [Doe] (August 1, 2024). A copy of that summary is provided to the Appellate Officer with this appeal.

7

VT-000586

At approximately 2:00 a.m. on September 18, 2023, Roe went to the women's community bathroom. ( Cadet SJ OEA Statement, Investigation Report at 67). Roe was not wearing any clothes at the time. (*Ibid*). She was holding a white shirt in front of her and carrying her student ID card, which she needed to be able to get back into her room after going to the bathroom (to enter a dorm room, a student must use both her student ID and punch in a four-digit pass code). (*Ibid.;* Cadet DM Testimony, Tr. 104:7-14).

Another female cadet, Cadet SJ , went to the bathroom at the same time and saw Roe in the hallway and in the bathroom. (Cadet SJ OEA Statement, Investigation Report at 67). Cadet SJ then saw Roe go back into her room. (*Ibid*.) Cadet SJ reported the incident to the Corps of Cadets. (*Ibid*.) When an investigator later asked if Roe appeared intoxicated, Cadet SJ told the investigator that "she did not speak with Roe but Roe "appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner." (*Id.* at 68). Cadet SJ told the investigator that "the only thing that would have made her think Roe may have been intoxicated was that Roe did not say anything about her appearance." (*Ibid.*).

**D. The morning after Roe's party.**

Doe Roe and Cadet DM woke up (around 6:00 a.m.) on Monday, September 18 because all three had to attend the Corps of Cadet's morning formation at 7:00 a.m. ( Doe Testimony, Tr. 41:19 – 42:2).

During the morning formation, Roe was directed to go speak to one of the Corps of Cadets staff because of the report that Cadet SJ had filed about Roe being naked in the hallway. (Cadet DM VTPD Statement at 2). Roe blamed her actions on the fact that she had been drinking. (Roe Statement to Corps of Cadets, Investigation Report at 105). And she claimed that she had been so

8

VT-000587

drunk that she could not remember anything after approximately 11:30 pm on the night of the 17th. (*Ibid*).

**E. Roe's behavior toward Doe during the four-plus weeks following her party.**

Text messages and other evidence show that during the four-plus weeks following Roe's party, Roe's engaged in behavior toward Doe that was inconsistent with Roe's later claim that she believes Doe sexually assaulted her.

- On the afternoon of September 18, Roe accepted an invitation from Doe to help him with some ROTC projects. (Text Messages, Investigation Report at 75).

- On September 20, Roe asked Doe if she would stand in for her as the ROTC physical fitness officer that day. (Text Messages, Investigation Report at 76).

- Sometime during the week of or after the party, Doe and Roe had dinner together at the Waffle House. (Roe Testimony, Tr. 223:3-9; Doe Testimony, Tr. 221:6-9).

- On September 24, Roe texted Doe's older cousin AL whom she had never met in person, to ask if he would give her a ride to the airport when he was in Blacksburg visiting Doe the first weekend of Thanksgiving break. (Text Messages, Investigation Report at 89). Roe's text began with the words, "Hey! This is j Doe's friend Roe (*Ibid*.) Roe also said she would like to hang out with AL and Doe when AL was in town. (*Ibid*.)

- On September 29, Roe sent Doe $5.00 via the Venmo payment app to repay Doe money he had lent her during an ROTC field trip that day. Roe wrote "Sugar baby" in the subject line of the payment. (Venmo Screenshot, Investigation Report at 97).

- On October 7, Roe and Doe engaged in an extended text conversation as part of their (successful) effort to purchase alcohol and sneak it into Roe's dorm room. (Text Messages, Investigation Report at 79-82).

- On October 8, Roe and Doe's cousin AL communicated again via text. (Text Messages, Investigation Report at 91). During those texts, AL and Roe made good-natured jokes about Doe (*See, e.g., Ibid.* ( AL "It's blinding how white his face is!" Roe "He gotta hop in a tanning bed sometime. Or get his hermit ass outside [emoji of smiling face with tears of laughter]'").

- On October 12, Roe texted Doe "Hey how are you doing?" (Text Messages, Investigation Report at 82).

VT-000588

- On October 21, [Roe] texted [Doe] to ask him if he was going to McDonald's. (Text Messages, Investigation Report at 83).

## F. [Roe]'s complaint against [Doe] and the OEA investigation.

### 1. [Roe]'s statements to VTPD and the Corps of Cadets.

On November 1 and 6, [Roe] met with VTPD and alleged that [Doe] had sexually assaulted her on September 17 (the night of her party). ([Roe]'s Statements to VTPD, Investigation Report at 18). [Roe] told VTPD that when she woke up on the morning of the 18th [Doe] was in her bed and he told her they had sex, but that she did not remember having sex with him. (*Ibid.* ("The victim did not remember what happened the night prior and when the suspect woke up he told her they had sex.")).

When VTPD asked [Roe] what the last thing she remembered from the night of the 17th was, [Roe] stated "the last thing she remembered was sitting on the floor listening to music and talking with all five" persons at the party. (*Id.* at 19). She said that someone else told her that she walked [Cadet CP] back to his room, but that she had no memory of doing that. (*Id.*). [Roe] told VTPD that it would be ok for them to speak with [Cadet DM] about the party, but that she did not want them to speak with [Cadet MS] or [Cadet CP] (*Id.* at 19, 21).

When VTPD asked [Roe] about her previous interactions with [Doe] she said that "she was friends with" [Doe] but "was never in a relationship with him." (*Id.* at 18). When VTPD asked [Roe] if she had any text messages with [Doe] she said that all her texts with [Doe] were via Snap Chat and therefore had been automatically deleted. (*Id.* at 21).

After her initial meeting with VTPD, [Roe] filed a formal Title IX complaint against [Doe] (Investigation Report at 5). [Roe] declined to make a statement to OEA and instead asked OEA to rely on her statements to VTPD. (*Ibid.*).

