# EXHIBIT 24

**VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY**
**OFFICE OF STUDENT AFFAIRS**

| | | |
|---|---|---|
| <span style="background:black;color:white">Jane Roe</span> , | ) | |
| Complainant, | ) | |
| | ) | Case No. 2024348902 |
| vs. | ) | |
| | ) | |
| <span style="background:black;color:white">John Doe</span> , | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## APPEAL OF FINAL HEARING OUTCOMES AFTER RECONVENED
## HEARING IN TITLE IX/OFFICE OF STUDENT CONDUCT CASE

I, Appellant/Respondent <span style="background:black;color:white">John Doe</span>, submit this appeal of the Final Hearing Outcomes ("FHOs") finding that I am responsible for violating the Virginia Tech Title IX policy on sexual assault. The grounds for this appeal are (1) the FHOs' findings are arbitrary; (2) the Hearing Officers demonstrated bias that affected the outcome of the case; and (3) this case involved procedural irregularities and denial of procedural guarantees. Based on these grounds, the Appellate Officer should vacate the FHOs' finding against me.

To make this submission easier to read, I will refer to myself in the third person (as "<span style="background:black;color:white">Doe</span>") and I will refer to the Complainant, <span style="background:black;color:white">Jane Roe</span>, as "<span style="background:black;color:white">Roe</span>

## INTRODUCTION

It is undisputed that <span style="background:black;color:white">Roe</span> and <span style="background:black;color:white">Doe</span> engaged in sexual intercourse in <span style="background:black;color:white">Roe</span>'s dorm room late on the night of September 17, 2023, after they and three other students had been drinking in the dorm room. But <span style="background:black;color:white">Roe</span> claims to have no memory of the incident, and therefore claims that she must have been "incapacitated" and unable to provide consent, whereas <span style="background:black;color:white">Doe</span> claims that <span style="background:black;color:white">Roe</span> gave verbal consent to the sexual intercourse.

1

VT-000662

To find **Doe** responsible for the alleged policy violation (sexual assault – rape), the Hearing Officers had to find by a preponderance of the evidence that (1) **Roe** was "incapacitated" at the time of the sexual intercourse, and (2) **Doe** "should have known that **Roe** was 'incapacitated'" at the time of the sexual intercourse.

1.  Although the FHOs find **Doe** responsible, the Appellate Officer should vacate that finding because it is arbitrary for at least four reasons.

*__First__*, the finding that **Roe** was "incapacitated" is arbitrary because it ignores evidence contradicting its position. For example, the FHOs ignore the statements and testimony of **Cadet MS**, the only party attendee who said he was not intoxicated at the party, that **Roe** did not appear to be intoxicated, let alone "incapacitated." As another example, the FHOs ignore the unrebutted written statement from **Doe**'s expert witness, a faculty member at an Ivy League medical school, that the evidence in this case does not support a finding that **Roe** was "incapacitated."

*__Second__*, the finding that **Roe** was "incapacitated" is arbitrary because it is not reasonably explained. The FHOs find that **Roe** was "incapacitated" based on a combination of factors. But the FHOs do not explain why any of those factors (let alone a combination of those factors) established by a preponderance of the evidence that **Roe** was "incapacitated."

*__Third__*, the finding of responsibility is arbitrary because it does not find that **Doe** should have known that **Roe** was "incapacitated." The FHOs find that **Doe** should have known that **Roe** was "intoxicated." But that is not the applicable standard under Virginia Tech policy. Moreover, even if that was the applicable standard, the FHOs do not reasonably explain why **Doe** should have known that **Roe** was "intoxicated."

*__Fourth__*, the finding is arbitrary because it holds the male witnesses who testified (including **Doe** to a higher standard for credibility than it holds the females witnesses who testified

2

VT-000663

(including Roe For example, the FHOs ignore the testimony of Cadet MS (who was sober at the party and who testified that Roe did not appear intoxicated, let alone incapacitated) while it fully credits the testimony of Cadet DM (who was so drunk at the party that she threw up and who could not keep her story straight on why she thought Roe was intoxicated and could not keep her story straight on who was in the room at the end of Roe's party).

2. The Appellate Officer should also vacate the FHOs because the Hearing Officers demonstrated bias that affected the outcome of the case. In addition to holding the male witnesses to a higher standard for credibility than the female witnesses, the Hearing Officers allowed Roe to violate Virginia Tech's "Rules of Decorum for All Participants in Formal Title IX Hearings" by using language toward Doe that was "demeaning, derogatory," and "disrespectful." The Hearing Officers also attempt to explain away certain evidence in ways that are so patently absurd that they must be the product of bias. And the Hearing Officers did not even bother to proofread the second FHO (they misspelled " Doe " in the first paragraph of the second FHO).

3. The Appellate Officer should vacate the finding of responsibility because this case involved procedural irregularities and denial of procedural guarantees. The Office for Equity and Accessibility, the Office of Student Conduct, and/or the Office of University Legal Counsel knowingly committed at least four violations of the Department of Education's Title IX regulations in this case.

3

VT-000664

**APPLICABLE POLICY**

Virginia Tech policy defines "rape" as including "penetration, no matter how slight, of the vagina or anus of a person with any body part … without the consent of the victim."[1] Virginia Tech policy states that "consent" cannot be given by a person who is "incapacitated."[2]

Virginia Tech policy defines "incapacitation" as follows: "Physical or mental inability to make informed, rational judgments. Incapacitation includes but is not limited to being asleep, being unconscious, and the inability to make decisions due to the voluntary or involuntary use of alcohol or drugs."[3] In other words, and as the Appellate Officer knows from her Title IX decision-maker training, "incapacity" is not synonymous with "intoxicated." *See* PowerPoint presentation titled "Title IX Higher Education Decision-Maker, Virginia Polytechnic and State University" (hereinafter "Decision-Maker PowerPoint") at slide 31 (Apr. 30, 2024) (stating, "Incapacity $\neq$ impaired, drunk, intoxicated, or under the influence").[4]

Moreover, the fact that a complainant has no memory of an incident does not mean that the complainant was "incapacitated." *See* Decision-Maker PowerPoint at slide 32 (stating, "Blackout $\neq$ incapacitation (automatically)"). Therefore, decision-makers must determine if there is other "evidence of incapacity." *Id*. at slide 33. Such evidence can include "slurred speech," "shaky equilibrium; disorientation," "passing out/unconsciousness," and "throwing up." *Id.*

---

[1] Policy No. 1026, *Policy on Title IX Sexual Harassment and Responsible Employee Reporting* at 5 (Nov. 1, 2022 Rev.).

[2] *Id.* at 4.

[3] *Student Code of Conduct* at 7 (Aug. 18, 2023).

[4] In accordance with federal law, *see* 34 C.F.R. § 106.45(b)(1)(iii) (Aug. 14, 2020), this PowerPoint presentation is posted on Virginia Tech's website. *See* https://oea.vt.edu/title-ix-vawa/titleix_training.html (last accessed Aug. 3, 2024). And because "decision-makers" include Hearing Officers and Appellate Officers, *see* 34 C.F.R. § 106.45(b)(8)(iii)(B) (Aug. 14, 2020), the PowerPoint presentation is not "new information." Rather, it is information the Hearing Officers and Appellate Officer learned during their training to be decision-makers in Title IX cases.

VT-000665

A respondent cannot be held responsible for violating the "rape policy" on a finding that the complainant was "incapacitated" unless the respondent knew or reasonably should have known that the complainant was "incapacitated." *See* Decision-Maker PowerPoint at slide 34 (stating there is "no policy violation" if "the respondent did not know, and the respondent would not have reasonably known of the complainant's incapacity").[5]

Finally, Virginia Tech Hearing Officers use the "preponderance of the evidence" standard "to determine whether or not the respondent is responsible for the alleged conduct."[6] Under that standard, the respondent cannot be found responsible unless the "information presented in the investigation report and at the hearing" establishes that "it is more likely than not that a violation occurred."[7]

---

[5] Of course, it is inconceivable that Virginia Tech would have a policy that could label a respondent a "rapist" where the respondent neither knew nor should have known that the complainant was incapacitated. Under both federal and state law, an accused cannot be found to have committed rape based on allegations that the purported victim was incapacitated unless the accused knew or should have known that the purported victim was incapacitated. *See* Va. Code. § 18-2-67.10(3) (defining incapacitation in the context of sexual assault as "the condition of the complaining witness existing at the time of the [alleged assault] which prevents the complaining witness from understanding the nature or consequences of the sexual act [at issue] ***and about which the accused knew or should have known***") (emphasis added); *United States v. Rouillard*, 740 F.3d 1170, 1171 (8th Cir. 2014) (holding that the accused could not be found to have violated the federal rape statute under an incapacitation theory unless "the defendant knew that [the purported victim] was incapable of appraising the nature of conduct"). And a federal court would likely find that such a policy violates a student's rights to due process under the United States Constitution and Virginia Constitution. *See Baum v. Doe*, 903 F.3d 575, 585 (6th Cir. 2018) (noting the "critical facts" in a Title IX case were whether the complainant was "too drunk to consent to have sex" and whether the respondent "knew or should have known as much").

[6] Policy No. 1026 at 8.

[7] *Ibid.*

5

VT-000666

**UNDISPUTED FACTS**

**A.** ▉Roe▉ **and** ▉Doe▉ **'s relationship prior to September 17, 2023.**

▉Doe▉ and ▉Roe▉ met during their freshmen year at Virginia Tech, which was the 2022-23 school year. They were both enrolled in the Corps of Cadets and the Air Force ROTC program. (Investigation Report at 6).

