# EXHIBIT 41

**VIRGINIA POLYTECHNIC INSTITUTE AND STATE UNIVERSITY**
**OFFICE OF STUDENT AFFAIRS**

| | | |
|---|---|---|
| John Doe , | ) | |
| Appellant/Respondent, | ) | |
| | ) | Case No. 2024459902 |
| vs. | ) | |
| | ) | |
| Pauline Poe , | ) | |
| Appellee/Complainant | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**(CORRECTED) APPEAL OF FINAL HEARING OUTCOME IN**
**OFFICE OF STUDENT CONDUCT CASE**

I, Appellant/Respondent John Doe , submit this appeal of the Final Hearing Outcome ("FHO") determination that I am responsible for the policy violations alleged in this case. As discussed in more detail below, the Appellate Officer should vacate the findings against me because they are arbitrary.

To make this submission easier to read, I will refer to myself in the third person (as " Doe throughout the remainder of the submission.

**INTRODUCTION**

This is a "he said/she said" sexual assault (rape) case. There is no dispute on the issue of whether the parties engaged in sexual activity (including sexual intercourse). But the parties dispute whether the sexual activity (including sexual intercourse) was consensual. Doe says it was, and the Complainant, Pauline Poe , says it was not. The parties also dispute whether the sexual activity included violent acts such as choking, slapping, hitting, and pulling of hair. Doe says the activity did not include such acts, and Poe says it did include such acts. There is no

VT-000247

physical evidence to support **Poe's** allegations, and there were no non-party eye witnesses to the sexual activity between **Doe** and **Poe**

The FHO finds that **Poe** is more credible than **Doe** and therefore finds **Doe** responsible for violating various Virginia Tech policies. The FHO does not base its credibility determination on the demeanor of either **Poe** or **Doe** when they testified at the Student Conduct Hearing. Instead, the FHO finds **Poe** more credible than **Doe** because (1) " **Poe's** "general story" has "not changed" and, "regarding the details of the sexual encounter, **Poe's** version of events remained the same in both the investigation and the hearing," whereas (2) **Doe** "was unable to articulate how consent was established and could not articulate, in detail, how the sexual encounter progressed." (FHO at 13).

Fortunately for **Doe** his attorney paid for professional court reporting services to transcribe **Poe's** sworn testimony at a Protective Order Hearing (at which the Judge denied **Poe's** request for a Protective Order against **Doe** finding **Poe's** testimony "incredible as a matter of law" and "extremely unique, if not bizarre") and to transcribe **Poe** and **Doe's** testimony at the Student Conduct Hearing. So, determining exactly what **Poe** and **Doe** said is an easy task. Although the Office of Student Conduct declined to provide the transcript of the Student Conduct hearing to the Hearing Officers, the *Student Code of Conduct* does not prohibit the Appellate Officer from utilizing a transcript of a Student Conduct Hearing.[1]

---

[1] In declining to provide the Student Conduct Hearing transcript to the Hearing Officers, the Office of Student Conduct said that the Hearing Officers are allowed to review only "the information that was received and shared to all parties prior to and during the hearing" so that the parties "have an opportunity to review and ask questions related to" the "information" presented at the hearing. But the transcript is not "new information." It is nothing more than a verbatim written version of the audio recording of the Student Conduct Hearing that was made available to both parties, and which, according to publicly available court records, is listened to by Virginia Tech appellate officers when they review appeals of Student Conduct Hearings. Indeed, nobody would claim it is inappropriate for an appellate officer to review a written transcript of the audio recording of a Student Conduct Hearing if the appellate officer was hearing impaired.

VT-000248

As discussed in more detail below, federal and Virginia courts have explained that there are several bases upon which an administrative decision can be deemed "arbitrary." And as discussed in more detail below, at least three of those bases are present with respect to the FHO's credibility determinations in this case.

*First*, an administrative decision is "arbitrary" when it is not "reasonable" or "reasonably explained." *Second*, an administrative decision is "arbitrary" when it "disregards" critical "facts" or "issues." *Third*, an administrative decision is "arbitrary" when it treats "similarly situated" persons "differently."

<b>FACTUAL AND PROCEDURAL BACKGROUND</b>

**A. Undisputed facts established by the OEA Investigation Report, other documents submitted to the Hearing Officers, and witness testimony at the Student Conduct Hearing.**

**1. ███Doe███ and ███Poe███ had consensual sexual intercourse during Spring semester 2023.**

███Doe███ and ███Poe███ met via a dating app during Spring Semester 2023.[2] Shortly thereafter, they had sexual intercourse.[3] However, when testifying under oath (*i.e.*, under penalty of perjury), ███Poe███ said that she was "honestly not too sure" if she had sexual intercourse with ███Doe███ more than one time in the Spring of 2023.[4]

---

So, there should be no basis for concluding that it is inappropriate for a non-hearing impaired appellate officer to utilize a written transcript.

[2] (███Poe's███ Written Statement to the Blacksburg PD, Addendum to the Office for Equity and Accessibility ("OEA") Investigation Report at 8).

[3] (Protective Order Hearing ("POH") Transcript at page 32, lines 1 to 19). Note: The Protective Order Hearing Transcript is included in the OEA Investigation Report. From this point forward, this appeal will use the following format when citing to the Protective Order Hearing Transcript, "POH Tr. 32:1-19," which means page 32, lines 1 to 19.

[4] (*See* POH Tr. 32:1-8; POH Tr. 32:17-19 (Q. "Okay, the two of you had actually had sexual intercourse before, hadn't you?" A. "Correct, yes." Q. "On two different occasions or three different occasions?" A. "Once." … Q. "And you're sure it's only the one time and not two? You are under oath." A. "I'm honestly not too sure, like.")).

3

VT-000249

In any event, [Poe] said that during the Spring 2023 sexual intercourse [Doe] "was soft with her and it seemed like he really cared about her."[5] [Poe] also described this sexual intercourse as "very" consensual.[6] When asked to articulate "how consent was established" with [Doe] in Spring 2023, [Poe] said [Doe] "did not like straight up ask, like, oh, is this okay?" and that she and [Doe] "went about like cuddling, then kissing," and "it was more like the bodily language, stuff like that."[7]

**2.      [Poe] broke things off with [Doe] because he "screwed her over" by seeing someone else.**

[Poe] said that she later discovered that [Doe] had "screwed [her] over" by seeing someone else during Spring 2023.[8] [Poe] said she then broke things off with [Doe] because he was only "using" her for "sex."[9]

**3.      [Poe] and [Doe] reconnected via a dating app in Fall 2023, but [Poe] was worried that [Doe] was going to "screw her over" again.**

In September 2023, [Doe] and [Poe] reconnected via a dating app.[10] Before seeing each other again, [Poe] expressed concern that [Doe] was going to "screw her over" again[11] Despite that concern, [Poe] invited [Doe] to her off-campus townhome on the evening of

---

[5] (OEA Investigator Dez Twigger's Interview of [Poe's] OEA Report of Investigation at 17). Note: Unfortunately, the OEA Investigation Report does not include page numbers. When citing to the OEA Investigation Report, this appeal cites to the PDF page number, with the cover page being page 1.

[6] (Formal Hearing ("FH") Tr. 91:15-22).

[7] (FH Tr. 92:5-7; FH Tr. 93:3-6).

[8] (*See* Addendum to OEA Investigation Report, Blacksburg PD Records at 8; *see also* Addendum II to OEA Investigation Report at 11, Oct. 9, 2023 IM text message from [Poe] to [Doe] in which [Poe] expresses concern that "ur gonna fuck me iver [sic] again")).

[9] (POH Tr. 34:2-18).

[10] (Addendum to OEA Investigation Report at 8).

[11] (Addendum II to OEA Investigation Report at 11).

VT-000250

October 11.[12] **Poe** alleged that she and **Doe** agreed ahead of time that they would cook dinner and watch a movie.[13] **Doe** was at **Poe's** townhome on October 11 from approximately 7:35 p.m. to some point shortly after 9:44 p.m.[14]

4. **Poe** **filed a complaint with the Office Student Conduct alleging that Doe violently raped her after brandishing a switchblade knife.**

On October 30, **Poe** filed a complaint against **Doe** with the Office of Student Conduct.[15]

**Poe** alleged that while she was showing **Doe** her bedroom on October 11, **Doe** "took out a very big knife that looked like a switchblade," and he then "opened it and played around with it in the air" before throwing it onto her bedside table.[16] **Poe** alleged that because she was scared of the knife she immediately went to the bedroom of one of her roommates, **OM** , and told **OM** "multiple times that something was wrong and that [she] needed help and was going to be sick."[17]

**Poe** did not provide any information in her complaint about what, if anything, **OM** did when **Poe** told her something was wrong and she was going to be sick. In any event,

---

[12] (Addendum to OEA Investigation Report at 8).