10

VT-000589

During its investigation (at Doe's request), OEA obtained a transcript of a Corps of Cadets interview of Roe regarding Roe's party. (Roe Corps of Cadets Interview, Investigation Report at 171). During that interview, Roe stated that the last thing she remembered from the night of September 17 was sitting in a circle in her room with everyone at the party. (*Ibid.*).

**2. Cadet DM's statements to VTPD, OEA, and the Corps of Cadets.**

VTPD interviewed Cadet DM on November 17. (Cadet DM VTPD Statement). OEA interviewed Cadet DM on December 7. (Cadet DM OEA Statement, Investigation Report at 51).

Cadet DM told both VTPD and OEA that on the night of September 17 Roe gave no sign she was intoxicated until she accidentally took Doe's phone with her instead of Roe's phone when she walked Cadet CP back to his room. (Cadet DM VTPD Statement at 1 (Cadet DM stated that she did not think Roe was very intoxicated until Roe walked Cadet CP back to his room and accidentally took Doe's phone instead of her own."); Cadet DM OEA Statement, Investigation Report at 54 ("Cadet DM stated, 'she didn't think Roe was that intoxicated until she ended up walking Cadet CP back to his dorm.' Cadet DM explained that 'Roe keeps her [student ID] on the back of her phone, and she grabbed Doe's phone when she left.' Cadet DM stated that when she realized what Roe did, she knew Roe 'needed to stop drinking because she took the wrong phone.'")). But at the hearing, Cadet DM conceded that she had not known that Roe had been using Doe's phone to send texts to Doe's roommate. (Cadet DM Testimony, Tr. 104:17-24).

Cadet DM told OEA that she was intoxicated at the party but that at the end of the night "she did a cartwheel, and it caused her to throw up, which made her sober up a lot." (Cadet DM OEA Statement, Investigation Report at 53-54). Cadet DM told VTPD and OEA that Cadet MS did not appear to be intoxicated at the party. (Cadet DM OEA Statement, Investigation Report at 54 ("Cadet DM stated Cadet MS had 2, maybe 3 Busch lights and 1 high noon, but did not seem intoxicated at all."); Cadet DM

11

VT-000590

VTPD Statement at 1 ("I asked Cadet DM how Cadet CP and Cadet MS seemed when they left and she replied that Cadet CP seemed really intoxicated and Cadet MS seemed fine.")).

Cadet DM told VTPD that Cadet MS left the room *before* Roe returned to the room. (Cadet DM VTPD Statement at 1 ("Cadet DM stated that around 23:00 Roe walked Cadet CP back to his room and Cadet MS left before Roe returned.")). But Cadet DM told OEA that Cadet MS did not leave the room until *after* Roe returned. (Cadet DM OEA Statement, Investigation Report at 51). And Cadet DM conceded at the hearing that Cadet MS was still in the room when Roe returned. (Cadet DM Testimony, Tr. 109:24 – 110:4 (Q. "And Cadet MS was still in the room when Roe got back from walking Cadet CP back to Cadet CP's room; correct?" A. "Correct.").

During its investigation (at Doe 's request), OEA obtained a transcript of two Corps of Cadets interviews of Cadet DM regarding Roe's party. (Cadet DM Corps of Cadets Interviews, Investigation Report at 168-170). During one of those interviews, Cadet DM said that Cadet MS left the room *before* Roe returned. (*Id.* at 168 ("Maybe I'd say two hours later my roommate walked Cadet CP back to his room. And Cadet MS left the room while my roommate was gone.")).[10]

### 3. Cadet MS's Statements to VTPD and OEA.

VTPD interviewed Cadet MS on February 5, 2024. (Cadet MS VTPD Statement, Investigation Report at 59). OEA interviewed Cadet MS on March 20, 2024. (Cadet MS OEA Statement, Investigation Report at 62).

Cadet MS agreed with Cadet DM that he was not drunk at the party. (Cadet MS VTPD Statement, Investigation Report at 61; *see also* Cadet MS Testimony, Tr. 140:18-19 (Q. "Would you consider yourself intoxicated that night?" A. "No, not at all.")).

---

[10] The second Corps of Cadets interview did not address when Cadet MS left the room.

VT-000591

**Cadet MS** told VTPD and OEA that **Roe** did not appear to be intoxicated at the party. ( **Cadet MS** VTPD Statement, Investigation Report at 61 ("I asked **Cadet MS** how **Roe** seemed when he left and he replied that she seemed normal."); **Cadet MS** OEA Statement, Investigation Report at 65 (stating that **Cadet MS** said **Roe** was "perfectly fine" when she returned from walking **Cadet CP** home")). In fact, **Cadet MS** noted that when **Roe** returned to the room she cleaned up **Cadet DM**'s vomit. ( **Cadet MS** OEA Statement, Investigation Report at 65).

### G. The Title IX hearing.

The Office of Student Conduct held the hearing in this case on June 24, 2024. The Hearing Officers heard live testimony from five witnesses: **Roe** **Doe** **Cadet DM** **Cadet MS** and Dez Twigger (the OEA investigator for this case).

#### 1. **Roe**'s testimony.

Although **Roe** said during the investigation that the last thing she remembered from the night of the 17th was sitting on the floor in a circle with the other attendees, **Roe** testified at the hearing that the last thing she remembered from that night was using **Doe**'s phone to send a text to one of **Doe**'s roommates to say that **Doe** would be spending the night in her room. ( **Roe** Testimony, Tr. 178:7-12).

At the hearing, **Roe** gave inconsistent testimony about whether she and **Doe** had a conversation on the morning of September 18 and the contents of any such conversation. (*See* **Roe** Testimony, Tr. 186:19-24 ("I remember briefly having a conversation. I could not tell you the contents of this conversation as I was still pretty – I didn't feel great, and then I had just also woken up."); *id.* at 187:4-7 ("I don't remember if we had a conversation or not. I remember saying something along the lines of, you know, 'Get back to your room, change for formation, don't be

13

late.' And that was it."); *id.* at 197:9-10 ("I don't remember having a conversation with Mr. Doe that morning.").