Although they never "dated," ▉Doe▉ and ▉Roe▉ described their relationship as "friends with benefits." (▉Doe▉ Testimony, Tr. 208:14-19; ▉Roe▉ Testimony, Tr. 194:16-24).[8] This included ▉Doe▉ and ▉Roe▉ "making out," ▉Roe▉ performing fellatio on ▉Doe▉ in a classroom on campus, and ▉Doe▉ stimulating ▉Roe▉'s vagina with his hand. (▉Doe▉ Testimony, Tr. 34:23 – 35:25; ▉Roe▉ Testimony, Tr. 240:5-22). ▉Roe▉ also texted to ▉Doe▉ "selfie" photographs of herself wearing only a bra and her Corps of Cadets camouflage pants. (Photos, Investigation Report at 150).

**B.** ▉Roe▉**'s prior claims of sexual assault and grant of immunity for underage drinking.**

During fall semester 2023, ▉Roe▉ was roommates with ▉Cadet DM▉. ▉Cadet DM▉ and ▉Roe▉ are "close friends." (▉Cadet DM▉ Testimony, Tr. 119:14-24). ▉Roe▉ told ▉Cadet DM▉ that prior to September 17, 2023 (the date of the alleged incident with ▉Doe▉ ▉Roe▉ had been sexually assaulted approximately four times. (Report at 56; Tr. 115:25 – 116:17). ▉Roe▉ has never alleged that ▉Doe▉ was involved in any of those four other incidents.

According to ▉Cadet DM▉ during the first week of fall semester 2023 she observed a Corps of Cadets Dormitory Residential Assistant ("RA") and two other cadets carry ▉Roe▉ into ▉Roe▉ and

---

[8] Citations to "Tr." are citations to the transcript of the June 24, 2024 Title IX hearing in this case. "Tr. 194:16-24" means page 194, lines 16 to 24. Citations to "09/20/24 Tr." are citations to the September 20, 2024 Title IX reconvened hearing. The same format for citations to the transcripts are used throughout the remainder of this appeal. (The transcripts are not "new information." They are simply written versions of the information that is on the audio recordings of the hearings. The transcripts were prepared by a professional court reporting service at ▉Doe▉ 's request).

VT-000667

Cadet DM's dorm room and put Roe to bed because Roe was heavily intoxicated. (09/20/24 Tr. 32:15 – 33:13). According to Cadet DM later that night Roe woke up and tried to leave the room, but Cadet DM would not let Roe leave the room because Roe "was stumbling" and "slurring her words." (09/20/24 Tr. 33:9-24).

According to Cadet DM Roe later claimed that she had been "roofied" (*i.e.*, given a "date rape" drug) on the night that the R.A. and two other cadets carried Roe to her room. (Cadet DM VTPD Statement at 4).[9] The Corps of Cadets never disciplined Roe for being intoxicated that night, presumably because Virginia Tech students who make a report "of gender-based violence" are "immune from disciplinary action for their personal consumption of alcohol or other drugs occurring at the time of the reported incident." (Student Code of Conduct at 14 (Aug. 18, 2023)).

**C.      The party in Roe's dorm room on September 17, 2023.**

On the night of Sunday, September 17, 2023, Roe hosted a party in her Corps of Cadets dorm room. (Roe Statements, Investigation Report at 105, 171). The party was attended by four other persons, all of whom were also members of the Corps of Cadets— Cadet DM Cadet MS, Cadet CP, and Doe (Roe Statement, Investigation Report at 171). Roe and all her guests were under 21 years old at the time. (Roe Statement, Investigation Report at 173).

All the cadets drank alcohol while at Roe's party. (Roe Statement, Investigation Report at 172). Cadet DM and Doe became intoxicated. (Cadet DM Testimony, Tr. 79:20; Doe Testimony, Tr. 37:21). Roe used Doe's phone to send text messages to one of Doe's roommates to tell him that Doe was going to spend the night in her room because he was too drunk to walk back

---

[9] Cadet DM's statement to VTPD was not included in the Title IX Investigation Report. Doe did not learn that VTPD had interviewed Cadet DM until Cadet DM mentioned the interview during her June 24 hearing testimony. (Cadet DM Testimony, Tr. 91:17 – 92:19). The Office of Student Conduct provided a copy of the VTPD's summary of the interview to Doe on the day it sent the first FHO to Doe (August 1, 2024).

VT-000668

to Doe 's room, which was in a different dorm. (Roe Testimony, Tr. 177:6 – 177:10; Cadet DM Testimony; Tr. 58:13-15; Text Messages, Investigation Report at 84-87).

Before going to bed for the night, Roe walked Cadet CP back to his dorm. (Roe Statements, Investigation Report at 105, 171). Cadet MS remained in Roe 's room with Doe and Cadet DM while Roe walked Cadet CP home. (Cadet DM Testimony, Tr. 109:24 – 110:4). Shortly after Roe returned, Cadet DM vomited on the dorm room floor and a trashcan (even though there was a sink in the dorm room and the women's bathroom was "right across the hall." (Cadet DM Testimony, Tr. 97:8 – 98:10; Cadet MS Testimony, Tr. 151:9 – 152:4). After Roe cleaned up Cadet DM 's vomit, Cadet MS left the room and went back to his dorm room. (Cadet MS VTPD Statement, Investigation Report at 60). Roe then got into her bed with Doe and Cadet DM got into her own bed. (Cadet DM OEA Statement, Investigation Report at 51). Cadet DM wore noise-cancelling headphones (called "beats") with music playing so that she would not hear any noise in the room. (Cadet DM VTPD Statement at 2). After Cadet DM fell asleep, Doe and Roe had sexual intercourse. (Doe Testimony, Tr. 39:14 – 41:7).

**D.      Roe 's 2:00 a.m. trip to the bathroom.**

Roe 's dorm room was across the hall and two doors down (approximately ten feet) from the women's community bathroom. (Cadet DM Testimony, Tr. 98:9-10; Cadet MS Testimony, Tr. 159:9-21; Doe Statement, Investigation Report at 40).

At approximately 2:00 a.m. on September 18, 2023, Roe went to the women's community bathroom. ( Cadet SJ OEA Statement, Investigation Report at 67). Roe was not wearing any clothes at the time. (*Ibid*). She was holding a white shirt in front of her and carrying her student ID card, which she needed to be able to get back into her room after going to the bathroom (to enter a dorm room, a student must use both her student ID and punch in a four-digit pass code). (*Ibid.;* Cadet DM Testimony, Tr. 104:7-14).

8

VT-000669

Another female cadet, ▮Cadet SJ▮, went to the bathroom at the same time and saw ▮Roe▮ in the hallway and in the bathroom. (▮Cadet SJ▮ OEA Statement, Investigation Report at 67). ▮Cadet SJ▮ then saw ▮Roe▮ go back into her room. (*Ibid*.) ▮Cadet SJ▮ reported the incident to the Corps of Cadets. (*Ibid*.) When an investigator later asked if ▮Roe▮ appeared intoxicated, ▮Cadet SJ▮ told the investigator that "she did not speak with ▮Roe▮ but ▮Roe▮ "appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner." (*Id.* at 68). ▮Cadet SJ▮ told the investigator that "the only thing that would have made her think ▮Roe▮ may have been intoxicated was that ▮Roe▮ did not say anything about her appearance." (*Ibid.*).

**E.      The morning after ▮Roe▮'s party.**

▮Doe▮ ▮Roe▮ and ▮Cadet DM▮ woke up around 6:00 a.m. on Monday, September 18 because all three had to attend the Corps of Cadets' morning formation at 7:00 a.m. (▮Doe▮ Testimony, Tr. 41:19 – 42:2).

During the morning formation, ▮Roe▮ was directed to go speak to one of the Corps of Cadets staff because of the report that ▮Cadet SJ▮ had filed about ▮Roe▮ being naked in the hallway. (▮Cadet DM▮ VTPD Statement at 2). ▮Roe▮ blamed her actions on the fact that she had been drinking. (▮Roe▮ Statement to Corps of Cadets, Investigation Report at 105). And she claimed that she had been so drunk that she could not remember anything after approximately 11:30 pm on the night of the 17th. (*Ibid*).

9

VT-000670

**F.     Roe's behavior toward Doe during the four-plus weeks following her party.**

Text messages and other evidence show that during the four-plus weeks following Roe's party, Roe's engaged in behavior toward Doe that was inconsistent with Roe's later claim that she believes Doe sexually assaulted her.  For example:

- On the afternoon of September 18, Roe accepted an invitation from Doe to help him with some ROTC projects.  (Text Messages, Investigation Report at 75).

- On September 20, Roe asked Doe if he would stand in for her as the ROTC physical fitness officer that day.  (Text Messages, Investigation Report at 76).

- Sometime during the week of or after the party, Doe and Roe had dinner together at the Waffle House.  (Roe Testimony, Tr. 223:3-9; Doe Testimony, Tr. 221:6-9).

- On September 24, Roe texted Doe's older cousin AL whom she had never met in person, to ask if he would give her a ride to the airport when he was in Blacksburg visiting Doe the first weekend of Thanksgiving break.  (Text Messages, Investigation Report at 89).  Roe's text began with the words, "Hey!  This is Doe's friend Roe (*Ibid*.)  Roe also said she would like to hang out with AL and Doe when AL was in town.  (*Ibid*.)

- On September 29, Roe sent Doe $5.00 via the Venmo payment app to repay Doe money he had lent her during an ROTC field trip that day.  Roe wrote "Sugar baby" in the subject line of the payment.  (Venmo Screenshot, Investigation Report at 97).

- On October 7, Roe and Doe engaged in an extended text conversation as part of their (successful) effort to purchase alcohol and sneak it into Roe's dorm room.  (Text Messages, Investigation Report at 79-82).