[13] *Ibid.*

[14] (*See* **Doe's** Supplemental Statement to R. Settled at 1). Note although this statement is dated April 7, 2024, it was actually submitted to Mr. Settle on or about May 8, 2024. (*See* FH Tr. 135:25 – 136:3). (*See also* Oct. 11, 2023 Text Messages Between **Doe** and **SC** ).

[15] (OEA Investigation Report at 4). Note that **Poe** asked OEA to use her written statement to the Blacksburg PD as her Student Conduct complaint. *Ibid.* That written statement at page 8-10 of the Addendum to the OEA Investigation Report.

[16] (Addendum to OEA Investigation Report at 8).

[17] *Ibid.*

VT-000251

according to her complaint, **Poe** then returned to her bedroom and got into bed with **Doe** to watch a movie on her laptop.[18]

**Poe** alleged in her complaint that shortly after the movie started **Doe** started kissing her, "grinding on [her]," "grabbing [her] boobs and trying to rub [her] vagina through [her] pants and underwear."[19] **Poe** alleged that although she told **Doe** to stop "multiple times" because she "wanted to watch the movie," they eventually got undressed.[20]

**Poe** alleged that **Doe** then "told [her] to get condoms" and said that "if [they] didn't have sex now [they] would after the movie." **Poe** alleged that because she "was so scared with how he was acting and how he had a knife" she "told [herself] it was just something [she] had to do and get it over with."[21]

**Poe** alleged that "as soon as [she] got the condom [**Doe** put it on and started to get more aggressive [by] choking, grabbing, and hitting [her]."[22] **Poe** alleged that **Doe** continued to have sexual intercourse with her even though she told him to stop.[23]

**Poe** alleged that she told **Doe** "to give [her] a second" and that she "made him get off from on top of [her]." [24] **Poe** alleged that she sent a text message to her roommates and neighbors saying "something [is] very wrong and [she] needed someone to come to [her] room and help [her] get **Doe** off of [her]."[25]

---

[18] *Ibid*.

[19] *Ibid*.

[20] (Addendum to OEA Investigation Report at 8-9).

[21] (Addendum to OEA Investigation Report at 9).

[22] *Ibid.*

[23] *Ibid.*

[24] *Ibid.*

[25] *Ibid.*

6

VT-000252

Poe alleged that she did "not know whether [Doe] noticed her texts or not but as soon as [she] was off [her] phone he pushed himself into [her] again" and she told him to "stop."[26] Poe alleged that her roommate OM then knocked on her door and asked Poe for help with something.[27] Poe alleged that she then "put her clothes on and went to [OM's] room" and told OM "what just happened."[28]

Poe alleged that she then returned to her bedroom and told Doe he needed to leave because she and OM needed to deal with an emergency.[29] Poe alleged that after Doe got dressed she drove him to a bus stop so that he could return to his dorm.[30] Poe alleges that while she was driving Doe to the bus stop he revealed to her that a female student in the Corps of Cadets was accusing him of sexual assault.[31]

Poe alleged that when she returned to her townhome OM recommended that she go to the hospital.[32] Poe alleged she and her roommates then went to the hospital so that Poe could have a forensic sexual assault examination.[33] Poe alleged that she subsequently had to return to "the hospital 2-3 more times with major back/kidney pain from [Doe] hitting [her] and "urine/vaginal pain from" Doe "hurting [her] so much."[34] Poe

---

[26] *Ibid.*

[27] *Ibid.*

[28] *Ibid.*

[29] *Ibid.*

[30] *Ibid.*

[31] (Addendum to OEA Investigation Report at 9-10).

[32] (Addendum to OEA Investigation Report at 10).

[33] *Ibid.*

[34] *Ibid.*

VT-000253

alleged that she was in "so much physical pain" that she could not "go a day without pain management meds."[35]

5. **A Montgomery County District Court Judge denied** Poe's **request for a Protective Order.**

The same day that Poe filed her Student Conduct complaint, she filed a request for a Protective Order from the Montgomery County District Court. Under Virginia law, courts may issue a Protective Order if "a preponderance of the evidence" establishes that the respondent has committed an "act of violence," including a "criminal sexual assault," against the complainant.[36]

A District Court Judge conducted a live, in-person hearing on Poe's request for a Protective Order on November 14.[37] Both Poe and Doe were represented by counsel at the hearing.[38] Poe's roommate OM did not attend the hearing.[39]

During Poe's testimony (which lasted over an hour), Poe disclosed information and evidence that she had not included in her Student Conduct complaint and/or that contradicted the allegations in her Student Conduct complaint.

For example, although Poe's complaint said that she and Doe only "talked" during Spring 2023, Poe conceded at the hearing that she and Doe had sexual intercourse in Spring 2023.[40] However, Poe could not articulate whether she and Doe had sex more than one time in Spring 2023. (POH Tr. 32:17-19 (Q. "And you're sure it's only the one time and not two? You're under oath." A. "I'm honestly not too sure, like.")).

---

[35] *Ibid.*

[36] *See* Va. Code §§ 19.2-152.7:1, 19.2-152.9(D).

[37] (POH Tr. 1).

[38] (POH Tr. 2).

[39] (POH Tr. 3:13-19).

[40] (POH Tr. 32:1-19).

8

VT-000254

Poe also disclosed that because she is "not too familiar with knives," she did not actually "know if [Doe's knife] was a switchblade." (POH Tr. 9:1-3). And when Doe's counsel showed her a photo of a pocket knife, Poe conceded that the knife in the photo looked like Doe's knife. (POH Tr. 64:16 – 65:14). Moreover, Poe conceded that Doe did not threaten her with the knife. (POH Tr. 45:8-10 (Q. "Well, he never threatened you with a knife, did he?" A. "No, sir.")).

Poe also indicated that when she returned to her bedroom to ask Doe to leave (i.e., after Doe had allegedly violently raped her), she got back into the bed with Doe (POH Tr. 16:19 – 17:3).

Although Poe alleged in her Student Conduct complaint that she had so much back, kidney, and vaginal pain that she had to go to the hospital several times and had to be put on "pain management meds," Poe did not present any evidence to support those allegations. Instead, Poe provided the Judge with two "selfies" that she says she took of herself on the night of and the morning after the alleged incident that she said showed "redness" on her chest and neck. (POH Tr. 20:22 – 22:15).[41] Poe also conceded that the hospital only put her on antibiotics (not "pain management meds") to prevent potential sexually-transmitted infections. (POH Tr. 19:19 – 20:6).

At the conclusion of the hearing, the Judge denied Poe's request for a Protective Order. In doing so, the Judge indicated that Poe's testimony was "incredible as a matter of law" and "extremely unique, if not bizarre." (POH Tr. 77:18 – 78:11).

---

[41] The photos are at page 143 of the OEA Investigation Report.

VT-000255

6.      **The full Blacksburg Police Department file contains evidence that contradicts much of** █Poe's█ **story.**

At the time of the Protective Order Hearing, neither the District Court Judge nor █Doe█ and his lawyers had access to the full Blacksburg PD file on the alleged incident. But OEA Investigator Deziree Twigger eventually obtained the entire file, which is the Addendum to the OEA Investigation Report. That file contains at least four facts that further contradict █Poe's█ story.

*First*, █Poe█ made no mention of a knife when she first spoke with the police. The Blacksburg PD file contains a detailed summary of the first police interview of █Poe█ and that summary says nothing about a knife. (Addendum to OEA Investigation Report at 6). Moreover, when the officer who conducted that interview filled out the cover page for the report, he affirmatively stated that the alleged incident did not involve a knife. The cover page is at page 3 of the Addendum to the OEA Investigation Report, and the relevant sections of the cover page are reproduced below.

---

**29-WEAPON FORCE** (Max. 3)
*( For 11-15, place "A" in space next to box if weapon was an Automatic.)*

| | |
|---|---|
| ____ ☐ (11) Firearm (Type not stated) | ☐ (50) Poison |
| ____ ☐ (12) Handgun | ☐ (60) Explosives |
| ____ ☐ (13) Rifle | ☐ (65) Fire/Incendiary Device |
| ____ ☐ (14) Shotgun | ☐ (70) Narcotics/Drugs/ |
| ____ ☐ (15) Other Firearm |       Sleeping Pills |
| ☐ (20) Knife/Cutting Instru. (Ax, etc.) | ☐ (85) Asphyxiation |
| ☐ (30) Blunt Object (Club, etc.) | ☐ (90) Other ____ ____ ____ |
| ☐ (35) Motor Vehicle (As weapon) | ☐ (95) Unknown |
| ☐ (40) Personal Weapons (Hands, etc.) | ■ (99) None |

| | 58-REPORT DATE | 59-DAY | 60-TIME (Military) | 61-REPORTING OFFICER |
|---|---|---|---|---|
| ADM | 10/12/2023 | Thu | 4:20 | Connor M. Martin |

---

10

VT-000256

*Second*, OM contradicted Poe's story about Poe's first trip to OM 's room on October 11. Although Poe said that during her first visit to OM 's room she told OM "multiple times that something [was] wrong and that [she] needed help and was going to be sick,"[42] OM told the police that during Poe's first trip to her room Poe "was happy and laughing and being loud," and that "at no time did [ Poe state to her that she need[ed] help or there was anything wrong." (Addendum to OEA Investigation Report at 30).