Roe also testified that she was unable to recall details regarding other conversations and interactions she had with Doe and others in the weeks following her party. For example, although she remembered going out to dinner with Doe the first or second week following her party, she could not remember anything that she and Doe talked about while they were having dinner. (Roe Testimony, Tr. 223:4-19 (Q. "Did you go to the Waffle House with Doe after this incident?" A. "I do remember us going. I don't remember if it was the week of or the week after, but I do remember sometime we had gone to the Waffle House." Q. "And then do you remember anything about that conversation or what you guys talked about?" A. "Not that I can think of. Sorry. Not that I can think of. I remember it being a little bit awkward and kind of like strained, but I don't remember the contents of any conversation that we did have."). As another example, Roe testified that although she and Doe drank alcohol together on a recent occasion other than her party on September 17, she could not recall whether that other occasion occurred before or after September 17. (Roe Testimony, Tr. 176:6 – 177:5).[11]

As discussed above, text messages show that the other occasion of Roe and Doe drinking together around that time occurred about three weeks after September17. (Text Messages, Investigation Report at 79-82). Incredibly, the Hearing Officers did not ask Roe *why* she went to dinner with Doe and drank alcohol with Doe after September 17 if she thought Doe had

---

[11] (*See also id.* at 198:12-18 (Q. "Can you talk to me about what the [later] conversation [with Doe looked like? Was that in person or on Snap Chat? What was that?" A. "Like I said, I don't particularly remember because it was so long ago, and I've had a lot of conversations with a lot of people since then. But I think it was a mix of both."); 199:24-25 ("I don't remember word-for-word verbatim what I did say"); 229:10-22 (Roe testifying that she did not know "for sure" who told her that she walked Cadet CP back to his room, but that she believes it was either Cadet DM or Cadet CP

VT-000593

sexually assaulted her. And Doe 's Advisor was unable to ask Roe those questions because Roe chose to stop answering questions before Doe 's Advisor had finished cross-examination. (Roe Testimony, Tr. 242:7-8).

**2. Doe 's testimony.**

Doe testified that Roe gave verbal consent to all acts of sexual intercourse between her and him on the night in question. (Doe Testimony, Tr. 39:14 – 41:7). He also testified that at the time they had sex he did not know that Roe was intoxicated. (*Id.* at 210:3-6).

**3. Cadet DM 's testimony.**

As discussed above, during the investigation Cadet DM told both VTPD and OEA that on the night of September 17 Roe gave no sign she was intoxicated until she accidentally took Doe 's phone with her instead of Roe 's phone when she walked Cadet CP back to his room. At the hearing, Cadet DM testified that (1) the OEA investigator gave her a draft of the interview summary to review for accuracy, (2) she did review the summary for accuracy, and (3) she did not ask the OEA investigator to make any changes to the summary.[12]

At the hearing, Cadet DM offered a completely new basis for her opinion that Roe was affected by alcohol on the night of September 17. When asked how Roe "appear[ed] after drinking alcohol" that night, Cadet DM stated: "She definitely seemed out of it. I didn't know how intoxicated she was because this was the first time me and Roe had ever drank together, but I could definitely tell that she was not completely herself. She was just kind of zoning out, staring at stuff throughout the night." (Cadet DM Testimony, Tr. 59:14-20).

---

[12] (*See* Cadet DM Testimony, Tr. 93:3-18 (Q. "Did Ms. Twigger email you a copy [of the summary] and give you a chance to make any corrections?" A. "Yes." Q. "Did you make any corrections?" A. "I did not." Q. "Did you review it to see if it needed to be corrected?" A. "I did.")).

15

VT-000594

In any event, as discussed above, under Virginia Tech policy "intoxicated" is not synonymous with "incapacitation." And Cadet DM did not give any testimony from which a reasonable fact finder could conclude by a preponderance of the evidence that Roe was "incapacitated," let alone that Roe was "incapacitated" by the time she went to bed with Doe

To the contrary, Cadet DM testified that Roe did *not* show some of the potential signs of "incapacitation." For example, Virginia Tech's Title IX training materials state that "slurred speech" is a potential sign of "incapacitation,"[13] and Cadet DM testified that she does not believe that Roe slurred her speech. (Cadet DM Testimony, Tr. 79:16-21 (Q. "At any point, when you were all talking, did Roe ever have like slurred speech?" A. "Not that I can remember. I again, was also intoxicated, but I do not think so.")). As another example, Virginia Tech's Title IX training materials indicate that difficulty walking is a potential sign of "incapacitation,"[14] and Cadet DM testified that Roe did not have difficulty walking. (*Id.* at 78:25 – 79:2 (Cadet DM stating, "[Roe could walk, so like mentally I thought since she could still walk decent, she wasn't that intoxicated.")). Virginia Tech's Title IX training materials also state that "throwing up" is a potential sign of "incapacitation,"[15] and Cadet DM testified that she knew of no evidence that Roe threw up. (*Id.* at 110:19 – 120:3 (Q. "Did anyone [other than you] throw up that night, that you saw?" A. "No, not that I saw." Q. "Did anyone tell you they threw up?" A. "No.")).

Cadet DM added that, "[Roe was just a little bit out of it, disoriented. Again, picking up other people's phones." (Cadet DM Testimony, Tr. 79:3-5). When a Hearing Officer asked her, "Besides picking up other people's phones, how – when you say 'disoriented,' what gave you the

---

[13] (*See* Decision-Maker PowerPoint at slide 33).

[14] (*See* Decision-Maker PowerPoint at slide 33 (stating a "shaky equilibrium" is a potential sign of "incapacitation").

[15] (*See* Decision-Maker PowerPoint Presentation at slide 33).

16

VT-000595

idea that she was disoriented?" Cadet DM responded, "Well, her eyes. She would kind of just give me like a blank stare when we weren't like actively talking. And that was basically it. She was sitting on the floor most of the night, and she was kind of just staring at the floor when we weren't talking." (*Ibid.* at 79:6-15).