- On October 8, Roe and Doe's cousin AL communicated again via text.  (Text Messages, Investigation Report at 91).  During those texts, AL and Roe made good-natured jokes about Doe (*See, e.g.*, *Ibid.* ( AL : "It's blinding how white his face is!" Roe "He gotta hop in a tanning bed sometime.  Or get his hermit ass outside 😂'").

- On October 12, Roe texted Doe "Hey how are you doing?"  (Text Messages, Investigation Report at 82).

- On October 21, Roe texted Doe to ask him if he was going to McDonald's.  (Text Messages, Investigation Report at 83).

10

VT-000671

**G.** Roe's complaint against Doe and the OEA investigation.

**1.** Roe's statements to VTPD and the Corps of Cadets.

On November 1 and 6, Roe met with VTPD and alleged that Doe had sexually assaulted her on September 17 (the night of her party). (Roe's Statements to VTPD, Investigation Report at 18). Roe told VTPD that when she woke up on the morning of the 18th Doe was in her bed and he told her they had sex, but that she did not remember having sex with him. (*Ibid.* ("The victim did not remember what happened the night prior and when the suspect woke up he told her they had sex.")).

When VTPD asked Roe what the last thing she remembered from the night of the 17th was, Roe stated "the last thing she remembered was sitting on the floor listening to music and talking with all five" persons at the party. (*Id.* at 19). She said that someone else told her that she walked Cadet CP back to his room, but that she had no memory of doing that. (*Id.*). Roe told VTPD that it would be ok for them to speak with Cadet DM about the party, but that she did not want them to speak with Cadet MS or Cadet CP (*Id.* at 19, 21).

When VTPD asked Roe about her previous interactions with Doe she said that "she was friends with" Doe but "was never in a relationship with him." (*Id*. at 18). When VTPD asked Roe if she had any text messages with Doe she said that all her texts with Doe were via Snap Chat and therefore had been automatically deleted. (*Id.* at 21).

After her initial meeting with VTPD, Roe filed a formal Title IX complaint against Doe (Investigation Report at 5). Roe declined to make a statement to OEA and instead asked OEA to rely on her statements to VTPD. (*Ibid.*).

During its investigation (at Doe's request), OEA obtained a transcript of a Corps of Cadets interview of Roe regarding Roe's party. (Roe Corps of Cadets Interview, Investigation

11

VT-000672

Report at 171).  During that interview, Roe stated that the last thing she remembered from the night of September 17 was sitting in a circle in her room with everyone at the party.  (*Ibid*.).

    2.      Cadet DM**'s statements to the Corps of Cadets, VTPD, and OEA.**

The Corps of Cadets interviewed Cadet DM in October 2023.  Cadet DM Corps of Cadets Interviews, Investigation Report at 168-170).  VTPD interviewed Cadet DM on November 17, 2023.  (Cadet DM VTPD Statement).  OEA interviewed Cadet DM on December 7, 2023.  (Cadet DM OEA Statement, Investigation Report at 51).

Cadet DM told the Corps of Cadets and VTPD that Cadet MS left the room *before* Roe returned from walking Cadet CP home on the night of Roe's party.  (*See* Cadet DM Corps of Cadets Interviews, Investigation Report at 168 ("Maybe I'd say two hours later my roommate walked Cadet CP back to his room.  And then Cadet MS left the room while my roommate was gone."); Cadet DM VTPD Statement at 1 ("Cadet DM stated that around 23:00 Roe walked Cadet CP back to his room and Cadet MS left before Roe returned.")).

But Cadet DM told OEA and testified at the June 24 hearing that Cadet MS left the room *after* Roe returned from walking Cadet CP home.  (Cadet DM OEA Statement, Investigation Report at 51 ("Cadet MS left while [I] was brushing my teeth, and Roe went to the restroom to get changed into her pajamas"); Cadet DM Testimony, Tr. 109:24 – 110:4 (Q. "And Cadet MS was still in the room when Roe got back from walking Cadet CP back to Cadet CP's room; correct?"  A. "Correct.")).

Cadet DM told both VTPD and OEA that on the night of Roe's party Roe gave no sign she was intoxicated until Roe accidentally took Doe 's phone with her instead of Roe's phone when she walked Cadet CP back to his room.  (Cadet DM VTPD Statement at 1 ("Cadet DM stated that she did not think Roe was very intoxicated until Roe walked Cadet CP back to his room and accidentally took Doe 's phone instead of her own."); Cadet DM OEA Statement, Investigation

12

Report at 54 ("**Cadet DM** stated, 'she didn't think **Roe** was that intoxicated until she ended up walking **Cadet CP** back to his dorm.' **Cadet DM** explained that '**Roe** keeps her [student ID] on the back of her phone, and she grabbed **Doe** 's phone when she left.' **Cadet DM** stated that when she realized what **Roe** did, she knew **Roe** 'needed to stop drinking because she took the wrong phone.'")).  But at the June 24 hearing, **Cadet DM** conceded that she had not known that **Roe** had been using **Doe** 's phone to send texts to **Doe** 's roommate.  (**Cadet DM** Testimony, Tr. 104:17-24).

**Cadet DM** admitted to OEA and at the June 24 hearing that she was intoxicated at **Roe**s party."  (**Cadet DM** OEA Statement, Investigation Report at 53-54; **Cadet DM** Testimony, Tr. 84:24-25 ("We were intoxicated that night.")).  **Cadet DM** told VTPD and OEA that **Cadet MS** did not appear to be intoxicated at the party and that **Cadet CP** seemed "really intoxicated."  (**Cadet DM** OEA Statement, Investigation Report at 54 ("**Cadet DM** stated **Cadet MS** had 2, maybe 3 Busch lights and 1 high noon, but did not seem intoxicated at all" and that "**Cadet CP** seemed really intoxicated"); **Cadet DM** VTPD Statement at 1 ("I asked **Cadet DM** how **Cadet CP** and **Cadet MS** seemed when they left and she replied that **Cadet CP** seemed really intoxicated and **Cadet MS** seemed fine.")).

### 3.     **Cadet MS**'s Statements to VTPD and OEA.

VTPD interviewed **Cadet MS** on February 5, 2024.  (**Cadet MS** VTPD Statement, Investigation Report at 59).  OEA interviewed **Cadet MS** on March 20, 2024.  (**Cadet MS** OEA Statement, Investigation Report at 62).

**Cadet MS** agreed with **Cadet DM** that he was not drunk at the party.  (**Cadet MS** VTPD Statement, Investigation Report at 61; *see also* **Cadet MS** Testimony, Tr. 140:18-19 (Q. "Would you consider yourself intoxicated that night?"  A. "No, not at all.")).

**Cadet MS** told VTPD and OEA that **Roe** did not appear to be intoxicated at the party.  (**Cadet MS** VTPD Statement, Investigation Report at 61 ("I asked **Cadet MS** how **Roe** seemed when he left and

13

he replied that she seemed normal."); <sup>Cadet MS</sup> OEA Statement, Investigation Report at 65 (stating that

Cadet MS said Roe was "perfectly fine" when she returned from walking Cadet CP home)). In fact,

Cadet MS noted that when Roe returned to the room, she cleaned up Cadet DM 's vomit. (Cadet MS OEA

Statement, Investigation Report at 65).

**H.      The June 24 Title IX hearing.**

The Office of Student Conduct held a hearing in this case on June 24, 2024. The Hearing

Officers heard live testimony from five witnesses: Roe  Doe  Cadet DM Cadet MS and Dez Twigger

(the OEA investigator for this case).

**1.      Roe 's testimony.**

Although Roe said during the investigation that the last thing she remembered from the

night of the 17th was sitting on the floor in a circle with the other attendees, Roe testified at the

hearing that the last thing she remembered from that night was using Doe 's phone to send a text

to one of Doe 's roommates to say that Doe would be spending the night in her room. (Roe

Testimony, Tr. 178:7-12).

At the hearing, Roe gave inconsistent testimony about whether she and Doe had a

conversation on the morning of September 18 and the contents of any such conversation. (*See* Roe

Testimony, Tr. 186:19-24 ("I remember briefly having a conversation. I could not tell you the

contents of this conversation as I was still pretty – I didn't feel great, and then I had just also woken

up."); *id.* at 187:4-7 ("I don't remember if we had a conversation or not. I remember saying

something along the lines of, you know, 'Get back to your room, change for formation, don't be

late.' And that was it."); *id.* at 197:9-10 ("I don't remember having a conversation with Mr. Doe

that morning.").

14

VT-000675

Roe also testified that she was unable to recall details regarding other conversations and interactions she had with Doe and others in the weeks following her party. For example, although she remembered going out to dinner with Doe the first or second week following her party, she could not remember anything that she and Doe talked about while they were having dinner. (Roe Testimony, Tr. 223:4-19 (Q. "Did you go to the Waffle House with Doe after this incident?" A. "I do remember us going. I don't remember if it was the week of or the week after, but I do remember sometime we had gone to the Waffle House." Q. "And then do you remember anything about that conversation or what you guys talked about?" A. "Not that I can think of. Sorry. Not that I can think of. I remember it being a little bit awkward and kind of like strained, but I don't remember the contents of any conversation that we did have."). As another example, Roe testified that although she and Doe drank alcohol together on a recent occasion other than her party on September 17, she could not recall whether that other occasion occurred before or after September 17. (Roe Testimony, Tr. 176:6 – 177:5).[10]

As discussed above, text messages show that the other occasion of Roe and Doe drinking together around that time occurred about three weeks after September 17. (Text Messages, Investigation Report at 79-82). Incredibly, the Hearing Officers did not ask Roe *why* she went to dinner with Doe and drank alcohol with Doe after September 17 if she thought Doe had sexually assaulted her. And Doe's Advisor was unable to ask Roe those questions because Roe

---

[10] (*See also id.* at 198:12-18 (Q. "Can you talk to me about what the [later] conversation [with Doe looked like? Was that in person or on Snap Chat? What was that?" A. "Like I said, I don't particularly remember because it was so long ago, and I've had a lot of conversations with a lot of people since then. But I think it was a mix of both."); 199:24-25 ("I don't remember word-for-word verbatim what I did say"); 229:10-22 (Roe testifying that she did not know "for sure" who told her that she walked Cadet CP back to his room, but that she believes it was either Cadet DM or Cadet CP

VT-000676

chose to stop answering questions before ▮Doe▮'s Advisor had finished cross-examination. (▮Roe▮ Testimony, Tr. 242:7-8).