*Third*, the text message that Poe sent to her roommates and neighbors during a break in the alleged sexual assault did not actually say that "something was very wrong" and that Poe needed "help" to "get Doe off of [her]." Instead, the text message,[43] which is at page 27 of the Addendum to the OEA Report of Investigation and is reproduced below, said only:



*Fourth*, OM contradicted Poe's story about Poe's second trip to OM 's room on October 11. Poe said that after the alleged sexual assault she returned to OM 's room and told OM "what was happening and that I'm very scared." (PH Tr. 16:13-15). But OM told the police that during Poe's second visit to her room Poe stated only that "she and Mr. Doe had sex and he has been in her room for a long time and will not leave." (Addendum to OEA Investigation Report at page 30).

---

[42] (Addendum to OEA Investigation Report at 8).

[43] At some points during the Student Conduct Hearing, Poe seemed to imply that she sent texts other than the ones to the "group chat" at 9:43 asking for help, but she later said that none of the texts to group chat prior to 9:43 was relevant to this case, and that she turned all relevant texts from that night over to the Blacksburg PD. (*See* 05/09/24 Student Conduct Hearing at page 145, line 17 to page 147, line 115). So, the only way to interpret Poe's testimony that she "immediately" sent a text when the sex allegedly got violent is that she was referring to the 9:43 p.m. "group chat" text.

VT-000257

7. **Neither OM nor Poe's other two roommates would agree to be interviewed by the OEA.**

During the OEA investigation, Ms. Twigger sent three email requests to OM and Poe other two roommates requesting an interview. (OEA Investigation Report at 4). Although OM had been interviewed by the Blacksburg PD, she would not agree to be interviewed by the OEA. *Ibid.* Poe other two roommates also declined to be interviewed by the OEA. *Ibid.*

8. **Doe provided additional evidence that contradicts Poe's story.**

Prior to the Student Conduct Hearing, Doe provided the OEA and the Office of Student Conduct with additional evidence that further contradicted Poe's story.

Most importantly, Doe provided written statements that said he did not sexually or physically assault Poe on October 11. (*See* OEA Investigation Report at 20-26). Doe said that he and Poe had consensual sexual intercourse twice during Spring 2023, and his sexual activity with Poe on October 11 was no different than his sexual activity with Poe during Spring 2023. (*See* OEA Investigation Report at 24-25).

In one of those written statements, Doe noted that shortly after he arrived at Poe's townhome on October 11, Poe said something along the lines of: "If you screw me over, I'm going to fuck up your life." (OEA Investigation Report at 24).

Doe also provided screenshots from his phone that show that while he was at Poe's townhome on October 11 he engaged in a text conversation with another female student (who later became Doe's girlfriend). That conversation included a text in which Doe said "I'll be back around 10 so we can talk about it." (October 11, 2023 Text Messages Between Doe and SC ; Supplemental Statement from Doe to R. Settle at 2 and footnote 2).

VT-000258

Doe also provided screenshots of IM text messages between him and Poe from October 9-11 that show (1) Poe acknowledged that she and Doe had sex twice during Spring 2023; (2) Doe told Poe about the other possible sexual assault allegation on October 9; and (3) Doe and Poe had not planned to cook dinner when Doe came to her townhome on October 11. (Addendum II to OEA Investigation Report at 7, 11, 14).

Doe also provided expert reports from Ms. Amber O'Malley, a Sexual Assault Nurse Examiner.[44] Nurse O'Malley analyzed the two "selfie" photographs that Poe presented during the Protective Order Hearing that allegedly showed "redness" on Poe's chest and neck, as well as a forensic photograph allegedly taken of Poe at the hospital that showed a small area of redness around the collarbone between the chest and neck area.

Nurse O'Malley concluded: "Overall, the areas of redness appear at different anatomical locations at different times over the course of several hours. None of the redness is confirmed bruising or injurious in nature." (O'Malley Addendum at 2). Notably, Nurse O'Malley observed that the forensic photo was taken with a forensic filter that makes the redness seen in the photo appear "deeper in color than it was with the naked eye." (O'Malley Addendum at 1).

**B.      The Student Conduct Formal Hearing and the Formal Hearing Outcome.**

The Student Conduct Hearing was held on May 9, 2024. The Hearing lasted approximately four hours. Poe and Doe both testified at the Hearing. Poe did not present any live witnesses, nor did she present any written witness statements. Doe again denied that he sexually or physically assaulted Poe in any way.

---

[44] (*See* O'Malley Expert Report, dated 05/05/24 and Addendum to O'Malley Expert Report, dated 05/08/24).

VT-000259

The Hearing Officers issued the Formal Hearing Outcome on May 31, 2024. The FHO found Doe responsible for violating the "sexual assault policy" by touching " Poe's breasts and vagina" through Poe's clothing and "without Poe's consent" while Doe and Poe were watching the movie. (FHO at 13-14).

The FHO also found that Doe violated the "rape policy." Although the FHO found that Doe reasonably believed that Poe consented to the initial vaginal penetration, it also found that Doe became violent almost immediately after the initial penetration (by attempting to choke Poe slapping Poe and hitting Poe that Poe "withdrew consent" by asking Doe to "stop," but that Doe continued to penetrate Poe's vagina after she withdrew consent. (See FHO at 12-13).

The FHO also found Doe responsible for violating the "abusive conduct" and "dating violence" policies based on his attempting to choke Poe and his slapping and hitting her. (FHO at 15-16).

Doe timely filed this appeal.

## STANDARD OF REVIEW

The *Student Code of Conduct* states that an appellate officer may vacate an FHO if its findings are "arbitrary." *See Student Code of Conduct* at 20 (August 18, 2023). Although the *Student Code of Conduct* does not define the term "arbitrary," it does say that an FHO is an "administrative" decision. *See Student Code of Conduct* at 15. Federal and Virginia courts have explained that there are several bases upon which an administrative decision can deemed "arbitrary." At least three of those bases are present in this case.

***First***, as the United States Supreme Court unanimously states in 2021, an administrative decision is "arbitrary" when it is not "reasonable" or it is not "reasonably explained." *FCC v.*

14

VT-000260

*Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An administrative decision is not "reasonably explained" when it is based on "conclusory statements," *Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), or when it employs no "intelligible decisional standard," *Select Specialty Hosp. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014).

**_Second_**, an administrative decision is "arbitrary" when it disregards critical facts or issues. *See, e.g., New Age Care, LLC v. Juran*, 71 Va. App. 407, 428 (2020) (stating an administrative "decision is arbitrary" when it is "taken without consideration or in disregard of facts"); *Ren v. U.S. Citizenship & Immigration Services*, 60 F.3d 89, 93 (4th Cir. 2023) (stating an administrative decision is "arbitrary" when it "ignores a critical issue").

**_Third_**, an administrative decision is "arbitrary" when it treats "similarly situated" persons "differently." *PharmaCann Va., LLC v. Va. Bd. Of Pharm.*, 77 Va. App. 208, 225-226 (2023). Indeed, it is well settled that an administrative decision "is at its *most arbitrary* when it treats similarly situated persons differently." *Nasdaq Stick Mkt. LLC v. SEC*, 38 F.4th 1126, 1141 (D.C. Cir. 2022). (emphasis added).

**ARGUMENT**

A.     **The FHO's finding that Doe is responsible for violating the "sexual assault policy" (by touching Poe through her clothing while watching a movie) is arbitrary because it unreasonable and because it disregards critical facts.**

The FHO finds Doe responsible for violating the "sexual assault" policy. (FHO at 13-14). The *Student Code of Conduct* defines "sexual assault" as the "actual or attempted sexual contact with another person without that person's consent."[45] According to the FHO, Doe touched "Poe's breasts and vagina" through Poe's clothing and "without Poe's

---

[45] *Student Code of Conduct* at 10.

15

VT-000261

consent" while **Doe** and **Poe** were watching the movie. (FHO at 14). This finding is arbitrary for at least three reasons.