But as discussed above, Roe's sitting on the floor occurred *before* she walked Cadet CP back to his room, and Cadet DM told *both* VTPD and OEA that she did not think Roe was intoxicated until she noticed that Roe took Doe 's phone *after* Roe left the room to walk Cadet CP home. (Cadet DM VTPD Statement at 1; Cadet DM OEA Statement, Investigation Report at 54). Cadet DM offered no explanation for this inconsistency. (Cadet DM Testimony, Tr. at 105:14-20 (Q. "You didn't tell Ms. Twigger that Roe seemed to be zoning out or was – had expressions in her eyes or face that made it seem like she was out of it, did you?" A. "I did not.")). And the fact that Roe was able to walk back to her room alone after walking Cadet CP home is inconsistent with a finding that Roe was "disoriented." *See* [Cambridge Dictionary (online)](#) (defining "disoriented" as "confused and not knowing where to go or what to do"). Moreover, Cadet DM implicitly conceded that Roe's conduct with respect to going to the women's room at 2:00 a.m. was inconsistent with a finding that Roe was "disoriented." (Cadet DM Testimony, Tr. 104:7-14 ("Q. "So when Roe went to the women's room early in the morning of September 18th, she would have had to have had the wherewithal to take her [student ID] and then use that plus the four-digit code to get back into her room; correct?" A. "Correct.").

Finally, Cadet DM conceded that her own intoxication affected her memory of the events of September 17. (*See* Cadet DM Testimony, Tr. 84:15 – 85:7 (Q. "Back in October you told [the Corps of Cadets] you had three High Noons and three or four Bush Lights, and you didn't mention BuzzBallz. But earlier today you said you had a couple of beers and one-and-a-half BuzzBalls.

17

VT-000596

So which is it?" A. "Both are correct. I left out the BuzzBallz. I probably forgot. We were intoxicated that night." Q. "So your – your memory from that night is affected by the fact that you were intoxicated? A. "Yes. Pertaining to the – how much I drank.")). Indeed, Cadet DM said that before she threw up (which she said occurred when Roe was walking Cadet CP to his room), she was "out of it" and had "brain fog" from drinking. (*Id.* at 100:4-12, 101:21-24; 110:11-12).[16]

**4.** Cadet MS **'s testimony.**

Cadet MS 's testimony at the hearing was consistent with his statements to VTPD and OEA. Cadet MS testified he was not intoxicated at the party and Roe did not appear to be intoxicated. (Cadet MS Testimony, Tr. 140:17-20, 141:10-16). In testifying that Roe did not appear to be intoxicated, he noted that Roe was able to walk Cadet CP back to his dormitory and then return to her room without being stopped by any RAs. (*Id.* at 142:1-9). He also noted that Roe "was able to clean up all [Cadet DM 's] vomit and take care of Cadet DM on her own." (*Id.* at 142:10-14).

Moreover, Cadet MS testified that Roe did not show any of the potential signs of "incapacitation" identified in Virginia Tech's Title IX training materials. (*See* Cadet MS Testimony, Tr. 158:4-10 (Q. "At any point did it seem like she was not able to understand what people were saying to her?" A. "She looked like she was able to comprehend everything that anybody was saying to her."); 158:11-17 (Q. "And I think you wrote in your written statement that she was not slurring her speech; is that correct?" A. "She was not slurring her speech that night."); 158:18-23

---

[16] As discussed above, by the time of the hearing, Roe had learned that Doe had documentary evidence that on the night of September 17 Roe took Doe 's phone and used it to send several texts to Doe 's roommate from 10:16 p.m. to approximately 11:22 p.m. (*See* Text Messages, Investigation Report at 84-87). And given that Roe and Cadet DM are "close friends" (Cadet DM Testimony, Tr. 119:14-24), it seems likely that Cadet DM was also aware of that fact by the time of the hearing. So, Cadet DM had a motive to testify that something other than Roe 's taking Doe 's phone indicated to her that Roe was intoxicated.

18

(Q. "And did you see her ever having trouble walking?"  A. "No, I did not see any trouble in her walking."); 158:24 – 159:3 (Q. "Did you ever see her passing out?"  A. "No, I did not."); 159:4-8 (Q. "Did you ever see her throwing up?"  A. "No, I did not.")).

**H.  The Final Hearing Outcome.**

Although the FHO is twelve (unnumbered) pages long, it provides little in the way of analysis. In any event, at bottom the FHO concludes it is more likely than not that (1) "Roe was incapacitated due to alcohol consumption" and thus "lacked the capacity to consent" to sexual intercourse; and (2) Doe "should have known that Roe was intoxicated."  (FHO at 11, third paragraph).

<div align="center">ARGUMENT</div>

**A.  The FHO's finding of responsibility against Doe is arbitrary.**

Policy 1026 states that the Appellate Officer may vacate "arbitrary findings."  *See* Policy 1026 at 9.  Although Virginia Tech policy does not define "arbitrary," it does say that an FHO is an "administrative" decision.  *See Student Code of Conduct* at 15.  Federal and Virginia courts have explained that there are several bases upon which an administrative decision can deemed "arbitrary."  At least four of those bases are present in this case.

*__First__*, an administrative decision is "arbitrary" when it "ignores 'evidence contradicting its position.'"  *Delaware Valley Regional Center, LLC v. Dep't of Homeland Security*, 678 F. Supp. 3d 73, 87 (D.D.C. 2023) (quoting *Butte County v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010); *see also, e.g.*, *New Age Care, LLC v. Juran*, 71 Va. App. 407, 428 (2020) (stating an administrative "decision is arbitrary" when it is "taken without consideration or in disregard of facts").

*__Second__*, an administrative decision is "arbitrary" when it is not "reasonably explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

<div align="center">19</div>

VT-000598

*Third*, an administrative decision is "arbitrary" when "the deciding body departed from the appropriate standard in making its decision." *PharmaCann Va., LLC v. Va. Bd. of Pharm.*, 77 Va. App. 208, 220 (2023).

*Fourth*, an administrative decision is "arbitrary" when it treats "similarly situated" persons "differently." *Id.* at 225-226. Indeed, an administrative decision "is at its *most arbitrary* when it treats similarly situated people differently**."** *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1141 (D.C. Cir. 2022) (emphasis added).