**2.  ▮Doe▮'s testimony.**

▮Doe▮ testified that ▮Roe▮ gave verbal consent to all acts of sexual intercourse between her and him on the night in question. (▮Doe▮ Testimony, Tr. 39:14 – 41:7). He also testified that at the time they had sex he did not know that ▮Roe▮ was intoxicated. (*Id.* at 210:3-6).

**3.  ▮Cadet DM▮'s testimony.**

As discussed above, during the investigation ▮Cadet DM▮ told both VTPD and OEA that on the night of September 17 ▮Roe▮ gave no sign she was intoxicated until she accidentally took ▮Doe▮'s phone with her instead of ▮Roe▮'s phone when she walked ▮Cadet CP▮ back to his room. At the hearing, ▮Cadet DM▮ testified that (1) the OEA investigator gave her a draft of the interview summary to review for accuracy, (2) she did review the summary for accuracy, and (3) she did not ask the OEA investigator to make any changes to the summary.[11]

At the hearing, ▮Cadet DM▮ offered a completely new basis for her opinion that ▮Roe▮ was affected by alcohol on the night of September 17. When asked how ▮Roe▮ "appear[ed] after drinking alcohol" that night, ▮Cadet DM▮ stated: "She definitely seemed out of it. I didn't know how intoxicated she was because this was the first time me and ▮Roe▮ had ever drank together, but I could definitely tell that she was not completely herself. She was just kind of zoning out, staring at stuff throughout the night." (▮Cadet DM▮ Testimony, Tr. 59:14-20).

In any event, as discussed above, under Virginia Tech policy "intoxicated" is not synonymous with "incapacitation." And ▮Cadet DM▮ did not give any testimony from which a

---

[11] (*See* ▮Cadet DM▮ Testimony, Tr. 93:3-18 (Q. "Did Ms. Twigger email you a copy [of the summary] and give you a chance to make any corrections?" A. "Yes." Q. "Did you make any corrections?" A. "I did not." Q. "Did you review it to see if it needed to be corrected?" A. "I did.")).

16

VT-000677

reasonable fact finder could conclude by a preponderance of the evidence that Roe was "incapacitated," let alone that Roe was "incapacitated" at the time she went to bed with Doe.

To the contrary, Cadet DM testified that Roe did *not* show some of the potential signs of "incapacitation." For example, Virginia Tech's Title IX training materials state that "slurred speech" is a potential sign of "incapacitation,"[12] and Cadet DM testified that she does not believe that Roe slurred her speech. (Cadet DM Testimony, Tr. 79:16-21 (Q. "At any point, when you were all talking, did Roe ever have like slurred speech?" A. "Not that I can remember. I again, was also intoxicated, but I do not think so.")). As another example, Virginia Tech's Title IX training materials indicate that difficulty walking is a potential sign of "incapacitation,"[13] and Cadet DM testified that Roe did not have difficulty walking. (*Id.* at 78:25 – 79:2 (Cadet DM stating, "[Roe could walk, so like mentally I thought since she could still walk decent, she wasn't that intoxicated.")). Virginia Tech's Title IX training materials also state that "throwing up" is a potential sign of "incapacitation,"[14] and Cadet DM testified that she knew of no evidence that Roe threw up. (*Id.* at 110:19 – 120:3 (Q. "Did anyone [other than you] throw up that night, that you saw?" A. "No, not that I saw." Q. "Did anyone tell you they threw up?" A. "No.")).

Cadet DM added that, "[Roe was just a little bit out of it, disoriented. Again, picking up other people's phones." (Cadet DM Testimony, Tr. 79:3-5). When a Hearing Officer asked her, "Besides picking up other people's phones, how – when you say 'disoriented,' what gave you the idea that she was disoriented?" Cadet DM responded, "Well, her eyes. She would kind of just give me like a blank stare when we weren't like actively talking. And that was basically it. She was

---

[12] (*See* Decision-Maker PowerPoint at slide 33).

[13] (*See* Decision-Maker PowerPoint at slide 33 (stating a "shaky equilibrium" is a potential sign of "incapacitation").

[14] (*See* Decision-Maker PowerPoint Presentation at slide 33).

17

VT-000678

sitting on the floor most of the night, and she was kind of just staring at the floor when we weren't talking." (*Id.* at 79:6-15).

But as discussed above, Roe's sitting on the floor occurred *before* she walked Cadet CP back to his room, and Cadet DM told *both* VTPD and OEA that she did not think Roe was intoxicated until she noticed that Roe took  Doe 's phone *after* Roe left the room to walk Cadet CP home. (Cadet DM VTPD Statement at 1; Cadet DM OEA Statement, Investigation Report at 54). Cadet DM offered no explanation for this inconsistency. (Cadet DM Testimony, Tr. at 105:14-20 (Q. "You didn't tell Ms. Twigger that Roe seemed to be zoning out or was – had expressions in her eyes or face that made it seem like she was out of it, did you?" A. "I did not.")). And the fact that Roe was able to walk back to her room alone after walking Cadet CP home is inconsistent with a finding that Roe was "disoriented." *See* Cambridge Dictionary (online) (defining "disoriented" as "confused and not knowing where to go or what to do"). Moreover, Cadet DM implicitly conceded that Roe's conduct with respect to going to the women's room at 2:00 a.m. was inconsistent with a finding that Roe was "disoriented." (Cadet DM Testimony, Tr. 104:7-14 ("Q. "So when Roe went to the women's room early in the morning of September 18th, she would have had to have had the wherewithal to take her [student ID] and then use that plus the four-digit code to get back into her room; correct?" A. "Correct.").

Finally, Cadet DM conceded that her own intoxication affected her memory of the events of September 17. (*See* Cadet DM Testimony, Tr. 84:15 – 85:7 (Q. "Back in October you told [the Corps of Cadets] you had three High Noons and three or four Bush Lights, and you didn't mention BuzzBallz. But earlier today you said you had a couple of beers and one-and-a-half BuzzBalls. So which is it?" A. "Both are correct. I left out the BuzzBallz. I probably forgot. We were intoxicated that night." Q. "So your – your memory from that night is affected by the fact that you

18

VT-000679

were intoxicated?  A. "Yes.  Pertaining to the – how much I drank.")).  Indeed, Cadet DM said that before she threw up (which she said occurred when Roe was walking Cadet CP to his room), she was "out of it" and had "brain fog" from drinking.  (*Id.* at 100:4-12, 101:21-24; 110:11-12).[15]

**4.  Cadet MS's testimony.**

Cadet MS's testimony at the hearing was consistent with his statements to VTPD and OEA. Cadet MS testified he was not intoxicated at the party and Roe did not appear to be intoxicated.  (Cadet MS Testimony, Tr. 140:17-20, 141:10-16).  In testifying that Roe did not appear to be intoxicated, he noted that Roe was able to walk Cadet CP back to his dormitory and then return to her room without being stopped by any RAs.  (*Id.* at 142:1-9).  He also noted that Roe "was able to clean up all [Cadet DM's] vomit and take care of Cadet DM on her own."  (*Id.* at 142:10-14).

Moreover, Cadet MS testified that Roe did not show any of the potential signs of "incapacitation" identified in Virginia Tech's Title IX training materials.  (*See* Cadet MS Testimony, Tr. 158:4-10 (Q. "At any point did it seem like she was not able to understand what people were saying to her?"  A. "She looked like she was able to comprehend everything that anybody was saying to her."); 158:11-17 (Q. "And I think you wrote in your written statement that she was not slurring her speech; is that correct?"  A. "She was not slurring her speech that night."); 158:18-23 (Q. "And did you see her ever having trouble walking?"  A. "No, I did not see any trouble in her

---

[15] As discussed above, by the time of the hearing, Roe had learned that Doe had documentary evidence that on the night of September 17 Roe took Doe's phone and used it to send several texts to Doe's roommate from 10:16 p.m. to approximately 11:22 p.m.  (*See* Text Messages, Investigation Report at 84-87).  And given that Roe and Cadet DM are "close friends" (Cadet DM Testimony, Tr. 119:14-24), it seems likely that Cadet DM was also aware of that fact by the time of the hearing.  So, Cadet DM had a motive to testify that something other than Roe's taking Doe's phone indicated to her that Roe was intoxicated.

19

VT-000680

walking."); 158:24 – 159:3 (Q. "Did you ever see her passing out?" A. "No, I did not."); 159:4-8 (Q. "Did you ever see her throwing up?" A. "No, I did not.")).

## I. The First Formal Hearing Outcome.

The Hearing Officers issued their first FHO on August 1, 2024. The first FHO concludes it is more likely than not that (1) "Roe was incapacitated due to alcohol consumption" and thus "lacked the capacity to consent" to sexual intercourse; and (2) Doe "should have known that Roe was intoxicated." (FHO at 11, third paragraph).