1. **The finding is unreasonable because it is based on the fact that Doe did not answer a question that he was never asked.**

In finding **Doe** responsible for sexual assault, the FHO states that "during the hearing **Doe** could not articulate what words or actions, from **Poe** led to him touching her during the movie, prior to them engaging in sexual intercourse." (FHO at 14). But the hearing transcript shows that neither the Hearing Officers nor **Poe** ever asked **Doe** to articulate what words or actions led to him touching **Poe** during the movie. In other words, the FHO's finding that **Doe** is responsible for sexual assault is based on the fact that **Doe** did not answer a question that he was never asked. Such a finding is unreasonable, and thus "arbitrary." *See Prometheus Radio Project*, 141 S. Ct. at 1158 (stating that an administrative decision is "arbitrary" when it is not "reasonable").

2. **The finding is unreasonable because it is based on testimony that had nothing to do with consent to touch Poe during the movie.**

The FHO states, "**Doe** shared he had consent to touch **Poe** and to escalate the sexual interaction due to them making out and touching each other." (FHO at 14). But the FHO's sole support for that assertion is testimony that had nothing to do with consent to touch **Poe** while **Doe** and **Poe** were watching the movie.

The FHO quotes **Doe's** testimony that "I'm not saying that kissing or hugging leads -- is consent to sexual intercourse, but when you make out and you're also touching each other and it leads to sexual intercourse, that is." (FHO at 14). The FHO does not explain how that testimony can be reasonably interpreted as **Doe** saying that he believed he had consent to touch **Poe** while they were watching the movie because he and **Poe** were making out. The finding is

16

therefore "arbitrary" because it is not "reasonably explained." *Prometheus Radio Project*, 141 S. Ct. at 1158 (stating that an administrative decision is "arbitrary" when it is not "reasonably explained").

Indeed, the quoted testimony came in response to a question *from* **Poe** not from the Hearing Officers (*see* FH Tr. 153:15-25), and **Poe** questioned **Doe** *after* the Hearing Officers did, (*see* FH Tr. 142:10-11 (end of Hearing Officers' questioning of **Doe** The fact that the FHO is forced to rely on testimony that **Doe** gave *after* the Hearing Officers had finished questioning **Doe** is an admission by the Hearing Officers that they did not ask **Doe** to articulate how consent was established for him to touch **Poe** while he and **Poe** were watching the movie.

**3.** **The finding is arbitrary because it simply disregards the fact that Doe testified that Poe initiated the touching during the movie.**

Even though **Doe** was never asked how consent had been established for him to touch **Poe** during the movie, **Doe** did testify how consent for that touching was established. Specifically, he testified that **Poe** "initiated everything that happened that night," that he "was just going with the flow of it," and that when he and **Poe** were making out she "touched [his] crotch and [he] touched her crotch." (FH Tr. 120:8-10; FH Tr. 125:9-13). **Doe** subsequently clarified that by his "crotch" he meant his "penis," (FH Tr. 130:18-23), and that by her "crotch" he meant her "vagina," (FH Tr. 125:12-16). The FHO's finding is therefore "arbitrary" because it disregards facts in the record. *See New Age Care, LLC*, 71 Va. App. at 428 (2020) (stating an administrative "decision is arbitrary" when it is "taken without consideration or in disregard of facts").[46]

---

[46] To be sure, the FHO references some of **Doe's** above-cited testimony in its eight-page, bullet-point summary of the evidence. (*See* FHO at 3-11). But the FHO disregards that testimony when it gives its rationale for finding **Doe** responsible for violating the sexual assault policy. (FHO at 13-14). An

17

**B.** **The FHO's finding that** `Doe` **is responsible for violating the "rape policy" (by continuing to have sexual intercourse with** `Poe` **after she withdrew consent) is arbitrary because it disregards critical facts and is not reasonably explained.**

The FHO finds `Doe` responsible for violating the "rape policy." (FHO at 11-13). The *Student Code of Conduct* defines "rape" as including "penetration, no matter how slight," of "the vagina" of "another person, without that person's consent."[47] The FHO finds that `Doe` reasonably believed that `Poe` consented to the initial vaginal penetration, but that `Poe` "withdrew consent" by asking `Doe` to "stop" when he became "violent" and that `Doe` continued to penetrate `Poe's` vagina after she withdrew consent. (FHO at 12-13).

Although `Doe` testified that he never became violent and that `Poe` never gave verbal or physical indication that she wanted the intercourse to stop,[48] the FHO finds `Poe` "more credible" than `Doe` (FHO at 13). Before making that credibility determination, the FHO briefly notes that there were "several inconsistencies with `Poe's` story." (FHO at 13). But the FHO does not analyze any of `Poe's` "several inconsistencies."

Instead of analyzing any of `Poe's` "several inconsistencies," the FHO finds `Poe` more credible than `Doe` because: (1) "`Poe's` "general story" had "not changed" and, "regarding the details of the sexual encounter, `Poe's` version of events remained the same in both the investigation and the hearing," whereas (2) `Doe` "was unable to articulate how consent

---

administrative decision cannot escape a finding of arbitrariness by citing evidence in a summary of the evidence but then ignoring that evidence when explaining the decision's rationale.

[47] *Student Code of Conduct* at 10.

[48] (*See* FH Tr. 130:24 – 131:9 (Q. "Do you recall `Poe` saying stop at any point during your sexual encounter?" A. "She never said stop." Q. "Did it seem like she was trying to make excuses to stop the sexual interaction --" A. "No." Q. "-- or do something else such as watch the movie?" A. "No."); FH Tr. 126:21 – 127:7 (Q. "And at any point during intercourse did you smack `Poe` on her buttocks?" A. "No, ma'am." Q. "What about her back?" A. "No, ma'am." Q. "At any point during intercourse did you choke `Poe` A. "No, ma'am." Q. "Did you apply pressure using your hands around her clavicle area or neck?" A. "No, ma'am."); FH Tr. 120:23-24 ("I did not shove her face into a pillow or anything like that.")).

18

VT-000264

was established and could not articulate, in detail, how the sexual encounter progressed." (FHO at 13).

The FHO also says that Doe could not provide details about the sexual intercourse other than that it "was not nothing crazy" and "was nothing out of the ordinary." (FHO at 12). The FHO also says: "Doe was also asked where his hands were during their sexual encounter. He stated 'not on her neck' and followed this up by stating, 'but I don't know where they were,' citing the fact that this encounter took place seven months ago as the reason he did not remember." (FHO at 12).

The FHO's finding of responsibility on the "rape policy" is arbitrary because it disregards several facts, it is not reasonably explained, and it treats Doe and Poe differently.

1. **The FHO is arbitrary because it disregards Doe's testimony and because it does not reasonably explain its criticisms of Doe's testimony.**

The FHO simply disregards Doe's testimony when it says that Doe "was unable to articulate how consent was established and could not articulate, in detail, how the sexual encounter progressed." (FHO at 13). As shown in the testimony quoted in the footnote below, Doe articulated, in detail, how consent was established and how the sexual encounter progressed.[49]

---

[49] Doe testified that Poe "began kissing" him, which led to them "making out." (FH Tr. 116:23-25). He testified that while they were "making out," Poe said something along the lines of "you are giving me the female version of blue balls" and "are you going to finish what you started?" (FH Tr. 121:12-25). Doe testified that "making out," led to "foreplay," which included "touching each other sexually." (FH Tr. 125:4-8). He testified that "touching each other sexually" included touching each other's genitals. (*See* FH Tr. 130:18-23 (Q. "Can you describe where Poe touched you in regards to the foreplay?" A. "My crotch." Q. "Could you provide any additional details?" A. "She touched my penis."); FH Tr. 125:9-19 (Q. "Could you describe touching each other sexually? Where were you touching each other?" A. "We each -- she touched my crotch and I touched her crotch." Q. "Is that on top of her vagina, inside, like I need more details." A. "Just vaginal, ma'am." Q. "Did you penetrate her vagina with your fingers?" A. "Yes, ma'am.")). Doe also testified that he took his clothes off and Poe took her clothes off. (FH Tr. 123:24 – 124:4 (Q. "And who took your clothing off?" A. "I did ma'am." Q. "Who took Poe's clothing off?" A. "She did ma'am.")). And Doe testified that it was Poe's idea to retrieve condoms from her drawer and that Poe is the one who retrieved the condoms from her drawer. (FH Tr. 124:13-18 (Q. "And whose idea was it to get condoms out?" A. "She did ma'am." Q. "It was her idea or she got them out?" A. "Both, ma'am.")). Doe testified that he and Poe then engaged in sex in the

VT-000265

The FHO also disregards Doe's testimony when it says Doe could not provide details about the sexual intercourse other than that it "was not nothing crazy" and "was nothing out of the ordinary." The relevant testimony is quoted in the in the footnote below.[50]

As for Doe's testimony about where he put his hands, the passages in the footnote below show that the FHO does not accurately quote Doe.[51] Moreover, the FHO does not explain (let alone reasonably explain) why anyone would be able would be able to answer the question: "Where were your hands when you had a 20-minute sexual encounter seven months ago?" (Or similar questions, such as: "When you had a twenty-minute sexual encounter seven months ago, how many times did you switch positions and how did you go about switching positions?").