1. **The finding that Roe was "incapacitated" is arbitrary because it ignores evidence contradicting its position.**

The FHO finds that "Roe was "incapacitated," and it notes that Virginia Tech policy states the term "incapacitation" means the "physical or mental inability to make informed rational judgments" and "includes but is not limited to being asleep, being unconscious, and the inability to make decisions due to the voluntary or involuntary use of alcohol." (FHO at 10). For at least three reasons, the FHO's finding that Roe was "incapacitated" is arbitrary in that it ignores evidence contradicting its position.

*First*, the FHO ignores Cadet MS's investigation statements and hearing testimony about Roe's demeanor on September 17. During both the investigation and the hearing, Cadet MS stated that Roe did not appear intoxicated. (Cadet MS VTPD Statement, Investigation Report at 61; Cadet MS OEA Statement, Investigation Report at 65; Cadet MS Testimony, Tr. 140:17-20, 141:10-16). And at the hearing, Cadet MS testified that Roe did not show any of the potential signs of "incapacitation" identified in Virginia Tech's Title IX training materials—*i.e.*, it did not appear that Roe was unable to understand what people were saying to her; Roe was not slurring her speech; Roe was not having trouble walking; Roe did not pass out; and Roe did not throw up. (Cadet MS Testimony, Tr. 158:4 – 159:8).

VT-000599

*Second*, the FHO ignores evidence regarding Roe's 2:00 a.m. trip to the bathroom that is inconsistent with the finding that Roe was "incapacitated." Cadet SJ told OEA that Roe "appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner." (Cadet SJ Statement, Investigation Report at 68). And Cadet DM conceded that when Roe left her room to go to the bathroom Roe had "the wherewithal to take her [student ID] and then use that [student ID] plus the four-digit code to get back into her room." (Cadet DM Testimony, Tr. 104:7-14). And to the extent the FHO implies that Roe must have been "incapacitated" because she did not bother to put clothes on before walking to the bathroom (which was only a few feet from her room) at 2:00 a.m. on a Monday, the FHO ignores the fact that Roe engages in risky behavior (even when perfectly sober) and is not shy about showing off her body. Specifically, it is undisputed that Roe performed fellatio on Doe *in a classroom on campus* and that she texted Doe photos of herself wearing only a bra and her Corps of Cadets camouflage pants. (Doe Testimony, Tr. 34:23 – 35:25; Roe Testimony, Tr. 240:5-22; Photos, Investigation Report at 150).

*Third*, the FHO ignores the *unrebutted* written statement from Doe's expert witness, Dr. Wetherill. (*See* Expert Witness Opinion Statement, Investigation Report at 116). Dr. Wetherall is an Associate Professor of Psychiatry at the University of Pennsylvania Perelman School of Medicine and is an expert on "the effects of alcohol use, intoxication, memory processes, and alcohol-related consequences (*e.g.*, alcohol-associated blackouts)." (*Id.* at 118). After reviewing all the evidence that OEA provided to the parties for the 10-day review, Dr. Wetherill concluded that Roe "was not incapacitated by alcohol on the night of September 17 into the morning of September 18, 2023," and that Roe's "behavior and reports of memory loss are consistent with an individual who experienced an alcohol-associated blackout." (*Id.* at 123).

21

VT-000600

**2. The finding that Roe was "incapacitated" is arbitrary because it is not reasonably explained.**

The FHO finds that Roe was "incapacitated" based on a combination of factors: (1) "the amount" of alcohol "Roe consumed" ("8-10 drinks within 2 hours"), (2) Roe's "behavior in the hallway," (3) Cadet DM's statement that Roe "was intoxicated," (4) Roe's claim to have "no memory of the sexual interaction," and (5) the Hearing Officers' determination that Doe was "less credible" than Roe (FHO at 11). But FHO does not explain why any of these factors (let alone the combination of these factors) establishes that Roe met the definition of "incapacitation."

**3. The finding of responsibility is arbitrary because it does not find that Doe knew or should have known that Roe was "incapacitated."**

The FHO correctly notes that *even if* Roe was "incapacitated," Doe can be held responsible for a policy violation only if he should have known that Roe was "incapacitated." (*See* FHO at 10 (stating, "the Hearing Officers must determine if Roe was incapacitated and if Doe *should have known that* Roe *was incapacitated*.") (emphasis added)).

But the FHO does not address whether "Doe knew or should have known that Roe was incapacitated." The FHO finds only that Doe "should have known that Roe was *intoxicated*." (FHO at 11, third paragraph) (emphasis added). Because the FHO does not apply the proper standard, it is, by definition, "arbitrary." *PharmCann Va., LLC*, 77 Va. App. at 220 (stating an administrative decision is "arbitrary" when "the deciding body departed from the appropriate standard when making its decision").

Even if the proper standard was that Doe should have known that Roe was "intoxicated," the FHO does not reasonably explain why Doe should have known that Roe was intoxicated. The only rationale the FHO gives for its finding that Doe should have known that Roe was intoxicated was that he "was present throughout the entirety of Roe's drinking period" and because

22

VT-000601

the five persons in attendance "were drinking in a small residence hall room in very close proximity." (FHO at 11, first paragraph). But the FHO does not identify what, if any, behavior Roe engaged in while the group was drinking that should have put Doe on notice that Roe was "intoxicated." Moreover, the FHO does not explain why Doe should have known that Roe was "intoxicated" when Cadet MS (who was not intoxicated) testified that Roe did not appear to be intoxicated.

**4. The finding is arbitrary because it holds the male witnesses ( Doe and Cadet MS to a higher standard for credibility than it holds the female witnesses (Roe and Cadet DM**

   **a. The FHO holds Doe to a higher standard for credibility than it holds Roe**

The FHO finds that Doe is "less credible" than Roe (FHO at 11) because Doe "provided highly specific details about the sexual encounter *but claimed to remember nothing else from that night or the following morning, citing that it occurred nine months ago.*" (FHO at 10) (emphasis added). The FHO also finds that Doe is "less credible" than Roe because Doe engaged in "*selective disclosure*" by waiting until the hearing to explain how Roe gave consent. For at least three reasons, the emphasized portion of those statements in the FHO are so objectively false, misleading, and/or one-sided that that they can only be explained by a bias against male witnesses and in favor of female witnesses.