## J. The Appeal of the First FHO.

Doe filed a timely appeal of the first FHO on several grounds, including that he was not made aware of VTPD's interview of Cadet DM until Cadet DM mentioned that interview during her testimony at the June 24 hearing.

On September 5, 2024, the Appellate Officer ordered a reconvened hearing with respect to Cadet DM's VTPD interview so that the Hearing Officers could "determine if that information impacts their finding and/or sanction." (*See* Appellate Officer Decision at 2).[16]

## K. The September 20 Reconvened Hearing.

The reconvened hearing was held on September 20, 2024. Cadet DM was the only witness to testify at the reconvened hearing.

Cadet DM was unable to provide a definite answer on whether she told the OEA investigator that she spoke with VTPD. (Cadet DM Testimony, 09/20/24 Tr. 13:22 – 14:2 (Q. "Did you tell the

---

[16] The Appellate Officer's Decision stated that her "review of the case file indicates that *no parties were aware of this statement until* Cadet DM shared that she was interviewed by VTPD during her hearing testimony." (Appellate Officer's Decision at 1-2) (emphasis added). But the case file shows that *one of the parties* (Roe has been aware of the VTPD interview since the day that interview took place—*i.e.,* November 17, 2023. (*See* Cadet DM Testimony, Tr. 73:1-23 (Cadet DM testifying that when she got back to her room after the VTPD interview she told Cadet DM about the interview)).

VT-000681

Title IX investigator that you met with VTPD?" A. "I believe I did. I'm not too sure. I don't really remember.")).

In her VTPD statement, Cadet DM said that Cadet CP "got mad" when he found out that Doe and Roe had sex "because [Cadet CP and Roe were 'talking.'" (Cadet DM VTPD Statement at 3). Cadet DM testified that "talking" meant that Roe and Cadet CP had been eating lunch and dinner together and Cadet CP wanted a romantic relationship with Roe (09/20/24 Tr. 21:23 – 22:14).

In her VTPD statement, Cadet DM said that "she and Roe believed that Roe was 'roofied' earlier that year" because "Roe came back to their room highly intoxicated and incoherent." (Cadet DM VTPD Statement at 4). Cadet DM testified that this event occurred during the first week of fall semester 2023. (09/20/24 Tr. 35:9-10). Cadet DM testified that a Corps of Cadets Dormitory RA and two other cadets carried Roe into Roe and Cadet DM's room and put Roe to bed because Roe was heavily intoxicated. (09/20/24 Tr. 32:15 – 34:13). Cadet DM testified that the RA used his own key card to access the room because Roe was not "coherent enough to tell him her numbers [4-digit access code]." (09/20/24 Tr. 34:12-13). Cadet DM testified that later that night Roe woke up and tried to leave the room, but Cadet DM would not let Roe leave the room because Roe "was stumbling" and "slurring her words." (09/20/24 Tr. 33:9-24).

## L. The Second Formal Hearing Outcome.

The Hearing Officers issued their second FHO ("FHO II") on October 4, 2024. According to FHO II, the Hearing Officers "reviewed all available information" before reaching their October 4 decision. (FHO II at 2). The FHO says that nothing in Cadet DM's VTPD statement or testimony at the September 20 hearing altered the first FHO's conclusions. (FHO II at 3).

VT-000682

**ARGUMENT**

**A.     The FHOs' finding of responsibility against** █Doe█ **is arbitrary.**

Policy 1026 states that the Appellate Officer may vacate "arbitrary findings." *See* Policy 1026 at 9. Although Virginia Tech policy does not define "arbitrary," it does say that an FHO is an "administrative" decision. *See Student Code of Conduct* at 4, 15. Federal and Virginia courts have explained that there are several bases upon which an administrative decision can deemed "arbitrary." At least four of those bases are present in this case.

*First*, an administrative decision is "arbitrary" when it "ignores 'evidence contradicting its position.'" *Delaware Valley Regional Center, LLC v. Dep't of Homeland Security*, 678 F. Supp. 3d 73, 87 (D.D.C. 2023) (quoting *Butte County v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010); *see also, e.g.*, *New Age Care, LLC v. Juran*, 71 Va. App. 407, 428 (2020) (stating an administrative "decision is arbitrary" when it is "taken without consideration or in disregard of facts").

*Second*, an administrative decision is "arbitrary" when it is not "reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

*Third*, an administrative decision is "arbitrary" when "the deciding body departed from the appropriate standard in making its decision." *PharmaCann Va., LLC v. Va. Bd. of Pharm.*, 77 Va. App. 208, 220 (2023).

*Fourth*, an administrative decision is "arbitrary" when it treats "similarly situated" persons "differently." *Id.* at 225-226. Indeed, an administrative decision "is at its *most arbitrary* when it treats similarly situated people differently**."** *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1141 (D.C. Cir. 2022) (emphasis added).

22

**1. The finding that Roe was "incapacitated" is arbitrary because it ignores evidence contradicting its position.**

The FHOs find that "Roe was "incapacitated," and note that Virginia Tech policy states the term "incapacitation" means the "physical or mental inability to make informed rational judgments" and "includes but is not limited to being asleep, being unconscious, and the inability to make decisions due to the voluntary or involuntary use of alcohol." (FHO at 10). For at least three reasons, the FHOs' finding that Roe was "incapacitated" is arbitrary in that it ignores evidence contradicting its position.

*__First__*, the FHOs ignore Cadet MS's investigation statements and testimony about Roe's demeanor on September 17. During both the investigation and the hearing, Cadet MS stated that Roe did not appear intoxicated. (Cadet MS VTPD Statement, Investigation Report at 61; Cadet MS OEA Statement, Investigation Report at 65; Cadet MS Testimony, Tr. 140:17-20, 141:10-16). And at the June 24 hearing, Cadet MS testified that Roe did not show any of the potential signs of "incapacitation" identified in Virginia Tech's Title IX training materials—*i.e.*, it did not appear that Roe was unable to understand what people were saying to her; Roe was not slurring her speech; Roe was not having trouble walking; Roe did not pass out; and Roe did not throw up. (Cadet MS Testimony, Tr. 158:4 – 159:8).

*__Second__*, the FHOs ignore evidence regarding Roe's 2:00 a.m. trip to the bathroom that is inconsistent with the finding that Roe was "incapacitated." Cadet SJ told OEA that Roe "appeared to be walking normally down the hallway and was able to open the bathroom door in what looked like a normal manner." (Cadet SJ Statement, Investigation Report at 68). And Cadet DM conceded that when Roe left her room to go to the bathroom Roe had "the wherewithal to take her [student ID] and then use that [student ID] plus the four-digit code to get back into her room." (Cadet DM Testimony, Tr. 104:7-14). And to the extent the FHOs imply that Roe must have been

23

"incapacitated" because she did not bother to put clothes on before walking to the bathroom (which was only a few feet from her room) at 2:00 a.m. on a Monday, the FHOs ignore the fact that Roe engages in risky behavior (even when perfectly sober) and is not shy about showing off her body. Specifically, it is undisputed that Roe performed fellatio on Doe *in a classroom on campus* and that she texted Doe photos of herself wearing only a bra and her Corps of Cadets camouflage pants. ( Doe Testimony, Tr. 34:23 – 35:25; Roe Testimony, Tr. 240:5-22; Photos, Investigation Report at 150).

*Third*, the FHOs ignore the ***unrebutted*** written statement from Doe 's expert witness, Dr. Reagan Wetherill. (*See* Expert Witness Opinion Statement, Investigation Report at 116). Dr. Wetherall is an Associate Professor of Psychiatry at the University of Pennsylvania Perelman School of Medicine and is an expert on "the effects of alcohol use, intoxication, memory processes, and alcohol-related consequences (*e.g.*, alcohol-associated blackouts)." (*Id.* at 118). After reviewing all the evidence that OEA provided to the parties for the 10-day review, Dr. Wetherill concluded that Roe "was not incapacitated by alcohol on the night of September 17 into the morning of September 18, 2023," and that Roe's "behavior and reports of memory loss are consistent with an individual who experienced an alcohol-associated blackout." (*Id.* at 123).

**2.      The finding that Roe was "incapacitated" is arbitrary because it is not reasonably explained.**

The FHOs' finding that Roe was "incapacitated" is based on a combination of factors: (1) "the amount" of alcohol "Roe consumed" ("6 to 8.5" drinks within 2 hours), (2) Roe's "behavior in the hallway," (3) Cadet DM's statement that Roe "was intoxicated," (4) Roe's claim to have "no memory of the sexual interaction," and (5) the Hearing Officers' determination that Doe was "less credible" than Roe (FHO at 11). But the FHO do not explain why any of these factors (let alone the combination of these factors) establishes that Roe met the definition of "incapacitation."

24

VT-000685

**3.** **The finding of responsibility is arbitrary because it does not find that** [Doe] **knew or should have known that** [Roe] **was "incapacitated."**

The FHOs correctly note that *even if* [Roe] was "incapacitated," [Doe] can be held responsible for a policy violation only if he should have known that [Roe] was "incapacitated." (*See* FHO at 10 (stating, "the Hearing Officers must determine if [Roe] was incapacitated and if [Doe] *should have known that* [Roe] *was incapacitated*.") (emphasis added)).

But the FHOs do not address whether "[Doe] knew or should have known that [Roe] was incapacitated." The FHOs find only that [Doe] "should have known that [Roe] was *intoxicated*." (FHO at 11, third paragraph) (emphasis added). Because the FHOs do not apply the proper standard, they are, by definition, "arbitrary." *PharmCann Va., LLC*, 77 Va. App. at 220 (stating an administrative decision is "arbitrary" when "the deciding body departed from the appropriate standard when making its decision").