---

"missionary" position and that they later switched positions whereby Poe was "facing on the bed," and "then it concluded after that." (FH Tr. 120:21-23; *see also* 122:7-10 (Q. "And you mentioned that you started missionary style and then later she was turned the other way, correct?" A. "Yes, ma'am.")). He testified that this sexual encounter lasted about "20 minutes." (FH Tr. 125:20-23).

[50] (*See, e.g.*, FH Tr. 120:11-25 (Q. "Can you share a little bit more about everything that happened that night, the types of sexual activity that you did engage in?" A. "Normal sexual activity. Nothing crazy." Q. "What does that mean, normal sexual activity?" A. "It was nothing insane really. It was just us making out which led to more like getting handsy with each other, specifically with each other, not just me. And it eventually led to normal missionary sex. Eventually we got to where she's facing on the bed. I did not shove her face into the pillow or anything like that."); FH Tr. 122:1-10 (Q. "And you stated from there things proceeded much like they had during your previous meetings. Could you just again clarify what proceeded?" A. "Normal sex as I said before." Q. "And you mentioned that you started missionary style and the later she was turned the other way; is that correct?" A. "Yes, ma'am."); *see also* FH Tr. 152:1-24 (questioning by Poe (Q. "[W]hat does the respondent mean by 'nothing crazy' and normal sex?'" A. "It was the same type of sexual interactions we had in the spring. There was no hitting and there was nothing else aside from that. And no violence.")).

[51] (FH Tr. 127:2-12 (Q. "At any point during intercourse did you choke Poe A. "No ma'am." Q. "Did you apply pressure using your hands around her clavicle area or neck? No, ma'am." Q. "So where were your hands when you were having sex?" A. "That's really not something I'd be able to remember from that. But not on her neck.")). The FHO also does not explain (let alone reasonably explain) why it criticizes Doe for saying that he did not put his hands onto Poe's neck when he conceded that he did not remember where his hands were. If the Hearing Officers had asked Doe whether he shoved his hands under his armpits while having sex, he would have said no. But according to the FHO's logic, Doe's answer would have rendered him less credible than Poe because Doe also said he did not remember where his hands were.

VT-000266

Indeed, when the Hearing Officers asked ███Poe███ a similar question, ███Poe███ gave an answer that was wholly non-responsive and incoherent:

> Q. "Where were your hands during this interaction?"
>
> A. "So my body was basically being pushed into my bed so I was kind of like, like powered in and uncomfortably like that. And I know I tried before to kind of like push him away and show -- I tried to create as much distance in between us and I had even gotten to the other side of the bed. That's when he followed me and my backside was towards him and that's when he tried to digitally penetrate my anus. Yeah.
>
> Q. "Okay."
>
> A. "And yes, during this time I was basically like forcibly smushed into my bed and was being pulled by my neck, by my hair, a number of things. Yes.
>
> (FH Tr. 86:23 – 87:13).

In other words, ███Poe███ could not answer where her hands were seven months ago. The FHO does not explain (let alone reasonably explain) why ███Doe's███ answer to that question rendered him less credible than ███Poe███ even though ███Poe███ was unable to answer that question.

Finally, ███Poe███ was unable to answer other questions due to the passage of time. (*See, e.g.*, FH Tr. 78:16-23 (Q. "███Doe███ stated that you both went to the kitchen to get snacks for the movie; is that correct?" A. "If I'm going to be completely honest, I do not remember fully. I mean, *it's been a long seven months*. So I don't want to give you a black and white answer.") (emphasis added)).

21

VT-000267

2. **The FHO is arbitrary because it disregards the fact that throughout the investigation (including the Student Conduct Hearing)** Poe **made objectively false statements.**

The FHO is more than charitable in saying that there were "inconsistencies" in Poe's story. Throughout the investigation, including at the Student Conduct Hearing, Poe actually made statements that were proven to be *objectively false*.

*First*, in her Student Conduct complaint, Poe wrote that after she saw Doe's knife she went to her roommate OM 's room and told OM "multiple times that something was wrong and that [she] needed help and was going to be sick." (Addendum to OEA Investigation Report at 8). That was proven to be objectively false. OM told the Blacksburg PD that when Poe first came to her room that night Poe "was happy and laughing and being loud," and that "at no time did [ Poe state to her that she need[ed] help or there was anything wrong." (Addendum to OEA Investigation Report at 30).

*Second*, in her Student Conduct complaint Poe wrote that Doe's knife "looked like a switchblade." (Addendum to OEA Investigation Report at 8). That statement was proven to be objectively false. Poe later admitted she does not know what a switchblade is. (POH Tr. 9:1-3).

*Third*, in her sworn testimony at the Protective Order Hearing, Poe said the Blacksburg PD rushed to the hospital to interview her on the night of October 11 because she had reported that Doe had a knife. (POH Tr. 64:4-15). That statement was proven to be objectively false. The Blacksburg PD file shows that the police heard nothing about a knife until Poe visited the police station later in October. (*Compare* Addendum to OEA Investigation Report at 6 *with* Addendum to OEA Investigation Report at 13).

22

VT-000268

*Fourth*, in her testimony at the Student Conduct Hearing, **Poe** testified that when she spoke to Officer Martin of the Blacksburg PD at the hospital she told Officer Martin that **Doe** had a knife.[52] That testimony was proven to be objectively false. Officer Martin made no mention of a knife in his summary of his interview of **Poe** (Addendum to OEA Investigation Report at 6), and when Officer Martin filled out the cover page for his report he affirmatively stated that the alleged incident did not involve a knife, (Addendum to OEA Investigation Report at 3).

*Fifth*, during the investigation **Poe** said that when she returned to **OM**'s room after the alleged rape she told **OM** "what was happening" and that she was "very scared." (POH Tr. 16:13-15). That statement was proven to be objectively false. **OM** told the Blacksburg PD that when **Poe** came to her room the second time that night **Poe** stated only that "she and Mr. **Doe** had sex and he has been in her room for a long time and will not leave." (Addendum to OEA Investigation Report at 30).

*Sixth*, at the Protective Order Hearing, **Poe** testified that she applied for a Protective Order "as soon as" she learned she could file for one. (POH Tr. 63:16-20). That testimony was proven to be objectively false. The Blacksburg PD report shows that the police told **Poe** how to file for a Protective Order 13 days before she filed for an Emergency Protective Order and 17 days before she filed for a Protective Order. (Addendum to OEA Investigation Report at 13).

*Seventh*, at the Protective Order Hearing and at the Student Conduct Hearing, **Poe** testified that she and **Doe** had sex only one time prior to October 11. (POH Tr. 32:1-7; FH Tr. 148:6-13). Three pieces of evidence prove that those statements were objectively false. When **Doe's** counsel at the Protective Order Hearing reminded **Poe** that she was under oath, she

---

[52] (FH Tr. 75:1-6 ("And I do not remember the other officer's name but I remember Officer Martin. And he's the one who was taking my statement and I did mention that [**Doe** had a weapon. I don't know if I phrased it as a switchblade, a pocket knife, or just a knife.").

23

VT-000269

claimed she was "not too sure" if it was only one time. (POH Tr. 32:17-19). At the Student Conduct Hearing, [Poe] slipped up and admitted that it was more than one time. (FH Tr. 91:15-20 (Q. "And [Poe] had you previously had sex with [Doe] prior to October 11?" A. "Yes." Q. "Could you share how consent was established *those times*?" A. "Yes. So *those times* it was yes, very, consensual.") (emphasis added). And it text messages with [Doe] prior to October 11, she indicates she and [Doe] had had sex "twice." (Addendum II to OEA Investigation Report at 7).

> **3. The FHO is arbitrary because it disregards the number of inconsistent statements [Poe] made throughout the investigation, including statements about the alleged rape.**

Not only does the FHO fail to analyze [Poe's] "inconsistencies," it fails to acknowledge the number of inconsistencies. As discussed below, [Poe] made at least eleven inconsistent statements during the investigation. Although it may be tedious to read through this list, [Doe] notes that it is necessary to do so because the fact that this list is so long refutes the FHO's conclusion that [Poe] was more credible than [Doe] because [Doe] could not remember details such as how he and [Poe] switched sexual positions seven months ago.