*First*, in response to questions by the Hearing Officers, Doe provided many details about the night of Roe's party and about the following morning. (*See* Tr. 209:10-15 (Q. "How much alcohol did you consume on the evening of September 17th?" A. "I do not remember exactly how much I had to drink that night, but it was around three seltzers, two to three beers, and some of a BuzzBall."); 210:3-6 (Q. "Did you know that Roe was intoxicated the night of the incident?" A. "I knew that she consumed alcohol, but I did not know that she was drunk."); 211:9-19 (Q. "How did you get into Roe's bed?" A. "I went up a ladder." Q. "So did – did Roe help you in any way,

23

or did anybody else in the room help you get into the bed?" A. "She was near me. She did not help me, but she was there close by." Q. "So you – you got in the bed by yourself?" A. "Yes."); 219:24 – 220:9 (Q. "Do you remember Roe walking Cadet CP back [to his room]?" A. "Yes, I remember when they left the room together." Q. "Was there a conversation that was had about Roe walking him back or what he did that – did they – what did that look like?" A. "They said they were going to walk back to [his] room, and that's really it."); 211:20 – 212:2 (Q. "You said that Roe fell out of bed. Can you talk to me about that?" A. "I recall her falling out of the bed in the middle of the night. I did not see it happen, but I heard it happen."); 212:7-12 (Q. "Where – where were your bodies [in the bed when Roe fell out of the bed]?" A. "I'm on the innermost side of the bed closest to the wall."); 212:20 – 213:4 (Q. "So she fell out of a lofted bed and you heard it and just went back to sleep? You didn't think to check on her or ask any questions, or anything like that?" A. "She got back into the bed after she fell out and fell back to sleep." Q. "You didn't ask her if she was okay?" A. "I did ask her if she okay, and then I went back to sleep."); 213:8-10 (Q. "Was this before or after the two of you had sexual intercourse?" A. "This was after."); 216:20 – 215:3 (Q. "Do you remember Roe leaving the room in the middle of the night?" A. "Yes. I heard her clock back into her room." Q. "Did you hear her leave?" A. "Yes, but I was also half asleep at the time."); 217:23 – 218:7 (Q. "The next morning it was reported that you asked Roe if she was okay. Did you see any bruises on her body?" A. No, I did not." Q. "Did she mention any soreness to you?" A. "No, she did not." Q. "Did she ask you about what happened the night before?" A. "No, she did not."); 218:17-22 (Q. "Well, tell me about the conversation that took place that morning?" A. "I just asked if she was hungover. We had not talked very much that morning because we had to both go to formation.").

24

VT-000603

***Second***, with respect to the events of the night of Roe's party and the following morning, there were *only two* topics about which Doe said he could not remember due to the passage of time. Doe said he could not remember a conversation other people had at the party about Doe staying the night in Roe's room.[17] And Doe said he could not remember *all* the details about his conversation with Roe when the two woke up in the morning.[18] Moreover, as discussed above, Roe was also unable to remember all of the details of her conversations and interactions with Doe on the morning of September 18 and in the days and weeks following the 18th. (Roe Testimony, Tr. 176:6 – 177:5, 186:19-24, 187:4-7, 197:9-10, 223:3-19).

***Third***, the fact that Doe waited until the hearing to provide details on how Roe gave consent has no bearing on Doe's credibility. Indeed, the Hearing Officers violated federal law and Virginia Tech policy by questioning Doe's credibility because he waited until the hearing to provide those details. Respondents in Title IX proceedings are presumed to be not responsible for the alleged misconduct unless and until a finding of responsibility is made *after* the conclusion of the hearing. *See* 34 C.F.R. § 106.45(b)(1)(iv) (Aug. 14, 2020) (stating that Title IX grievance procedures must "include a presumption that the respondent is not responsible for the alleged

---

[17] *See* Tr. 210:18 – 211:8 (Q. "You stated that Cadet MS suggested that he take you back to your room and that Roe insisted on you spending the night. Can you walk me through that part of the evening?" A. "As stated in the previous statements, I was pretty intoxicated, and it was unsafe for me to go back to my dorm room in fear of getting caught for being – for consuming alcohol. And so other people at the party made the decision for me; I was not the person making the decision there." Q. But do you remember that conversation or what happened there?" A. "No. It was nine months ago.").

[18] *See* Tr. 218:17 – 219:8 (Q. "Well, tell me about the conversation that took place that morning." A. "I just asked if she was hungover. We had not talked very much that morning because we both had to go to formation." Q. "So what exactly was – was said?" A. This was nine months ago. I can't remember exact statements said." Q. "All right. But you just – you gave a very detailed explanation of sex because you said you were fully awake. I'm assuming you were fully awake the next morning and not intoxicated." A. "I assume that we talked about just getting ready for formation and just getting prepared for the day, but I cannot list specifics.").

25

VT-000604

conduct until a determination regarding responsibility is made at the conclusion of the grievance process").[19]  Respondents do not have a burden to present any evidence, including testimony, during the investigation or at the hearing.  *See* 34 C.F.R. § 106.45(b)(5)(i) (Aug. 14, 2020) (stating that "when investigating a formal complaint and throughout the grievance process, a recipient must … ensure that the burden of proof … rest[s] on the recipient and not the parties").  And respondents are "entitled" to "remain silent or participate as they see fit, including full, partial, or no participation."  Policy 1026 at 6.[20]

Even if **Doe** engaged in "selective disclosure" (which he did not), **Roe** engaged in *several* forms of "selective disclosure."  For example, although **Roe** initially submitted to cross-examination by **Doe**'s Advisor, she abruptly halted cross-examination when she decided she had answered enough questions to explain "her truth."  (*See* Tr. 242:7-8 ("I decline to answer any more questions"); Tr. 242: 17-18 ("I think I've said what I need to say about my truth")).  **Roe**'s refusal to submit to full cross-examination at the hearing was, by definition, "selective disclosure."