Even if the proper standard was that [Doe] should have known that [Roe] was "intoxicated," the FHOs do not reasonably explain why [Doe] should have known that [Roe] was intoxicated. The only rationale the FHOs give for finding that [Doe] should have known that [Roe] was intoxicated was that he "was present throughout the entirety of [Roe]'s drinking period" and because the five persons in attendance "were drinking in a small residence hall room in very close proximity." (FHO at 11, first paragraph). But the FHOs do not identify what, if any, behavior [Roe] engaged in while the group was drinking that should have put [Doe] on notice that [Roe] was "intoxicated." Moreover, the FHOs do not explain why [Doe] should have known that [Roe] was "intoxicated" when [Cadet MS] (who was not intoxicated) testified that [Roe] did not appear to be intoxicated.

25

VT-000686

4. **The FHOs are arbitrary because they hold the male witnesses (◼Doe◼ and ◼Cadet MS◼ to a higher standard for credibility than they hold the female witnesses (◼Roe◼ and ◼Cadet DM◼**

    a. **The FHOs hold ◼Doe◼ to a higher standard for credibility than they hold ◼Roe◼**

The FHOs find that ◼Doe◼ is "less credible" than ◼Roe◼ (FHO at 11) because ◼Doe◼ "provided highly specific details about the sexual encounter *but claimed to remember nothing else from that night or the following morning, citing that it occurred nine months ago.*" (FHO at 10) (emphasis added). The FHOs also find that ◼Doe◼ is "less credible" than ◼Roe◼ because ◼Doe◼ engaged in "*selective disclosure*" by waiting until the hearing to explain how ◼Roe◼ gave consent. (FHO at 10) (emphasis added). For at least three reasons, the emphasized portions of those statements in the FHOs are so objectively false, misleading, and/or one-sided that that they can only be explained by a bias against male witnesses and in favor of female witnesses.

*First*, in response to questions by the Hearing Officers, ◼Doe◼ provided many details about the night of ◼Roe◼'s party and about the following morning. (*See* Tr. 209:10-15 (Q. "How much alcohol did you consume on the evening of September 17th?" A. "I do not remember exactly how much I had to drink that night, but it was around three seltzers, two to three beers, and some of a BuzzBall."); 210:3-6 (Q. "Did you know that ◼Roe◼ was intoxicated the night of the incident?" A. "I knew that she consumed alcohol, but I did not know that she was drunk."); 211:9-19 (Q. "How did you get into ◼Roe◼'s bed?" A. "I went up a ladder." Q. "So did – did ◼Roe◼ help you in any way, or did anybody else in the room help you get into the bed?" A. "She was near me. She did not help me, but she was there close by." Q. "So you – you got in the bed by yourself?" A. "Yes."); 219:24 – 220:9 (Q. "Do you remember ◼Roe◼ walking ◼Cadet CP◼ back [to his room]?" A. "Yes, I remember when they left the room together." Q. "Was there a conversation that was had about ◼Roe◼ walking him back or what he did that – did they – what did that look like?" A. "They said

26

they were going to walk back to [his] room, and that's really it."); 211:20 – 212:2 (Q. "You said that Roe fell out of bed. Can you talk to me about that?" A. "I recall her falling out of the bed in the middle of the night. I did not see it happen, but I heard it happen."); 212:7-12 (Q. "Where – where were your bodies [in the bed when Roe fell out of the bed]?" A. "I'm on the innermost side of the bed closest to the wall."); 212:20 – 213:4 (Q. "So she fell out of a lofted bed and you heard it and just went back to sleep? You didn't think to check on her or ask any questions, or anything like that?" A. "She got back into the bed after she fell out and fell back to sleep." Q. "You didn't ask her if she was okay?" A. "I did ask her if she okay, and then I went back to sleep."); 213:8-10 (Q. "Was this before or after the two of you had sexual intercourse?" A. "This was after."); 216:20 – 215:3 (Q. "Do you remember Roe leaving the room in the middle of the night?" A. "Yes. I heard her clock back into her room." Q. "Did you hear her leave?" A. "Yes, but I was also half asleep at the time."); 217:23 – 218:7 (Q. "The next morning it was reported that you asked Roe if she was okay. Did you see any bruises on her body?" A. No, I did not." Q. "Did she mention any soreness to you?" A. "No, she did not." Q. "Did she ask you about what happened the night before?" A. "No, she did not."); 218:17-22 (Q. "Well, tell me about the conversation that took place that morning?" A. "I just asked if she was hungover. We had not talked very much that morning because we had to both go to formation.").

**_Second_**, with respect to the events of the night of Roe's party and the following morning, there were *only two* topics about which Doe said he could not remember due to the passage of time. Doe said he could not remember a conversation other people had at the party about Doe staying the night in Roe's room.[17] And Doe said he could not remember *all* the details about

---

[17] *See* Tr. 210:18 – 211:8 (Q. "You stated that Cadet MS suggested that he take you back to your room and that Roe insisted on you spending the night. Can you walk me through that part of the evening?" A. "As stated in the previous statements, I was pretty intoxicated, and it was unsafe for

27

VT-000688

his conversation with Roe when the two woke up in the morning.[18]  Moreover, as discussed above, Roe was also unable to remember all of the details of her conversations and interactions with Doe on the morning of September 18 and in the days and weeks following the 18th.  (Roe Testimony, Tr. 176:6 – 177:5, 186:19-24, 187:4-7, 197:9-10, 223:3-19).

*__Third__*, the fact that Doe waited until the hearing to provide details on how Roe gave consent has no bearing on Doe 's credibility.  Indeed, the Hearing Officers violated federal law and Virginia Tech policy by questioning Doe 's credibility because he waited until the hearing to provide those details.  Respondents in Title IX proceedings are presumed to be not responsible for the alleged misconduct unless and until a finding of responsibility is made *after* the conclusion of the hearing.  *See* 34 C.F.R. § 106.45(b)(1)(iv) (Aug. 14, 2020) (stating that Title IX grievance procedures must "include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process").[19]  Respondents do not have a burden to present any evidence, including testimony, during the investigation or at the hearing.  *See* 34 C.F.R. § 106.45(b)(5)(i) (Aug. 14, 2020) (stating that "when investigating a formal complaint and throughout the grievance process, a recipient must

---

me to go back to my dorm room in fear of getting caught for being – for consuming alcohol.  And so other people at the party made the decision for me; I was not the person making the decision there."  Q. But do you remember that conversation or what happened there?"  A. "No.  It was nine months ago.").

[18] *See* Tr. 218:17 – 219:8 (Q. "Well, tell me about the conversation that took place that morning." A. "I just asked if she was hungover.  We had not talked very much that morning because we both had to go to formation."  Q. "So what exactly was – was said?"  A. This was nine months ago.  I can't remember exact statements said."  Q. "All right.  But you just – you gave a very detailed explanation of sex because you said you were fully awake.  I'm assuming you were fully awake the next morning and not intoxicated."  A. "I assume that we talked about just getting ready for formation and just getting prepared for the day, but I cannot list specifics.").

[19] *See also* Policy 1026 at 3 (stating that Virginia Tech's Title IX procedures "start with a presumption of non-responsibility for the respondent").

28

… ensure that the burden of proof … rest[s] on the recipient and not the parties"). And respondents are "entitled" to "remain silent or participate as they see fit, including full, partial, or no participation." Policy 1026 at 6.[20]

Even if Doe engaged in "selective disclosure" (which he did not), Roe engaged in *several* forms of "selective disclosure." For example, although Roe initially submitted to cross-examination by Doe 's Advisor, she abruptly halted cross-examination when she decided she had answered enough questions to explain "her truth." (*See* Tr. 242:7-8 ("I decline to answer any more questions"); Tr. 242: 17-18 ("I think I've said what I need to say about my truth")). Roe 's refusal to submit to full cross-examination at the hearing was, by definition, "selective disclosure."

Roe attempted to limit the investigation to witnesses who she believed would be favorable to her case. (*See* Roe 's Statements to VTPD, Investigation Report at 19 (stating that Roe told the investigator she did not want him interview Cadet CP *id.* at 21 (stating that Roe told the investigator that she did not want him to interview Cadet MS but that it would be ok for him to interview Cadet DM Roe 's attempt to limit the investigation to witnesses favorable to her case was, by definition, "selective disclosure."

Roe withheld relevant information during the investigation. She told an investigator that she and Doe had communicated with each other via text message but that none of those messages was available because they had all been sent via Snap Chat (and thus self-deleted within 24 hours of being read). (*See* Roe 's Statements to VTPD, Investigation Report at 21). But Roe withheld the fact that she and Doe had also communicated with each other via a different app

---

[20] At no point during the investigation did Virginia Tech put Doe on notice that the Hearing Officers would question his credibility if he waited until the hearing to provide details on how Roe gave consent. Therefore, the FHOs' finding of responsibility against Doe violates his right to due process under the United States and Virginia Constitutions.

29

VT-000690

(iMessage) that does not self-delete texts after a short period of time. ▮Doe▮ provided the OEA investigator with *all* the iMessage texts sent between ▮Roe▮ and him on and after the day of ▮Roe▮'s party. (*See* Text Messages, Investigation Report at 74-83). Those texts show that in the weeks following ▮Roe▮'s party, ▮Roe▮'s actions toward ▮Doe▮ were inconsistent with ▮Roe▮'s later claim that ▮Doe▮ had sexually assaulted her.[21]

▮Roe▮ also told an investigator that "she was friends with [▮Doe▮ and was never in a relationship with him." (*See* ▮Roe▮'s Statements to VTPD, Investigation Report at 18). But it is undisputed that ▮Roe▮ and ▮Doe▮ had been "intimate" and engaged in "foreplay" a "few times," including engaging in fellatio in a classroom on campus and digital vaginal penetration. (*See* Tr. 34:19 – 35:25; Tr. 172:11-13; Tr. 240:5-22).