*First*, [Poe] gave wildly inconsistent statements about how long the alleged rape lasted. During the investigation, [Poe] said that (1) "as soon as [[Doe] put the condom on" he "started to get more aggressive" by "choking, grabbing, and hitting [her] abnormally hard,"[53] and (2) the sexual intercourse lasted "for an hour and a half."[54]

But at the Student Conduct Hearing, [Poe] testified that she could not "give an approximate amount of time" as to "how long the sexual interaction lasted." (FH Tr. 95:14-24).

---

[53] (Addendum to OEA Investigation Report at 8; POH Tr. 12:5 – 16:18; FH Tr. 84:10-19).

[54] (Addendum to OEA Investigation Report at 6).

24

VT-000270

Although she acknowledged that she previously said the sex lasted "an hour and a half," she explained that "like half" of that time (*i.e.*, 45 minutes) was when she went to OM 's room and when she was sending her group chat text. (FH Tr. 95:14-21). But that explanation was inconsistent with Poe's previous testimony that her visits to OM 's room totaled no more than five minutes[55] and that she wrote the group chat text quickly.[56]

***Second***, Poe gave inconsistent statements about where she and Doe were when she sent the group chat text. During the Protective Order Hearing, Poe testified that she was sitting in her bed next to Doe when she sent the group chat text. That testimony is set forth below.

> Q. Were you able to get him off you when he wanted [sic] back?
>
> A. Yes, that second time I had gotten out from under him and I went, I sat on my bed and I grabbed my phone that was on the bedside table and I texted a group chat with my neighbors and my roommates …
>
> Q. What happened after you sent that message?
>
> A. After I sent that message I'm not too sure if he saw that message or not, but he tried to get on top of me again …
>
> \* \* \*
>
> Q. Okay, and so you got your phone in your hand and you started texting people?
>
> A. Correct, yes.
>
> Q. Where was Doe at this point?
>
> A. He was on the left side of me …

---

[55] (POH Tr. 16:13-20; POH Tr. 48:14-24).

[56] (FH Tr. 101:23-25).

25

(POH Tr. 15:17; POH Tr. 15:21 – 16:1; POH Tr. 59:5-9).[57]

But at the Student Conduct Hearing, ▐Poe▐ testified that ▐Doe▐ was still on top of her when she sent the group chat text.  The testimony is set forth below.

> Q.  So was he still penetrating you when you were texting?
>
> A.  No, but he was still touching me on my body *holding me down*. But kind of like, like I said, he was holding me down from like my chest, neck, shoulders.  *And when a body is on you*, it's hard to also like get up.  So I was kind of just texting. … And *I was at this time on my back being pushed into my bed* like that.
>
> (FH Tr. 100:7-22) (emphasis added)).

***Third***, ▐Poe▐ gave inconsistent statements about whose idea it was to get condoms out. In her Student Conduct complaint, ▐Poe▐ wrote that ▐Doe▐ "told [her] to get condoms" out. (Addendum to OEA Investigation Report at 9).  But at the Student Conduct Hearing, ▐Poe▐ stated that it was her idea to get condoms out.  The testimony is set forth below.

> Q.  Whose idea was it to get condoms out?"
>
> A.  So it was 100 percent that he was going to attempt to have sex with me un-consensually.  And I wanted to protect myself in the best way.  I am a 20-year old college student.  I have condoms.  That's not a surprise.  And I said in my head, if this is going to happen, I want it to happen in the safest way possible for both of us, especially me.
>
> Q.  Okay.  So did you retrieve the condoms?
>
> A.  Yes, I did.
>
> (FH Tr. 83:22 – 84:9).

---

[57] (*See also* Addendum to OEA Investigation Report 9 ("I told him to give me a second so I made him get off from on top of me.  During this time I frantically texted 5 of my roommates and my other three roommates … .")).

VT-000272

*Fourth*, **Poe** gave inconsistent statements about who took her clothes off.  In her Student Conduct complaint, **Poe** wrote that **Doe** "told [her] to take [her] pants off and [she] did so they would not get ruined."  (Addendum to OEA Investigation Report at 9).  But during questioning by her lawyer at the Protective Order Hearing, **Poe** testified that **Doe** took her pants off.  (*See* POH Tr. 12:7-9 (**Poe** stating, "I put [condoms] down on the bedside table next to him, and at that point he started to undress himself and he took my pants off"); POH Tr. 12:19-21 (Q. "When he had taken your pants off, did he take all of your clothes off?"  A. "Yes.")).

During questioning by **Doe's** lawyer at the Protective Order Hearing, however, **Poe** testified that she was not sure who took her pants off.  (PH Tr. 53:4-10 (Q. "You told the Judge here today that he took your pants off, didn't you?"  A. "I, again, I'm very sorry, I do not recall specific details about this traumatic event, so."  Q. "If you told the Judge here today that he took your pants off, is that true or untrue?"  A. "Again, I'm not too sure, sir.")).  And at the Student Conduct Hearing she testified that she could not remember who took her pants off.  (FH Tr. 82:11-16 (Q. "So who -- so are you saying that you took your clothing off; is that correct?"  A. "I, again, I do not 100% recall if I took my pants off and not my shirt or vice versa or stuff like that …")).

*Fifth*, **Poe** gave inconsistent statements on whether she got undressed before or after she got the condoms.  In her Student Conduct complaint and her interview with Dez Twigger, **Poe** stated that she got the condoms *after* she got undressed.  (Addendum to OEA Investigation Report at 9 ("He told me to take off my pants and I did so they wouldn't get ruined. He then told me to get condoms …"); OEA Investigation Report at 19 ("**Poe** stated, 'when she walked over to the dresser after **Doe** told her to get condoms, *she was completely naked at that point*, and just reached into her dresser drawer and pulled one out but it was still connected to another one, so she took them both out.") (emphasis added)).

VT-000273

But at the Protective Order Hearing, [Poe] testified that she got the condoms *before* she got undressed. (PH Tr. 12:5-9 ("So I went to by beside table to grab, two condoms came out when I just grabbed at my beside table, and I put them down on the bedside table next to him, and at that point he started to undress himself and he took my pants off.")).

***Sixth***, [Poe] gave inconsistent statements about whether [OM] called her on her phone after [Poe] sent the group chat text. In her Student Conduct complaint and her interview with a Blacksburg PD detective, [Poe] stated that [OM] only came to [Poe's] room and knocked on the door after [Poe] sent the group chat text. (Addendum to OEA Investigation Report at 9; 15). But at other times [Poe] said that [OM] first called and spoke to [Poe] on the phone before subsequently coming to [Poe's] room and knocking on the door. (*See, e.g.*, OEA Investigation Report at 20).

***Seventh***, [Poe] gave inconsistent statements about who went with her to the hospital. She told a Blacksburg PD detective that only [OM] went with her. (Addendum to OEA Investigation Report at 15). But at the Student Conduct Hearing, she testified that [OM] and one other roommate went with her. (FH Tr. 145:2-15).

***Eighth***, [Poe] gave inconsistent statements about how many times she spoke with [Doe] on the phone in the days leading up to October 11. At the Protective Order Hearing, she testified that she spoke to him on the phone only once. (POH Tr. 5:18-20 (Q. "Did you speak on the telephone at any time between August and October 11?" A. "Once, yes.")). But at the Student Conduct Hearing, she testified she spoke with him two to three times. (FH Tr. 93:13-22 (Q. "How did you communicate with [Doe] that you didn't want to have sex during or after the movie?" A. "Are you relating to the October 11?" A. "Yes, sorry. Thank you." A. "Okay. So it was established. I know we had, I think, like two or three phone calls talking about everything.")).

28

VT-000274

*Ninth*, Poe gave inconsistent statements about the state of her laptop on October 11. When she first spoke to the police, she said that she and Doe began watching the movie and then the laptop died while they were watching the movie. (Addendum to OEA Investigation Report at 6). But in her Student Conduct complaint and at the Protective Order Hearing, she said that before the movie she tried "stalling" Doe by telling him that her laptop "was dead" that she had to go downstairs to get the charger before they started watching the movie. (Addendum to the OEA Investigation Report at 8; POH Tr. 8:12-18; POH Tr. 41:3-11).

*Tenth*, Poe gave inconsistent statements on the medications she took as a result of the alleged sexual assault. In her Student Conduct complaint, she said she took "pain management meds." (Addendum to OEA Investigation Report at 10). But at the Protective Order Hearing, she said she took "antibiotics" to protect against sexually transmitted infections. (POH Tr. 19:19 – 20:6).

*Eleventh*, Poe gave inconsistent testimony on whose idea it was to go to the hospital. At the Student Conduct Hearing, Poe testified that after Doe ejaculated on her bare shoulder she was careful to make sure nothing wiped the semen off of her shoulder because she planned to have the semen DNA tested. (FH Tr. 105:7-13). But in her Student Conduct complaint, Poe said that it was OM 's idea to go to the hospital and that OM did not make that suggestion until after Poe returned from driving Doe to the bus stop. (Addendum to OEA Investigation Report at 9). (Note: OM said the same thing, and OM said that Poe did not want to go to the hospital. *See* Addendum to OEA Investigation Report at 30).