**Roe** attempted to limit the investigation to witnesses who she believed would be favorable to her case.  (*See* **Roe**'s Statements to VTPD, Investigation Report at 19 (stating that **Roe** told the investigator she did not want him interview **Cadet CP** *id.* at 21 (stating that **Roe** told the investigator that she did not want him to interview **Cadet MS** but that it would be ok for him to interview **Cadet DM**  **Roe**'s attempt to limit the investigation to witnesses favorable to her case was, by definition, "selective disclosure."

---

[19] *See also* Policy 1026 at 3 (stating that Virginia Tech's Title IX procedures "start with a presumption of non-responsibility for the respondent").

[20] At no point during the investigation did Virginia Tech put **Doe** on notice that the Hearing Officers would question his credibility if he waited until the hearing to provide details on how **Roe** gave consent.  Therefore, the FHO finding of responsibility against **Doe** violates his right to due process under the United States and Virginia Constitutions.

VT-000605

Roe withheld relevant information during the investigation. She told an investigator that she and Doe had communicated with each other via text message but that none of those messages was available because they had all been sent via Snap Chat (and thus self-deleted within 24 hours of being read). (*See* Roe's Statements to VTPD, Investigation Report at 21). But Roe withheld the fact that she and Doe had also communicated with each other via a different app (iMessage) that does not self-delete texts after a short period of time. Doe provided an investigator with *all* the iMessage texts sent between Roe and him on and after the day of Roe's party. (*See* Text Messages, Investigation Report at 74-83). Those texts show that in the weeks following Roe's party, Roe's actions toward Doe were inconsistent with Roe's later claim that Doe had sexually assaulted her.[21]

Roe also told an investigator that "she was friends with [ Doe and was never in a relationship with him." (*See* Roe's Statements to VTPD, Investigation Report at 18). But it is undisputed that Roe and Doe had been "intimate" and engaged in "foreplay" a "few times," including engaging in fellatio in a classroom on campus and digital vaginal penetration. (*See* Tr. 34:19 – 35:25; Tr. 172:11-13; Tr. 240:5-22).

Roe's withholding of relevant information during the investigation is, by definition, "selective disclosure."

---

[21] (*See id.* at 75 (Roe agreeing to help Doe with Air Force ROTC projects); *id.* at 76 (Roe asking Doe to fill in for her as an Air Force ROTC physical fitness officer); *id.* at 77-78 (Roe and Doe discussing another Air Force ROTC project); *id.* at 79-82 (Roe and Doe discussing plans to purchase alcohol and sneak it into the dorm); *id.* at 83 (Roe asking Doe "Hey, how are you doing?" after Doe learned that Roe had named him in the Corps of Cadets investigation about her party); *id.* at 83 (Roe asking Doe if he was going to go to McDonald's to get food with her and other cadets).

27

VT-000606

**b. The FHO holds <span style="background:black;color:white">Cadet MS</span> to a higher standard for credibility than it does <span style="background:black;color:white">Cadet DM</span>**

As discussed above, <span style="background:black;color:white">Cadet MS</span>'s statements during the investigation and at the hearing refute any finding that <span style="background:black;color:white">Roe</span> was "incapacitated." But the FHO simply ignores <span style="background:black;color:white">Cadet MS</span>'s statements. And in finding that <span style="background:black;color:white">Roe</span> was "incapacitated," the FHO relies on <span style="background:black;color:white">Cadet DM</span>'s testimony that <span style="background:black;color:white">Roe</span> that "seemed out of it" and "was kind of staring at the floor when" she and <span style="background:black;color:white">Cadet DM</span> "weren't talking." (<span style="background:black;color:white">Cadet DM</span> Testimony, Tr. 59:14-20, 79:6-15).

The FHO offers no explanation as to why it found <span style="background:black;color:white">Cadet MS</span> less credible that <span style="background:black;color:white">Cadet DM</span>  Indeed, it ignores evidence from which it can find <span style="background:black;color:white">Cadet MS</span> *more* credible than <span style="background:black;color:white">Cadet DM</span>  For example, it is undisputed that <span style="background:black;color:white">Cadet MS</span> was not intoxicated at the party and that <span style="background:black;color:white">Cadet DM</span> was so intoxicated at the party that she threw up.

As another example, is undisputed that <span style="background:black;color:white">Cadet DM</span> gave statements during the investigation that were flatly inconsistent with her statements at the hearing. During the investigation, <span style="background:black;color:white">Cadet DM</span> told the VTPD that <span style="background:black;color:white">Cadet MS</span> left the room *before* <span style="background:black;color:white">Roe</span> returned from walking <span style="background:black;color:white">Cadet CP</span> home. But at the hearing, she conceded that <span style="background:black;color:white">Cadet MS</span> did not leave the room until *after* <span style="background:black;color:white">Roe</span> returned. The fact that <span style="background:black;color:white">Cadet DM</span> could not get her story straight as to who was in the room immediately before <span style="background:black;color:white">Roe</span> went to bed is inconsistent with the notion that <span style="background:black;color:white">Cadet DM</span>'s testimony about <span style="background:black;color:white">Roe</span>'s condition at that point in the evening is credible. <span style="background:black;color:white">Cadet DM</span> also told both the VTPD and OEA that the only reason she thought <span style="background:black;color:white">Roe</span> may have been intoxicated was that <span style="background:black;color:white">Roe</span> took <span style="background:black;color:white">Doe</span>'s phone when she walked <span style="background:black;color:white">Cadet CP</span> home. But <span style="background:black;color:white">Roe</span> changed her story at the hearing to add her claim that <span style="background:black;color:white">Roe</span> "seemed out of it" and was "was kind of staring at the floor when" she and <span style="background:black;color:white">Cadet DM</span> "weren't talking."