▮Roe▮'s withholding of relevant information during the investigation is, by definition, "selective disclosure."

Finally, the evidence that was made available to ▮Roe▮ for the 10-day review on April 5, 2024 included ▮Cadet MS▮ and ▮Cadet CP▮'s VTPD statements; it did not include ▮Cadet DM▮'s VTPD statement. ▮Roe▮ learned of ▮Cadet DM▮'s VTPD interview the day the interview occurred—*i.e.*, November 17, 2023. (*See* ▮Cadet DM▮ Testimony, Tr. 73:1-23 (▮Cadet DM▮ testifying that when she got back to her room after the VTPD interview she told ▮Cadet DM▮ about that interview)). But ▮Roe▮ did not notify OEA that ▮Cadet DM▮'s VTPD statement was missing from the 10-day review evidence.

---

[21] (*See id.* at 75 (▮Roe▮ agreeing to help ▮Doe▮ with Air Force ROTC projects); *id.* at 76 (▮Roe▮ asking ▮Doe▮ to fill in for her as an Air Force ROTC physical fitness officer); *id.* at 77-78 (▮Roe▮ and ▮Doe▮ discussing another Air Force ROTC project); *id.* at 79-82 (▮Roe▮ and ▮Doe▮ discussing plans to purchase alcohol and sneak it into the dorm); *id.* at 83 (▮Roe▮ asking ▮Doe▮ "Hey, how are you doing?" after ▮Doe▮ learned that ▮Roe▮ had named him in the Corps of Cadets investigation about her party); *id.* at 83 (▮Roe▮ asking ▮Doe▮ if he was going to go to McDonald's to get food with her and other cadets).

30

VT-000691

Ironically, Roe blames Doe for the fact that the Appellate Officer ordered a reconvened hearing. (*See* 09/20/24 Tr. 8:15-18 (Roe stating: "The reconvening of this body over events that transpired over a year ago after a thorough investigation, hearing, and deliberation were concluded should make respondent sick.")). There would have been no need for a reconvened hearing if Roe had not engaged in the selective disclosure of failing to let OEA know that Cadet DM's VTPD statement was missing from the 10-day review evidence.

> **b.** **The FHOs hold Cadet MS to a higher standard for credibility than Cadet DM**

As discussed above, Cadet MS's statements during the investigation and at the hearing refute any finding that Roe was "incapacitated." But the FHOs simply ignore Cadet MS's statements. And in finding that Roe was "incapacitated," the FHOs rely on Cadet DM's testimony that Roe that "seemed out of it" and "was kind of staring at the floor when" she and Cadet DM "weren't talking." (Cadet DM Testimony, Tr. 59:14-20, 79:6-15).

The FHOs offer no explanation as to why they found Cadet MS less credible that Cadet DM Indeed, they ignore evidence from which they can find Cadet MS *more* credible than Cadet DM For example, it is undisputed that Cadet MS was not intoxicated at the party and that Cadet DM was so intoxicated at the party that she threw up.

As another example, is undisputed that Cadet DM gave statements during the investigation that were flatly inconsistent with her statements at the hearing. Cadet DM told the Corps of Cadets and VTPD that Cadet MS left the room *before* Roe returned from walking Cadet CP home. (Cadet DM Corps of Cadets Interviews, Investigation Report at 168; Cadet DM VTPD Statement at 1). But at the hearing, she conceded that Cadet MS did not leave the room until *after* Roe returned. (Cadet DM Testimony, Tr. 109:24 – 110:4). The fact that Cadet DM could not get her story straight as to who was in the room immediately before Roe went to bed is inconsistent with the notion that Cadet DM's

31

VT-000692

testimony about Roe's condition at that point in the evening is credible. Cadet DM also told both the VTPD and OEA that the only reason she thought Roe may have been intoxicated was that Roe took Doe 's phone when she walked Cadet CP home. (Cadet DM VTPD Statement at 1; Cadet DM OEA Statement, Investigation Report at 54). But Roe changed her story at the hearing to add her claim that Roe "seemed out of it" and was "was kind of staring at the floor when" she and Cadet DM "weren't talking." (Cadet DM Testimony, Tr. 79:3-15).

Given these undisputed facts, the only possible explanation for the FHO's decision to find Cadet MS less credible that Cadet DM is that Cadet MS is a male and Cadet DM is a female.

**B.     The Hearing Officers are biased against males and biased toward females; and their bias affected the outcome of this case.**

Policy 1026 states that the Appellate Officer may vacate a finding based on "bias" of the "hearing officer(s)" that "affected the outcome" of the case. *See* Policy 1026 at 9. The FHOs demonstrate that the Hearing Officers in this case are biased against males and biased toward females.

As discussed above, the Hearing Officers held the male witnesses (Doe and Cadet MS to a higher standard for credibility than they held the female witnesses (Roe and Cadet DM Holding male witnesses to a higher standard for credibility than female witnesses is, by definition, "bias."

Several other aspects of the FHOs and this case make clear that the Hearing Officers are biased against males and biased toward females. Here are some examples.

1. The Hearing Officers allowed Roe to violate Virginia Tech's "Rules of Decorum for All Participants in Formal Title IX Hearings." As the Hearing Officers explained, those rules require that participants "use respectful language that is not demeaning, derogatory, or disrespectful." (Tr. 7:24-25). The Hearing Officers also said that "if anyone violates these rules

32

VT-000693

of decorum, we will give a warning" and that they could "stop the hearing" if the violation of the rules continued. (Tr. 8:6-8).

At both hearings, Roe used language toward Doe that was "demeaning, derogatory," and "disrespectful." (*See, e.g.*, Tr. 23:6-8 (alleging Doe 's "willingness to submit bold untruths gives ample evidence of the weak nature of his character"); Tr. 25:13-14 (alleging Doe told "habitual lies" about her); Tr. 25:25 – 26:8 (alleging Doe "has stated in another total falsehood that I did not get a field training slot" and "stating that I did not earn a field training slot is yet another lie he's been allowed to submit in an official document")[22]; Tr. 28:9-11 (alleging Doe 's efforts to defend himself were "childish"); Tr. 28:23 – 29:3 (stating: "My hope is that this body will consider the desperate lies submitted by the Respondent as evidence of his character. If he can lie so easily about everything having to do with me, it is probable that he's lying about this attack."); Tr. 249:13 (saying, " John Doe , you are a rapist"); 09/20/24 Tr. 7:17-21 (stating, "I have the distinct privilege and responsibility to continue to combat the respondent and his vain attempts to salvage [his] reputation"); 09/20/24 Tr. 8:20 (accusing Doe of spinning a "web of lies"); 09/20/24 Tr. 8:20-24 (alleging Doe was "fully immersed in slandering [her], forcing this hearing body into believing his sick delusion")). But the Hearing Officers simply sat on their hands while Roe

---

[22] Doe never stated that Roe did not get an Air Force field training slot. To the contrary, in his April 16, 2024 supplemental written statement to the Title IX Investigator, Doe said: "On April 2, 2024, Air Force ROTC announced the Virginia Tech students who were selected to attend Air Force Field Training this coming summer. Roe was selected, neither Cadet MS nor Cadet DM was selected." (Investigation Report at 42). (Presumably, the fact that Cadet MS and Cadet DM were disciplined by the Corps of Cadets for drinking at Roe's party played a role in the Air Force's decision to not give them a Field Training slot. Of course, Roe was not disciplined for drinking at her party because Virginia Tech gave her immunity based on her claim that Doe sexually assaulted her. (Tr. 135:20-25)). Doe did send a follow-up email to the Title IX Investigator stating that it was his understanding that Roe had been dropped from the Air Force ROTC program for submitting false PT test results. (Investigation Report at 146).

VT-000694

violated the Rules of Decorum.  Not once did the Hearing Officers give Roe a warning for her violations.  Apparently, the Rules of Decorum did not apply to Roe (because she's a female).

2.  The first FHO intentionally overstated the number of drinks that Roe had on the night of her party by stating that Roe had "8-10" drinks.  (FHO at 10-11).  Doe called the Hearing Officers out on this during the September 20 hearing.  (*See* 09/20/24 Tr. 41:16 – 42:6 (noting that based on Roe's testimony and Cadet DM's VTPD statement, Roe had only 6 to 8.5 drinks).  The second FHO conceded this point, but it then said the discrepancy did not matter because "6 or more" drinks "is still considered a large amount of alcohol and *could* be enough for Roe to be considered *intoxicated*, *given her size*."  (FHO II at 1) (emphasis added).

But as Doe noted above (and as the Hearing Officers are fully aware), under Virginia Tech policy the issue is not whether Roe was "intoxicated"; the issue is whether she was "incapacitated" (and whether Doe knew or should have known that Roe was "incapacitated"); and "intoxicated" is not synonymous with "incapacitated."  The fact that the Hearing Officers continue to apply the wrong standard demonstrates that they are biased.

Moreover, neither the Investigation Report nor the hearings in this case included evidence regarding Roe's size.[23]  So, the Hearing Officers either conducted an *ex parte* investigation about Roe's size or they simply made up the reference to "her size."  Either explanation indicates bias.[24]

3.  The Hearing Officers' attempts to explain away certain evidence in this case are so patently absurd that they must be the product of bias.

---

[23] Both hearings were conducted via Zoom, and the video feed never showed the size of Roe's body.