Moreover, Poe testified at the Protective Order Hearing and the Student Conduct Hearing that she got "fully clothed" before she made her second trip to OM 's room (which was before Doe allegedly ejaculated on her bare shoulder) (POH Tr. 59:22 – 60:6; FH Tr. 106:4-6),

29

VT-000275

and during her OEA interview ███Poe███ said she wore a "zip up sweatshirt" on the night of October 11, (OEA Investigation Report at 18). In short, ███Poe's███ testimony that she is the one who decided to go to the hospital (so that she could have the semen on her bare shoulder DNA tested) is inconsistent with her other statements.

4. **The FHO is arbitrary because it disregards the fact that ███Poe███ withheld information from the investigation that was both relevant and helpful to ███Doe███**

On October 31, 2023, ███Poe's███ phone would have had all of the IM text messages exchanged between her and ███Doe███ during the month of October. (*See* POH Tr. 35:21 – 36:6 (███Poe███ testifying that her phone is set to automatically delete texts after 30 days)).[58]

On or about October 31, 2023, ███Poe███ chose to provide excerpts of some of those IM text messages to the Blacksburg PD. (Addendum to OEA Investigation Report at 16-25). But ███Poe███ withheld portions of those texts that are relevant to her allegations and that are helpful to ███Doe███

For example, ███Poe███ has alleged that **after** the alleged incident—while she was driving ███Doe███ to the bus stop—she learned for the first time that a female member of the Corps of Cadets may be bringing a Title IX complaint against ███Doe███ (Addendum to OEA Investigation Report 6, 9-10, 13).

But IM text messages that ███Poe███ withheld from the Blacksburg PD (and Ms. Twigger) indicate that ███Doe███ first told ███Poe███ about the female cadet's potential Title IX complaint no later than October 9—*i.e.*, at least two days before the day that ███Doe███ went to ███Poe's███

---

[58] IM texts are texts sent using the standard iPhone text app. They are different than Snap Chat texts, which delete automatically after they are read by every recipient or 24 hours after being sent unless someone on the text takes steps to preserve the message.

VT-000276

apartment. Those texts are at pages 11-12 of Addendum II to the OEA Investigation Report, and they are shown below.[59]



As another example, although Poe purported to provide the IM text messages she and Doe exchanged on October 11, a comparison of the texts taken from Doe phone and the texts Poe provided from her phone shows that Poe withheld lines of text that are helpful to Doe

Specifically, Poe withheld lines of text showing that at 6:45 p.m. on October 11, Doe told Poe that he was eating dinner and that he would be at her apartment in 30 minutes. Those lines are inconsistent with Poe's allegations that she and Doe planned to cook dinner

---

[59] In addition to communicating via text messages in the days leading up to October 11, Poe and Doe talked to each other on the phone. (*See* FH Tr. 93:20-22; FH Tr. 134:9-14).

VT-000277

when he arrived at her apartment that evening.[60] The relevant texts are at page 14 of Addendum II to the OEA Investigation Report (texts provided by ██Doe██ and pages 17-18 of the Addendum to the OEA Investigation Report (text provided by ██Poe██ A side-by-side comparison of the texts is shown below.

| Texts submitted by ██Doe██ to the Office for Equity and Accessibility | Differences between texts | Texts submitted by ██Poe██ to the Blacksburg Police Department |
|---|---|---|
| | At 6:45pm (after ██Poe██ says, "U can come whenever), ██Doe██ says "Ok!," that he's eating, and will be at ██Poe's██ apartment in 30 minutes. ←←← ██Poe██ withheld those 3 lines in the texts she provided →→→ →→→ →→→ →→→ | |

1.

---

[60] (*See, e.g.*, Addendum to OEA Investigation Report at 8, ██Poe's██ written statement to Blacksburg PD ("On October 11, we agreed to have a date night, cook dinner, and watch a movie."); Addendum to OEA Investigation Report at 14, Officer Wilson Narrative of Interview with ██Poe██ ("On October 11th, 2023 ██Poe██ agreed to have a 'date night' which she described as a movie and dinner with Mr. ██Doe██ at his residence.").

32

**5.** **The FHO finding is arbitrary because it disregards evidence that would explain why** Poe's **allegations are untrue.**

Unless Virginia Tech's Hearing Officers presume that female students never make false rape allegation, then those Hearing Officers would evaluate whether any of the evidence could indicate that the allegations are false. Here, the FHO contains no such evaluation even though there is evidence indicating at least five possible bases upon which a reasonable fact finder could determine that Poe's allegations are false.

*First*, there is evidence in the record that Poe believed Doe had "screwed her over" in the past by having sex with her while he was pursuing other women, and that she was worried he was going to "screw her over again" on October 11. (FH Tr. 68:17 – 69:15; Addendum II to OEA Investigation Report at 11). And there is evidence in the record that while Doe was at Poe's apartment on October 11, he sent three texts to another female student, Cadet SC , including a text saying that he would see Cadet SC at the Corps of Cadets dormitories at around 10:00 p.m. that night. (October 11, 2023 Text Messages Between Doe and Cadet SC ). And Doe stated that shortly after he arrived at Poe's apartment that night, Poe said something along the lines of "if you screw me over I'm going to fuck up your life," (OEA Investigation Report at 24), and Doe testified that he sent the texts to Cadet SC while he was sitting next to Poe (FH Tr. 136:21 – 137:2). In short, it would be reasonable to conclude that at some point during the evening Poe decided to "fuck up" Doe life because Doe was "screwing her over again."

*Second*, none of OM 's three roommates, including OM , would agree to be interviewed by Ms. Twigger (even though Ms. Twigger sent three emails to each of them requesting an interview) (OEA Investigation Report at 4-5), and none of Poe's three roommates testified (in writing or in person) at the Student Conduct Hearing. It would be

33

VT-000279

reasonable to conclude that those three women decided to not participate in the Student Conduct process because, after having lived with Poe for a few months,[61] they concluded that Poe is not credible (perhaps because, as discussed below, Poe appears to have a need to be the center of attention, Poe has mental health issues, and/or Poe is an immature person).

*Third*, as demonstrated during her Protective Order Hearing and Student Conduct Hearing testimony, Poe appears to have a need to be the center of attention and make self-aggrandizing statements. For example, at both the PO Hearing and the Student Conduct Hearing, Poe made it a point of saying that her apartment is bigger and nicer than most student residences. (POH Tr. 28:13-14 ("Our residence is a lot bigger than most on campus."); *id.* at 39 9-13 (testifying that she gave Doe a tour of her apartment because "I know he does live on campus and I do know where I live is very nice and a lot of people like living there"); FH Tr. 66:11-18 (testifying that she gave Doe a tour of the residence because "I lived in a three-story townhome" and "I know how it was as a freshman living on campus")). At the Student Conduct Hearing, she testified that she stopped seeing Doe in the Spring of 2023 "out of respect for" the other girl that Doe was seeing. (FH Tr. 62:7-23). Poe also made it a point at both of the hearings to say that she did not have anyone go with her when she drove Doe to the bus stop because she did not want to put anyone else in danger. (POH Tr. 62:21-24 ("I did not want to bring, involve more people, and I did know that if it came to it I could possibly handle it."); FH Tr. 106:25 – 107:3 ("So I was like, you know what? It's just what I need to do. I need to do it not only for me but for the safety of my roommates.")). And at the Student Conduct Hearing she testified that she makes it a habit of finishing all of the on-line coursework for her classes two months early, (FH Tr. 77:23 to 78:2), and that she has such a sense of self-modesty that she took the time to get fully clothed before

---

[61] Poe had different roommates during the 2022-23 school year. (POH Tr. 30:16 – 31:7).

34

going to OM's room to report that she had been raped, (*see id.* at 106:4-6 ("So I mean, before I even went into OM's room to devise a plan I got dressed and made myself decent. I'm not one to barge into my roommate's room unclothed.")).

*Fourth*, the evidence in the record indicates that Poe was suffering from mental health issues in the months leading up to October 11, 2023. Poe testified that she was seeing a therapist during the summer of 2023. (FH Tr. 63:25 – 64: 3). And Poe told Ms. Twigger that her cats are "registered Emotional Support Animals" that "provide support for her in more ways than just companionship." (OEA Investigation Report at 18).