Given these undisputed facts, the only possible explanation for the FHO's decision to find <span style="background:black;color:white">Cadet MS</span> less credible that <span style="background:black;color:white">Cadet DM</span> is that <span style="background:black;color:white">Cadet MS</span> is a man and <span style="background:black;color:white">Cadet DM</span> is a woman.

28

VT-000607

**B. The Office of Student Conduct has provided** Doe **with significant and relevant new information that was not available to him at the time of the hearing.**

Policy 1026 states that the Appellate Officer may vacate a finding based on "significant and relevant new information that was not available at the time of the hearing." *See* Policy 1026 at 9. Such relevant and new information exists in this case.

As discussed above, the FHO bases its finding in part on Cadet DM's testimony. But during the hearing, it was discovered that Cadet DM's statement to the VTPD (which was the statement taken closest in time to the date of the alleged incident) had not been provided to the parties. (*See* Cadet DM Testimony, Tr. 91:17 – 92:19). The Office of Student Conducted provided the statement to Doe the same day it provided the FHO to Doe

Cadet DM's statement to the VTPD contains relevant and new information. For example, Cadet DM told the VTPD that Roe had six and a half drinks on the night in question (less than the eight to ten drinks cited in the FHO). (*Compare* Cadet DM Statement to VTPD at 1 *with* FHO at 11). That statement would have been helpful to Doe at the hearing as it would have raised questions as to whether Roe really drank as much as she claims she did. Cadet DM also told the VTPD that "she did not think Roe was very intoxicated until Roe walked Cadet CP back to his room and accidentally took Doe 's phone instead of her own." (Cadet DM Statement to VTPD at 1). That statement would have been helpful to Doe at the hearing as it would have shown that Cadet DM's testimony that she thought Roe was intoxicated because Roe "seemed out of it" and was "was kind of staring at the floor" was inconsistent with *two* of Cadet DM's prior statements. Cadet DM also told the VTPD that "Cadet MS left [the room] before Roe returned." (Cadet DM Statement to VTPD at 1). That statement would have been helpful to Doe at the hearing because it is undisputed that Cadet MS did not leave the room until after Roe returned, and Cadet DM telling the VTPD otherwise raises serious doubts about Cadet DM's ability to accurately recall the events of the night of September 17.

29

**C.** █Doe█ **was denied at least two procedural guarantees.**

Policy 1026 states that the Appellate Officer may vacate a finding based on a "denial of procedural guarantees." *See* Policy 1026 at 9. █Doe█ was denied at least two procedural guarantees in this case.

**1.** █Doe█ **was denied his guaranteed right to have his Advisor question the OEA investigator.**

In accordance with the governing federal regulation, 34 C.F.R. § 106.45(b)(6)(i) (Aug. 14, 2020), Policy 1026 states that parties are guaranteed the right to "have their advisor conduct live cross-examination on the other party and any witnesses." *See* Policy 1026 at 6. But prior to the hearing, the Office of Student Conduct sent █Doe█ a letter stating that advisors cannot question the case investigator even though the investigator attends the hearing to provide an oral summary of the investigation and to answer any questions about the investigation.

On June 17, 2024, █Doe█ sent a letter to the Office of Student Conduct noting that the Department of Education interprets the term "witness" in the governing regulation to include investigators, and that Virginia Tech's own Title IX training materials state that the investigator is a "witness" and "may be questioned and subjected to cross-examination by all parties' advisors." The Office of Student conduct refused to address either of those points, and instead offered the conclusory statement that Virginia tech has a "legal basis" for its refusal to allow advisors to question investigators. At the hearing, the Hearing Officers said it is Virginia Tech's "policy" to not allow advisors to question investigators. (Tr. 21:17-24). But neither the Office of Student Conduct nor the Office of the University Legal Counsel has identified a written policy that says advisors cannot question investigators.

VT-000609

**2.** ▮Doe▮ **was denied his guaranteed right to present evidence, including witnesses.**

In accordance with the governing federal regulation, 34 C.F.R. § 106.45(b)(5)(ii) (Aug. 14, 2020), Policy 1026 states that parties are guaranteed the right to present "evidence that supports or refutes the alleged conduct" including live testimony from "witnesses." *See* Policy 1026 at 6.

The week before the hearing, ▮Doe▮ provided the Office of Student Conduct and the Office of the University Legal Counsel with photos of ▮Roe▮ drinking alcohol in a classroom and an expert report from a forensic nurse stating that none of the statements in the investigation report about ▮Roe▮'s alleged bruising provided an adequate basis to determine the cause of the alleged bruising. ▮Doe▮ also notified Office of Student Conduct and the Office of the University Legal Counsel that, in accordance with the intention stated in one of his written submissions to the OEA investigator, he planned to call a witness (▮AL▮) to testify at the hearing about communications that ▮AL▮ had with ▮Roe▮ that were inconsistent with ▮Roe▮'s claim that ▮Doe▮ had sexually assaulted her.

The Office of Student Conduct and the Office of the University Legal Counsel responded that it would not provide the photos or expert report to the Hearing Officers and it would not allow ▮AL▮ to testify at the hearing because "only evidence and information submitted prior to the final investigation report will be considered." But that rule is flatly inconsistent with the governing regulation, which states that parties are permitted to provide submissions after they receive the final investigation report. *See* 34 C.F.R. § 106.45(b)(5)(vii) (Aug. 14, 2020). Moreover, as discussed above, the Hearing Officers relied on "new information" in reaching their decision in this case (*e.g.*, ▮Cadet DM▮'s "new" story that she thought ▮Roe▮ was intoxicated because ▮Roe▮ "seemed out of it" and was "was kind of staring at the floor"). So, Virginia's Tech's application of its rule on "new information" seems somewhat "selective."

31

VT-000610

**CONCLUSION**

For the reasons discussed above, the Appellate Officer should vacate the FHO's finding that  Doe  is responsible for a policy violation.

August 10, 2024

<div style="margin-left:40%">

Respectfully submitted,

 John Doe 
Respondent

</div>

VT-000611