[24] Ironically, at the June 24 hearing, Doe's Advisor tried to ask Cadet DM questions establishing that Cadet MS's ingestion of 2-3 beers and an alcoholic seltzer did not render Cadet MS intoxicated because he is a large person.  But the Hearing Officers would not allow Doe's Advisor to pursue that line of questioning because they failed to see how it was "relevant."  (Tr. 106:9 – 107:19).

34

VT-000695

For example, the second FHO acknowledges that Cadet DM gave flatly inconsistent statements about why she thought Roe was intoxicated on the night of the incident. (FHO II at 1). The second FHO says these inconsistencies are no big deal because: "While the words used to describe Roe were different, Cadet DM stated in the Title IX interview, VTPD interview, and the formal hearing that she thought Roe was intoxicated on the night of the incident." (FHO II at 1). In other words, according to the Hearing Officers, it does not matter that a witness is unable to give a consistent basis for her opinion that another person was intoxicated so long as the witness consistently holds the opinion that the other person was intoxicated. A former Supreme Court justice referred to such poor reasoning as "pure applesauce." In any event, such reasoning is also evidence of bias.

As another example, the second FHO acknowledges that prior to the alleged September 17 incident Roe told Cadet DM that she had been sexually assaulted four times and that she had been "roofied." (FHO II at 1). As Doe pointed out at the reconvened hearing, given this history, there is no way Cadet DM would have let Roe take Cadet CP home if she thought Roe was intoxicated. (09/20/24 Tr. 44:3-25). After all, Cadet DM did not know Cadet CP very well, but she knew that Cadet CP was interested in Roe and she thought Cadet CP was "really intoxicated." (Cadet DM Testimony, Tr. 68:15-16; Cadet DM VTPD Statement at 1). The second FHO waives away these facts by stating: "Roe's past sexual history and any knowledge of Roe being 'roofied' is not relevant in determining responsibility to the charges." (FHO II at 2).

But evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining" the result of the

35

case.[25]  The Office of University Legal Counsel has surely advised the Hearing Officers of the definition of "relevant" evidence (every first-year law student knows the definition).

In any event, here is the rather straight-forward relevance analysis: (1) prior to September 17, Roe told Cadet DM that she had been sexually assaulted four times and that she had been "roofied," (2) Cadet DM did not know Cadet CP very well, but she did know that Cadet CP was interested in Roe and she thought Cadet CP was "really intoxicated" at Roe's party, (3) a reasonable person with Cadet DM's knowledge of Roe's claimed history of sexual assault and being "roofied" would not have let Roe walk Cadet CP home if she thought Roe was intoxicated, (4) Roe's claims of previous sexual assault and being "roofied" are therefore relevant because they make it less likely that Cadet DM really thought Roe was intoxicated based on Roe's demeanor at the September 17 party.  The Hearing Officers' refusal to employ such a straight-forward analysis is evidence of bias.

As another example, the second FHO acknowledges that Cadet DM could not get her story straight on whether Cadet MS left the room *before* Roe returned from walking Cadet CP home or *after* Roe returned from walking Cadet CP home.  (FHO II at 2).  The second FHO says this does not matter because "whether Cadet MS left before or after Roe returned from walking Cadet CP home is not relevant in determining responsibility for the charges."  (FHO II at 2).

But just as with Cadet DM's inability to get her story straight about why she thought Roe was intoxicated, Cadet DM's inability to get her story straight about when Cadet MS left the room is relevant because it shows that she is not a credible witness.  The Hearing Officers' lame attempt to characterize these facts as irrelevant is evidence of bias.

---

[25] Federal Rule of Evidence 401.

VT-000697

4. The Hearing Officers did not even bother to proofread the second FHO. (*See* FHO II at 1 (misspelling "Doe" as "Doe" and misspelling "since" as "sine.").   The Office of Student Conduct should be embarrassed that its Hearing Officers churn out such sloppy work.  In any event, the fact that the Hearing Officers did not bother to proofread the second FHO is evidence of bias.  After all, there's no need to do careful work when the outcome of the case is predetermined (boys lose, girls win).[26]

## C.   This case involved procedural irregularities and denials of Doe 's procedural guarantees.

Policy 1026 states that the Appellate Officer may vacate a finding based on a "procedural irregularity or denial of procedural guarantees."   *See* Policy 1026 at 9.   This case involved procedural irregularities and denials of procedural guarantees.

### 1.   OEA denied Doe his right under the Department of Education's Title IX regulations to submit a written response to the evidence provided in the 10-day review.

The Department of Education's Title IX regulations require Virginia Tech to allow parties to submit "a written response" to the evidence made available in the 10-day review.  34 C.F.R. § 106.45(b)(5)(vi) (Aug. 14, 2020).  On April 16, 2024, Doe submitted a 50-page written response to the 10-day-review evidence, but OEA refused to include the first 37 pages of the response in the Investigation report on the grounds that those pages "summarized information already contained in the report" and was "not new information and not a response to any collected information." (Investigation Report at 6).  But OEA offered no basis for its interpretation of 34

---

[26] *See* Black's Law Dictionary 868 (6th ed. 1990) (defining "kangaroo court" as "a sham legal proceeding … in which the result is a foregone conclusion because of the bias of the court or other tribunal").

VT-000698

C.F.R. § 106.45(b)(5)(vi) as not allowing a response to include a summary of the evidence or limiting a response to "new" information.

**2.      The Office of Student Conduct and the Office of University Legal Counsel denied  Doe  his right under the Department of Education's Title IX regulations to submit a written response to the Investigation Report.**

The Department of Education's Title IX regulations also require Virginia Tech to allow parties to submit a "written response" to the Title IX investigation report.  34 C.F.R. § 106.45(b)(5)(vii) (Aug. 14, 2020).  On June 17, 2024,  Doe  submitted his written response to the Title IX investigation report to the Office of Student Conduct and the Office of University Legal Counsel.   Doe  asked those offices to forward the response to the Hearing Officers.  But although  Doe 's written response (and a separate letter to the Office of Student Conduct and the Office of University Legal Counsel) explained that the Department of Education's Title IX regulations give parties the right to submit such a response, the Office of Student Conduct and the Office of University Legal Counsel refused to send the response to the Hearing Officers.

**3.      The Office of Student Conduct and the Office of University Legal Counsel denied  Doe  his right under the Department of Education's Title IX regulations to have his Advisor question the OEA investigator.**

The Department of Education's Title IX regulations also require Virginia Tech to allow a party's Advisor to cross-examine "any other party and any witnesses." 34 C.F.R. § 106.45(b)(6)(i) (Aug. 14, 2020).  But prior to the hearing, the Office of Student Conduct sent  Doe  a letter stating that advisors cannot question the case investigator even though the investigator attends the hearing to provide an oral summary of the investigation and to answer any questions about the investigation.

On June 17, 2024,  Doe  sent a letter to the Office of Student Conduct and the Office of University Legal Counsel noting that the Department of Education interprets the term "witness"

38

VT-000699

in the governing regulation to include investigators, and that Virginia Tech's own Title IX training materials state that the investigator is a "witness" and "may be questioned and subjected to cross-examination by all parties' advisors."  The Office of University Legal Counsel refused to address either of those points, and instead offered the conclusory statement that Virginia tech has a "legal basis" for its refusal to allow advisors to question investigators.  At the hearing, the Hearing Officers said it is Virginia Tech's "policy" to not allow advisors to question investigators.  (Tr. 21:17-24).  But neither the Office of Student Conduct nor the Office of the University Legal Counsel has identified a written policy that says advisors cannot question investigators.

4. **The Office of Student Conduct and the Office of University Legal Counsel denied** ▉Doe▉ **his right under the Department of Education's Title IX regulations to present evidence, including witnesses.**

The Department of Education's Title IX regulations also require Virginia Tech to allow the parties to present "witnesses" and other "evidence."  34 C.F.R. § 106.45(b)(5)(ii) (Aug. 14, 2020).

The week before the hearing, ▉Doe▉ provided the Office of Student Conduct and the Office of University Legal Counsel with photos of ▉Roe▉ drinking alcohol in a classroom and an expert report from a forensic nurse stating that none of the statements in the investigation report about ▉Roe▉'s alleged bruising provided an adequate basis to determine the cause of the alleged bruising. ▉Doe▉ also notified Office of Student Conduct and the Office of University Legal Counsel that, in accordance with the intention stated in one of his written submissions to the OEA investigator, he planned to call a witness ( ▉AL▉ ) to testify at the hearing about communications that ▉AL▉ had with ▉Roe▉ that were inconsistent with ▉Roe▉'s claim that ▉Doe▉ had sexually assaulted her.

The Office of Student Conduct and the Office of University Legal Counsel responded that they would not provide the photos or expert report to the Hearing Officers and that they would not

VT-000700

allow Mr. Lukitch to testify at the hearing because "only evidence and information submitted prior to the final investigation report will be considered." But that rule is flatly inconsistent with the governing regulations, which state that parties are permitted to provide submissions after they receive the final investigation report. *See* 34 C.F.R. § 106.45(b)(5)(vii) (Aug. 14, 2020). Moreover, as discussed above, the Hearing Officers relied on "new information" in reaching their decision in this case (*e.g.*, Cadet DM's "new" story that she thought Roe was intoxicated because Roe "seemed out of it" and was "was kind of staring at the floor"). So, Virginia's Tech's application of its rule on "new information" seems somewhat "selective."

**CONCLUSION**

For the reasons discussed above, the Appellate Officer should vacate the FHO's finding that Doe is responsible for a policy violation.

October 14, 2024

Respectfully submitted,

John Doe
Respondent

40