Prior to the Student Conduct Hearing, Doe provided the Hearing Officers with a copy of a U.S. Department of Housing and Urban Development ("HUD") guidance document that explains that tenants living in rental property with a "no pets" policy generally have a right to have a support animal if the tenant can establish that she is suffering from a mental health disorder. *See* FHEO-2020-1, Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act (Jan. 28, 2020). At the Student Conduct Hearing, Poe refused to answer Doe's question about why she has emotional support animals. (FH Tr. 147:17-24). Of course, she had a right not to answer that question. Nevertheless, it would be reasonable to conclude that because of a mental health issue, Poe has incorrectly convinced herself that Doe sexually and physically assaulted her.[62]

---

[62] Doe notes that when Virginia Tech interimly suspended him based solely on the basis of the allegations in Poe's Petition for an Emergency Protective Order, the University told Doe that it could require him to undergo a "psychological evaluation" as part of any appeal of the suspension. So, Virginia Tech should not now be heard to say that Poe's mental health issues are off limits when evaluating whether her allegations are untrue. If a mental health issue can cause a male student to sexually and physically assault a female student, then a mental health issue can surely cause a female student to falsely accuse a male student of sexual and physical assault.

VT-000281

*Fifth*, as Poe demonstrated at the Student Conduct Hearing, she is an immature person. Although that statement may seem harsh, it's not nearly as harsh as the things Poe said about Doe at the Student Conduct Hearing. (FH Tr. 40:5-7 ("Mr. Doe is not only a threat to campus safety … but [also] to society.").

In any event, during Poe's opening statement, she attacked Doe's for helping Doe defend himself. (FH Tr. 41:11-19 (accusing Doe's lawyer of providing Doe with "legal jargon" to "try and intimidate and distract from the facts of this case" and "bombard all parties with evidence to take away from the horrific act that he did"). Poe also attacked Doe for using his "privilege" of having an attorney . *Ibid*.[63]

Also during her opening statement, Poe alleged that Doe's lawyer and one of Doe's expert witnesses, Joanna Collins, must have known each other before this case because they were both in the Air Force at the same time and they once worked "just 1.4 miles away from" each other in Baltimore, Maryland. (FH Tr. 40:17 – 41:7). Poe's allegation that Doe's lawyer knew Ms. Collins before this case was wrong. (*See id.* at 60: 2-7 (Ms. Collins' testimony). More importantly, Poe's allegation was childish.[64]

---

[63] Hopefully Poe's Advisor, Tamara Cherry-Clarke, did not tell Poe to make such statements. After all, Ms. Clarke is a Senior Assistant Dean of Students and a former Assistant Director of the VT Office of Student Conduct. So, she knows that respondents have a (constitutional) right to be advised by a lawyer when defending themselves. It would be more than concerning if Ms. Clarke did advise Poe to make such statements, as such action by Ms. Clarke would reflect a belief within the Virginia Tech administration that it's unfair to allow respondents in formal hearings (who are almost always men) to exercise their constitutional right to the assistance of an attorney.

[64] Virginia Tech has about 30,000 students, whereas the Air Force has over 300,000 active duty members. But no serious adult would contend that two persons must have known each other if they were students at Virginia Tech at the same time, let alone that they must have known each other if they served in the Air Force at the same time. And the City of Blacksburg has about 45,000 residents, whereas the City of Baltimore has nearly 570,000 residents. But no serious adult would contend that two persons must have known each other if they both worked in Blacksburg at the same time, let alone that they must have known each other if they both worked in Baltimore at the same time (even if they worked "just 1.4 miles away" from each other).

VT-000282

Finally, although not relevant to this case, ▮Poe▮ told the Hearing Officers that a person who has "consumed any amount of alcohol cannot consent" to sexual activity. (FH Tr. 44: 21-23). That statement wrong (and obviously so).

In short, ▮Poe▮ demonstrated that she in an immature person. So, it would not be unreasonable to find that ▮Poe▮ is not credible (especially when you combine her immaturity with the other factors discussed in this section of ▮Doe▮ appeal).

6.      **The FHO is arbitrary because it does not explain (let alone reasonably explain) the basis for its narrowly-cabined view as to what evidence is relevant (or most relevant) on the issue of credibility.**

Although not entirely clear, the FHO seems to intimate that in a "he said/she said" case such as this one, where there is no physical evidence of rape and there are no non-party eye witnesses to the sexual activity at issue, the only relevant evidence (or the most relevant evidence) is the parties' testimony about the details of the sexual activity. (*See* FHO at 13 (intimating that ▮Poe▮ was more credible because, "regarding the details of the sexual encounter, her version of events remained the same in both the investigation and during the hearing")). But as is shown above, ▮Poe▮ numerous inconsistent statements included inconsistent statements about the sexual activity with ▮Doe▮ The FHO just ignores those inconsistent statements. That's one of the reasons the FHO is arbitrary.

In any event, the FHO does not explain (let alone reasonably explain) the basis for its narrowly-cabined view of what evidence is relevant (or most relevant) on the issue of credibility. Indeed, it is impossible to identify a situation in American society (other than college and university sexual misconduct hearings) in which fact finders tasked with making credibility determinations use a framework similar to the one that the FHO attempts to use here.

37

VT-000283

The only possible basis for such an evidentiary framework is a desire to make it easier to find in favor of complainants (who are mostly women) and against respondents (who are mostly men). But that's not a reasonable basis to apply such an evidentiary framework.

**C.** **The FHO's findings that Doe is responsible for violating the "abusive conduct policy" and the "dating violence policy" are arbitrary for the same reasons the FHO's findings are arbitrary with respect to the "sexual assault policy" and the "rape policy."**

The FHO finds Doe responsible for violating the "abusive conduct policy" and the "dating violence policy." (FHO at 15-16). The *Student Code of Conduct* defines "abusive conduct" as "the use of physical force against an individual or any acts that cause physical harm; threats including words or actions, that may cause a person reasonable apprehension of imminent physical harm." *Student Code of Conduct* at 9. The *Student Code of Conduct* defines "dating violence" as "acts of physical or sexual abuse committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim." *Student Code of Conduct* at 11.

The FHO finds Doe responsible for violating those policies based on a credibility determination that mirrors the ones it used for the "sexual assault policy" and the "rape policy." (*See* FHO at 15 (finding Doe responsible for violating the "abusive conduct policy" because " Poe was able to provide a detailed account of the sexual activity, whereas Doe's account was limited to denying the alleged violations occurred and characterizing the sex that took place as 'normal' and 'nothing crazy.'""); FHO at 16 (finding Doe responsible for violating the "dating violence policy" based on the FHO's findings with respect to the findings regarding "sexual assault," "rape," and "abusive conduct")).

As is explained above, the FHO's findings with respect to the "sexual assault policy" and the "rape policy" are arbitrary. For the same reasons those findings are arbitrary, the FHO's findings with respect to the "abusive conduct policy" and the "dating violence policy" are arbitrary.

38

VT-000284

**D.** **The FHO is arbitrary (and unconstitutional and a violation of Title IX) because it applies a higher standard for credibility to** Doe **than it does to** Poe

Finally, in light of this appeal's detailed analysis of Doe and Poe's testimony (complete with quotations from and page number/line citations to certified transcripts) as well as the appeal's analysis of documentary evidence (such as the Blacksburg PD file), it is clear that the FHO applies a higher standard for credibility to Doe than it does not Poe The FHO disregards and/or mischaracterizes Doe's testimony; it disregards Poe's numerous statements that were later proven to be objectively false; it disregards Poe's numerous inconsistent statements (including statements about the alleged rape); it disregards the fact that Poe withheld evidence that was relevant to the investigation and was helpful to Doe it disregards evidence that would reasonably explain why Poe's allegations are false; and it attempts to employ an evidentiary framework designed to support findings in favor of Poe and against Doe

In short, the FHO applies a different (higher) standard for credibility to Doe than it does for Poe That is a textbook case of "arbitrary" treatment. *See Nasdaq Stock Mkt. LLC*, 38 F.4th at 1142 (noting that an administrative body "is at its most arbitrary when it treats similarly situated parties differently"). Moreover, because Doe and Poe are of different genders, the application of a higher standard for credibility to Doe than to Poe violates the United States Constitution, the Virginia Constitution, and Title IX of the Education Amendments of 1972.[65]

---

[65] The Fourteenth Amendment to the United States Constitution provides, in part, that no State may "deny to any person within its jurisdiction the equal protection of the laws." Article I, Section 1.1 of the Virginia Constitution provides, in part, that "the right to be free from any governmental discrimination upon the basis of … sex … shall not be abridged." Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

VT-000285

## CONCLUSION

For the reasons discussed above, all of the FHO's findings against **Doe** on the issue of responsibility are arbitrary. Therefore, the Appellate Officer should vacate the findings against **Doe** direct the Office of Student conduct to enter a finding of not responsible on all charges, and direct that **Doe's** interim suspension be lifted.

Dated: June 10, 2024.

Respectfully submitted,

**John Doe**
Respondent/Appellant

VT-000286